# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

----------------------------------------------------x

| | |
|---|---|
| SHELBY BAILEY, | : |
| an individual, | :   **CASE NO.:** |
| | : |
| Plaintiff, | :   **Judge:** |
| | : |
| vs. | :   **Magistrate Judge:** |
| | : |
| | : |
| BOARD OF COMMISSIONERS OF THE | : |
| LOUISIANA STADIUM AND | : |
| EXPOSITION DISTRICT, as the political | : |
| entity which owns the Mercedes-Benz | : |
| Superdome; KYLE FRANCE, in his official | : |
| capacity as chief executive of the BOARD | : |
| OF COMMISSIONERS OF THE | : |
| LOUISIANA STADIUM AND | : |
| EXPOSITION DISTRICT; and SMG, | : |
| | : |
| Defendants. | : |

----------------------------------------------------x

## COMPLAINT

"I now lift my pen to sign this Americans with Disabilities Act and say: Let the shameful wall of exclusion finally come tumbling down. God bless you all."

- George H. W. Bush, July 26, 1990

Plaintiff, SHELBY BAILEY, by and through his undersigned counsel, hereby files this Complaint and sues the BOARD OF COMMISSIONERS OF THE LOUISIANA STADIUM AND EXPOSITION DISTRICT, as the political entity which owns the Mercedes-Benz Superdome (hereinafter referred to as "BOARD"), for compensatory and nominal[1] damages, injunctive and declaratory relief, and attorneys' fees and costs pursuant to Title II of the

---

[1] With regard to Mr. Bailey's request for nominal damages, it is Mr. Bailey's position that an award of nominal damages would confer significant civil rights to the public, as a judgment in his favor against the BOARD, regardless of the amount, would deter the BOARD from discriminating against people with disabilities in the future.

Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("Americans with Disabilities Act" or "ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Rehabilitation Act"); sues KYLE FRANCE (hereinafter referred to as "FRANCE"), in his official capacity as chief executive of BOARD, for injunctive and declaratory relief, attorneys' fees and costs pursuant to Title II of the ADA and the Rehabilitation Act; and sues SMG, (hereinafter referred to as "SMG"), for declaratory and injunctive relief, attorneys' fees, and costs pursuant to Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*; and states as follows:

## JURISDICTION AND PARTIES

1. This is an action for declaratory and injunctive relief pursuant to Title II and Title III of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* (hereinafter referred to as the "ADA"), and the Rehabilitation Act, 29 U.S.C. §794, *et seq.*

2. This Court is vested with original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

4. Plaintiff, SHELBY BAILEY, (hereinafter referred to as "MR. BAILEY"), is a resident of Assumption Parish, Louisiana.

5. MR. BAILEY is a qualified individual with a disability under the ADA.   MR. BAILEY has muscular dystrophy and relies on a ventilator to breathe.

6. Due to his disability, MR. BAILEY is substantially impaired in multiple major life activities.   MR. BAILEY relies on an electric wheelchair for mobility and a ventilator to breathe.

7. Upon information and belief, the BOARD is the political entity which owns the real property, improvements, and programs which are the subject of this action, to wit: the

Mercedes-Benz Superdome, located at 1500 Sugar Bowl Drive, New Orleans, LA 70112 (hereinafter "Superdome").

8.     Upon information and belief, KYLE FRANCE, named in his official capacity as the chairman of the BOARD, is the official with chief executive power with respect to the BOARD, and bears responsibility in his official capacity as chief executive for administering, operating, and maintaining the BOARD'S public goods and services.

9.     Upon information and belief, SMG is a partnership doing business in Orleans Parish, Louisiana.

10.    Upon information and belief, SMG is domiciled at 300 Conshohocken State Road, Ste. 450, West Conshohocken, PA 19428.

11.    Upon information and belief, pursuant to an agreement between SMG and the BOARD, SMG operates some or all of the programs, services, accommodations which are offered at the Superdome.

12.    Upon information and belief, SMG is responsible for any violations of Title III of the ADA at the Property.

13.    The BOARD and MR. FRANCE are responsible for any violations of Title II of the ADA and the Rehabilitation Act at the Property and are also responsible for the actions of its contractor, SMG.   *See* 28 C.F.R. § 35.130(b)(1) ("a public entity, in providing any aid, benefit, or service, may not, directly *or through contractual, licensing, or other arrangements*, discriminate against individuals with disabilities.") (emphasis added).

14.    DEFENDANTS are obligated to comply with the ADA.

15.     All events giving rise to this lawsuit occurred in the Eastern District of Louisiana, in

Orleans Parish, Louisiana.

## FACTUAL STATEMENT

MR. BAILEY's Season Tickets in the 100-Level, Row 36 Designated Seating

16.     MR. BAILEY is a lifelong fan of the New Orleans Saints.   He has been a Saints season

ticket holder for over thirty years.

17.     As a person with a disability who relies on an electric wheelchair for mobility, MR.

BAILEY has always required wheelchair accessible seating for his Saints season tickets.

18.     Prior to 2011, MR. BAILEY's season tickets for designated wheelchair accessible seats

were located on a raised platform in the 100-level section of the Superdome, around the

ten yard line, which, on information and belief, was pursuant to the DEFENDANTS'

then-configuration for designated accessible seating during Saints football games.

19.     In 2011, DEFENDANTS engaged in an $85 million, extensive and substantial renovation

of the Superdome.[2]   This renovation led to the complete reconfiguration of the

designated accessible seating sections for patrons with disabilities, in addition to other

substantial changes to the entire facility.

