# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SHELBY BAILEY** | **CIVIL ACTION** |
| **VERSUS** | **CASE NO. 18-5888** |
| **BOARD OF COMMISSIONERS OF THE LOUISIANA STADIUM AND EXPOSITION DISTRICT, ET AL.** | **SECTION: "G"(2)** |

## ORDER AND REASONS

Pending before the Court is Defendants the Board of Commissioners of the Louisiana Stadium and Exposition District (the "Board"), Kyle France, in his official capacity as Chairman of the Board ("France"), and SMG's (collectively "Defendants"), "Motion for Summary Judgment on all of Plaintiff's Remaining Claims."[1] Plaintiff Shelby Bailey ("Plaintiff") filed a complaint alleging that the owners and operators of the Mercedes-Benz Superdome (the "Superdome"), failed to provide him with handicap accessible seating during New Orleans Saints (the "Saints") football games.[2] In the instant motion, Defendants argue that all of Plaintiff's claims should be dismissed because Plaintiff has not satisfied his burden of proving discrimination as defined in Titles II and III of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.[3] Considering Defendants' motion, the memoranda in support and opposition, the record, and the applicable law, the Court grants the motion in part and denies the motion in part.

## I. Background

On June 14, 2018, Plaintiff filed a Complaint in this Court naming as defendants SMG as the operator of the Superdome, the Board as the owner of the Superdome, and France in his official

---

[1] Rec. Doc. 91.

[2] Rec. Doc. 1.

[3] Rec. Doc. 91-1 at 1-2.

1

capacity as chairman of the Board.[4] Plaintiff brings claims against the Board and France for declaratory and injunctive relief pursuant to Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act, 29 U.S.C. §794, *et seq.*[5] Plaintiff brings claims against SMG for declaratory and injunctive relief pursuant to Title III of the ADA.[6] Plaintiff also seeks recovery of attorneys' fees and costs.[7]

According to the Complaint, Plaintiff has a disability and relies on an electric wheelchair for mobility.[8] Plaintiff alleges that he has been a Saints season ticket holder for over 30 years.[9] Plaintiff alleges that prior to 2011, his seat was located on a wheelchair accessible raised platform in the 100 Level section of the Superdome.[10] Plaintiff alleges that in 2011, Defendants began extensive renovations on the Superdome and reconfigured the accessible seating section for patrons with disabilities.[11] Plaintiff alleges that as a result of the renovations, the wheelchair accessible seating at the Superdome was moved to other positions where the views are obstructed by barriers and other patrons or players standing during the game, or the seating is not fully accessible by wheelchair.[12]

Plaintiff alleges that Defendants have been on notice of ongoing accessibility issues for

---

[4] Rec. Doc. 1.

[5] *Id.* at 1–2.

[6] *Id.* at 2.

[7] *Id.*

[8] *Id.* at 4.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.* at 4–8.

many years.[13] According to the Complaint, in 2008 the United States Department of Justice conducted an inspection of the Superdome and issued a report detailing violations of ADA regulations.[14] Additionally, Plaintiff alleges that Defendants were sued by private litigants in 2018 regarding ongoing accessibility violations.[15]

As a result, Plaintiff alleges that Defendants have failed to comply with various parts of the ADA and Rehabilitation Act.[16] Plaintiff seeks compensatory and nominal damages along with declaratory and injunctive relief, and attorneys' fees.[17]

On December 13, 2019, the Court granted in part and denied in part Defendant SMG's Motion for Judgment on the Pleadings.[18] Accepting as true the allegations in the Complaint, the Court found that SMG could be held liable as an operator of the Superdome because SMG controls modification of the Superdome and could cause the Superdome to comply with the ADA.[19] Additionally, viewing the allegations in the Complaint in the light most favorable to Plaintiff, the Court found that Plaintiff's claims for injunctive and declaratory relief were timely because the Complaint was filed within one year of SMG allegedly denying Plaintiff "the full and equal enjoyment" of a place of public accommodation.[20] However, the Court found that Plaintiff's claim

---

[13] *Id.* at 10.

[14] *Id.*

[15] *Id.* at 10–11.

[16] *Id.* at 11–29.

[17] *Id*. at 1.

[18] Rec. Doc. 86.

[19] *Id*. at 24.

[20] *Id*. at 24–25.

regarding future renovations was not ripe for judicial review.[21] Accordingly, the Court granted the motion to the extent it sought dismissal of Plaintiff's claim regarding future renovations but denied the motion in all other respects.[22]

Defendants filed the instant motion on December 30, 2019.[23] Plaintiff filed an opposition on January 7, 2020.[24] SMG, with leave of Court, filed a reply in further support of the motion on January 17, 2020.[25] The Board and France, with leave of Court, filed a reply in further support of the motion on January 27, 2020.[26] At the request of the parties, the Court heard oral argument on this motion on February 4, 2020 at 10:00 a.m.[27]

## II. Parties' Arguments

### A. *Defendant's Arguments in Support of the Motion*

In the instant motion, Defendants argue that all of Plaintiff's claims should be dismissed because Plaintiff has not satisfied his burden of proving discrimination as defined in Title II and III of ADA and the Rehabilitation Act.[28] Defendants contend that for Plaintiff to succeed on a claim for discrimination under Title II or Title III of the ADA, or under the Rehabilitation Act, he must show that (1) he requested an alteration and (2) the alteration was readily achievable.[29]

---

[21] *Id.* at 25.

[22] *Id.*

[23] Rec. Doc. 91.

[24] Rec. Doc. 101.

[25] Rec. Doc. 123.

[26] Rec. Doc. 130.

[27] Rec. Doc. 134.

[28] Rec. Doc. 91-1 at 1–2.

[29] *Id.* at 5 (citing *Tatum v. Doctors Assocs., Inc.*, No. 14-2980, 2016 WL 852458, at *7 (Mar. 4, 2016) (Lemelle, J.)).

Furthermore, Defendants argue that Plaintiff bears the initial burden of producing evidence to show that an alteration is readily achievable.[30] Defendants contend that Plaintiff has failed to show that the alterations Plaintiff's expert, James Terry, recommended in his report are plausible or that the costs of the other proposed alterations do not exceed their benefits.[31] Accordingly, Defendants argue that because Plaintiff cannot establish an element of the claims on which he bears the burden of proof, summary judgment is appropriate.[32]

Defendants contend that *Marradi v. Galway House, Inc.*, a case decided by a district court judge in the United States District Court for the District Court of Massachusetts, is analogous to the case here.[33] In *Marradi*, Defendants argue that the court granted summary judgment after noting that a plaintiff in an architectural barrier case must provide a defendant with evidence of a proposed solution so the defendant may consider the difficulty of implementation as well as the cost.[34] Defendants contend that the court found that a photograph and an unsworn declaration of an expert insufficient to survive summary judgment without more information, such as cost estimates.[35] Defendants argue that here, Plaintiff has not provided any evidence to show that removal of the architectural barriers in the Superdome is readily achievable or that the costs associated with the proposed alterations do not facially exceed the benefits.[36] Defendants liken the solutions offered by Plaintiff's expert, Mr. Terry, to the solutions offered in *Marradi*, in that costs

---

[30] *Id.* at 5–6 (citing *Tatum*, 2016 WL 852458, at *7).

[31] *Id.* at 7 (citing Rec. Doc. 91-3).

[32] *Id.* at 1–2.

[33] *Id.* at 7–8.

[34] *Id.* at 8.

