# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SHELBY BAILEY** | **CIVIL ACTION** |
| **VERSUS** | **CASE NO. 18-5888** |
| **BOARD OF COMMISSIONERS OF THE LOUISIANA STADIUM AND EXPOSITION DISTRICT, ET AL.** | **SECTION: "G"(2)** |

## ORDER AND REASONS

Pending before the Court is Defendants SMG's "Motion for Summary Judgment on Modifications."[1] Plaintiff Shelby Bailey ("Plaintiff") filed a complaint alleging that the owners and operators of the Mercedes-Benz Superdome (the "Superdome"), failed to provide him with handicap accessible seating during New Orleans Saints (the "Saints") football games.[2] In the instant motion, SMG argues that all of the remaining claims against SMG should be dismissed because SMG is not an operator as defined by Title III of the Americans with Disabilities Act ("ADA").[3] Considering SMG's motion, the memoranda in support and opposition, the record, and the applicable law, the Court grants the motion in part and denies the motion in part.

## I. Background

On June 14, 2018, Plaintiff filed a Complaint in this Court naming as defendants SMG as the operator of the Superdome, the Board of Commissioners of the Louisiana Stadium and Exposition District (the "Board") as the owner of the Superdome, and Kyle France ("France") in his official capacity as chairman of the Board (collectively, "Defendants").[4] Plaintiff brings claims

---

[1] Rec. Doc. 92.

[2] Rec. Doc. 1.

[3] Rec. Doc. 92-1 at 1-2.

[4] Rec. Doc. 1.

against the Board and France for declaratory and injunctive relief pursuant to Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act, 29 U.S.C. §794, *et seq.*[5] Plaintiff brings claims against SMG for declaratory and injunctive relief pursuant to Title III of the ADA.[6] Plaintiff also seeks recovery of attorneys' fees and costs.[7]

According to the Complaint, Plaintiff has a disability and relies on an electric wheelchair for mobility.[8] Plaintiff alleges that he has been a Saints season ticket holder for over 30 years.[9] Plaintiff alleges that prior to 2011, his seat was located on a wheelchair accessible raised platform in the 100 Level section of the Superdome.[10] Plaintiff alleges that in 2011, Defendants began extensive renovations on the Superdome and reconfigured the accessible seating section for patrons with disabilities.[11] Plaintiff alleges that as a result of the renovations, the wheelchair accessible seating at the Superdome was moved to other positions where the views are obstructed by barriers and other patrons or players standing during the game, or the seating is not fully accessible by wheelchair.[12]

Plaintiff alleges that Defendants have been on notice of ongoing accessibility issues for many years.[13] According to the Complaint, in 2008 the United States Department of Justice

---

[5] *Id.* at 1–2.

[6] *Id.* at 2.

[7] *Id.*

[8] *Id.* at 4.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.* at 4–8.

[13] *Id.* at 10.

conducted an inspection of the Superdome and issued a report detailing violations of ADA regulations.[14] Additionally, Plaintiff alleges that Defendants were sued by private litigants in 2018 regarding ongoing accessibility violations.[15]

As a result, Plaintiff alleges that Defendants have failed to comply with various parts of the ADA and Rehabilitation Act.[16] Plaintiff seeks compensatory and nominal damages along with declaratory and injunctive relief, and attorneys' fees.[17]

On December 13, 2019, the Court granted in part and denied in part Defendant SMG's Motion for Judgment on the Pleadings.[18] Accepting as true the allegations in the Complaint, the Court found that SMG could be held liable as an operator of the Superdome because SMG controls modification of the Superdome and could cause the Superdome to comply with the ADA.[19] Additionally, viewing the allegations in the Complaint in the light most favorable to Plaintiff, the Court found that Plaintiff's claims for injunctive and declaratory relief were timely because the Complaint was filed within one year of SMG allegedly denying Plaintiff "the full and equal enjoyment" of a place of public accommodation.[20] However, the Court found that Plaintiff's claim regarding future renovations was not ripe for judicial review.[21] Accordingly, the Court granted the motion to the extent it sought dismissal of Plaintiff's claim regarding future renovations but denied

---

[14] *Id.*

[15] *Id.* at 10–11.

[16] *Id.* at 11–29.

[17] *Id*. at 1.

[18] Rec. Doc. 86.

[19] *Id*. at 24.

[20] *Id*. at 24–25.