20.     As a result of the 2011 renovations, the designated accessible seating section on the field

level of the Superdome was eliminated.   MR. BAILEY's season tickets, along with

nearly all 100-level ADA accessible seating, were moved to the very last row of the

100-level section (with some select season tickets moved to the front rows of the

100-level section).   MR. BAILEY's relocated accessible seating is located in an inferior

---

[2]  See Exhibit 1, Mercedes-Benz Superdome website, "Historical Timeline" "Louisiana Superdome
becomes Mercedes-Benz Superdome *available at*
http://www.mbsuperdome.com/about-us/event-highlights.

location with an obstructed view.

21.     Specifically, since 2011, MR. BAILEY's season tickets have been located in Section 109, Row 36.

22.     The DEFENDANTS' seating charts depicting seating configurations for Saints football games show that throughout the entire arena, every Row 36, at the back of every 100-level section, has been designated for accessible seating.[3]

23.     On information and belief, there are a few front-row seats available in certain rows in the 100-Level for patrons with disabilities.   However, these seats sell at a price point that exceeds what MR. BAILEY can afford.   Furthermore, the view from these seats is obstructed by players and other on-field personnel.

24.     MR. BAILEY's seats at Section 109, Row 36 offer a substantially limited view that is obstructed by multiple barriers.

25.     First, a cement overhang physically obstructs MR. BAILEY's view of the aerial video screens and all aerial game play (e.g., punts, kicks, and long passes) that routinely occur during a football game.

26.     Second, MR. BAILEY's line of sight is obstructed when other patrons immediately in front of him are standing.   During football games, it is routine and commonplace for patrons to stand during the game.   As a result, MR. BAILEY cannot see the field during large portions of the game.

27.     Prior to filing suit, MR. BAILEY sought numerous times to resolve his concerns and to identify accessible seating with an unobstructed view.   On or around September 2013,

---

[3] See Exhibit 2, Mercedes-Benz Superdome website, "Football Seating Charts – Plaza Level Seating Chart," *available at* http://www.mbsuperdome.com/assets/img/plazafull-2017-ddd73026cc.jpg.

he appeared in a local news segment with WWLTV discussing his concerns about the lack of accessible seating for Saints fans with disabilities. He also complained to the Saints management during both the 2015 and 2016 seasons.

28.     The response to his 2015 and 2016 complaints was to move him to various designated accessible seats along Row 36 in different 100-level sections.   MR. BAILEY realized that no matter where he sat in the 100-level sections' respective Row 36, all designated accessible seats suffered from the same line of sight obstructions.   The overhang obstructed the view of the video screens and aerial play, and the accessible seats were not high enough for him to see over standing patrons in the immediate rows in front.

29.     On one occasion, the DEFENDANTS seated MR. BAILEY in the accessible seating located in the front row.   To MR. BAILEY's significant disappointment, he discovered that the view from these seats was also obstructed, by the players and other on-field personnel.   A patron's full enjoyment of these front row seats necessitates standing, for prolonged periods.

MR. BAILEY's Alternative Seating Options in the 600-level Terrace Designated Seating

30.     MR. BAILEY also considered the **only other** **designated accessible seating in the** **Superdome**; to wit, the designated seating along four quadrants in the upper 600-level terrace.[4]   MR. BAILEY deliberated these seats with great hesitation, as they are worse seats than what he has obtained, and desired to obtain, over his thirty plus years of season-ticket subscriptions.

31.     While MR. BAILEY has not sat in these inferior 600-level seats, on information and

---

[4]  See Exhibit 3, Mercedes-Benz Superdome website, "Football Seating Charts – Terrace Level Seating Chart," *available at* http://superdome.s3.amazonaws.com/img/terrace-full.jpg.

belief, the 600-level terrace designated seating is not fully accessible to MR. BAILEY.

32.     First, there is no accessible route to reach any of the designated accessible seats in the 600-level Terrace because of the slope of the ramps to get there, and lack of handrails. Specifically, one must traverse ramps that are impermissibly steep for wheelchair users to safely and independently navigate.    Additionally, there are no handrails along the ramps.

33.     Second, the accessible seats in 600-level terrace are configured for side access by wheelchair users, meaning, a person in a wheelchair must wheel down the row and pivot their chair into the designated space for their accessible seat.    However, the accessible designated rows in the 600-level terrace are too narrow.

34.     Third, the spaces designated for accessible seating are configured in a single, narrow row, such that there is no way for a wheelchair user to enter or exit around another wheelchair user already in the row.    In other words, the accessible routes impermissibly overlap for *each* wheelchair user needing to access the row.    This means that wheelchair users are essentially trapped at their seats in the 600-level terrace, and cannot leave to use the restroom or visit the concession stand without forcing all other people in the row to leave their seats as well.

35.     Fourth, the floor in the designated accessible seating areas has a non-level landing pad, and also has impermissible bumps and thresholds.

36.     Fifth, the designated accessible rows are positioned immediately behind a thick, metal guardrail that is positioned directly in the sight line of wheelchair users.    Wheelchair users sitting in these rows have an obstructed line of sight to the field because of the guard rail's design and location.

37.     Sixth, there are no companion seats in the 600-level terrace designated seating rows.

7

Rather, companions to wheelchair users are afforded seats in the row *behind* the accessible seating area, instead of adjacent to the individual in a wheelchair, in violation of federal regulations.

38. Because of the lack of accessibility in these 600-level terrace designated seats, MR. BAILEY is deterred from seeking a season ticket subscription for these accessible seats.

39. After unsuccessfully seeking assistance from the Saints for sufficiently accessible seating, MR. BAILEY retained the undersigned counsel to advocate for his rights.