[35] *Id.*

[36] *Id.* at 8–9.

are not taken into consideration.[37] Defendants further argue that Plaintiff's failure to provide evidence in support of the recommended alterations is even more problematic as it relates to Plaintiff's claims for injunctive relief.[38] Defendants contend that to be entitled to injunctive relief, a plaintiff must identify each architectural barrier that they contend violates the ADA and offer evidence as to why the removal of the barrier is readily achievable and beneficial to the plaintiff.[39]

Next, Defendants contend that Plaintiff did not provide the recommended alterations in his pre-suit correspondence to Defendants.[40] Defendants argue that in addition to identifying a readily achievable modification, Plaintiff must also demonstrate that he requested the modifications.[41] Defendants contend that here, the "pre-suit conciliation letter" sent by Plaintiff does not mention any proposed modifications and that therefore, Plaintiff failed to provide any such pre-suit notice.[42]

Finally, Defendants argue that, to the extent the Court allows any of Plaintiff's claims to proceed, "Defendants are entitled to an order limiting Plaintiff's claims to those centered on sightlines from the accessible seating he has actually occupied for Saints games, in the front row and in Row 36 of the 100 level / lower bowl of the Superdome."[43] Defendants contend that Plaintiff is only entitled to relief that would remedy individualized harms, not for harms he has not personally suffered.[44]

---

[37] *Id.* at 9.

[38] *Id.*

[39] *Id.* (citing *Access for the Disabled, Inc. v. Osceola Enters. of Kissimmee*, No. 6:09-cv-1805, 2010 U.S. Dist. LEXIS 74056 at *4; 2010 WL 2889823, at *1 (M.D. Fla. July 22, 2010)).

[40] *Id.* at 10.

[41] *Id.* (citing *Tatum*, 2016 WL 852458, at *7).

[42] *Id.* at 11.

[43] *Id.*

[44] *Id.*

### B. *Plaintiff's Arguments in Opposition to the Motion*

In opposition to the motion, Plaintiff argues that the motion for summary judgment should be denied because Defendants have grossly misstated the law.[45] Plaintiff asserts that he is bringing a claim against all Defendants under the "alteration standard" and against France under the "program access" standard, but that Defendants failed to analyze either standard.[46] Plaintiff contends that he has established a violation of the ADA because: (1) Plaintiff is a qualified individual with a disability; (2) Plaintiff is being denied the benefits of a public entity and a place of public accommodation; and (3) the discrimination against Plaintiff is by reason of his disability.[47] Finally, Plaintiff argues that Defendants' request to restrict Plaintiff's case to the sightline issues at the 100 Level is baseless.[48] Accordingly, Plaintiff asserts that the motion for summary judgment should be denied in its entirety.[49]

First, Plaintiff argues that he is a qualified individual with a disability.[50] Plaintiff contends that under the ADA, an individual has a disability if he or she has a mental or physical impairment that substantially limits a major life activity.[51] Plaintiff argues that he has muscular dystrophy and is substantially limited in walking and breathing, and therefore qualifies as an individual with a disability under the ADA.[52]

---

[45] Rec. Doc. 101 at 1.

[46] *Id.* at 2.

[47] *Id.* at 3–23.

[48] *Id.* at 24.

[49] *Id.* at 2.

[50] *Id.* at 3–4.

[51] *Id.* at 3 (citing 42 U.S.C. § 12102(1)(A) (2012)).

[52] *Id.* at 3–4.

Second, Plaintiff contends that he is being denied the benefits of a public entity (as to France and the Board), and a place of public accommodation (as to SMG).[53] Plaintiff first notes that Title II applies to government entities whereas Title III applies to private entities operating a place of public accommodation.[54] Plaintiff contends that Title II and Title III differ in their coverage of existing elements of a facility that have not been altered—under Title II, a public entity must provide "program access," whereas, under Title III, a private entity must make "readily achievable" changes to the facility.[55] However, Plaintiff asserts that Title II and Title III impose "nearly identical" requirements on public and private entities for facilities built or altered after 1992.[56] Plaintiff contends that while Title II and Title III differ in what constitutes a "wrongful act", they are "nearly identical" when it comes to alterations.[57]

Plaintiff argues that Defendants violated the alteration requirements of the ADA.[58] Plaintiff contends that to succeed on a claim under the alteration standard, a plaintiff must merely show that he encountered a barrier that was subject to the alteration standard, whereas to defeat a claim under the alteration standard, a defendant must show that the non-compliant barrier exists because compliance with the regulations is "virtually impossible."[59] Plaintiff contends that the 2010 renovations constitute an alteration.[60] Plaintiff further argues that despite having a blank slate to

---

[53] *Id.* at 4–23.

[54] *Id.* at 4.

[55] *Id.* at 2–3, 5–6.

[56] *Id.* at 7.

[57] *Id.* at 6–7.

[58] *Id.* at 8–17.

[59] *Id.* at 8.

[60] *Id.* at 9.

work with, "Defendants relegated individuals with disabilities to the absolute worst seats in the 100 Level."[61]

Plaintiff contends that Defendants violated the alteration requirements of the ADA in six ways.[62] First, Plaintiff asserts that Defendants violated the alteration requirements due to the sideline obstructions at 100 Level, Row 1.[63] Plaintiff argues that as a part of the 2010 renovations, Defendants installed ADA seating on the 100 Level, Row 1 on a "step-down," which left wheelchair users unable to see the field.[64] Second, Plaintiff contends that Defendants violated the alteration requirements of the ADA due to the sideline obstructions at 100 Level, Row 36.[65] Plaintiff argues that his expert "found that wheelchair users on Row 36 in the back of Section 114 could see 78% of the field over the tops of the heads of average height people standing two rows ahead of them on Row 34 while comparable spectators on row 35 could see 98% of the field."[66] Third, Plaintiff contends that Defendants violated the alteration requirements of the ADA due to the inadequate amount of accessible seating available at the 100 Level.[67] Plaintiff argues that the 100 Level presently contains 25,640 seats, of which 236 are designated as wheelchair-accessible seats, but Defendants are required to have 256 wheelchair-accessible designated seats.[68] Fourth, Plaintiff argues that Defendants violated the alteration requirements of the ADA by making the

---

[61] *Id.*

[62] *Id.* at 10.

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.* at 11 (citing Rec. Docs. 92-2, 92-3).

[67] *Id.* at 12.

[68] *Id.* (citing Rec. Doc. 92-3).

Superdome less accessible to individuals with mobility-related disabilities.[69] Plaintiff contends that the regulations prohibit alterations which decreases accessibility and that here, the elimination of the ADA platforms meant Plaintiff went from unobstructed views to obstructed views.[70] Fifth, Plaintiff argues that Defendants violated the alteration requirements of the ADA by making the 200 (Club) Level less accessible to individuals with mobility-related disabilities.[71] Plaintiff contends that currently, the Superdome does not provide wheelchair-designated seats on the 200 Level, but that the regulations indicate that 139 ADA seats are required in that level.[72] Sixth, Plaintiff argues that the extensive renovations triggered ADA requirements as to the entire Superdome.[73] Plaintiff contends that pursuant to current regulations, the Superdome is required to have 732 wheelchair accessible seats, but currently only has 292 wheelchair accessible seats.[74]

Next, Plaintiff argues that the 2010 renovations do not comply with the ADA to the "maximum extent feasible."[75] Plaintiff contends that modifications done "to the maximum extent feasible" refers to a case where the nature of an existing facility makes it virtually impossible to fully comply with applicable accessibility standards.[76] Plaintiff argues that here, Defendants had a blank slate to work with and "chose to prioritize non-disabled persons over disabled persons."[77]

---

[69] *Id.*

[70] *Id.* at 12–13.