[21] *Id*. at 25.

the motion in all other respects.[22]

SMG filed the instant motion on December 30, 2019.[23] Plaintiff filed an opposition on January 7, 2020.[24] The Board and France filed their own response to the instant motion on January 7, 2020.[25] SMG, with leave of Court, filed a reply in further support of the motion on January 17, 2020.[26] At the request of the parties, the Court set this motion for oral argument on February 4, 2020 at 10:00 a.m.[27]

## II. Parties' Arguments

### A.  *Defendant's Arguments in Support of the Motion*

In the instant motion, SMG argues that it does not have control over the alleged discriminatory conditions in the Superdome and therefore, cannot be held liable as an "operator" under Title III of the ADA.[28] SMG argues that it is merely the manager of the Superdome and that, as the owner of the Superdome, the Board would have to be the one to approve any structural modification.[29] SMG contends that pursuant to various agreements between it and the Board, SMG is unable to implement any of the proposed solutions or modifications proposed by Plaintiff.[30] SMG argues that because it does not have control over the aspects of the Superdome Plaintiff seeks

---

[22] *Id.*

[23] Rec. Doc. 92.

[24] Rec. Doc. 102.

[25] Rec. Doc. 107.

[26] Rec. Doc. 21.

[27] Rec. Doc. 134.

[28] Rec. Doc. 92 at 1.

[29] Rec. Doc. 92-1 at 3.

[30] *Id.* at 4–8.

to modify, it is not an "operator" and is therefore entitled to be dismissed.[31]

SMG contends that it does not have the power to implement the modifications set forth by Plaintiff through the report of his retained expert James Terry ("Mr. Terry").[32] SMG argues that in an analogous case, *Neff v. American Dairy Queen, Inc.*, the district court granted summary judgment because it determined that the plaintiff provided no evidence that the defendant could require an existing franchise to make modifications to an existing structure.[33] SMG argues that in affirming the district court's holding, the Fifth Circuit determined that supervisory authority without more does not support a holding that the defendant "operated" the stores with respect to the removal of architectural barriers.[34] SMG points to the specific modifications proposed by Plaintiff and contends that each solution involves a capital improvement, and, as in *Neff*, SMG does not have the authority to implement the modifications without direction, approval and funding from the Board.[35]

Additionally, SMG responds to the suggestion of Plaintiff's expert, Mr. Terry, that "Defendants should modify the content of video programming shown on monitors in the Superdome during Saints games to comply with the ADA's 'effective communication' requirements."[36] First, SMG contends that Plaintiff did not include an "effective communication"

---

[31] *Id.* at 1–2.

[32] *Id.* at 10.

[33] *Id.* at 10–11 (citing *Neff v. Am. Dairy Queen, Inc.*, 879 F. Supp. 57, 58, 60 (W.D. Tex. 1994)).

[34] *Id.* at 11 (citing *Neff*, 58 F.3d at 1068-69).

[35] *Id.* at 12.

[36] *Id.* at 13.

claim in his Complaint, and the claim should be rejected for this omission.[37] Second, SMG argues

that the evidence establishes that the Saints organization, not SMG, controls the content displayed

on monitors in the Superdome during Saints games.[38] SMG contends that because it does not have

the authority to implement this proposed solution, it should be dismissed.[39]

Finally, SMG notes that the Court, in its December 13, 2019 Order, cited the Ninth

Circuit's opinion in *Disabled Rights Action Committee v. Las Vegas Events, Inc.*,[40] in ultimately

concluding that SMG could be held liable as an operator of the Superdome.[41] SMG contends that

the plaintiff in *Disabled Rights Action Committee* was "permitted to engage in discovery 'to

develop the factual basis for th[e] claim' that the defendants had control over the modifications at

issue."[42] SMG argues that here, Plaintiff has been afforded an opportunity to engage in discovery,

and the evidence shows that SMG is entitled to summary judgment.[43]

### B. *Plaintiff's Arguments in Opposition to the Motion*

In opposition to the motion, Plaintiff argues that the contractual agreements between SMG

and the Board show that SMG could effectuate the modifications Plaintiff suggested; therefore,

Plaintiff contends that SMG is the operator of the Superdome.[44] Additionally, Plaintiff argues that

---

[37] *Id.* (citing *Johnson v. Thibodaux City*, 887 F.3d 726, 736 (5th Cir. 2018) ("[T]he plaintiffs may not defeat summary judgment on the basis of a theory found nowhere in their complaint, at least without also moving to amend or absent trial by consent.").

[38] *Id.* (citing Rec. Doc. 92-18).

[39] *Id.* at 13–14 (citing *Neff*, 58 F.3d at 1068-69).

[40] 375 F.3d 861 (9th Cir. 2004).

[41] Rec. Doc. 92-1 at 14 (citing Rec. Doc. 86 at 16).

[42] *Id.* (citing *Disabled Rights Action Committee v. Las Vegas Events, Inc.*, 375 F.3d 861, 878 (9th Cir. 2004)).

[43] *Id.* at 15.