40. In November 2017, the undersigned counsel sent a pre-suit conciliation letter to the DEFENDANTS notifying them of the violations of MR. BAILEY's rights and attempting to discuss a mutual resolution to the lack of appropriate ADA accessible seating at the Superdome.[5] This letter constituted a request for "reasonable accommodation" or "reasonable modification" under the ADA and RA. Several months passed with no response, until the undersigned counsel again initiated contact to discuss the matter in January 2018.   Some discussion occurred in late January 2018, but the DEFENDANTS stopped engaging in discussions and since February 19, 2018, provided no further correspondence on the matter.[6]   The entire effort was a futile endeavor, and MR. BAILEY has yet to identify any meaningfully accessible seats.

Renovations of the Superdome

41. The Superdome was originally constructed in 1975, but has been renovated numerous times.   For instance, massive renovations occurred after Hurricane Katrina, between 2006 and 2007.

---

5  Attached as Exhibit 4.
6  *See* Exhibit 5, reflecting pre-suit negotiation emails between counsel for MR. BAILEY and the DEFENDANTS.

42.     The last major renovation occurred in 2011, at an expense of $85 million.[7]

43.     One result of the 2011 renovations was the relegation of all ADA accessible seating from a raised platform in the front rows of the 100-level to Row 36.   To wit, MR. BAILEY's season ticket subscription was moved from the fully accessible, optimal view field level seats to the inaccessible seats at Row 36, with an obstructed view.

44.     On information and belief, DEFENDANTS did not adequately consider the impact of the 2011 renovations on Saints fans with disabilities.   Alternatively, if DEFENDANTS did consider disability access prior to the 2011 renovations, they were purposeful in their decision to reassign the designated accessible seating sections to sections of the Superdome with obstructed views, limited sightlines, impermissibly narrow rows, and no accessible route. **Put another way, Saints fans with disabilities were reassigned to some of the worst seats in the stadium**.

45.     In Summer 2016, the DEFENDANTS made additional renovations to the Superdome by installing new video screens, characterized in the local media as a "fan amenity" and amongst "the largest video boards in the nation."   The boards were the "feature attraction in a $40 million renovation project at the Superdome."[8]

46.     As an individual with a disability assigned to the accessible seating at Section 109, Row 36, MR. BAILEY has an obstructed view and cannot see these video screens.   MR. BAILEY is denied access to and enjoyment of this fan amenity due his status as a person with a disability.

47.     According to local news, the DEFENDANTS are once again in the process of beginning

---

[7] *See* Exhibit 1, *supra* p. 4, fn. 2.
[8] *See* Exhibit 6, Duncan, Jeff, "Massive new video boards in Superdome almost ready to shine," Nola.com – Times Picayune (May 27, 2016).

massive, "game-changing" renovations to the Superdome, at an estimated cost of $150 to $500 million.   Architectural firms have already been retained to work on these future renovations.[9]

48.     Given immediate and unfolding plans to once again conduct massive renovations of the Superdome, MR. BAILEY files this litigation to protect his rights as an individual with a disability and ensure that DEFENDANTS abide by their obligations under federal disability anti-discrimination laws when conducting these renovations.

<u>DEFENDANTS' Past Notice of ADA Violations at the Superdome</u>

49.     The DEFENDANTS have been on clear notice of ongoing accessibility issues with its seating during football games for many years—even prior to MR. BAILEY's advocacy.

50.     In 2008, the U.S. Department of Justice conducted an extensive three-day site inspection of the Superdome and wrote a lengthy report summarizing violations of ADA regulations and a lack of accessibility for persons with disabilities.[10] While the DOJ's report predates the 2011 renovations, on information and belief, some or all of the violations noted by the DOJ concerning the accessible designated seating still persist today—despite representations made by DEFENDANTS to the DOJ a decade ago that there were plans to remove many of the accessibility barriers through renovations.[11]

51.     In 2010, DEFENDANTS were sued by private litigants regarding ongoing ADA

---

[9] *See* Exhibit 7, Duncan, Jeff, "State, Saints officials considering 'game-changing' renovation of the Superdome, surrounding campus," Nola.com – Times Picayune (May 26, 2017) and Exhibit 8, Duncan, Jeff, "Superdome renovations move one step closer as state officials approve survey funding," Nola.com – Times Picayune (March 30, 2018).

[10] *See* Exhibit 9, U.S. Dep't. of Justice, "Louisiana Superdome Site Survey Report" (July 1, 2008), *available* at *Price v. SMG Corp.*, Case 2:09-cv-03495-JCZ-DEK (E.D. La. 2011) at Rec. Doc. 69-2.

[11] See Exhibit 10, Trahan Architects, "Louisiana Superdome ada analysis" (Oct. 15, 2008) (prepared for the State of Louisiana, Office of Facility Control and Planning), *available* at *Price v. SMG Corp.*, Case 2:09-cv-03495-JCZ-DEK (E.D. La. 2011) at Rec. Doc. 62-6.

accessibility violations at the Superdome.   The parties conducted additional inspections of the Superdome's ADA compliance[12] and eventually entered into a confidential settlement agreement.[13]

52.   **None of the renovations to the Superdome following the 2008 DOJ investigation or the 2010 private lawsuit have remedied the accessibility issues alleged herein.   In fact, MR. BAILEY's seats are *less accessible* and *less enjoyable* today than they were back in 2010.**

53.   **MR. BAILEY is gravely concerned that the next round of renovations to the Superdome will again neglect Saints fans with disabilities, and continue to relegate them to the "back of the bus" seats from which large portions of the field are obstructed.**

<u>COUNT I - VIOLATION OF TITLE III OF THE<br>AMERICANS WITH DISABILITIES ACT<br>AS TO SMG</u>

54.   MR. BAILEY realleges and reavers Paragraphs 1 - 53 as if they were expressly restated herein.

55.   The Property is a place of public accommodation, subject to the ADA, generally located at: the Mercedes-Benz Superdome, 1500 Sugar Bowl Drive, New Orleans, LA 70112.