[71] *Id.* at 13.

[72] *Id.*

[73] *Id.* at 14.

[74] *Id.* (citing Rec. Doc. 92-2).

[75] *Id.* at 14–16.

[76] *Id.* at 15 (citing 28 C.F.R. § 36.402 (c)).

[77] *Id.*

Additionally, Plaintiff contends that in an alternation standard case, a plaintiff does not have the burden to make an initial showing of a "plausible accommodation, the cost of which, facially, do not clearly exceed its benefits."[78] Plaintiff argues that Defendants misrepresent the holding of *Roberts v. Royal Atl. Corp.* in their brief.[79]

Next, Plaintiff contends that there is a genuine issue of material fact as to whether the Board and France violated the "program access" requirement of the ADA.[80] Plaintiff argues that under the "program access" requirement, a program, viewed in its entirety, must be readily accessible to individuals with disabilities.[81] Plaintiff contends that there is a genuine issue of material fact as to whether the Superdome is readily accessible to Plaintiff.[82] Plaintiff argues that Defendants have failed to prove undue financial or administrative burden as an affirmative defense.[83] Additionally, Plaintiff contends that Defendants distorted the standard for the "program access" requirement by suggesting it should be evaluated under the "readily achievable" standard.[84]

Plaintiff also argues that the Board and France denied Plaintiff the opportunity to participate in or benefit from a service, in violation of Title II, because Plaintiff does not have an equal opportunity to view the field or the Jumbotron.[85] Plaintiff next contends that Defendants

---

[78] *Id.* at 16 (citing *Roberts v. Royal Atl. Corp.*, 542 F.3d 363 (2nd Cir. 2008)).

[79] *Id.* at 16–17.

[80] *Id.* at 17.

[81] *Id.*

[82] *Id.* at 18–19.

[83] *Id.* at 19.

[84] *Id.* at 20.

[85] *Id.* at 21 (citing 28 C.F.R. § 35.130(b)(1)(i)).

failed to provide a reasonable accommodation as requested by Plaintiff.[86] Responding to Defendants' argument that Plaintiff's request letter was deficient because it did not mention proposed modifications, Plaintiff argues that the ADA does not require a plaintiff to state in granular detail his or her request for modifications.[87] Furthermore, Plaintiff contends that he experienced the above discrimination due to his disability.[88]

Lastly, Plaintiff argues that Defendants' request to restrict Plaintiff's case to the sightline issues at the 100 Level is baseless.[89] Plaintiff contends that if there were wheelchair-accessible seats in the 200, 600, and 700 Levels, Plaintiff would be able to attempt to sit in those sections.[90] Plaintiff argues that he has standing to seek removal of all barriers that impact his disability.[91] For these reasons, Plaintiff asserts that the motion for summary judgment should be denied in its entirety.[92]

## C.    SMG's Arguments in Further Support of the Motion

In reply, SMG argues that Plaintiff must present evidence that (1) Defendants failed to alter the Superdome in a manner that, to the maximum extent feasible, made the altered portions readily accessible, and (2) a plausible, feasible modification that could have been implemented, but was

---

[86] *Id.*

[87] *Id.* at 22 (citing *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 622 (5th Cir. 2009); *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 444 (5th Cir. 2017)).

[88] *Id.* at 23.

[89] *Id.* at 24.

[90] *Id.*

[91] *Id.* (*Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 188 (2d Cir. 2013); *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 950–51 (9th Cir. 2011) (en banc); *Steger v. Franco, Inc.*, 228 F.3d 889, 893–94 (8th Cir. 2000)).

[92] *Id.* at 25.

not.[93]

First, SMG contends that it is Plaintiff who is misinterpreting the holding of *Royal Atlantic*.[94] SMG argues that the analysis in *Royal Atlantic* shows that the "maximum extent feasible" standard requires Plaintiff to show a modification that is "facially plausible" and "feasible."[95] SMG contends that accordingly, Plaintiff has the initial burden to show a "plausible accommodation, the costs of which, facially, do not clearly exceed its benefits."[96] SMG argues that the Second Circuit's decision to apply the burden-shifting framework to an alteration claim is important because a plaintiff in an action under Title III of the ADA can only seek injunctive relief.[97] Therefore, SMG contends that to prevail, Plaintiff must have presented the Court with specific modifications that the Court could order as injunctive relief.[98]

Second, SMG argues that Plaintiff did not satisfy the pre-suit requirement to request a reasonable solution by simply requesting a meeting.[99] SMG contends that a plaintiff must do more than make a general request for an accommodation before a burden is imposed on the defendant.[100] SMG argues that in the employment context "the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable

---

[93] Rec. Doc. 123 at 1.

[94] *Id.* at 2.

[95] *Id.* at 3 (citing *Royal Atl.*, 542 F.3d at 372).

[96] *Id.* at 4 (citing *Royal Atl.*, 542 F.3d at 370, 372).

[97] *Id.* at 5.

[98] *Id.*

[99] *Id.* at 6.

[100] *Id.*

accommodations."[101] Therefore, SMG contends that the initial onus is on the plaintiff to suggest an accommodation.[102]

Third and finally, SMG argues that Plaintiff's proposed solutions are vague and undefined.[103] Specifically, SMG contends that Plaintiff's expert fails to explain whether the proposed modifications (1) may be feasibly accomplished and (2) will make the facility accessible.[104] SMG includes a table which details (1) the proposed solution offered by the Plaintiff's expert, (2) any shortcomings of the proposal and (3) unanswered questions needed for injunction.[105] SMG contends that the table shows that the proposed solutions fails to meet Plaintiff's burden of presenting feasible proposals which would cure Plaintiff's accessibility complaints.[106]

### D.    The Board and France's Arguments in Further Support of the Motion

In reply, the Board and France (collectively, the "LSED Defendants") argue that in his opposition, Plaintiff still fails to present any readily achievable modifications.[107] The LSED Defendants contend that a plaintiff complaining of architectural barriers or physical obstructions has the initial burden of proposing such modifications, so defendants may evaluate the reasonableness of the proposal.[108] The LSED Defendants argue that under the ADA, defendants

---

[101] *Id.* at 7 (citing *Chevron Phillips*, 570 F.3d at 622).

[102] *Id.* (citing *Castillo v. Hudson Theatre, LLC*, 18-CV-7931, 2019 WL 4805648, at *3 (S.D.N.Y. Sept. 30, 2019)).

[103] *Id.*

[104] *Id.*

[105] *Id.* at 8–10.

[106] *Id.* at 10.

[107] Rec. Doc. 130 at 1.

[108] *Id.* at 1–2.

are not required to undertake modifications that are not readily achievable, present an unreasonable burden, or would be virtually impossible to achieve.[109] The LSED Defendants contend that the regulatory language at issue confirms, despite Plaintiff's arguments to the contrary, that the plaintiff must propose modifications so the defendants may consider the alteration.[110] The LSED Defendants argue that Plaintiff has not presented adequate summary-judgment evidence which shows that the renovations to the 100 / Plaza Level of the Superdome resulted in a facility that was not "readily accessible to and usable by individuals with disabilities."[111] Responding to Plaintiff's argument that the pre-suit letter sent by Plaintiff triggered an "interactive process," the LSED Defendants contend that the interactive process is unique to employment-related claims under the ADA and is not applicable to the claims in this case.[112]

Responding to Plaintiff's argument that the 2011 renovations triggered ADA requirements as to the entire Superdome, the LSED Defendants argue that case law is to the contrary.[113] The LSED Defendants contend that 28 C.F.R. §35.151(b)(1) is confined to "[e]ach facility or part of a facility altered . . . ," and only requires that ". . . the altered portion of the facility [be] readily accessible to and usable by individuals with disabilities . . . ."[114] Therefore, the LSED Defendants

---

[109] *Id.* at 2 (citing 28 C.F.R. §§ 35:150-151).