[44] Rec. Doc. 102 at 1.

it is not a valid defense for SMG to state that the National Football League regulations prevent it from re-installing on-field platforms.[45]

First, Plaintiff contends that SMG is the Superdome's operator and as such, can modify the physical aspects of the Superdome to make it comply with the ADA.[46] Plaintiff argues that *Neff* is distinguishable from the case here because in *Neff*, the franchisor never prevented the franchisee from making modifications and therefore, the franchisor never operated the store.[47] Plaintiff contends that SMG "operates" the Superdome because it controls, directs, and manages the Superdome.[48] Plaintiff argues that the depositions of Mr. Freeman and Mr. Thornton shows that SMG is the true manager of the Superdome and that LSED is less involved.[49] Furthermore, Plaintiff contends that the Management Agreement and the Support Agreement show that SMG is responsible for the day-to-day management of the Superdome.[50] Accordingly, Plaintiff argues that SMG controls, directs, and manages the Superdome and, thus, operates it.[51]

Responding to SMG's argument that the Board must approve all capital improvement projects, Plaintiff contends that this relationship does not negate SMG's status as an operator.[52] Plaintiff argues that if SMG makes a venue assessment and there's a maintenance cost that is

---

[45] *Id.*

[46] *Id.* at 5.

[47] *Id.* at 6–7 (citing *Neff*, 58 F.3d, at 1068-69).

[48] *Id.* at 7.

[49] *Id.* at 7–8.

[50] *Id.* at 8–9.

[51] *Id.* at 10.

[52] *Id.*

necessary, the Board is required to fund it pursuant to the management contract.[53]

Responding to SMG's argument that NFL regulations prevent it from replacing the ADA platforms on the field, Plaintiff contends that the ADA trumps the NFL.[54] Lastly, Plaintiff argues that his claims about the video monitor are in the Complaint.[55] Furthermore, Plaintiff contends that while the Saints may control the content on the video monitors, the size of the physical monitors is what Plaintiff complains about and what SMG can remedy.[56]

## C.    The Board and France's Arguments in Opposition to the Motion

In opposition to the motion, the Board and France (collectively, the "LSED Defendants") argue in response to SMG's argument that it does not qualify as an "operator" under Title III of the ADA, that (1) there is Fifth Circuit case law to the contrary and (2) the material facts upon which SMG's argument rests are disputed by the evidentiary record in this case.[57] The LSED Defendants argue that SMG is an "operator" of the Superdome, pursuant to contractual agreements that vest SMG with authority to manage all operations at the Superdome.[58]

## D.    SMG's Arguments in Further Support of the Motion

In reply, SMG argues that it does not have the authority to approve of the solutions proposed by Plaintiff because any structural modification to the Superdome must be funded by the Board.[59] SMG argues that "with respect to the television monitors, Plaintiff's demands regarding

---

[53] Id. at 10–11.

[54] Id. at 11.

[55] Id. at 12 (citing Rec. Doc. 1).

[56] Id.

[57] Rec. Doc. 107 at 1.

[58] Id. at 2.

[59] Rec. Doc. 121 at 1–2 (citing Rec. Docs. 92-4, 92-5, 102-2, 105-3).

the readability of the television monitors were not included in Plaintiff's Complaint."[60] SMG contends that while both Plaintiff and the Board oppose SMG's motion, neither "explains how the proposed modifications fall within the scope of 'managing' or 'operating' the facility, and neither disputes that the structural modifications requested by the Plaintiff require the approval and funding of the [Board]."[61] Therefore, SMG argues that Plaintiff and the Board have failed to establish a genuine issue of material fact regarding whether SMG could make the modifications requested by Plaintiff.[62] SMG contends that its authority to operate the Superdome does not mean it has the authority to make structural modifications to the Superdome, as Plaintiff has requested.[63] SMG states that it is not contending it has no obligation under the ADA in its current capacity, simply that it is not responsible for the type of architectural changes Plaintiff is requesting.[64] In sum, SMG contends that it does not own the Superdome, but merely manages it and therefore cannot make the structural modification Plaintiff requests.[65] Lastly, SMG argues that the Court cannot order SMG to re-assemble temporary platforms in violation of NFL restrictions.[66]

### III. Legal Standard

A.    *Legal Standard for Summary Judgment*

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[60] *Id.* at 3.

[61] *Id.* at 4.

[62] *Id.*

[63] *Id.* at 4–5 (citing O'Byrne v. Reed, No. CV0908406DMGDTBX, 2010 WL 11596710, at *3 (C.D. Cal. Aug. 6, 2010); *No Barriers, Inc. v. Brinker Chili's Texas, Inc.*, 262 F.3d 496 (5th Cir. 2001)).

[64] *Id.* at 6.

[65] *Id.* at 6–7.