56.   The Superdome is a domed sports and exhibition venue, located in the Central Business District of New Orleans, Louisiana.

57.   The New Orleans Saints play in the Superdome.

---

[12]  *See* Exhibit 11, Plaintiff's "[ADA] Title II and Title III Compliance Observations & Findings" (March 2010), *available* at *Price v. SMG Corp.*, Case 2:09-cv-03495-JCZ-DEK (E.D. La. 2011) at Rec. Doc. 62-5.
[13]  *See* Exhibit 12, *Price v. SMG Corp.*, Case 2:09-cv-03495-JCZ-DEK (E.D. La. 2011) at Rec. Doc. 70.

58.  Upon information and belief, SMG organizes, promotes, and produces various events at the Property and/or operates the Property.

59.  In its management and operation capacity of the Property, SMG is required to follow Title III of the ADA.   SMG meets the definition of a public accommodation, as a private entity that manages or otherwise operates a place of public accommodation, the Superdome (a stadium).   *See* 28 C.F.R. § 36.104 (*defining* "public accommodation" and "place of public accommodation").

60.  MR. BAILEY is a longtime season ticket-holder of the New Orleans Saints and will visit the Superdome in the near future to watch the Saints play.

61.  "Public accommodations and commercial facilities," like the Property at issue in this litigation, "must follow the requirements of … the Title III regulations at 28 CFR part 36, subpart D; and the 2004 ADA Accessibility Guidelines ("ADAAG") at 36 CFR part 1191, appendices B and D."[14]

Violations of ADAAG Line of Sight Requirements

62.  U.S. Department of Justice ("DOJ") regulations require that assembly areas, like the Property at issue, provide wheelchair spaces with clear lines of sight. "Wheelchair spaces shall provide spectators with choices of seating locations and viewing angles that are substantially equivalent to, or better than, the choices of seating locations and viewing angles available to all other spectators."   2004 ADAAG at 221.2.3.   The Advisory Rule 221.2.3 states that "while individuals who use wheelchairs need not be provided with the best seats in the house, neither may they be relegated to the worst."

---

[14]  *See* U.S. Dep't. of Justice, Civil Rights Division, *2010 ADA Standards for Accessible Design*, "2010 Standards for Public Accommodations and Commercial Facilities: Title III" (September 15, 2010), *available at* https://www.ada.gov/regs2010/2010ADAStandards/2010ADAstandards.htm#titleIII

63.    In assembly areas "where spectators are expected to stand during events," as routinely occurs during Saints football games, "spectators seated in wheelchair spaces shall be afforded lines of sight over the heads of standing spectators in the first row in front of wheelchair spaces."    2004 ADAAG at 802.2.2.1.

64.    Additionally, "where standing spectators are provided lines of sight over the shoulders and between the heads of spectators standing in the first row in front of their seats, spectators seated in wheelchair spaces shall be afforded lines of sight over the shoulders and between the heads of standing spectators in the first row in front of wheelchair spaces."    2004 ADAAG at 802.2.2.2.

65.    As alleged above at paragraphs 25 and 26, MR. BAILEY's season tickets at Section 109, Row 36 have an obstructed line of sight.   MR. BAILEY, seated in his wheelchair space, cannot see over or between the heads of standing spectators in the first row in front of his wheelchair space.  Additionally, due to the low concrete overhang, MR. BAILEY cannot see the video screens or any aerial play, and is thus deprived of a view that is "substantially equivalent to, or better than, the choices of seating locations and viewing angles available to all other spectators."    2004 ADAAG at 221.2.3.

66.    As alleged above at paragraph 36, the accessible seating at the 600-Level Terrace is situated directly behind a guard rail that sits directly at eye level of a seated wheelchair user, obstructing their view of the field and game play.   Placement of the accessible seating in the 600-Level Terrace relative to the guard rail violates the ADAAG's line of sight regulations.

67.    Lastly, as alleged above at paragraph 29, additional accessible seating afforded in the front row of 100-level section also suffers from an obstructed view for patrons who are

wheelchair users or who cannot stand, posed by the players and other on-field personnel.

Violations of ADAAG Vertical Dispersion Requirements

68.     DOJ regulations require that "In providing lines of sight, wheelchair spaces shall be dispersed." 2004 ADAAG at 221.2.3.   Wheelchair spaces must be "dispersed vertically *at varying distances* from the . . . playing field." 2004 ADAAG at 221.2.3.2 (emphasis added).

69.     However, as MR. BAILEY has alleged at Paragraphs 22, 29, and 30, the totality of accessible designated seats in the entire stadium are located in only a few areas: Row 36 and Row 1 of the 100-level, and within the 600-level terrace.   Entire levels of the stadium are lacking accessible seating, and the few areas providing wheelchair-accessible seats suffer from serious visual obstructions and other accessibility issues, as explained herein.

Violations of ADAAG Ramp Requirements

70.     DOJ regulations require that where a facility utilizes ramps along accessible routes, ramp runs shall not have a running slope steeper than 1:12.   2004 ADAAG at 402.2. Additionally, ramp runs with a rise greater than 6 inches shall have handrails.

71.     As alleged above at paragraph 32, the accessible seats at the 600-Level Terrace are reached by traversing a series of ramps that, on information and belief, are excessively sloped, and do not have the required handrails.