[110] *Id.* at 2–3.

[111] *Id.* at 3 (citing *Mannick v. Kaiser Found. Health Plan, Inc.*, No. 03-5905, 2006 U.S. Dist. LEXIS 38430, at *32 (N.D. Cal. June 9, 2006); *Cherry v. City College of San Francisco*, No. 04-04981, 2006 U.S. Dist. LEXIS 98661, at *27 (N.D. Cal. Jan. 12, 2006)).

[112] *Id.* at 4 (citing *Tauscher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959, 964-65 (9th Cir. 2019); *Clemons v. Dart*, 168 F.Supp.3d 1060, 1071 (N.D. Ill. 2016), remanded on other grounds by No. 16-3452, 2017 U.S. App. LEXIS 11573 (7th Cir. Feb. 9, 2017); *Meeks v. Schofield*, 10 F. Supp.3d 774, 791 (M.D. Tenn. 2014), aff'd, 625 F. App'x 697 (6th Cir. 2015)).

[113] *Id.* at 5 (citing *Mannick*, 2006 U.S. Dist. LEXIS 38430, at *32; *Cherry*, 2006 U.S. Dist. LEXIS 98661, at *27).

[114] *Id.*

argue that the alteration standard should not apply to other, unaltered portions of the Superdome.[115]

Additionally, the LSED Defendants contend that the Court should reject Plaintiff's program access claims.[116] The LSED Defendants argue that the Superdome is readily accessible to and usable by individuals with disabilities, including Plaintiff, for purposes of attending Saints home football games; Plaintiff's complaint that he cannot see certain portions of the game does not rob the Superdome of its program access.[117] The LSED Defendants also contend that, in the opinion of their expert, Mark J. Mazz, "[i]t is virtually impossible to achieve full compliance with the new construction requirements."[118] The LSED Defendants argue that, in Mazz's opinion, the age and design of the Superdome make the ADA defenses of technical infeasibility, structural impracticability, and maximum extent feasible applicable to this case.[119] Lastly, the LSED Defendants adopt and incorporate by reference the Reply Memorandum filed by SMG.[120]

### III. Legal Standard

*A.* *Legal Standard for Summary Judgment*

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[121] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or

---

[115] *Id.*

[116] *Id.* at 5–6.

[117] *Id.* at 6.

[118] *Id.* at 7 (citing Rec. Doc. 106-2).

[119] *Id.* at 7–8 (citing Rec. Doc. 106-2 at 4-6).

[120] *Id.* at 8 (citing Rec. Doc. 114-1).

[121] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

weighing the evidence."[122] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[123] If the record, as a whole, "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists, and the moving party is entitled to judgment as a matter of law.[124] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[125]

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[126] Thereafter, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[127] To withstand a motion for summary judgment, the nonmoving party must show that there is a genuine issue for trial by presenting evidence of specific facts.[128] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by

---

[122] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[123] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[124] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[125] *See Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[126] *Celotex*, 477 U.S. at 323.

[127] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

[128] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1996)).

"unsubstantiated assertions," or "by only a scintilla of evidence."[129] Rather, a factual dispute precludes a grant of summary judgment only if the evidence presented by the nonmovant is sufficient to permit a reasonable trier of fact to find for the nonmoving party.[130] Further, a court "resolve[s] factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[131] Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[132] Ultimately, summary judgment is appropriate in any case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."[133]

## B.    *ADA Compliance*

The Americans with Disabilities Act of 1990 ("ADA") "is a broad mandate of comprehensive character and sweeping purpose intended to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life."[134] "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)."[135] Plaintiff brings claims against the

---

[129] *Little*, 37 F.3d at 1075.

[130] *Anderson*, 477 U.S. at 248.

[131] *Little*, 37 F.3d at 1075.

[132] Fed. R. Civ. P. 56(c)(2); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987).

[133] *Armstrong v. City of Dallas*, 997 F.2d 62 (5th Cir. 1993).

[134] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 599 (1999) (internal quotation marks omitted)).

[135] *PGA Tour*, 532 U.S. at 675.

Board and France under Title II of the ADA and the Rehabilitation Act.[136] Plaintiff brings claims against SMG under Title III of the ADA.[137]

### 1. Title II of the ADA and the Rehabilitation Act

"Title II of the ADA focuses on disability discrimination in the provision of public services."[138] Specifically, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[139] A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government."[140]

Similarly, "Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal funding."[141] Like Title II, Section 504 provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[142] "The ADA and the Rehabilitation Act generally are interpreted *in pari materia*."[143] "Indeed, Congress has instructed courts that "nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under title V [i.e., § 504] of the

---

[136] Rec. Doc. 1 at 1–2.

[137] *Id.* at 2.

[138] *Frame*, 657 F.3d at 223.

[139] 42 U.S.C. § 12132.

[140] *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (quoting 42 U.S.C. § 12131(1)(B)).

[141] *Frame*, 657 F.3d at 223.

[142] 29 U.S.C. § 794(a).

[143] *Frame*, 657 F.3d at 223 (citing *Kemp v. Holder*, 610 F.3d 231, 234–35 (5th Cir. 2010); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287–88, 289 n. 76 (5th Cir. 2005) (en banc)).

Rehabilitation Act . . . or the regulations issued by Federal agencies pursuant to such title.'"[144]

"To show a violation of either statute, a plaintiff must prove "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability."[145]

The United States Attorney General is authorized to promulgate regulations implementing Title II.[146] The regulations provide that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."[147] A public entity must operate "each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[148] Therefore, Title II requires "program accessibility."[149]

"Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility."[150] However, a public entity is not "necessarily required . . . to make each of its existing facilities accessible to and usable by

---

[144] *Id.* at 223–24 (quoting 42 U.S.C. § 12201(a); *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998)).

[145] *Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565, 574 (5th Cir. 2018) (quoting *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (per curiam)).

[146] 42 U.S.C. § 12134(a).

[147] 28 C.F.R. § 35.149.

[148] 28 C.F.R. § 35.150(a).

[149] *Tennessee v. Lane*, 541 U.S. 509, 531 (2004).

[150] *Id.* (citing 42 U.S.C. § 12131(2)).

individuals with disabilities."[151] Instead, with respect to facilities built before 1992, Title II only requires "'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service."[152]

"In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards,"[153] including the ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG") set forth at 36 C.F.R. part 1191, appendices B and D. Pursuant to the regulations, "[e]ach facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility . . . shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities. . . ."[154]

### 2. Title III of the ADA

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[155] A stadium is considered to be a place of public accommodation under Title III.[156] "The ADA does not require a place of public accommodation to provide a plaintiff with the ideal or preferred accommodation; rather, the ADA

---

[151] 28 C.F.R. § 35.150(a)(1).

[152] *Lane*, 541 U.S. at 531.

[153] *Id.* (citing 28 CFR § 35.151).

[154] 28 C.F.R. § 35.151(b)(1).

[155] 42 U.S.C. § 12182(a).