[66] *Id.* at 7.

as a matter of law."[67] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[68] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[69] If the record, as a whole, "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists, and the moving party is entitled to judgment as a matter of law.[70] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[71]

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[72] Thereafter, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[73] To withstand a motion for summary judgment, the nonmoving party must

---

[67] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[68] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[69] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[70] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[71] *See Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[72] *Celotex*, 477 U.S. at 323.

[73] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

show that there is a genuine issue for trial by presenting evidence of specific facts.[74] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[75] Rather, a factual dispute precludes a grant of summary judgment only if the evidence presented by the nonmovant is sufficient to permit a reasonable trier of fact to find for the nonmoving party.[76] Further, a court "resolve[s] factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[77] Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[78] Ultimately, summary judgment is appropriate in any case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."[79]

## B.      *ADA Compliance*

The Americans with Disabilities Act of 1990 ("ADA") "is a broad mandate of comprehensive character and sweeping purpose intended to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American

---

[74] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1996)).

[75] *Little*, 37 F.3d at 1075.

[76] *Anderson*, 477 U.S. at 248.

[77] *Little*, 37 F.3d at 1075.

[78] Fed. R. Civ. P. 56(c)(2); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987).

[79] *Armstrong v. City of Dallas*, 997 F.2d 62 (5th Cir. 1993).

life."[80] "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)."[81]

Title III provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[82] A stadium is considered to be a place of public accommodation under Title III.[83] Title III defines discrimination as including "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable."[84] The term "existing facilities" includes structures built prior to the Act taking effect on January 26, 1992, which have not been modified since then.[85]

The United States Attorney General is authorized to promulgate regulations implementing Title III.[86] Public accommodations must comply with both the Title III regulations set forth at 28 C.F.R. part 36, subpart D and the ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG") set forth at 36 C.F.R. part 1191, appendices B and D. Pursuant to the regulations, "[a]ny alteration to a place of public accommodation . . . after January 26, 1992, shall be made so

---

[80] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 599 (1999) (internal quotation marks omitted)).

[81] *PGA Tour*, 532 U.S. at 675.

[82] 42 U.S.C. § 12182(a).

[83] 42 U.S.C. § 12181(7)(C).

[84] 42 U.S.C. § 12182(b)(2)(A)(iv).

[85] *Tatum v. Doctor's Associates, Inc.*, No. CV 14–2980, 2016 WL 852458, at *3 (E.D.La. Mar. 4, 2016)

[86] 42 U.S.C. § 12186(b).

as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."[87] An alteration is defined as "a change to the place of public accommodation or a commercial facility that affects or could affect the usability of the building or facility or any part thereof."[88] "The ADA does not require a place of public accommodation to provide a plaintiff with the ideal or preferred accommodation; rather, the ADA requires that a defendant provide a plaintiff with an accommodation that is reasonable and permits the plaintiff to participate equally in the good, service, or benefit offered."[89]

Title III of the ADA applies to "any person who owns, leases (or leases to), or operates a place of public accommodation."[90] In an action under Title III of the ADA the Fifth Circuit explained that "[b]ecause the ADA does not define the term 'operates,' we 'construe it in accord with its ordinary and natural meaning.'"[91] The Fifth Circuit found that the term "operate" means "to put or keep in operation," "[t]o control or direct the functioning of," or "[t]o conduct the affairs of; manage."[92] The Fifth Circuit has held that the relevant inquiry is whether the defendant controls the modification of the public accommodation such that the defendant could cause the accommodation to comply with the ADA.[93] Conversely, "non-structural aspects" of the facility's

---

[87] 28 C.F.R. § 36.402(a)(1).

[88] 28 C.F.R. § 36.402(b).

[89] 1 Americans with Disab. Pract. & Compliance Manual § 4:1, Nondiscrimination Mandate.

[90] *See* 42 U.S.C. Section 12182(a)

[91] *Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063, 1066 (5th Cir. 1995) (quoting *Smith v. United States*, 508 U.S. 223 (1993); *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

[92] *Id.* (internal citations omitted).

[93] *Id.* at 1067; *see also Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 878 (9th Cir. 2004) ("whether Title III applies…depends on whether those private entities exercise sufficient control over the

operations, including accounting, personnel uniforms and use of trademarks, are irrelevant to the operator inquiry.[94]

<h2 style="text-align:center"><u>IV. Analysis</u></h2>

In the instant motion, SMG argues that it is entitled to summary judgment because: (1) SMG is not an "operator" capable of making the modifications Plaintiff requests, (2) Plaintiff's video monitor claims are not mentioned in the Complaint and SMG does not have the authority to change the content of the video monitors and (3) National Football League Regulations do not permit temporary seating on the field.[95] The Court will address each of these issues in turn.