Violations of ADAAG Side Access and Accessible Routes for Accessible Seats Requirements

72.     DOJ regulations require that "where a wheelchair space can be entered only from the side, the wheelchair space shall be 60 inches deep minimum."   2004 ADAAG at 802.1.3.   Furthermore, "accessible routes shall not overlap wheelchair spaces."   2004

ADAAG at 802.1.4.   Advisory 802.1.4 explains, "because accessible routes serving wheelchair spaces are not permitted to overlap the clear floor space at wheelchair spaces, *access to any wheelchair space cannot be through another wheelchair space."*

73.   However, the accessible seating afforded in the 600-Level Terrace violates these regulations.   As MR. BAILEY alleges at paragraphs 33 and 34, these accessible seats are configured for side access, but are not wide enough for a wheelchair user to access their seat.   Additionally, these seats are configured such that wheelchair users cannot enter or exit around other wheelchair users already in the row.

Violations of ADAAG Requirements for Level Landings

74.   DOJ Regulations require that on the "floor or ground surface of wheelchair spaces … changes in level are not permitted."   2004 ADAAG at 802.1.1.

75.   However, as MR. BAILEY has alleged at paragraph 35, the rows for accessible seating in the 600-Level Terrace have non-level landing pads and impermissible bumps and thresholds.

Violations of ADAAG Companion Seating Requirements

76.   DOJ regulations require that "at least one companion seat … shall be provided for each wheelchair space."   2004 ADAAG at 221.3.   Moreover, "in row seating, companion seats shall be located to provide shoulder alignment with *adjacent* wheelchair spaces." 2004 ADAAG at 802.3.1 (emphasis added).

77.   As alleged above in paragraph 37, in the 600-level designated accessible seating rows, there are no companion seats.   Rather, companions to wheelchair users are afforded seats in the row *behind* the accessible seating area, instead of adjacent to the individual in a wheelchair.

15

78.   The ADA outlaws not just intentional discrimination but also certain practices that have a disparate impact upon persons with disabilities even in the absence of any conscious intent to discriminate. Thus, a public accommodation may not "utilize standards or criteria or methods of administration that have the *effect* of discriminating on the basis of disability, or that perpetuate the discrimination of others who are subject to common administrative control." 28 C.F.R. § 36.204 (emphasis added).

79.   Within reason, a public accommodation may be required to modify its policies, practices, or procedures to mitigate any disparate impact upon persons with disabilities. 28 C.F.R. § 36.302(a).

80.   Public accommodations must also take affirmative measures to ensure that such persons have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations that are available from that public accommodation. 42 U.S.C. § 12182; 28 C.F.R. §§ 36.202(b), 36.201(a).

81.   MR. BAILEY reasonably anticipates that his season tickets will continue to be in the same section, and reasonably anticipates that his only alternative accessible seating choices will continue to be in the 600-level terrace.   MR. BAILEY reasonably anticipates that at the start of the next Saints Football season, he will be forced to continue sitting in inaccessible seating. SMG's failure to provide accessible seating to wheelchair users has a disparate impact on disabled patrons, including MR. BAILEY.

82.   MR. BAILEY will return to the Property in August 2018 for the 2018 Saints preseason and/or regular football season.

83.   Upon information and belief, modification of the currently offered accessible seating would provide MR. BAILEY with an equal opportunity to participate in, or benefit from,

the goods, services, and accommodations which SMG offers to the general public.

84.    MR. BAILEY has been obligated to retain the undersigned counsel for the filing and prosecution of this action.   MR. BAILEY is entitled to have his reasonable attorneys' fees, costs, and expenses paid by defendants pursuant to 42 U.S.C. § 12205.

**COUNT II - VIOLATION OF TITLE II OF THE
AMERICANS WITH DISABILITIES ACT
AS TO THE BOARD AND FRANCE**

85.    MR. BAILEY adopts and re-alleges the allegations contained in paragraphs 1-84 as if fully stated herein.

86.    The Property is a place of public accommodation, subject to the ADA, generally located at: the Mercedes-Benz Superdome, 1500 Sugar Bowl Drive, New Orleans, LA 70112.

87.    The Superdome is a domed sports and exhibition venue, located in the Central Business District of New Orleans, Louisiana.

88.    The New Orleans Saints play in the Superdome.

89.    MR. BAILEY is a long-time season ticketholder of the New Orleans Saints and will continue to visit the Superdome in the future to watch the Saints play.

90.    MR. BAILEY has visited the Property numerous times in the past and plans to visit the Property again in the near future, as a patron and visitor.

91.    MR. BAILEY continues to desire to visit the Property, but fears that he will experience serious difficulty again in light of the BOARD's and FRANCE's repeated failures to adequately consider wheelchair users in their renovation plans, or otherwise make appropriate accommodations for MR. BAILEY.

92.    As the owner of the Property, the BOARD and FRANCE are responsible for the physical

accessibility barriers at the Property, many of which are the result of new renovations, or ongoing issues which DEFENDANTS already assured the DOJ they would remedy a decade ago.

93.   As the owner of the Property, the BOARD and FRANCE are also liable for any discrimination which occurs at the Property under the ADA by it contractor, SMG.

94.   The DOJ's implementing regulations of Title II of the ADA clearly affirm that "a public entity, in providing any aid, benefit, or service, may not, directly or *through contractual, licensing, or other arrangements,* discriminate against individuals with disabilities." 28 C.F.R. § 35.130(b)(1) (emphasis added).

95.   The BOARD and FRANCE have failed to adopt alternative policies and are therefore liable for all polices which are used by SMG at the Property that deny MR. BAILEY meaningful access to the goods, services, and programs which are offered at the Property.

96.   Moreover, the 2004 ADAAG, referenced above and incorporated into MR. BAILEY's Title III allegations, is similarly applicable to state and local government facilities that must follow Title II.[15]

97.   42 U.S.C. § 12133 provides: "[t]he remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."