[156] 42 U.S.C. § 12181(7)(C).

requires that a defendant provide a plaintiff with an accommodation that is reasonable and permits the plaintiff to participate equally in the good, service, or benefit offered."[157]

Title III defines discrimination as including "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable."[158] The term "existing facilities" includes structures built prior to the Act taking effect on January 26, 1992, which have not been modified since then.[159]

Pursuant to the regulations implementing Title III, "[a]ny alteration to a place of public accommodation . . . after January 26, 1992, shall be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."[160] Public accommodations built or altered after January 26, 1992, must comply with both the Title III regulations set forth at 28 C.F.R. part 36, subpart D and the ADAAG unless "the nature of an existing facility makes it virtually impossible to comply fully with applicable accessibility standards through a planned alteration."[161]

## IV. Analysis

In the instant motion, Defendants argue that they are entitled to summary judgment because Plaintiff has not met his burden of producing evidence to show that an alteration is readily achievable.[162] Next, Defendants contend that Plaintiff did not provide the recommended alterations

---

[157] 1 Americans with Disab. Pract. & Compliance Manual § 4:1, Nondiscrimination Mandate.

[158] 42 U.S.C. § 12182(b)(2)(A)(iv).

[159] *Tatum v. Doctor's Associates, Inc.*, No. CV 14–2980, 2016 WL 852458, at *3 (E.D. La. Mar. 4, 2016)

[160] 28 C.F.R. § 36.402(a)(1).

[161] 28 C.F.R. § 36.402(c).

[162] Rec. Doc. 91-1 at 5-6 (citing *Tatum*, 2016 WL 852458, at *7). To the extent Defendants argue that any architectural barrier claim must be dismissed, it does not appear that Plaintiff is raising such a claim. *See* Rec. Doc. 101. Accordingly, the Court will not address this issue. Additionally, in LSED Defendants' reply memorandum, they argue that Plaintiff's program access claim should be dismissed. However, this argument was not raised in the motion

in his pre-suit correspondence to Defendants, and that therefore, Plaintiff failed to provide any such pre-suit notice.[163] Finally, Defendants argue that, to the extent the Court allows any of Plaintiff's claims to proceed, "Defendants are entitled to an order limiting Plaintiff's claims to those centered on sightlines from the accessible seating he has actually occupied for Saints games, in the front row and in Row 36 of the 100 level / lower bowl of the Superdome."[164] The Court addresses each of these issues in turn.

### A. *Whether Plaintiff bears the initial burden of producing evidence that an alteration is readily achievable to prevail on a claim for discrimination under Title II or Title III of the ADA.*

Defendants argue that Plaintiff bears the initial burden of producing evidence to show that an alteration is readily achievable.[165] Defendants contend that Plaintiff has failed to show that the alterations in Mr. James Terry's report are plausible or that the costs of the other proposed alterations do not exceed their benefits.[166] In opposition, Plaintiff argues that the 2010 renovations violate the alteration requirements of the ADA in six ways.[167] Plaintiff contends that to succeed on a claim under the alteration standard, a plaintiff must merely show that he encountered a barrier that was subject to the alteration standard, whereas to defeat a claim under the alteration standard, a defendant must show that the non-compliant barrier exists because compliance with the regulations is "virtually impossible."[168]

---

for summary judgment. Furthermore, there are clearly factual issues in dispute regarding whether the program, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. *See* 28 C.F.R. § 35.150(a).

[163] Rec. Doc. 91-1 at 10–11.

[164] *Id.* at 11.

[165] *Id.* at 5–6 (citing *Tatum*, 2016 WL 852458, at *7).

[166] *Id.* at 7 (citing Rec. Doc. 91-3).

[167] Rec. Doc. 101 at 8–17.

[168] *Id.* at 8.

As set forth above, under the regulations implementing Title II of the ADA "[e]ach facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility . . . shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities. . . ."[169] Under the regulations implementing Title III of the ADA, any alterations to a facility after 1992 must be "made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."[170] The Superdome was constructed in 1975. Therefore, this heightened "alteration standard" applies only to portions of the facility where an alteration occurred.

An alteration is defined as a change that "could affect the usability of the building or facility or any part thereof."[171] Alterations include events such as remodeling, renovation, rehabilitation, reconstruction, and changes or rearrangement in structural parts, but typically do not include normal maintenance or painting.[172] The DOJ has instructed that "'usability' [is] to be read broadly to include any change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities."[173] "[A]ll changes directly relating to access by individuals with disabilities indisputably affect usability."[174] "Neither the ADA nor the ADAAG

---

[169] 28 C.F.R. § 35.151(b)(1).

[170] 28 C.F.R. § 36.402(a)(1).

[171] 28 C.F.R. § 36.402(b). *See also* 28 C.F.R. § 35.151(b)(1).

[172] 28 C.F.R. § 36.402(b)(1).

[173] 28 C.F.R. Pt. 36, App. C.

[174] *Tatum*, 2016 WL 852458, at *4.

makes clear which party has the burden to prove that an 'alteration' did or did not occur. . ."[175]

Plaintiff relies on the deposition testimony of Alan Freeman, the general manager of the Superdome, who detailed "the last substantial renovation work [that] took place in 2009 and 2010."[176] Mr. Freeman testified that as part of the 2010 renovations the ADA Platforms were removed; temporary sideline seats were dismantled and removed from the 100 Level; permanent rows of seats were installed at the 100 Level sidelines; two rows of ADA seating were installed in the 100 Level; and the concourse on the 100 Level was expanded.[177] Mr. Freeman also testified that following Hurricane Katrina 9,540 seats were removed from the 200 Level and replaced with 8,919 seats.[178] These changes "could affect the usability of the building or facility or any part thereof," and are thus considered an alteration.[179] Therefore, Defendants were required to make any alterations "readily accessible" to individuals with disabilities to the "maximum extent feasible."[180]

Under this standard, the altered portion of the facility must comply fully with applicable accessibility standards and the ADAAG unless it is "virtually impossible"[181] If compliance is virtually impossible, "the alteration shall provide the maximum physical accessibility feasible."[182]

---

[175] *Rodriguez v. Barrita, Inc.*, 10 F. Supp. 3d 1062, 1082 n. 17 (N.D. Cal. 2014).

[176] Rec. Doc. 95-12 at 22.

[177] *Id.* at 25, 29–30.

[178] *Id.* at 51–52.

[179] 28 C.F.R. § 36.402(b). *See also* 28 C.F.R. § 35.151(b)(1).

[180] 28 C.F.R. § 36.402(c). *See also* 28 C.F.R. § 35.151(b)(1).

[181] 28 C.F.R. § 36.402(c).

[182] *Id.*

Importantly, "[a]ny altered features of the facility that can be made accessible shall be made accessible."[183]

Defendants argue that Plaintiff bears the initial burden of producing evidence to show that an alteration is "readily achievable."[184] In response, Plaintiff argues that the "readily achievable" standard governs only elements of a public accommodation that have not been altered since the passage of the ADA.[185] Here, Plaintiff contends that the 2010 renovations constitute an alteration and that therefore, the "readily achievable" standard is inapplicable.[186]

The parties primarily disagree about the holding of *Roberts v. Royal Atl. Corp*,[187] a Second Circuit case. Defendants cite to *Roberts* in stating that "[t]he Plaintiff notably bears the initial burden in demonstrating a 'plausible accommodation, the costs of which, facially, do not clearly exceed its benefits' even in cases analyzing whether alterations were made in such a manner that, to the maximum extent feasible the altered portions of the facility are readily accessible to and usable by individuals with disabilities."[188] Plaintiff argues that "[a]t no point does the *Roberts* court hold that a plaintiff in an alteration standard case must make an initial showing of a 'plausible accommodation, the cost of which, facially, do not clearly exceed its benefits.'"[189]

In *Roberts*, the plaintiffs alleged that the defendants, who owned and managed a resort complex, violated Title III of the ADA because the resort's rooms and facilities were not

---

[183] *Id.*

[184] Rec. Doc. 91-1 at 5–6.