*A.*     ***Whether SMG is an "operator" capable of making the modifications Plaintiff requests***

SMG argues that it does not have control over the alleged discriminatory conditions in the Superdome and can therefore not be held liable as an "operator" under Title III of the ADA.[96] Plaintiff argues that the contractual agreements between SMG and the Board show that SMG could effectuate the modifications Plaintiff suggested; therefore, Plaintiff contends that SMG is the operator of the Superdome.[97]

First, Plaintiff points to the depositions of Alan Freeman ("Mr. Freeman") and Doug Thornton ("Mr. Thornton") to demonstrate the level of control SMG maintains over the Superdome. Mr. Freeman, who was initially hired by SMG as a general manager of the Superdome, detailed the relationship between the Board and SMG. Mr. Freeman stated that while SMG

---

Center, and in particular over the configuration of the facilities, even temporarily, with regard to accessibility, that they can be said to 'operate' the stadium").

[94] *Neff*, 58 F.3d at 1067.

[95] Rec. Doc. 92.

[96] *Id.* at 1.

[97] Rec. Doc. 102 at 1.

"report[s] to a board . . . that board doesn't really have a lot of oversight relative to our operations."[98] Mr. Freeman stated that the Board "doesn't have any employees."[99] Mr. Freeman described SMG as a "company that manages on behalf of primarily municipal operations facilities such as stadiums, arenas, performing arts centers, and convention centers."[100] Mr. Freeman acknowledged that the Board must "approve any kind of capital expenditures that we propose to them"[101] and that SMG does not "have any legal right to undertake capital improvements at the Superdome without [the Board's] approval."[102] Mr. Thornton, another employee of SMG, stated that the Board "relies on SMG for operational best practices for maintenance and repair," and that SMG has "a lot of autonomy and flexibility with respect to operating the building."[103] Mr. Thornton also confirmed that the Board does not have any employees.[104]

Second, Plaintiff and the Board point to several agreements between SMG and the Board to demonstrate SMG's responsibility for managing and operating the Superdome. Pursuant to the initial Management Agreement,[105] the State of Louisiana "grant[ed] [SMG] . . . the exclusive right to perform and furnish or cause to be performed and furnished, from the effective date [t]hereof, all management, services, labor and materials needed to operate and maintain the Facility known

---

[98] Rec. Doc. 95-12 at 13-14.

[99] *Id.* at 15.

[100] *Id.* at 11.

[101] *Id.* at 14.

[102] *Id.* at 85.

[103] Rec. Doc. 102-2 at 27.

[104] *Id.* at 26.

[105] As the Board notes in its memo in support of its motion for summary judgment, HMC Management Corporation was the original "manager" under the initial Management Agreement. Rec. Doc. 92-8. SMG became the "manager" as a result of the Fourth Amendment to Management Agreement dated June 19, 1998. Rec. Doc. 92-12. The Management Agreement has been amended a total of seven times. *See* Rec. Docs. 92–8–92–15.

as the 'Louisiana Superdome', in the most efficient and profitable manner as can be reasonably expected."[106] The initial Management Agreement further provides under the section entitled "Capital Improvements Budget":

> At least six (6) months prior to the commencement of each Fiscal Year, [SMG] will submit a budget for such Fiscal Year setting forth projected Capital Expenditures. This budget will be subject to the procedures customarily employed in connection with the development, approval and implementation of budgets for operating agencies of the State. In addition, when [SMG] becomes aware, [SMG] will advise the State of any unanticipated condition which jeopardizes the structural soundness of the Superdome, or the ability of [SMG] to perform under this agreement, and the State agrees to make available the funds necessary to correct such conditions, within such time as required under the circumstances.[107]

"Capital Expenditures" are defined in the Management Agreement as "all expenditures for building additions, alterations or improvements, and for purchases of additional or replacement furniture, machinery or equipment, the depreciable life of which, according to accepted accounting principles, is in excess of one (1) year and expenditures for maintenance or repairs which extend the useful life of the assets being maintained or repaired for a period in excess of one year."[108]

Pursuant to the Amended and Restated Support Services Agreement, the Board delegated to SMG responsibility for certain services.[109] For example, the "Asset Management" section states:

> SMG shall provide all asset management services relating to the Facilities and other properties of the LSED, including maintenance of inventory control; oversight of the condition and maintenance requirements of the Facilities; to the extent that funds supplied by the LSED are made available therefor and the LSED has authority with respect thereto, see that the Facilities are maintained in good order and condition; to the extent that funds supplied by the LSED are made available therefor, rent, lease or purchase all equipment and maintenance supplies necessary or appropriate for the performance of the LSED's obligations with respect to the operation and maintenance of the Facilities; manage all maintenance and capital

---

[106] Rec. Doc. 92-8 at 2.

[107] *Id.* at 5–6.

[108] *Id.* at 1.