98.   The BOARD and FRANCE have discriminated against MR. BAILEY, and continue to discriminate against him, by denying him full access to the services, programs, and/or

---

[15] *See* U.S. Dep't. of Justice, Civil Rights Division, *2010 ADA Standards for Accessible Design*, "2010 Standards for State and Local Government Facilities: Title II" (September 15, 2010), *available at* https://www.ada.gov/regs2010/2010ADAStandards/2010ADAstandards.htm#titleII

activities offered at the Property, by failing to make their facilities readily accessible as required by 42 U.S.C. § 12132 and its implementing regulations at 28 C.F.R. Part 35.101-35.190 *et. seq*.

99.   Specifically, the actions set forth in paragraphs 1-84 show that the BOARD and FRANCE are effectively excluding wheelchair patrons from obtaining the same benefits available to ambulatory patrons, in violation of 28 C.F.R. §§ 35.130(a), 35.130(b)(1)(ii), 35.130(b)(1)(iii), 35.130(b)(3)(i), and 35.130(b)(7).

100.  The BOARD and FRANCE have discriminated against MR. BAILEY, and continue to discriminate against him, in violation of the ADA, by excluding and/or denying MR. BAILEY the full and equal benefits of the services, programs, and/or activities offered at the Property, by failing to provide seating that is accessible and has appropriate lines of sight.   MR. BAILEY has personally experienced and/or is aware of the numerous barriers to access at the Property discussed herein.

101.  The BOARD and FRANCE have discriminated against MR. BAILEY, and continue to discriminate against him, in violation of the ADA, by failing to ensure that all portions of the Property that have undergone renovations have been "to the maximum extent feasible, . . . altered in such a manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities."   28 C.F.R. § 35.151.

102.  28 C.F.R. § 35.130(4) states that "[a] public entity may not, in determining the site or location of a facility, make selections–(I) [t]hat have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination..."   The BOARD and FRANCE have violated this provision by providing their services, programs, and/or activities in a manner whereby patrons with disabilities

are unable to avail themselves of seating that is fully accessible and provides the same access to the services and programs provided to non-disabled patrons.

103.  Upon information and belief, MR. BAILEY has been denied access to, and has been denied the benefits of services, programs and/or activities of the BOARD, and has otherwise been discriminated against and damaged by the BOARD and FRANCE, because of the BOARD's and FRANCE'S discrimination, as set forth above. MR. BAILEY will continue to suffer such discrimination, injury and damage without the immediate relief provided by the ADA as requested herein.

104.  The BOARD and FRANCE's exclusion of MR. BAILEY from full and equal benefits of their services, programs, and activities available at the Property caused MR. BAILEY to experience loneliness, isolation, segregation, frustration, invasion of his civil rights, denial of self-determination, embarrassment, inconvenience, indignity, and/or humiliation.

105.  The BOARD and FRANCE, through their staff, employees, and/or contractors, knew or should have known of their obligations under Title II of the ADA to provide accommodations to individuals with disabilities, including individuals who are wheelchair users, and to engage in practices to promote compliance with these statutes.

106.  The BOARD and FRANCE, through their staff, employees, and/or contractors, knew or should have known that their policies and practices created an unreasonable risk of causing MR. BAILEY greater levels of loneliness, isolation, segregation, frustration, invasion of his civil rights, denial of self-determination, embarrassment, inconvenience, indignity, and/or humiliation than a non-disabled person would be expected to experience.

107. The harm sustained by MR. BAILEY herein is the expected and foreseeable consequence of the BOARD and FRANCE's failure to comply with the requirements and mandates of federal civil rights law. The statute and accompanying regulations exist to ensure that individuals with disabilities will have equal access to publicly-owned facilities. When the BOARD and FRANCE failed to adhere to their obligations under these statutes and regulations, it was imminently foreseeable that those with disabilities would sustain the exact harms alleged by MR. BAILEY in this lawsuit.

108. Despite the BOARD and FRANCE's explicit knowledge of their obligation to accommodate persons with disabilities, they did not take adequate steps to ensure that they communicated with MR. BAILEY in a manner equivalent to hearing persons.

109. As a result of the BOARD and FRANCE's failure to ensure equal access to MR. BAILEY, he received services that were unequal to those provided to individuals without disabilities.

110. The BOARD and FRANCE discriminated against MR. BAILEY with deliberate indifference to his disability and related accessibility needs.

111. Based on the facts alleged above, the BOARD and FRANCE intentionally discriminated against MR. BAILEY.

112. Further, the BOARD and FRANCE were purposeful in their choices, which is sufficient to constitute intentional discrimination under Title II of the ADA.

113. In the alternative, the BOARD and FRANCE are liable under Title II of the ADA pursuant to the case of *Kelly v. Boeing Petroleum Servs., Inc.*, in which the Fifth Circuit held that the Supreme Court case of *Alexander* expressly rejected the notion that a plaintiff is required to show intentional discrimination to establish a prima facie case of

disparate impact discrimination under Title II.   *See* 61 F.3d 350, 365 (5th Cir. 1995).

114.   The harm sustained by MR. BAILEY herein is the expected and foreseeable consequence of the BOARD and FRANCE's failure to comply with the requirements and mandates of Title II of the ADA. This statute and accompanying regulations exist to ensure that individuals with disabilities will have equal access to places of public accommodations. When the BOARD and FRANCE failed to adhere to their obligations under these regulations, it was imminently foreseeable that those with disabilities would sustain the exact harms alleged by MR. BAILEY in this lawsuit.

115.   By and through the BOARD and FRANCE's failures to make their programs, services, and activities meaningfully accessible to individuals who are in wheelchairs, they have committed disparate impact discrimination sufficient to state a claim for damages under Title II of the ADA.