[185] Rec. Doc. 101 at 8.

[186] *Id.* at 9.

[187] 542 F.3d 363 (2d Cir. 2008).

[188] Rec. Doc. 91-1 at 7 n. 15.

[189] Rec. Doc. 101 at 17.

wheelchair-accessible.[190] The Second Circuit distinguished between "discrimination" in regards to "the making of alterations" and discrimination in regards to "'a failure to remove architectural barriers … in existing facilities … where such removal is readily achievable.'"[191] The court noted that it must first determine when a facility is altered because "[i]f alterations have been made, a defendant 'discriminates' if those altered areas . . . are not made readily accessible to disabled individuals 'to the maximum extent feasible.'"[192] Again highlighting the distinction between the alteration standard on one hand and the standard for architectural barriers on the other, the court noted that "[e]ven in the absence of alterations, a defendant nonetheless 'discriminates' if it fails to remove any existing barriers to accessibility where such removal 'is readily achievable.'"[193] It is clear from this analysis that the Second Circuit recognizes that under Title III of the ADA, a defendant may discriminate in discrete ways, namely under an alteration standard and/or under an architectural barrier standard.

The *Roberts* court next analyzed when a facility is considered "altered" under the ADA.[194] In making this determination, the Second Circuit first "consider[ed] who bears the burden to establish that a modification is or is not an alteration."[195] Adopting the reasoning of their prior decision in *Borkowski v. Valley Central School District*,[196] the Second Circuit stated that "in applying the Rehabilitation Act and related statutes, our case law bars us from placing both the

---

[190] *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 365 (2d Cir. 2008).

[191] *Id.* at 368-369 (quoting 42 U.S.C. § 12182(b)(2)(A)(iv)).

[192] *Id.* at 369.

[193] *Id.*

[194] *Id.* at 369–71.

[195] *Id.* at 370.

[196] 63 F.3d 131 (2d Cir. 1995).

initial burden of production and the ultimate burden of persuasion on either the plaintiff or the defendant."[197] Therefore, the Second Circuit adopted a "middle course," in which a plaintiff seeking to establish a reasonable accommodation "bears only a burden of production" that "is not a heavy one."[198] Accordingly, "[t]o establish the existence of an alteration, a plaintiff fulfills his or her initial burden of production by identifying a modification to a facility and by making a facially plausible demonstration that the modification is an alteration under the ADA. The defendant then bears the burden of persuasion to establish that the modification is in fact not an alteration."[199] In sum, the Second Circuit held only that in determining whether a modification to a facility constitutes an alteration, the plaintiff has the initial burden of production by identifying a modification to a facility and by making a facially plausible demonstration that the modification is an alteration under the ADA.[200]

Next, the *Roberts* court analyzed the second step under the alteration standard, namely when is a facility deemed "altered" made readily accessible and usable to the "maximum extent feasible"?[201] The Second Circuit again applied the burden-shifting approach articulated in *Borkowski* to the "maximum extent feasible" standard and held that "once a plaintiff has met an initial burden of production identifying some manner in which the alteration could be, or could have been, made 'readily accessible and usable by individuals with disabilities, including individuals who use wheelchairs,' the defendant then bears the burden of persuading the factfinder

---

[197] *Roberts*, 542 F.3d at 370.

[198] *Borkowski*, 63 F.3d at 137-38.

[199] *Roberts*, 542 F.3d at 371.

[200] *Id.*

[201] *Id.* at 371–73.

that the plaintiff's proposal would be 'virtually impossible' in light of the 'nature of the facility.'"[202]

Finally, the *Roberts* court considered when the removal of an architectural barriers under 42 U.S.C. § 12182(b)(2)(A)(iv) is "readily achievable."[203] The Second Circuit again determined that the *Borkowski* approach is appropriate in determining plaintiff's initial burden of production in answering this question.[204]

The Second Circuit in *Roberts* clearly articulates two discrete analyses under the "alteration standard" on the one hand and the "architectural barrier standard" on the other. In instructing the district court on remand to determine whether a parking area had been altered, the Second Circuit stated: "Should the district court conclude that the parking lots were altered, the defendants would, of course, be required to establish that they had been made readily accessible and usable to the maximum extent feasible . . . If, on the other hand, the district court concludes that the lots were not altered . . . [the] 'readily achievable' standard for existing facilities [may apply]."[205] As the Second Circuit stated "section 12183 requires, with respect to altered facilities, that all feasible efforts be made toward compliance without regard to cost,"[206] whereas section 12182 "requires removal of architectural barriers, regardless of whether alterations have been made, 'where such removal is readily achievable.'"[207] In short, section 12182 and section 12183 are separate

---

[202] *Id*. at 372 (quoting 42 U.S.C. § 12183; 28 C.F.R. § 36.402).

[203] *Id*. at 373.

[204] *Id*.

[205] *Id*. at 376 (the court found that the readily achievable standard may apply to the parking area because their remained an open question as to whether the parking lots were within the "path of travel" to the rooms in the resort).

[206] *Id*. at 379.

[207] *Id*. at 367 (quoting 42 U.S.C. § 12182(b)(2)(A)(iv)).

provisions, providing for two possible ways in which a defendant may discriminate against a plaintiff with a disability. Indeed, district courts in the Second Circuit recognize this distinction and the effect it has on the court's analysis.[208] Because they contain different standards, they are to be analyzed and considered separately, as was done in *Roberts*.

Defendants argue that summary judgment must be granted in their favor because Plaintiff has not produced evidence to show that an alteration is readily achievable.[209] Defendant asserts that Plaintiff has failed to show that the proposed alterations in Mr. James Terry's report are plausible or that the costs of the other proposed alterations do not exceed their benefits.[210] However, in the case of an altered facility, the plaintiff is not required to show that a proposed modification is "readily achievable." Even under the burden-shifting framework established by the Second Circuit, a plaintiff only has the "initial burden of production identifying some manner in which the alteration could be, or could have been, made 'readily accessible and usable by individuals with disabilities.'"[211] Mr. Terry's report details the ways in which the Superdome could be made accessible.[212] Accordingly, Defendants' motion for summary judgment must be denied because under the alteration standard, Plaintiff does not have to show that a proposed modification is "readily achievable" and even under the Second Circuit's burden shifting framework, Plaintiff

---

[208] *de la Rosa v. 597 Broadway Dev. Corp.*, No. 13CV7999 (LAK) (MHD), 2015 WL 7351540, at *7 (S.D.N.Y. Aug. 4, 2015), report and recommendation adopted in part, 2015 WL 7308661 (S.D.N.Y. Nov. 19, 2015) ("A determination that a facility has undergone an 'alteration' has considerable significance with respect to the substance of the applicable legal standard. If the facility predated 1993 and has not undergone an alteration, the test is whether a proposed remedial step is readily achievable.").

[209] Rec. Doc. 91-1 at 5–6.

[210] *Id*. at 7 (citing Rec. Doc. 91-3).

[211] *Roberts*, 542 F.3d at 372 (quoting 42 U.S.C. § 12183; 28 C.F.R. § 36.402).