[109] Rec. Doc. 92-17 at 2–4.

projects undertaken by the LSED with respect to the Facilities; and otherwise perform all services necessary or useful in preserving and protecting the assets of the LSED. In addition, SMG shall manage any capital projects undertaken by the LSED with respect to the Superdome and the Arena to the extent such function is not already within the scope of SMG's duties and authority under the State Management Agreement.[110]

Furthermore, under the Amended and Restated Support Services Agreement SMG is obligated to "prepare and submit to the LSED . . . each year, proposed capital expenditures with respect to the facilities," as well as "a detailed budget for capital projects recommended to be undertaken. . ."[111]

Title III of the ADA applies to "any person who owns, leases (or leases to), or operates a place of public accommodation."[112] In an action under Title III of the ADA the Fifth Circuit explained that "[b]ecause the ADA does not define the term 'operates,' we 'construe it in accord with its ordinary and natural meaning.'"[113] The Fifth Circuit found that the term "operate" means "to put or keep in operation," "[t]o control or direct the functioning of," or "[t]o conduct the affairs of; manage."[114] The Fifth Circuit has held that the relevant inquiry is whether the defendant controls the modification of the public accommodation such that the defendant could cause the accommodation to comply with the ADA.[115] Conversely, "non-structural aspects" of the facility's operations, including accounting, personnel uniforms and use of trademarks, are irrelevant to the

---

[110] *Id.* at 2–3.

[111] *Id.* at 5.

[112] *See* 42 U.S.C. § 12182(a)

[113] *Neff*, 58 F.3d at 1066 (quoting *Smith*, 508 U.S. at 223; *Perrin*, 444 U.S. at 42 (1979).

[114] *Id.* (internal citations omitted).

[115] *Id.* at 1067; *see also Disabled Rights Action Comm.*, 375 F.3d at 878 (9th Cir. 2004) ("whether Title III applies…depends on whether those private entities exercise sufficient control over the Center, and in particular over the configuration of the facilities, even temporarily, with regard to accessibility, that they can be said to 'operate' the stadium"); *Colon v. League of United Latin Am. Citizens*, 91 F.3d 140 (5th Cir. 1996) ("[T]o be an 'operator' requires more than simply controlling some aspect of a public accommodation. Rather, the person must have control over the modification sought by the plaintiff.").

operator inquiry.[116]

SMG argues that pursuant to the Management Agreement and the Amended and Restated Support Services Agreement, SMG cannot be said to "operate" the Superdome because SMG is unable to implement Plaintiff's proposed modifications without Board approval.[117] While the Management Agreement does stipulate that the Board retains the ultimate authority to approve any capital expenditures, the Management Agreement also provides that "the State agrees to make available the funds necessary to correct . . . any unanticipated condition which jeopardizes the structural soundness of the Superdome, or the ability of [SMG] to perform under this agreement. . ."[118] The issue is whether the record shows sufficient control on SMG's part such that SMG can be said to "operate" the Superdome with respect to the ability to comply with the ADA.[119] The Court finds that a reasonable juror could conclude that it does, particularly where SMG has "the exclusive right to perform and furnish or cause to be performed and furnished . . . all management, services, labor and materials needed to *operate* and maintain the" Superdome.[120]

The deposition testimony of Mr. Freeman and Mr. Thornton as well as the language in the above-mentioned agreements establishes a genuine issue of material fact over whether SMG has sufficient control such that it "operates" the Superdome. The Management Agreement and the Amended and Restated Support Services Agreement paint a picture of one entity, SMG, evaluating problems and recommending solutions and another entity, the Board, approving or rejecting those solutions. In this way, the relationship between the Board and SMG is symbiotic. The Board is

---

[116] *Neff*, 58 F.3d at 1067.

[117] Rec. Doc. 92-1 at 4–8.

[118] Rec. Doc. 92-8 at 5–6.

[119] *Id.* at 2.

[120] *Id.*

comprised of seven individuals appointed by the governor and has no employees.[121] On the other hand, SMG is responsible for providing budgets, maintaining the facility, and managing all maintenance and capital projects undertaken by the Board.[122] This is not a case of a "franchisor with limited control over a franchisee's store."[123] Rather, SMG exercises fairly significant control over the functioning and day-to-day operation of the Superdome. Accordingly, summary judgment is inappropriate because genuine issues of material fact exist regarding SMG's level of control over the Superdome.

**B.    *Plaintiff's Video Monitor Claims***

Next, SMG takes issue with the suggestion of Plaintiff's expert, Mr. Terry, that "Defendants should modify the content of video programming shown on monitors in the Superdome during Saints games to comply with the ADA's 'effective communication' requirements."[124] First, SMG contends that Plaintiff did not include an "effective communication" claim in the Complaint, and the claim should be rejected for this omission.[125] Second, SMG argues that the evidence establishes that the Saints organization, not SMG, controls the content displayed on the monitors in the Superdome during Saints games.[126] SMG contends that because it does not have the authority to implement this proposed solution, it should be dismissed.[127] In response,

---

[121] Rec. Doc. 102-2 at 26.