116.   MR. BAILEY has retained the undersigned counsel and is entitled to recover reasonable attorneys' fees, costs and litigation expenses from the BOARD and FRANCE pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175.

117.   MR. BAILEY is without adequate remedy at law and is suffering irreparable harm.

118.   MR. BAILEY's attempts to obtain relief without litigation amounted to a futile gesture.

119.   42 U.S.C. § 12133 provides: "[t]he remedies, procedures, and rights set forth in section 794 of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."

120.   MR. BAILEY has retained the undersigned counsel and is entitled to recover compensatory and nominal damages, reasonable attorneys' fees, costs, and litigation

expenses from the BOARD and FRANCE pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175.   With regards to MR. BAILEY's request for nominal damages, it is MR. BAILEY's position that an award of nominal damages would confer significant civil rights to the public, as a judgment in his favor against the BOARD and FRANCE, regardless of the amount, would deter them from discriminating against people with disabilities in the future.

121.   MR. BAILEY is without adequate remedy at law and is suffering irreparable harm.

122.   Pursuant to 42 U.S.C. § 12131, *et seq*., this Court is provided authority to grant MR. BAILEY injunctive relief, including an order that the BOARD and FRANCE alter their policies at the Property to make those facilities readily and fully accessible and useable to MR. BAILEY as defined by the ADA.

## COUNT III - VIOLATION OF THE REHABILITATION ACT AS TO THE BOARD AND FRANCE

123.   MR. BAILEY adopts and re-alleges the allegations contained in paragraphs 1-122 as if fully stated herein.

124.   MR. BAILEY brings this claim against BOARD and FRANCE, based upon the Rehabilitation Act, 29 U.S.C. § 794, *et seq*.

125.   The Rehabilitation Act provides that:

> No otherwise qualified individual with handicaps in the United States, as defined by 7(8) [29 USCS § 706(8)], shall, solely by reason of his or her handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by

any Executive agency or by the United States Postal Service. 29 U.S.C. §
794(a).

126.   Upon information and belief, as set forth herein, the BOARD and FRANCE have
violated the Rehabilitation Act by excluding MR. BAILEY, solely by reason of his
disabilities, from the participation in, and denying him the benefits of, and otherwise
subjecting him to discrimination under, the BOARD and FRANCE's programs and
activities.

127.   Upon information and belief, a non-exclusive list of the BOARD and FRANCE's
violations of the Rehabilitation Act and discriminatory conduct against MR. BAILEY are
evidenced by:

A.   denying MR. BAILEY access to, and the equal opportunity to participate in
or benefit from, the aids, benefits, activities, programs, accommodations
and services offered at the Property;

B.   by otherwise limiting MR. BAILEY in the enjoyment of the rights,
privileges, advantages and opportunities enjoyed by individuals without
disabilities who receive the BOARD and FRANCE's aids, benefits and
services;

C.   making facility site or location selections, or renovation, layout, or design
decisions, that have the effect of discriminating against individuals with
disabilities and excluding them from and denying them the benefits of, and
defeating or substantially impairing the accomplishment of the objectives
of, the services, programs and activities offered by the BOARD and
FRANCE at the Property;

24

D.  failing to administer services, programs and activities in the most integrated setting appropriate to the needs of MR. BAILEY;

E.  excluding MR. BAILEY from participation in, and the benefits of, the BOARD and FRANCE's services programs and activities as a result of the BOARD and FRANCE's Property being inaccessible to or unusable by MR. BAILEY; and

F.  failing to design and implement new policies, or make alterations to existing policies, which would permit individuals with disabilities to fully and equally participate in the BOARD and FRANCE's activities and programs.

128.  Upon information and belief, there are additional, ongoing violations of the Rehabilitation Act at the Property which MR. BAILEY is more likely than not going to encounter upon his future visits to the subject premises.   MR. BAILEY brings this action:

A.  to redress injuries suffered as a result of the BOARD and FRANCE's discriminatory actions and inactions set forth herein;

B.  to reasonably avoid further and future injury to MR. BAILEY as a result of the BOARD and FRANCE's ongoing failure to cease their discriminatory practices as set forth in this action, including correcting past violations of the Act and/or avoiding future violations in planned renovations to the Property;

C.  to ensure the BOARD and FRANCE's Property is accessible and usable as required by the relevant applications of Title II of the ADA;

25

D.      to be made whole and ensure future compliance; and

E.      to reasonably avoid future ADA and Rehabilitation Act litigation involving the same Property and under the same laws as set forth herein with its concomitant impact on otherwise scarce judicial resources.

129.    Only through a complete inspection of the Property's designated accessible seating and access thereto, undertaken by MR. BAILEY and/or his representatives, can all said violations be identified and cured so as to ensure access for people with disabilities, the primary purpose of this action.

130.    Upon information and belief, the BOARD and FRANCE are the recipients of federal funds.

131.    Upon information and belief, as the recipients of federal funds, the BOARD and FRANCE are liable for damages to MR. BAILEY as a result of its acts and omissions constituting intentional discrimination.

132.    As set forth above, MR. BAILEY has been denied, and without the requested relief herein will continue to be denied, access to the goods, services, programs, facilities, activities, and accommodations offered by the BOARD and FRANCE, solely by reason of his disability.   Additionally, MR. BAILEY has otherwise been discriminated against and damaged, solely by reason of his disability, as a result of the BOARD and FRANCE's Rehabilitation Act violations set forth above.

133.    The BOARD and FRANCE's exclusion of MR. BAILEY from full and equal benefits of their services, programs, and activities available at the Property caused MR. BAILEY to experience loneliness, isolation, segregation, frustration, invasion of his civil rights,

26

denial of self-determination, embarrassment, inconvenience, indignity, and/or humiliation.