[212] Rec. Doc. 92-2 at 27–29.

has identified some manner in which the alteration could be, or could have been, made readily accessible.[213]

## B. Whether Plaintiff provided the recommended alterations in his pre-suit correspondence to Defendants

Defendants contend that Plaintiff failed to demonstrate that he requested the modifications in his pre-suit correspondence to Defendants.[214] Defendants contend that here, the "pre-suit conciliation letter" sent by Plaintiff does not mention any proposed modifications and that therefore, Plaintiff failed to provide any such pre-suit notice.[215] In response, Plaintiff argues that the ADA does not require a plaintiff to state in granular detail his or her request for modifications.[216] In SMG's reply brief, SMG argues that Plaintiff did not satisfy his pre-suit requirement to request a reasonable solution by simply requesting a meeting.[217] SMG contends that a plaintiff must do more than make a general request for an accommodation before a burden is imposed on the defendant.[218] SMG argues that in the employment context "the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting

---

[213] *See Rodriguez*, 10 F. Supp.3d at 1082 n. 17 ("Neither the ADA nor the ADAAG makes clear which party has the burden to prove that an 'alteration' did or did not occur, nor has the Ninth Circuit clarified the issue. In *Roberts v. Royal Atl. Corp.*, the Second Circuit adopted a burden-shifting scheme for establishing whether a public accommodation experienced a qualifying alteration . . . The court in *Roberts* reasoned that while plaintiffs should generally be capable of pointing to an initial modification potentially constituting an alteration, defendants 'can be expected to have superior access to information with which to refute assertions that their facilities have been altered within the meaning of the statute and the applicable regulations and commentary.' Here, ascertaining where the burden rests is not critical in that the conclusion of 'no alteration' arises under either formulation. Even if, consistent with *Roberts*, defendants in the Ninth Circuit must shoulder the burden of persuasion, defendants here have successfully established that the fire repairs did not constitute an alteration.").

[214] Rec. Doc. 91-1 at 10.

[215] *Id*.at 11.

[216] Rec. Doc. 101 at 22 (citing *Chevron Phillips*, 570 F.3d at 622; *Patton*, 874 F.3d at 444).

[217] Rec. Doc. 123 at 6.

[218] *Id*.

limitations, and to suggest the reasonable accommodations."[219] Therefore, SMG contends that the initial onus is on the plaintiff to suggest an accommodation.[220]

Title III of the ADA requires a public accommodation to make reasonable modifications when the modifications are necessary.[221] Similarly, a public entity must make reasonable modifications when necessary to avoid discrimination on the basis of a disability.[222] Generally, it is incumbent upon the person with the disability to request a reasonable modification.[223] Furthermore, the person requesting the modification has the burden of showing that there is a reasonable modification that would enable him to participate in the activity at issue.[224]

Defendants primarily rely on *Castillo v. Hudson Theatre, LLC*, a case decided by a district judge in the United States District Court for the Southern District of New York.[225] There, the court determined that "[a] plaintiff's request for a reasonable modification is necessary to determine whether the defendant could reasonably provide such modification and whether the defendant's

---

[219] *Id.* at 7 (citing *Chevron Phillips*, 570 F.3d at 622).

[220] *Id.* (citing *Castillo v. Hudson Theatre, LLC*, 18-CV-7931, 2019 WL 4805648, at *3 (S.D.N.Y. Sept. 30, 2019)).

[221] 42 U.S.C.A. § 12182(b)(2)(A)(ii) ("[A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations"); 28 C.F.R. § 36.302(a).

[222] 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

[223] *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003) (finding that "[t]o recover under section 12182(b)(2)(A)(ii) in a retail sale case, a plaintiff must show that . . . he . . . requested a reasonable modification in that policy or practice which, if granted, would have afforded him access to the desired goods;").

[224] *Matthews v. NCAA*, 179 F. Supp. 2d 1209, 1225 (E.D. Wash. 2001) ("A plaintiff has the burden of showing the existence of a reasonable rule modification that would enable him to participate in the subject activity . . . . Once a plaintiff meets that burden, the defendant must show that the requested modification would fundamentally alter the nature of the program or activity.").

[225] *Castillo*, 2019 WL 4805648.

subsequent failure to do so constitutes discrimination."[226] This is because "the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it."[227] "Title III's requirement that private entities make 'reasonable accommodations' for disabled individuals would be rendered meaningless if the entity had no basis for knowing (1) what accommodations the [plaintiff] was seeking, and (2) whether those accommodations were reasonable in light of the disability and the test."[228]

Here, Plaintiff argues that a pre-suit letter sent to all Defendants on November 21, 2017 qualifies as a request for reasonable accommodation.[229] According to Plaintiff, the letter was meant to serve "as a formal request to meet to discuss whether [Plaintiff's] issues and claims can be resolved without litigation."[230] The letter documented Plaintiff's grievances regarding the designated accessible seating.[231] The letter then states that Plaintiff and his counsel "welcome an opportunity to sit down together to discuss these issues, and what LSED/SMG intends to do to correct them."[232] While the letter does not specifically state the modifications Plaintiff was seeking, it does generally set forth Plaintiff's grievances and asks Defendants to correct those grievances. Defendants appear to suggest that Plaintiff would have been in the position—before

---

[226] *Id.* at *3.

[227] *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995).

[228] *Shaywitz v. Am. Bd. of Psychiatry & Neurology*, 848 F. Supp. 2d 460, 466 (S.D.N.Y. 2012) (citing *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 309 (1st Cir. 2003)).

[229] Rec. Doc. 101 at 22.

[230] Rec. Doc. 101-3 at 1.

[231] *Id.* at 1–2.

[232] *Id.* at 2.

conducting any discovery in this case—to identify specific structural changes that could be made to the Superdome to accommodate individuals in wheelchairs.

*Castillo* is easily distinguishable from the present matter because the plaintiff in *Castillo* did not submit any request for reasonable modification. Rather, the plaintiff contended that she was deterred from buying tickets to attend a show at the defendant's theatres because "the current policies and procedures on the [defendants'] websites made it clear that the [defendants] were unwilling to accommodate individuals with metabolic disorders."[233] The court reasoned that "[w]ithout her requesting an actual modification, though, it is impossible to determine whether the [defendants] were actually unwilling to accommodate [the plaintiff], rendering her allegations merely conclusory."[234] Here, Plaintiff sent pre-suit correspondence to Defendants highlighting the alleged deficiencies with the facility and asking Defendants to correct the deficiencies to accommodate Plaintiff's disability. Therefore, Defendants are not entitled to summary judgment on this basis.

## C.    *Whether Plaintiff's Claims Must be Limited to the Sightline Issues at the 100 Level*

Finally, Defendants argue that they are entitled to an order limiting Plaintiff's claims to those centered on sightlines from the accessible seating he has actually occupied for Saints games, in the front row and in Row 36 of the 100 level and the lower bowl of the Superdome.[235] Defendants contend that Plaintiff is only entitled to relief that would remedy individualized harms, not for harms he has not personally suffered.[236] Plaintiff argues that Defendants' request to restrict

---

[233] *Castillo*, 2019 WL 4805648, at *3.

[234] *Id.*

[235] Rec. Doc. 91-1 at 11.