[122] Rec. Doc. 92-17 at 2–3.

[123] *Neff*, 58 F.3d at 1066.

[124] Rec. Doc. 92-1 at 13.

[125] *Id.* (citing *Johnson v. Thibodaux City*, 887 F.3d 726, 736 (5th Cir. 2018) ("[T]he plaintiffs may not defeat summary judgment on the basis of a theory found nowhere in their complaint, at least without also moving to amend or absent trial by consent.").

[126] *Id.* (citing Rec. Doc. 92-18).

[127] *Id.* at 13–14 (citing *Neff*, 58 F.3d at 1068-69).

Plaintiff argues that his claims about the Jumbotron are in the Complaint.[128] Furthermore, Plaintiff contends that while the Saints may control the content on the Jumbotron, the size of the physical monitors is what Plaintiff complains about and what SMG can remedy.[129] In response, SMG argues that the readability of the television monitors were not included in the Complaint and that the Saints have exclusive control over the Communication Systems.[130]

In his expert report, Mr. Terry was asked to consider whether "all information provided on the large scoreboards communicated effectively to people with mobility disabilities, particularly those who sit in Row 36 of the 100 Level seating sections, in compliance with Sections 35.160 and 36.303 of the ADA regulations?"[131] Mr. Terry answered that "[t]he scoreboard is completely obscured by the overhang for wheelchair users . . . sitting on Row 36," whereas "comparable spectators . . . had almost full views of the scoreboard [and] could see all of the information communicated there."[132] To remedy this problem, Mr. Terry states that the "Superdome has installed TV monitors under the overhang [but] [t]hese TV monitors do not communicate effectively because they do not contain all of the same information that is shown on the large scoreboards over the end zones. Rather, the TV monitors show the game action and instant replays, but not all of the statistics, out-of-town scores, and other information that is shown on the large scoreboards."[133] Mr. Terry also recommends that Defendants "[v]erify that the size and spacing of

---

[128] Rec. Doc. 102 at 12 (citing Rec. Doc. 1).

[129] *Id.*

[130] Rec. Doc. 121 at 3.

[131] Rec. Doc. 92-2 at 6.

[132] *Id.* at 23.

[133] Rec. Doc. 92-2 at 23.

those monitors allow at least the same level of readability as that provided for spectators who can see the large scoreboards from the same sections."[134]

First, SMG's argues that Plaintiff did not include an "effective communication" claim in the Complaint, and that the claim should be rejected for this omission.[135] The Complaint states "[a]s an individual with a disability assigned to the accessible seating at Section 109, Row 36, MR. BAILEY has an obstructed view and cannot see these video screens. MR. BAILEY is denied access to and enjoyment of this fan amenity due his status as a person with a disability."[136] SMG points to *Johnson v. Thibodaux City* for the proposition that "plaintiffs may not defeat summary judgment on the basis of a theory found nowhere in their complaint, at least without also moving to amend or absent trial by consent."[137] However, this is not a case of a plaintiff asserting an entirely different, previously unalleged legal theory at the summary judgment stage in order to survive the motion for summary judgment.[138] Plaintiff did not asset these claims for the first time in response briefing to SMG's motion to simply defeat summary judgment. Rather, the claim that Plaintiff has an obstructed view of the video screens was alleged in the Complaint.[139] Accordingly, summary judgment is inappropriate on this basis.

---

[134] *Id.* at 29.

[135] Rec. Doc. 92-1 at 13 (citing *Johnson v. Thibodaux City*, 887 F.3d 726, 736 (5th Cir. 2018) ("[T]he plaintiffs may not defeat summary judgment on the basis of a theory found nowhere in their complaint, at least without also moving to amend or absent trial by consent.").

[136] Rec. Doc. 1 at 9.

[137] *Johnson*, 887 F.3d at 736.

[138] *See, e.g.*, *Yarbrough v. Hunt Southern Group, LLC*, 2019 WL 4345990, No. 1:18cv51-LG-RHW (S.D. Miss., Sept. 12, 2019) (dismissing plaintiff's claims for negligent infliction of emotional distress and intentional infliction of emotional distress, asserted for the first time in their response briefing to the defendants' summary judgment motions).

[139] Rec. Doc. 1 at 9.