134.   The BOARD and FRANCE, through their staff, employees, and/or contractors, knew or should have known of their obligations under the Rehabilitation Act to provide accommodations to individuals with disabilities, including individuals who are wheelchair users, and to engage in practices to promote compliance with these statutes.

135.   The BOARD and FRANCE, through their staff, employees, and/or contractors, knew or should have known that their policies and practices created an unreasonable risk of causing MR. BAILEY greater levels of loneliness, isolation, segregation, frustration, invasion of his civil rights, denial of self-determination, embarrassment, inconvenience, indignity, and/or humiliation than a non-disabled person would be expected to experience.

136.   The harm sustained by MR. BAILEY herein is the expected and foreseeable consequence of the BOARD and FRANCE's failure to comply with the requirements and mandates of federal civil rights law. The statute and accompanying regulations exist to ensure that individuals with disabilities will have equal access to publicly-owned facilities.   When the BOARD and FRANCE failed to adhere to their obligations under these statutes and regulations, it was imminently foreseeable that those with disabilities would sustain the exact harms alleged by MR. BAILEY in this lawsuit.

137.   Despite the BOARD and FRANCE's explicit knowledge of their obligation to accommodate persons with disabilities, they did not take adequate steps to ensure that they communicated with MR. BAILEY in a manner equivalent to hearing persons.

138.   As a result of the BOARD and FRANCE's failure to ensure equal access to MR. BAILEY, he received services that were unequal to those provided to individuals without disabilities.

139.   The BOARD and FRANCE discriminated against MR. BAILEY with deliberate indifference to his disability and related accessibility needs.

140.   Based on the facts alleged above, the BOARD and FRANCE intentionally discriminated against MR. BAILEY.

141.   Further, the BOARD and FRANCE were purposeful in their choices, which is sufficient to constitute intentional discrimination under the Rehabilitation Act.

142.   In the alternative, the BOARD and FRANCE are liable under the Rehabilitation Act pursuant to the case of *Kelly v. Boeing Petroleum Servs., Inc.*, in which the Fifth Circuit held that the Supreme Court case of *Alexander* expressly rejected the notion that a plaintiff is required to show intentional discrimination to establish a prima facie case of disparate impact discrimination under the Rehabilitation Act.   *See* 61 F.3d 350, 365 (5th Cir. 1995).

143.   The harm sustained by MR. BAILEY herein is the expected and foreseeable consequence of the BOARD and FRANCE's failure to comply with the requirements and mandates of the Rehabilitation Act. This statute and accompanying regulations exist to ensure that individuals with disabilities will have equal access to places of public accommodations. When the BOARD and FRANCE failed to adhere to their obligations under these regulations, it was imminently foreseeable that those with disabilities would sustain the exact harms alleged by MR. BAILEY in this lawsuit.

144.   By and through the BOARD and FRANCE's failures to make their programs, services,

and activities meaningfully accessible to individuals who are in wheelchairs, they have committed disparate impact discrimination sufficient to state a claim for damages under the Rehabilitation Act.

145. Pursuant to 29 U.S.C. § 794(a) this Court is provided authority to grant MR. BAILEY injunctive relief, including an order to alter the subject premises, facilities, services, activities, programs, and accommodations to make them accessible to and useable by individuals with disabilities to the extent required by the Rehabilitation Act, and closing all premises and facilities and discontinuing all non-complying services, activities, programs, and accommodations until the requisite modifications are completed. This Court is further provided authority to grant MR. BAILEY compensatory and nominal damages for the BOARD and FRANCE's discriminatory actions. With regards to MR. BAILEY's request for nominal damages, it is MR. BAILEY's position that an award of nominal damages would confer significant civil rights to the public, as a judgment in his favor against the BOARD and FRANCE, regardless of the amount, would deter them from discriminating against people with disabilities in the future.

146. MR. BAILEY has been obligated to retain undersigned counsel for the filing and prosecution of this action. MR. BAILEY is entitled to recover those attorneys' fees, costs and litigation expenses from the BOARD and FRANCE pursuant to 29 U.S.C. § 794(b).

## **PRAYER FOR RELIEF**

WHEREFORE, MR. BAILEY demands judgment against the BOARD, FRANCE, and SMG, and requests the following relief:

A. That this Court declare that the Property owned, leased and/or operated by

DEFENDANTS is in violation of Title II and Title III of the ADA;

B.     That this Court declare that the Property, programs and activities owned, operated and administered by the BOARD and FRANCE are in violation of Title II of the ADA and the Rehabilitation Act;

C.     That this Court enter an Order directing DEFENDANTS to alter the Property and DEFENDANTS' polices to make the Property accessible to and useable by individuals with mobility-related disabilities to the full extent required by the ADA;

D.     That this Court enter an Order directing DEFENDANTS to ensure that the future planned renovations of the Property are ADA-compliant and cure the violations identified in this complaint;

E.     That this Court award damages, including nominal damages, to MR. BAILEY pursuant to Title II and the Rehabilitation Act for the harm caused by the BOARD's discriminatory practices, including MR. BAILEY's emotional distress, invasion of his civil rights, and for upset stemming from segregation;

F.     That this Court award reasonable attorneys' fees, costs (including expert fees), and other expenses of suit pursuant to Title II and Title III of the ADA and the Rehabilitation Act, to MR. BAILEY; and

G.     That this Court award such other and further relief as it deems necessary, just and/or proper under Title II and Title III of the ADA and the Rehabilitation Act.

Respectfully Submitted,


**BIZER & DEREUS, LLC**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Jennifer M. Coco (LA #34492)
jcoco@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996


By:/s/ Andrew D. Bizer
    ANDREW D. BIZER