[236] *Id.*

Plaintiff's case to the sightline issues at the 100 level is baseless.[237] Plaintiff contends that if there were wheelchair-accessible seats in the 200, 600, and 700 Levels, Plaintiff would be able to attempt to sit in those sections.[238] Plaintiff also argues that he has standing to seek removal of all barriers that impact his disability.[239] Responding to Plaintiff's argument that the 2011 renovations triggered ADA requirements as to the entire Superdome, the LSED Defendants argue that case law is to the contrary.[240] The LSED Defendants contend that 28 C.F.R. § 35.151(b)(1) is confined to "[e]ach facility or part of a facility altered . . . ," and only requires that ". . . the altered portion of the facility [be] readily accessible to and usable by individuals with disabilities . . . ."[241] Therefore, the LSED Defendants argue that the alteration standard should not apply to other, unaltered portions of the Superdome.[242]

Pursuant to the regulation implementing Title II, "[e]ach facility or part of a facility altered . . . shall, to the maximum extent feasible, be altered in such manner that *the altered portion of the facility* is readily accessible to and usable by individuals with disabilities. . . ."[243] The regulation implementing Title III states "[a]ny alteration to a place of public accommodation or a commercial facility, after January 26, 1992, shall be made so as to ensure that, to the maximum extent feasible,

---

[237] Rec. Doc. 101 at 24.

[238] *Id.*

[239] *Id.* (*Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 188 (2d Cir. 2013); *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 950–51 (9th Cir. 2011) (en banc); *Steger v. Franco, Inc.*, 228 F.3d 889, 893–94 (8th Cir. 2000)).

[240] Rec. Doc. 130 at 5 (citing *Mannick v. Kaiser Found. Health Plan, Inc.*, No. 03-5905, 2006 U.S. Dist. LEXIS 38430, at *32 (N.D. Cal. June 9, 2006); *Cherry v. City College of San Francisco*, No. 04-04981, 2006 U.S. Dist. LEXIS 98661, at *27 (N.D. Cal. Jan. 12, 2006)).

[241] *Id.*

[242] *Id.*

[243] 28 C.F.R. § 35.151(b)(1) (emphasis added).

*the altered portions of the facility* are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."[244] Therefore, these regulations are confined to "the altered portions of the facility."[245]

In *Mannick v. Kaiser Found. Health Plan, Inc.*, a district court judge in the United States District Court for the Northern District of California granted summary judgment on Title III claims and found that the "1993 remodeling of the 4th/5th floor labor/delivery rooms did not trigger any obligation with regard to the patient rooms on the medical-surgical floors [unrelated floors/areas]."[246] The court reached this conclusion because "the undisputed evidence provided by defendants shows that there was no alteration or remodeling of the patient rooms that triggered an obligation to provide an accessible patient room on one of the medical-surgical floors."[247] A partial alteration does not trigger alteration obligations to unrelated or unaltered areas of the facility.[248]

Plaintiff argues that the 2010 renovations violate the alteration requirements of the ADA in the following ways: (1) sightline obstructions at 100 Level, Row 1; (2) sightline obstructions at 100 Level, Row 36; (3) inadequate amount of accessible seating at the 100 Level; (4) making the Superdome less accessible to individuals with mobility-related disabilities by eliminating the ADA platforms; (5) making the 200 Level less accessible; and (6) failure to provide sufficient accessible seating stadium wide.[249]

---

[244] 28 C.F.R. § 36.402(b) (emphasis added).

[245] *Id.*; 28 C.F.R. § 35.151(b)(1).

[246] *Mannick*, 2006 WL 1626909, at *11.

[247] *Id.*

[248] *See Cherry*, 2006 U.S. Dist. LEXIS 98661, at *9 (addressing Title II claims and rejecting plaintiff's argument that "any partial alteration triggers a federal duty to renovate the entire building").

[249] Rec. Doc. 101 at 10-14.

During his deposition, Alan Freeman, the general manager of the Superdome, detailed "the substantial renovation work [that] took place in 2009 and 2010."[250] Mr. Freeman testified that as part of the 2010 renovations the ADA Platforms were removed; temporary sideline seats were dismantled and removed from the 100 Level; permanent rows of seats were installed at the 100 Level sidelines; two rows of ADA seating were installed in the 100 Level; and the concourse on the 100 Level was expanded.[251] Mr. Freeman also testified that following Hurricane Katrina 9,540 seats were removed from the 200 Level and replaced with 8,919 seats.[252] As discussed above, Plaintiff argues that the 2010 renovations violate the alteration requirements of the ADA six ways. Five of Plaintiff's alteration claims relate to accessibility at the 100 and 200 Levels where alterations to the facility have occurred. Therefore, summary judgment is denied as to Plaintiff's claims regarding (1) sightline obstructions at 100 Level, Row 1; (2) sightline obstructions at 100 Level, Row 36; (3) inadequate amount of accessible seating at the 100 Level; (4) making the Superdome less accessible to individuals with mobility-related disabilities; and (5) making the 200 Level less accessible.

As stated above, the alteration regulations are confined to "the altered portions of the facility."[253] Therefore, Plaintiff's alteration claims are limited to the portions of the Superdome where alterations occurred. As to the sixth claim, Plaintiff argues that "The Overall Facility is Required to Comply with the Alteration Standard as a Result of the Elimination of the ADA Platforms and Renovating the 100 and 200 Levels."[254] Plaintiff argues that "by performing

---

[250] Rec. Doc. 95-12 at 22.

[251] *Id.* at 25, 29–30.

[252] *Id.* at 51–52.

[253] 28 C.F.R. § 35.151(b)(1); 28 C.F.R. § 36.402(b).

[254] Rec. Doc. 95-1 at 19.

extensive modifications to the Superdome, Defendants affected the usability of the building" and that therefore "the ADA requirements were triggered as to the entire Superdome."[255] This argument is contrary to the clear language of the alteration regulations, which contemplate a portion by portion analysis, and therefore this claim must be dismissed.[256] Plaintiff argues that he has standing to seek removal of all barriers that impact his disability.[257] While a plaintiff may have a claim to seek removal of architectural barriers he has not encountered, those claims are pursued under the architectural barrier standard rather than the alteration standard.[258] Accordingly, Plaintiff's claim that the entire facility must comply with the alterations standard by providing accessible seating stadium-wide is dismissed with prejudice.

## V. Conclusion

For the reasons discussed above, Defendants' motion for summary judgment is denied in part because under the alteration standard, Plaintiff does not have to show that a proposed modification is "readily achievable" and even under the Second Circuit's burden-shifting framework, Plaintiff has identified some manner in which the alteration could be, or could have been, made readily accessible. Additionally, the Court finds that Plaintiff requested a reasonable accommodation in the pre-suit letter; therefore, summary judgment is denied on that basis. Furthermore, five of Plaintiff's alteration claims relate to accessibility at the 100 and 200 Levels where Plaintiff has shown alterations to the facility have occurred. However, Plaintiff's claim that the entire facility must comply with the alteration standard by providing accessible seating

---

[255] Rec. Doc. 101 at 14.

[256] *See* 28 C.F.R. § 35.151(b)(1); 28 C.F.R. § 36.402(b).

[257] Rec. Doc. 101 at 24 (citing *Kreisler*, 731 F.3d at 188; *Chapman*, 631 F.3d at 950–51; *Steger, Inc.*, 228 F.3d at 893–94).

[258] *See Kreisler*, 731 F.3d at 188; *Chapman*, 631 F.3d at 950–51.

stadium-wide is dismissed with prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants, the Board of Commissioners of the Louisiana Stadium and Exposition District, Kyle France, in his official capacity as Chairman of the Board, and SMG's, "Motion for Summary Judgment on all of Plaintiff's Remaining Claims"[259] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the motion is **GRANTED** to the extent that Defendants seek dismissal of Plaintiff's claim that the entire facility must comply with the alteration standard by providing accessible seating stadium-wide. The claim that the entire facility must comply with the alterations standard by providing accessible seating stadium wide is **DISMISSED WITH PREJUDICE.** The motion is **DENIED** in all other respects.

**NEW ORLEANS, LOUISIANA**, this __19th__ day of February, 2020.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[259] Rec. Doc. 91.