Second, the Court addresses SMG's argument that the Saints organization, not SMG, controls the content displayed on monitors in the Superdome during Saints games.[140] SMG argues that the Stadium Agreement makes clear that SMG does not control the content of the information displayed on the monitors during Saints games and therefore cannot implement Plaintiff's proposed modifications.[141] The stadium agreement provides that "the Club [the Saints] shall have exclusive use and control of all Signage and Communication Systems that are the property of the State or the LSED and that are customarily made available to the Club for its use during Club Events."[142] Plaintiff argues that while the Saints control the content of the monitors, Plaintiff's complaint is focused on the size and placement of the monitors.[143] Based on the operator analysis above, there are genuine issues of material fact in dispute regarding SMG's level of control over the physical nature of the monitors, including the size of those monitors and their placement in the Superdome. Accordingly, to the extent Plaintiff's claim is about the physical nature of the monitors, those claims are inappropriate for summary judgement. However, Plaintiff seems to concede that SMG does not have any control over the content displayed on the monitors during the game.[144] Therefore, summary judgment is appropriate to the extent Plaintiff's claims are related to the content of the video monitors. Accordingly, those claims are dismissed with prejudice.

---

[140] Rec. Doc. 92-1 at 13 (citing Rec. Doc. 92-18).

[141] *Id.* at 13–14.

[142] Rec. Doc. 92-18 at 31.

[143] Rec. Doc. 102 at 12.

[144] *Id.* ("Furthermore, while the Saints may control the content of the television monitors during the games, Mr. Bailey testified in his deposition that the television monitors are so small that he cannot see them. The Saints may have control of the communications systems, but the physical monitors that Mr. Bailey claims are too small are not the responsibility of the Saints any more than the Jumbotron is.").

## C.    *National Football League Regulations Regarding Field Access*

Lastly, SMG argues that the recommendation of Plaintiff's expert that the temporary ADA platforms be reinstalled on the field cannot be implemented because National Football League regulations prohibit any such field access.[145] In support, SMG points to the deposition of Alan Freeman who stated "I don't know if the NFL had any input relative to do those temporary seats stay on the field. I will tell you they do not allow us today to sell any seats on the field."[146] Plaintiff first contends that the ADA trumps the National Football League regulations.[147] Next, Plaintiff argues that having triggered the alteration standard, Defendants must comply with applicable ADA regulations.[148] Plaintiff contends that his expert's suggestion of replacing the ADA platforms is merely one possible solution.[149]

For the reasons set forth in the Court's Order and Reasons on Defendant's Motion for Summary Judgment on all of Plaintiff's Remaining Claims,[150] Defendants are subject to the heightened alteration standard as to the portions of the facility where an alteration occurred and were required to make any alterations "readily accessible" to individuals with disabilities to the "maximum extent feasible."[151] Under this standard, the altered portion of the facility must comply

---

[145] Rec. Doc. 91-1 at 8.

[146] Rec. Doc. 95-12 at 31.

[147] Rec. Doc. 102 at 11.

[148] *Id.* at 11–12.

[149] *Id.* at 11.

[150] Rec. Doc. 140.

[151] 28 C.F.R. § 36.402(c). *See also* 28 C.F.R. § 35.151(b)(1).

fully with applicable accessibility standards and the ADAAG unless it is "virtually impossible"[152] If compliance is virtually impossible, "the alteration shall provide the maximum physical accessibility feasible."[153] Importantly, "[a]ny altered features of the facility that can be made accessible shall be made accessible."[154] National Football League regulations do not alter this obligation. Accordingly, summary judgment is inappropriate on this basis.

## V. Conclusion

For the reasons discussed above, Defendants' motion for summary judgment must be denied because genuine issues of material fact exist regarding SMG's level of control over the Superdome such that SMG could be considered the operator of the Superdome. Additionally, the Court finds summary judgement inappropriate as to Plaintiff's claims regarding the physical size and location of the video monitors; however, summary judgment is appropriate to the extent Plaintiff is bringing a claim regarding the content on the video monitors. Lastly, National Football League regulations do not alter Defendant's obligation to comply fully with applicable accessibility standards and the ADAAG unless it is virtually impossible.

Accordingly,

**IT IS HEREBY ORDERED** that SMG's "Motion for Summary Judgment on Modifications"[155] is **GRANTED IN PART** and **DENIED IN PART**.

---

[152] 28 C.F.R. § 36.402(c).

[153] *Id.*

[154] *Id.*

[155] Rec. Doc. 92.

**IT IS FURTHER ORDERED** that the motion is **GRANTED** to the extent that Defendants seek dismissal of Plaintiff's claim regarding the content, as opposed to the physical size and location, of the video monitors. The claim regarding the content of the video monitors is **DISMISSED WITH PREJUDICE.** The motion is **DENIED** in all other respects.

**NEW ORLEANS, LOUISIANA**, this <u>21st</u> day of February, 2020.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**