## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**SHELBY BAILEY**                                          **CIVIL ACTION**

**VERSUS**                                                **CASE NO. 18-5888**

**BOARD OF COMMISSIONERS OF THE LOUISIANA**             **SECTION: "G"(2)**
**STADIUM AND EXPOSITION DISTRICT, ET AL.**

### ORDER AND REASONS

Pending before the Court is Plaintiff Shelby Bailey's "Motion for Partial Summary Judgment."[1] Defendants SMG and Kyle France ("France") oppose the motion.[2] Plaintiff filed a complaint alleging that Defendants as the owners and operators of the Mercedes-Benz Superdome (the "Superdome"), failed to provide him with handicap accessible seating during New Orleans Saints (the "Saints") football games.[3] In the instant motion, Plaintiff argues that he is entitled to summary judgment as to the following alleged violations of the alteration requirements of the Americans with Disabilities Act: (1) sightline obstructions at 100 Level, Row 1; (2) sightline obstructions at 100 Level, Row 36; (3) inadequate amount of accessible seating at the 100 Level; (4) making the Superdome less accessible to individuals with mobility-related disabilities; (5) making the 200 Level less accessible; and (6) failure to provide sufficient accessible seating stadium wide.[4] Considering Plaintiff's motion, the memoranda in support and opposition, the record, and the applicable law, the Court denies the motion.

---

[1] Rec. Doc. 95.

[2] Rec. Docs. 105, 106. On February 21, 2020, the Court dismissed the Board of Commissioners of the Louisiana Stadium and Exposition District (the "Board") as a party. Rec. Doc. 144.

[3] Rec. Doc. 1.

[4] Rec. Doc. 95.

# I. Background

On June 14, 2018, Plaintiff filed a Complaint in this Court naming as defendants SMG as the operator of the Superdome, the Board as the owner of the Superdome, and France in his official capacity as chairman of the Board.[5] Plaintiff brings claims against the Board and France for declaratory and injunctive relief pursuant to Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act, 29 U.S.C. §794, *et seq.*[6] Plaintiff brings claims against SMG for declaratory and injunctive relief pursuant to Title III of the ADA.[7] Plaintiff also seeks recovery of attorneys' fees and costs.[8]

According to the Complaint, Plaintiff has a disability and relies on an electric wheelchair for mobility.[9] Plaintiff alleges that he has been a Saints season ticket holder for over 30 years.[10] Plaintiff alleges that prior to 2011, his seat was located on a wheelchair accessible raised platform in the 100 Level section of the Superdome.[11] Plaintiff alleges that in 2011, Defendants began extensive renovations on the Superdome and reconfigured the accessible seating section for patrons with disabilities.[12] Plaintiff alleges that as a result of the renovations, the wheelchair accessible seating at the Superdome was moved to other positions where the views are obstructed

---

[5] Rec. Doc. 1.

[6] *Id.* at 1–2.

[7] *Id.* at 2.

[8] *Id.*

[9] *Id.* at 4.

[10] *Id.*

[11] *Id.*

[12] *Id.*

by barriers and other patrons or players standing during the game, or the seating is not fully accessible by wheelchair.[13]

Plaintiff alleges that Defendants have been on notice of ongoing accessibility issues for many years.[14] According to the Complaint, in 2008 the United States Department of Justice conducted an inspection of the Superdome and issued a report detailing violations of ADA regulations.[15] Additionally, Plaintiff alleges that Defendants were sued by private litigants in 2018 regarding ongoing accessibility violations.[16]

As a result, Plaintiff alleges that Defendants have failed to comply with various parts of the ADA and Rehabilitation Act.[17] Plaintiff seeks compensatory and nominal damages along with declaratory and injunctive relief, and attorneys' fees.[18]

On December 13, 2019, the Court granted in part and denied in part Defendant SMG's Motion for Judgment on the Pleadings.[19] Accepting as true the allegations in the Complaint, the Court found that SMG could be held liable as an operator of the Superdome because SMG controls modification of the Superdome and could cause the Superdome to comply with the ADA.[20] Additionally, viewing the allegations in the Complaint in the light most favorable to Plaintiff, the Court found that Plaintiff's claims for injunctive and declaratory relief were timely because the

---

[13] *Id.* at 4–8.

[14] *Id.* at 10.

[15] *Id.*

[16] *Id.* at 10–11.

[17] *Id.* at 11–29.

[18] *Id*. at 1.

[19] Rec. Doc. 86.

[20] *Id*. at 24.

Complaint was filed within one year of SMG allegedly denying Plaintiff "the full and equal enjoyment" of a place of public accommodation.[21] However, the Court found that Plaintiff's claim regarding future renovations was not ripe for judicial review.[22] Accordingly, the Court granted the motion to the extent it sought dismissal of Plaintiff's claim regarding future renovations but denied the motion in all other respects.[23]

Plaintiff filed the instant motion on December 31, 2019. SMG filed an opposition on January 7, 2020. France filed an opposition on January 7, 2020. Plaintiff, with leave of Court, filed a reply to SMG's opposition to the motion on January 17, 2020. At the request of the parties, the Court heard oral argument on this motion on February 4, 2020 at 10:00 a.m.[24]

## II. Parties' Arguments

### A. Plaintiff's Arguments in Support of the Motion

In the instant motion, Plaintiff argues that he is entitled to summary judgment as to the following alleged violations of the alteration requirements of the ADA: (1) sightline obstructions at 100 Level, Row 1; (2) sightline obstructions at 100 Level, Row 36; (3) inadequate amount of accessible seating at the 100 Level; (4) making the Superdome less accessible to individuals with mobility-related disabilities; (5) making the 200 Level less accessible; and (6) failure to provide sufficient accessible seating stadium wide.[25]

---

[21] *Id*. at 24–25.

[22] *Id*. at 25.

[23] *Id*.

[24] Rec. Doc. 134.

[25] Rec. Doc. 95.

### 1. Standing

First, Plaintiff asserts he has standing to pursue his claim for injunctive relief.[26] Plaintiff states he attended nine Saints games in the year prior to filing this lawsuit and ten games since the case was filed.[27] He asserts that he intends to attend Saints games at the Superdome in the future.[28] Therefore, Plaintiff contends that he has standing to seek injunctive relief under the "intent to return" test.[29]

### 2. Plaintiff Asserts he is a Qualified Individual

Second, Plaintiff argues he is a qualified individual with a disability.[30] Plaintiff presents his affidavit, which states that he has muscular dystrophy and is unable to breathe, stand or walk.[31] As a result, Plaintiff attests he has to rely on a ventilator to breathe and a wheelchair for mobility.[32] Thus, Plaintiff contends he is a qualified individual with a disability within the meaning of the ADA.[33]

### 3. Plaintiff Contends He is Being Denied the Benefits of a Place of Public Accommodation

Third, Plaintiff asserts he is being denied the benefits of a place of public accommodation.[34] Plaintiff contends he does not have an equal opportunity to view and enjoy football games and the

---

[26] Rec. Doc. 95-1 at 12–13.

[27] *Id.* at 13.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* at 14 (citing Rec. Doc. 95-4).

[32] *Id.*

[33] *Id.*

[34] *Id.*

attendant screens at the Superdome in a manner comparable to non-disabled persons due to impermissible barriers to access.[35] Plaintiff points to his deposition testimony stating that he cannot see the field when patrons in front of him are standing, and concrete overhangs prevent him from seeing the scoreboard and all aerial gameplay.[36] Plaintiff contends that Mr. Kevin McGuire, an ADA consultant, confirmed these sight line issues during his deposition.[37] Therefore, Plaintiff asserts there are no material facts in dispute and he is entitled to summary judgment on the following violations of the alteration requirements of the ADA violations at the facility: (1) sightline obstructions at 100 Level, Row 1; (2) sightline obstructions at 100 Level, Row 36; (3) inadequate amount of accessible seating at the 100 Level; (4) making the Superdome less accessible to individuals with mobility-related disabilities; (5) making the 200 Level less accessible; and (6) failure to provide sufficient accessible seating stadium wide.[38]

First, as to the sightline obstruction at Level 100, Row 1, Plaintiff points to his expert, James Terry's finding that wheelchair users on the lowered platforms in Section 115 could see none of the field over the tops of the heads of average height people standing on the sidelines while comparable non-disabled spectators could see 69% of the field.[39] Second, as to the sightline obstruction at Level 100, Row 36, Plaintiff points to Mr. Terry's finding that wheelchair users on Row 36 in the back of Section 114 could see 78% of the field over the tops of the heads of average height people standing two rows ahead of them on Row 34 while comparable spectators on row

---

[35] *Id.*

[36] *Id.* (citing Rec. Doc. 95-11).

[37] *Id.* (citing Rec. Doc. 95-13).

[38] *Id.* at 15–21.

[39] *Id.* at 15 (citing Rec. Doc. 92-2 at 15).

35 could see 98% of the field.[40] Third, regarding the inadequate amount of accessible seating at the 100 Level, Plaintiff points to evidence showing that there are presently 25,460 seats, of which a total of 236 are designated as wheelchair-accessible seats, but Plaintiff contends that Defendants are required to have 256 wheelchair-accessible designated seats under the ADAAG formula.[41] Fourth, Plaintiff argues that Defendants made the Superdome less accessible by removing the ADA Platforms.[42] Fifth, Plaintiff argues that Defendants made the Superdome less accessible by removing wheelchair accessible seats at the 200 Level.[43] Sixth, Plaintiff asserts that by eliminating the ADA Platforms and renovating the 100 and 200 Levels, Defendants performed modifications that affect or could affect the overall usability of the Superdome.[44]

  **4.**  **Plaintiff Asserts the Discrimination Against Him is by Reason of His Disability**

  Plaintiff contends that he has been unable to fully utilize and experience the services offered at the Superdome due to the impermissible barriers to access.[45] But for the physical barriers, Plaintiff asserts he would have been able to see the game, the on-field plays, and the jumbotron.[46] Therefore, Plaintiff argues he experienced discrimination and exclusion "by reason of his disability."[47]

---

[40] *Id.* at 16 (citing Rec. Doc. 92-2 at 15).

[41] *Id.* at 18 (citing Rec. Doc. 92-3 at 25).

[42] *Id.*

[43] *Id.* at 19.

[44] *Id.*

[45] *Id.* at 22.

[46] *Id.*

[47] *Id.*

### 5. Plaintiff Argues SMG is an Operator of the Superdome

Plaintiff asserts SMG is liable as an operator of the Superdome.[48] Plaintiff contends SMG has engaged in various conduct that clearly shows that it controls, directs, and manages the Superdome.[49] Further, Plaintiff argues SMG could cause the Superdome to comply with the ADA.[50] In support, Plaintiff points to the deposition testimony of Alan Freeman, the Manager of the Superdome.[51] During his deposition, Mr. Freeman acknowledged that although SMG reports to the Board, the Board "doesn't really have a lot of oversight relative to our operations."[52] Plaintiff also notes that SMG had a construction manager during the 2010 renovations.[53] Plaintiff contends SMG's contract with the Saints also supports the position that SMG is an operator of the Superdome.[54] Accordingly, Plaintiff argues SMG is clearly serving as the operator of the Superdome and thus must ensure that the Superdome complies with the requirements of Title III of the ADA.[55]

### B. SMG's Arguments in Opposition to the Motion

SMG argues that Plaintiff's motion for summary judgment should be denied for five principal reasons.[56] First, SMG asserts it is not an operator under Title III for purposes of Plaintiff's

---

[48] *Id.*

[49] *Id.* at 23.

[50] *Id.*

[51] *Id.* at 23–24 (citing Rec. Doc. 95-12).

[52] *Id.*

[53] *Id.* at 24.

[54] *Id.*

[55] *Id.* at 25.

[56] Rec. Doc. 105.

claims.[57] Second, SMG contends Plaintiff's motion focuses solely on the alleged failure to make alterations that comply with the ADA "to the maximum extent feasible," but Plaintiff did not include any such claims against SMG in his Complaint, and any such alteration claims are prescribed.[58] Third, SMG asserts Plaintiff has not presented any evidence to support a finding that removal of any architectural barrier is readily achievable.[59] Fourth, even assuming that Plaintiff has a viable alteration claim, SMG argues Plaintiff has not satisfied his burden of showing he is entitled to summary judgment.[60] Finally, SMG contends Plaintiff's alteration claims are barred by the doctrine of laches.[61] Accordingly, SMG asserts Plaintiff's motion should be denied and SMG's previously filed motion for summary judgment should be granted.[62]

## 1. SMG Asserts it is not an Operator under Title III

First, SMG adopts the arguments made in its motion for summary judgment that it cannot be considered an operator for purposes of Plaintiff's claims.[63] SMG adds in this opposition that Plaintiff has altogether failed to demonstrate in any way that SMG has the ability to make the construction-related modifications he asserts are required to remedy Plaintiff's claims of discrimination.[64] SMG points to the deposition testimony of Alan Freeman, the General Manager of the Superdome, that SMG does not "have any legal right to undertake capital improvements at

---

[57] *Id.* at 9.

[58] *Id.*

[59] *Id.* at 9–10.

[60] *Id.* at 10.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

the Superdome without LSED approval."[65] SMG asserts that the evidence shows that the Board decides on and approves projects and that SMG oversees the logistics of those projects' completion.[66] SMG contends because it cannot require the Board to implement Plaintiff's requested modifications, it is not an "operator" under Title III.[67]

### 2. SMG Asserts Plaintiff does not have a Viable Alteration Claim

Second, SMG contends Plaintiff's motion focuses solely on the alleged failure to make alterations that comply with the ADA "to the maximum extent feasible," but Plaintiff did not include any such claims against SMG in his Complaint, and any such alteration claims are prescribed.[68] SMG points to this Court's prior holding that "Plaintiff's claims for injunctive and declaratory relief appear to be timely because the Complaint was filed within one year of SMG allegedly denying Plaintiff 'the full and equal enjoyment' of a place of public accommodation."[69] SMG concedes that Plaintiff raised architectural-barrier and alteration claims in the Complaint, but asserts that the Complaint only brings an alterations claim against the Board and France.[70]

Regardless, SMG asserts that Plaintiff's alterations claims are time-barred and that only the architectural-barrier claims remain viable.[71] SMG argues that an operator of an existing facility "has a continuing duty to meet the existing facilities standards" by removing architectural barriers when such removal is readily achievable, but as to alterations the limitations period runs from the

---

[65] *Id.* (citing Rec. Doc. 95-12).

[66] *Id.* at 11.

[67] *Id.*

[68] *Id.* at 9.

[69] *Id.* at 12 (citing Rec. Doc. 86 at 20).

[70] *Id.* at 13 (citing Rec. Doc. 1 at ¶ 101).

[71] *Id.*

first date on which the plaintiff experiences the allegedly discriminatory alteration.[72] Therefore, to the extent Plaintiff experienced discrimination on the basis that there was a failure in 2010 and 2011 to make alterations in such a manner that, to the maximum extent feasible, were readily accessible to and usable by individuals with disabilities, SMG asserts Plaintiff was subjected to that discrimination in 2011 and his "alteration" claims prescribed in 2012.[73]

### 3. SMG Contends Plaintiff did not Show Removal of any Architectural Barrier is Readily Achievable

SMG notes that "Plaintiff makes no argument concerning any alleged discrimination by Defendants for failing to remove an architectural barrier when such removal was readily achievable."[74] Nevertheless, SMG argues that Plaintiff would not be entitled to summary judgment on any architectural-barrier claim because Plaintiff cannot provide any evidence showing that removing any alleged architectural barrier is readily achievable.[75]

### 4. SMG Argues that Plaintiff has not Shown that he is Entitled to Summary Judgment on the Alterations Claims

Fourth, even assuming that Plaintiff has a viable alterations claim, SMG argues Plaintiff has not satisfied his burden of showing he is entitled to summary judgment.[76] SMG asserts that even under the alterations standard, Plaintiff failed to demonstrate that the facility could have been, but was not, made "readily accessible" or to state a plausible accommodation.[77] According to

---

[72] *Id.* at 14–15 (citing *Speciner v. NationsBank, N.A.*, 215 F. Supp. 2d 622, 630 (D. Md. 2002); *De La Rosa v. Lewis Foods of 42nd Street, L.L.C.*, 124 F. Supp. 3d 290, 300 (S.D.N.Y. 2015)).

[73] *Id.* at 15.

[74] *Id.*

[75] *Id.* at 15–16.

[76] *Id.* at 10.

[77] *Id.* at 17 (citing *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370, 372 (2d Cir. 2008)).

SMG, Plaintiff should be required to identify a violation and a plausible proposed remedy before putting Defendants to the task of negating every potential solution that might have been considered.[78] Although Plaintiff's expert, James Terry, provided a list of "solutions," SMG argues that Mr. Terry provided no analysis with respect to whether those solutions were plausible or whether they would enhance accessibility.[79] Therefore, SMG asserts Plaintiff failed to satisfy his initial burden with respect to any alterations claims.[80]

Alternatively, SMG argues that Plaintiff has not carried his burden of establishing that he is entitled to summary judgment on each of the six individual ADA violations asserted by Plaintiff.[81] First, as to the sightline obstruction at Level 100, Row 1, SMG points to Defendants' expert, Mark Mazz's finding that providing a "comparable view of the field" is virtually impossible and that an existing "continuous lateral support beam" prevents raising the front-row platform an additional six inches.[82] Second, as to the sightline obstruction at Level 100, Row 36, SMG points to Mr. Mazz's finding that these seats do provide comparable lines of sight to the field.[83] Third, regarding the inadequate amount of accessible seating at the 100 Level, SMG asserts this issue was not raised in the Complaint, and Plaintiff has not proposed where 20 additional seats might be placed.[84] Fourth, as to removing the on-field platforms, SMG asserts that Plaintiff has failed to satisfy his burden to show that the seating was made "less" accessible or that Defendants had

---

[78] *Id.* at 18.

[79] *Id.*

[80] *Id.*

[81] *Id.* at 19.

[82] *Id.* at 19 (citing Rec. Doc. 105-2 at 8–9).

[83] *Id.* (citing Rec. Doc. 105-2 at 9–10).

[84] *Id.* at 20.

anything to do with the decision to move the seats.[85] Fifth, regarding the alleged removal of wheelchair accessible seats at the 200 Level, SMG asserts that this is not an alteration because the 200 Level never had wheelchair accessible seats.[86] Sixth, SMG contends that Plaintiff has provided no basis for applying a heightened alterations standard to the entire Superdome based solely on changes to the 100 Level (and speculative changes to the 200 Level).[87]

### 5. SMG Contends the Alterations Claims are barred by the Doctrine of Laches

Finally, SMG argues that because Title III only permits injunctive relief against an operator of a public accommodation, which is an equitable remedy, such relief is subject to the equitable defense of laches.[88] SMG asserts that the delay in filing suit is unreasonable because Plaintiff first voiced his accessibility concerns in 2011 but did not file suit because he did not want to sue his favorite football team, the Saints.[89] Additionally, SMG contends that the delay has resulted in prejudice to SMJ because it has lost evidence through the passage of time.[90] Accordingly, SMG argues that Plaintiff's claims are barred by laches.[91]

### C. *France's Arguments in Opposition to the Motion*

In opposition to the motion, France argues that: (1) Plaintiff lacks standing to pursue all relief for which he prays; (2) Plaintiff has failed to meet his threshold burden of proof under the

---

[85] *Id.*

[86] *Id.* at 21–22.

[87] *Id.* at 23.

[88] *Id.* at 23–24.

[89] *Id.* at 24.

[90] *Id.* at 25.

[91] *Id.*

ADA; and (3) Plaintiff is not entitled to judgment as a matter of law on his claims against France because Plaintiff is not being "denied the benefits of a place of public accommodation."[92]

### 1.  France Asserts Plaintiff Lacks Standing to Pursue these Claims

First, France argues that Plaintiff is confined to seeking redress for only the alleged violations and physical barriers that he personally encountered.[93] According to France, Plaintiff admits he only personally experienced the sightline obstructions at 100 Level, Row 1 and the sightline obstructions at 100 Level, Row 36.[94] Therefore, France asserts that summary judgment must be denied with respect to Plaintiff's other alterations claims, as he lacks standing to raise such claims.[95]

### 2.  France Asserts Plaintiff has Failed to Establish his Threshold Burden of Proof

France contends Plaintiff has not met his initial burden of proving that the alterations are readily achievable.[96] France argues that Plaintiff has failed to produce any evidence that the solutions proposed by his expert, James Terry, are plausible or that the cost of the proposed modifications do not clearly exceed their benefits.[97] France contends that the proposals made by Mr. Terry are at most conceptual and are unaccompanied by estimates of the costs of implementation or information on the relative priority of any proposed alterations.[98] As such, France asserts Plaintiff has failed to establish an essential element of the claims on which he alone

---

[92] Rec. Doc. 106 at 4–14.

[93] *Id.* at 4.

[94] *Id.* at 4–5.

[95] *Id.* at 5.

[96] *Id.*

[97] *Id.* at 7.

[98] *Id.* at 8.

bears the burden of proof at trial, and his claims must be dismissed.[99]

Additionally, France argues that none of the proposed modifications were identified in Plaintiff's pre-suit correspondence to Defendants.[100] As such, France asserts Plaintiff failed to place Defendants on notice of the modifications he was requesting, and Defendants could not determine whether they could reasonably provide such modifications.[101]

### 3. France Argues Plaintiff is not being Denied the Benefits of a Place of Public Accommodation

Third, France asserts Plaintiff is not entitled to judgment as a matter of law on his claims against France because Plaintiff is not being "denied the benefits of a place of public accommodation."[102] Defendants contend Mark Mazz's report squarely refutes Plaintiff's principal arguments in support of his claims against France, and directly disputes the expert findings of Plaintiff's expert, James Terry.[103] For example, Defendants point to Mr. Mazz's opinion that the 100 Level, Row 36 spaces "do provide comparable lines of sight to the field" over standing patrons.[104] France also points to Mr. Mazz's opinion that it "is structurally impracticable and technically infeasible to provide comparable lines of sight of high punts to wheelchair spaces in the rear of the 100 Level."[105] With respect to the seats at Level 100, Row 1, France points to Mr. Mazz's opinion that "[t]he wheelchair spaces are not 6 inches lower that the other front row seats to protect the lines of sight of the seated spectators in the Row 4, the first row behind the wheelchair

---

[99] *Id.* at 7–8.

[100] *Id.* at 10.

[101] *Id.*

[102] *Id.* at 11.

[103] *Id.* at 12.

[104] *Id.* (citing Rec. Doc. 106-2 at 10).

[105] *Id.* at 13 (citing Rec. Doc. 106-2 at 10).

spaces. . . . The elevation of the wheelchair spaces cannot be raised because of the structural framing of the seating bowl."[106] As such, France contends this summary judgment evidence precludes any finding that Plaintiff is entitled to judgment as a matter of law on this element of his claim for ADA discrimination.[107]

### E.     *Plaintiff's Arguments in Further Support of the Motion*

On January 17, 2020, Plaintiff filed a reply brief to SMG's opposition to the motion for partial summary judgment.[108] First, Plaintiff asserts that SMG is an operator for the reasons set forth in Plaintiff's opposition to SMG's motion for summary judgment.[109]

Second, Plaintiff contends the alteration claim was pled at paragraphs 41–44, 52–53, and 62–69 of the Complaint.[110] Additionally, Plaintiff argues that the claims are timely because he filed suit within one year of being denied full and equal enjoyment of a place of public accommodation.[111] Plaintiff asserts that SMG's statute of limitations argument fails because Section 12182(b) of the ADA, which defines discriminatory conduct, does not give rise to a series of "discrete claims."[112] Instead, Plaintiff contends, Section 12182(a) provides that a cause of action only arises when a plaintiff is being denied the full and equal enjoyment of a place of public accommodation.[113] Plaintiff contends that the district court cases upon which SMG relies

---

[106] *Id.* at 14 (citing Rec. Doc. 106-2 at 8–9).

[107] *Id.*

[108] Rec. Doc. 127. The reply brief does not address France's opposition to the motion.

[109] *Id.* at 2, n.2.

[110] *Id.*

[111] *Id.* at 2.

[112] *Id.* at 4.

[113] *Id.*

improperly conflate the defendant's wrongful act with the disabled individual's injury—something the Fifth Circuit has expressly cautioned against.[114] Because his alterations claims are timely, Plaintiff argues that SMG's laches argument must fail because Plaintiff did not engage in unreasonable delay in filing suit.[115] Additionally, Plaintiff asserts that laches is an affirmative defense, and was not raised in SMG's answer.[116]

Third, Plaintiff argues that SMG's continued misconstruing of the Second Circuit's opinion in *Roberts v. Royal Atlantic Corporation* is improper.[117] Plaintiff asserts the *Roberts* court did not impose a "plausible accommodation" requirement on a plaintiff under an alteration standard.[118] According to Plaintiff, the *Roberts* court held that a plaintiff who sues over a violation of the "alteration standard" only bears an initial obligation to show "some manner in which the alteration could be, or could have been, made readily accessible and usable by individuals with disabilities. . . . ."[119] Furthermore, Plaintiff urges this Court to follow the text of the law, Section 36.402(c), which, by its plain language, does not require that a plaintiff show "some manner in which the alteration could be, or could have been," made readily accessible.[120]

Fourth, Plaintiff argues that Defendants failed to demonstrate that there is a genuine issue of material fact that: (1) Plaintiff's view is obstructed or (2) modifying the Superdome in

---

[114] *Id.* at 5.

[115] *Id.* at 2, n.2.

[116] *Id.*

[117] *Id.* (citing 542 F.3d 363 (2nd Cir. 2008)).

[118] *Id.*

[119] *Id.* at 6 (citing 542 F.3d at 372).

[120] *Id.*

compliance with the ADA accessibility guidelines would have been virtually impossible.[121] Plaintiff asserts that there are three obstructions at issue, including the obstructed Jumbotron screen, the obstructed "high plays and throws," and the obstructed field.[122]

Plaintiff asserts that Defendants' expert Mark Mazz provides a lengthy explanation as to perceived flaws with James Terry's measuring techniques as to how much of the field is obstructed due to standing spectators for wheelchair seating at 100 Level, Row 36.[123] Plaintiff acknowledges that Mr. Mazz's opinion creates a genuine issue of material fact as to the "obstructed field" barrier at Row 36.[124] However, Plaintiff argues Mr. Mazz does not dispute that the Jumbotron is obstructed by the overhang at the 100 Level, Row 36.[125] Further, Plaintiff notes that Mr. Mazz admits that individuals in wheelchairs seated at 100 Level, Row 36 can only see vertically 65 feet, that punts can reach 150 feet above the center of the field, and that "[n]one of the wheelchair spaces can see that high."[126] Likewise, at the 100 Level, Row 1, Plaintiff notes that Mr. Mazz readily admits that the view of much of the field is obstructed by an "opaque wall" of "players benches and equipment."[127] Therefore, Plaintiff argues that Defendants have failed to create a genuine issue of material fact as to the presence of obstructions of Plaintiff's view of the Jumbotron and aerial gameplay at the 100 Level, Row 36 and as to the presence of obstructions of Mr. Bailey's view of

---

[121] *Id.*

[122] *Id.*

[123] *Id.* at 7.

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] *Id.*

the field of play at the 100 Level, Row 1.[128]

Plaintiff asserts that Defendants point to no evidence that performing the alterations in compliance with the ADA would have been virtually impossible.[129] According to Plaintiff, if Defendants had kept the ADA Platforms, where Plaintiff sat before the 2010 renovations, he would still have seating that afforded him with a full view of the field, aerial gameplay, and the Jumbotron.[130] By making the facility less accessible, Plaintiff argues that Defendants violated 1991 ADAAG 4.1.6(1)(a), which prohibits alterations which decrease or have the effect of decreasing accessibility or usability below the ADA accessibility guidelines.[131] Despite their lengthy briefing about the current difficulty of making the seating accessible, Plaintiff asserts that Defendants failed to attach any evidence demonstrating that performing the modifications in compliance with the ADA accessibility guidelines would have been "virtually impossible" during the 2010 Renovation.[132]

### III. Legal Standard

A.    *Legal Standard for Summary Judgment*

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[133] When assessing whether a dispute as to any material fact exists, the court

---

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.* at 7–8.

[132] *Id.* at 8.

[133] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[134] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[135] If the record, as a whole, "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists, and the moving party is entitled to judgment as a matter of law.[136] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[137]

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[138] Thereafter, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[139] To withstand a motion for summary judgment, the nonmoving party must show that there is a genuine issue for trial by presenting evidence of specific facts.[140] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by

---

[134] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[135] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[136] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[137] *See Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[138] *Celotex*, 477 U.S. at 323.

[139] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

[140] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1996)).

"unsubstantiated assertions," or "by only a scintilla of evidence."[141] Rather, a factual dispute precludes a grant of summary judgment only if the evidence presented by the nonmovant is sufficient to permit a reasonable trier of fact to find for the nonmoving party.[142] Further, a court "resolve[s] factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[143] Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[144] Ultimately, summary judgment is appropriate in any case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."[145]

## B.    *ADA Compliance*

The Americans with Disabilities Act of 1990 ("ADA") "is a broad mandate of comprehensive character and sweeping purpose intended to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life."[146] "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)."[147] Plaintiff brings claims against the

---

[141] *Little*, 37 F.3d at 1075.

[142] *Anderson*, 477 U.S. at 248.

[143] *Little*, 37 F.3d at 1075.

[144] Fed. R. Civ. P. 56(c)(2); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987).

[145] *Armstrong v. City of Dallas*, 997 F.2d 62 (5th Cir. 1993).

[146] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 599 (1999) (internal quotation marks omitted)).

[147] *PGA Tour*, 532 U.S. at 675.

Board and France under Title II of the ADA and the Rehabilitation Act.[148] Plaintiff brings claims against SMG under Title III of the ADA.[149]

### 1. Title II of the ADA and the Rehabilitation Act

"Title II of the ADA focuses on disability discrimination in the provision of public services."[150] Specifically, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[151] A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government."[152]

Similarly, "Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal funding."[153] Like Title II, Section 504 provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[154] "The ADA and the Rehabilitation Act generally are interpreted *in pari materia*."[155] "Indeed, Congress has instructed courts that "nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under title V [i.e., § 504] of the

---

[148] Rec. Doc. 1 at 1–2.

[149] *Id.* at 2.

[150] *Frame*, 657 F.3d at 223.

[151] 42 U.S.C. § 12132.

[152] *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (quoting 42 U.S.C. § 12131(1)(B)).

[153] *Frame*, 657 F.3d at 223.

[154] 29 U.S.C. § 794(a).

[155] *Frame*, 657 F.3d at 223 (citing *Kemp v. Holder*, 610 F.3d 231, 234–35 (5th Cir. 2010); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287–88, 289 n. 76 (5th Cir. 2005) (en banc)).

Rehabilitation Act . . . or the regulations issued by Federal agencies pursuant to such title.'"[156]

"To show a violation of either statute, a plaintiff must prove "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability."[157]

The United States Attorney General is authorized to promulgate regulations implementing Title II.[158] The regulations provide that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."[159] A public entity must operate "each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[160] Therefore, Title II requires "program accessibility."[161]

"Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility."[162] However, a public entity is not "necessarily required . . . to make each of its existing facilities accessible to and usable by

---

[156] *Id.* at 223–24 (quoting 42 U.S.C. § 12201(a); *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998)).

[157] *Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565, 574 (5th Cir. 2018) (quoting *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (per curiam)).

[158] 42 U.S.C. § 12134(a).

[159] 28 C.F.R. § 35.149.

[160] 28 C.F.R. § 35.150(a).

[161] *Tennessee v. Lane*, 541 U.S. 509, 531 (2004).

[162] *Id.* (citing 42 U.S.C. § 12131(2)).

individuals with disabilities."[163] Instead, with respect to facilities built before 1992, Title II only requires "'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service."[164]

"In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards,"[165] including the ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG") set forth at 36 C.F.R. part 1191, appendices B and D. Pursuant to the regulations, "[e]ach facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility . . . shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities. . . ."[166]

### 2. Title III of the ADA

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[167] A stadium is considered to be a place of public accommodation under Title III.[168] "The ADA does not require a place of public accommodation to provide a plaintiff with the ideal or preferred accommodation; rather, the ADA

---

[163] 28 C.F.R. § 35.150(a)(1).

[164] *Lane*, 541 U.S. at 531.

[165] *Id.* (citing 28 CFR § 35.151).

[166] 28 C.F.R. § 35.151(b)(1).

[167] 42 U.S.C. § 12182(a).

[168] 42 U.S.C. § 12181(7)(C).

requires that a defendant provide a plaintiff with an accommodation that is reasonable and permits the plaintiff to participate equally in the good, service, or benefit offered."[169]

Title III defines discrimination as including "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable."[170] The term "existing facilities" includes structures built prior to the Act taking effect on January 26, 1992, which have not been modified since then.[171]

Pursuant to the regulations implementing Title III, "[a]ny alteration to a place of public accommodation . . . after January 26, 1992, shall be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."[172] Public accommodations built or altered after January 26, 1992, must comply with both the Title III regulations set forth at 28 C.F.R. part 36, subpart D and the ADAAG unless "the nature of an existing facility makes it virtually impossible to comply fully with applicable accessibility standards through a planned alteration."[173]

## IV. Analysis

In the instant motion, Plaintiff argues that he is entitled to summary judgment as to the following alleged violations of the alteration requirements of the Americans with Disabilities Act: (1) sightline obstructions at 100 Level, Row 1; (2) sightline obstructions at 100 Level, Row 36; (3) inadequate amount of accessible seating at the 100 Level; (4) making the Superdome less

---

[169] 1 Americans with Disab. Pract. & Compliance Manual § 4:1, Nondiscrimination Mandate.

[170] 42 U.S.C. § 12182(b)(2)(A)(iv).

[171] *Tatum v. Doctor's Associates, Inc.*, No. CV 14–2980, 2016 WL 852458, at *3 (E.D. La. Mar. 4, 2016)

[172] 28 C.F.R. § 36.402(a)(1).

[173] 28 C.F.R. § 36.402(c).

accessible to individuals with mobility-related disabilities; (5) making the 200 Level less accessible; and (6) failure to provide sufficient accessible seating stadium wide.[174]

In opposition to the motion, SMG argues that Plaintiff's motion for summary judgment should be denied for five principal reasons: (1) SMG is not an operator under Title III for purposes of Plaintiff's claims, (2) Plaintiff did not plead an alterations claim in the Complaint and any such claims are untimely; (3) Plaintiff has not presented any evidence to support a finding that removal of any architectural barrier is readily achievable; (4) even assuming that Plaintiff has a viable alterations claim, SMG argues Plaintiff has not satisfied his burden of showing he is entitled to summary judgment; (5) Plaintiff's alterations claims are barred by the doctrine of laches.[175] In opposition to the motion, France argues that: (1) Plaintiff lacks standing to pursue all relief for which he prays; (2) Plaintiff has failed to meet his threshold burden of proof under the ADA; and (3) Plaintiff is not entitled to judgment as a matter of law on his claims against France because Plaintiff is not being "denied the benefits of a place of public accommodation."[176] The Court will first address the preliminary issue of timeliness and standing before turning to whether Plaintiff is entitled to summary judgment on the alterations claims.

## A.    *Preliminary Issues*

### 1.    Whether SMG is an Operator of the Superdome under Title III

SMG asserts it is not an operator of the Superdome under Title III for purposes of Plaintiff's claims.[177] For the reasons set forth in the Court's Order and Reasons on SMG's Motion for

---

[174] Rec. Doc. 95.

[175] Rec. Doc. 105.

[176] Rec. Doc. 106 at 4–14.

[177] Rec. Doc. 105 at 9.

Summary Judgment,[178] there are genuine issues of material fact in dispute regarding whether SMG is an operator under Title III. Accordingly, Plaintiff is not entitled to summary judgment against SMG because the issue of whether SMG is an operator must be decided at trial.

### 2. Pleading of Alteration Claims and Timeliness of Alteration Claims

As noted above, Plaintiff is not entitled to summary judgment against SMG because there is a disputed issue of fact regarding whether SMG is an operator. Nevertheless, for completeness, the Court addresses SMG's alterative argument that Plaintiff's alteration claims were not raised in the Complaint and are not timely.

SMG contends Plaintiff did not plead any alteration claims in the Complaint.[179] However, this argument is without merit. The alteration claims are pled at paragraphs 41–44, 52–53, and 62–69 of the Complaint.[180] Therefore, this would not be an appropriate basis on which to deny the motion for summary judgment.

SMG also asserts that any alteration claims are prescribed.[181] In response, Plaintiff argues that the claims are timely because he filed suit within one year of being denied full and equal enjoyment of a place of public accommodation.[182] In support, SMG cites two district court cases holding that an operator of an existing facility "has a continuing duty to meet the existing facilities standards" by removing architectural barriers when such removal is readily achievable, but as to alterations, the limitations period runs from the first date on which the plaintiff experiences the

---

[178] Rec. Doc. 141.

[179] Rec. Doc. 105 at 9.

[180] *See* Rec. Doc. 1.

[181] Rec. Doc. 105 at 9.

[182] *Id.* at 2.

allegedly discriminatory alteration.[183] Plaintiff asserts that SMG's statute of limitations argument

fails because Section 12182(b) of the ADA, which defines discriminatory conduct, does not give

rise to a series of "discrete claims."[184] Instead, Plaintiff contends, Section 12182(a) provides that

a cause of action only arises when a plaintiff is being denied the full and equal enjoyment of a

place of public accommodation.[185] Plaintiff contends that the district court cases upon which SMG

relies improperly conflate the defendant's wrongful act with the disabled individual's injury.[186]

     In its prior Order denying SMG's Motion for Judgment on the Pleadings, this Court relied

the text of Section 12182(a) to find that Plaintiff's claims were timely.[187] Title III of the ADA

provides:

> No individual shall be discriminated against on the basis of disability in the full and
> equal enjoyment of the goods, services, facilities, privileges, advantages, or
> accommodations of any place of public accommodation by any person who owns,
> leases (or leases to), or operates a place of public accommodation.[188]

As this Court found in its prior Order, Congress's use of the present tense suggests that a new

claim accrued each time that SMG allegedly denied Plaintiff "the full and equal enjoyment" of a

place of public accommodation.[189] Plaintiff alleges that the 2010 renovations violated the alteration

requirements of the ADA in six ways. Plaintiff filed suit within one year of SMG allegedly denying

---

[183] *Speciner*, 215 F. Supp. 2d at 630 (D. Md. 2002); *De La Rosa v. Lewis Foods of 42nd Street, L.L.C.*, 124 F. Supp. 3d 290, 300 (S.D.N.Y. 2015)).

[184] Rec. Doc. 127 at 4.

[185] *Id.*

[186] *Id.* at 5.

[187] Rec. Doc. 86 at 19–20.

[188] 42 U.S.C. § 12182(a).

[189] Rec. Doc. 86 at 20.

Plaintiff "the full and equal enjoyment" of a place of public accommodation. Therefore, the claims are timely.

SMG also argues that Plaintiff's claims are barred under the doctrine of laches.[190] SMG asserts that the delay in filing suit is unreasonable because Plaintiff first voiced his accessibility concerns in 2011 but did not file suit because he did not want to sue his favorite football team, the Saints.[191] Additionally, SMG contends that the delay has resulted in prejudice to SMG because it has lost evidence through the passage of time.[192] "Laches is an affirmative defense which must be pled and proved by the defendants."[193] The affirmative defense of laches "requires a showing of both unreasonable delay and prejudice to the party who raises the defense."[194] "[L]oss of records, destruction of evidence, fading memories, or unavailability of witnesses," may constitute prejudice sufficient to bar a claim under laches.[195] However, "the harm is not merely that one loses what he otherwise would have kept, but that delay has subjected him to a disadvantage in asserting and establishing his claimed right or defense."[196] If there is a "genuine issue as to any material fact…a trial on the prejudice issue is required (to enable) the court on the basis of the whole record to determine the underlying rightness of it."[197]

---

[190] Rec. Doc. 105 at 24.

[191] *Id.*

[192] *Id.* at 25.

[193] *Matter of Henderson*, 577 F.2d 997, 1002 (5th Cir. 1978).

[194] *Id.* at 1001.

[195] *Cornetta v. United States*, 851 F.2d 1372, 1378 (Fed. Cir. 1988).

[196] *Akers v. State Marine Lines, Inc.*, 344 F.2d 217, 221 (5th Cir. 1965).

[197] *Id.* (internal citation omitted).

SMG did not raise laches as a defense in its answer.[198] Additionally, SMG has not shown that it was prejudiced by the delay in filing suit. The only purported prejudice SMG points to is that Plaintiff relies on a 2007 letter prepared by Larry Roedel, former counsel for the Board, concerning purported alterations to the 200 Level, but Mr. Roedel cannot remember where he obtained the information in the letter due to the passage of time.[199] SMG has not shown how this one lapse in memory by Mr. Roedel would subject SMG to a disadvantage in asserting and establishing a defense.[200] Therefore, SMG has not shown that Plaintiff's claims should be barred under the doctrine of laches. Accordingly, this would not be an appropriate basis upon which to deny the motion for summary judgment.

### 3. Standing

Plaintiff asserts he has standing to pursue his claim for injunctive relief.[201] Plaintiff states he attended nine Saints games in the year prior to filing this lawsuit and ten games since the case was filed.[202] He asserts that he intends to attend Saints games at the Superdome in the future.[203] Therefore, Plaintiff contends that he has standing to seek injunctive relief under the "intent to return" test.[204] France argues that Plaintiff is confined to seek redress for only the alleged violations and physical barriers that he personally encountered.[205] According to France, Plaintiff admits he

---

[198] Rec. Doc. 16.

[199] Rec. Doc. 105 at 24–25.

[200] *Akers*, 344 F.2d at 221.

[201] Rec. Doc. 95-1 at 12–13.

[202] *Id.* at 13.

[203] *Id.*

[204] *Id.*

[205] Rec. Doc. 106 at 4.

only personally experienced the sightline obstructions at 100 Level, Row 1 and the sightline obstructions at 100 Level, Row 36.[206] Therefore, France asserts that summary judgment must be denied with respect to Plaintiff's other alterations claims, as he lacks standing to raise such claims.[207]

In *Lujan v. Defenders of Wildlife*, the Supreme Court laid out the general requirements for plaintiffs to establish standing under Article III of the Constitution.[208] "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[209]

In *Frame v. City of Arlington*, the Fifth Circuit addressed whether the plaintiffs had Article III standing to pursue ADA claims.[210] In *Frame*, the plaintiffs were wheelchair users who alleged certain inaccessible sidewalks "ma[d]e it dangerous, difficult, or impossible for them to travel to a variety of public and private establishments."[211] While "[m]ere 'some day' intentions to use a particular sidewalk, 'without any description of concrete plans, does not support standing," the Fifth Circuit found that "'imminence' is an 'elastic concept' that is broad enough to accommodate challenges to at least some sidewalks that a disabled person has not personally encountered."[212]

---

[206] *Id.* at 4–5.

[207] *Id.* at 5.

[208] *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

[209] *Friends of the Earth, Inc. v. Laidlaw Environ. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61).

[210] *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011).

[211] *Id.* at 221.

[212] *Id.* at 235.

For example, the Fifth Circuit noted that "a plaintiff may seek injunctive relief with respect to a soon-to-be-built sidewalk, as long as the plaintiff shows a sufficiently high degree of likelihood that he will be denied the benefits of that sidewalk once it is built."[213] Similarly, the Fifth Circuit stated that "a disabled individual need not engage in futile gestures before seeking an injunction; the individual must show only that an inaccessible sidewalk actually affects his activities in some concrete way."[214]

Plaintiff attended nine Saints games in the year prior to filing this lawsuit and ten games since the case was filed. In his declaration, Plaintiff states that he intends to continue attending Saints games at the Superdome in the future, and he is "gravely concerned that [his] view of the game, jumbotron, and scoreboard will continue to be obstructed when [he] return[s].[215] Therefore, Plaintiff has standing to seek injunctive relief because: he has suffered an injury in fact that is concrete and particularized and actual or imminent; the injury is fairly traceable to the challenged action of Defendants; and it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[216]

**B.**     ***Whether Plaintiff is Entitled to Summary Judgment on his Alteration Claims***

To establish a violation of the ADA, a plaintiff must prove: (1) that he has a qualifying disability; (2) that he is being denied the benefits of programs for which a public entity is responsible or the benefits of a place of public accommodation; and (3) that such discrimination is by reason of his disability.[217]

---

[213] *Id.* at 235–36.

[214] *Id.* at 5.

[215] Rec. Doc. 95-4.

[216] *Friends of the Earth, Inc.*, 528 U.S. at 180–81.

[217] *Miraglia*, 901 F.3d at 574.

### 1. Whether Plaintiff has a Qualifying Disability

Under Title II of the ADA, an individual has a disability if he or she "[has] a physical or mental impairment that substantially limits one or more major life activities of such individual."[218] Walking, standing, and breathing are all "major life activities."[219]

Plaintiff presents his declaration, which states that he has muscular dystrophy and is unable to breathe, stand or walk.[220] As a result, Plaintiff attests he has to rely on a ventilator to breathe and a wheelchair for mobility.[221] Defendants do not present any evidence to dispute these assertions. Therefore, there is no issue of material fact in dispute that Plaintiff is a qualified individual with a disability within the meaning of the ADA.

### 2. Whether Plaintiff is Being Denied the Benefits of Programs (as to France) or the Benefits of a Place of Public Accommodation (as to SMG)

Plaintiff contends he does not have an equal opportunity to view and enjoy football games and the attendant screens at the Superdome in a manner comparable to non-disabled persons due to impermissible barriers to access.[222] Plaintiff asserts there are no material facts in dispute and he is entitled to summary judgment as to the following violations of the alteration requirements of the ADA at the Superdome: (1) sightline obstructions at 100 Level, Row 1; (2) sightline obstructions at 100 Level, Row 36; (3) inadequate amount of accessible seating at the 100 Level; (4) making the Superdome less accessible to individuals with mobility-related disabilities; (5) making the 200

---

[218] 42 U.S.C. § 12102(1)(A).

[219] 42 U.S.C. § 12102(2)(A).

[220] Rec. Doc. 95-4 at 1.

[221] *Id.*

[222] Rec. Doc. 95-1 at 14.

Level less accessible; and (6) failure to provide sufficient accessible seating stadium wide.[223] Accordingly, the Court addresses each of these claims in turn.

As set forth above, under the regulations implementing Title II of the ADA "[e]ach facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility . . . shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities. . . ."[224] Under the regulations implementing Title III of the ADA, any alterations to a facility after 1992 must be "made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible and usable by individuals with disabilities, including individuals who use wheelchairs."[225] The Superdome was constructed in 1975. Therefore, this heightened standard will only apply to portions of the facility where an alteration occurred.

An alteration is defined as a change that "could affect the usability of the building or facility or any part thereof."[226] Alterations include events such as remodeling, renovation, rehabilitation, reconstruction, and changes or rearrangement in structural parts, but typically do not include normal maintenance or painting.[227] The DOJ has instructed that "'usability' is to be read broadly to include any change that affects the usability of the facility, not simply changes that relate directly

---

[223] *Id.* at 15–21.

[224] 28 C.F.R. § 35.151(b)(1).

[225] 28 C.F.R. § 36.402(a)(1).

[226] 28 C.F.R. § 36.402(b). *See also* 28 C.F.R. § 35.151(b)(1).

[227] 28 C.F.R. § 36.402(b)(1).

to access by individuals with disabilities."[228] "[A]ll changes directly relating to access by individuals with disabilities indisputably affect usability."[229]

Plaintiff relies on the deposition of Alan Freeman, the general manager of the Superdome, who detailed "the substantial renovation work [that] took place in 2009 and 2010."[230] Mr. Freeman testified that as part of the 2010 renovations the ADA Platforms were removed; temporary sideline seats were dismantled and removed from the 100 Level; permanent rows of seats were installed at the 100 Level sidelines; two rows of ADA seating were installed in the 100 Level; and the concourse on the 100 Level was expanded.[231] Mr. Freeman also testified that following Hurricane Katrina 9,540 seats were removed from the 200 Level and replaced with 8,919 seats.[232] These changes "could affect the usability of the building or facility or any part thereof," and are thus considered an alteration.[233] Therefore, Defendants were required to make any alterations "readily accessible" to individuals with disabilities to the "maximum extent feasible."[234]

Under this standard, the altered portion of the facility must comply fully with applicable accessibility standards and the ADAAG unless it is "virtually impossible"[235] If compliance is virtually impossible, "the alteration shall provide the maximum physical accessibility feasible."[236]

---

[228] 28 C.F.R. Pt. 36, App. C.

[229] *Tatum*, 2016 WL 852458, at *4.

[230] Rec. Doc. 95-12 at 22.

[231] *Id.* at 25, 29–30.

[232] *Id.* at 51–52.

[233] 28 C.F.R. § 36.402(b). *See also* 28 C.F.R. § 35.151(b)(1).

[234] 28 C.F.R. § 36.402(c). *See also* 28 C.F.R. § 35.151(b)(1).

[235] 28 C.F.R. § 36.402(c).

[236] *Id.*

Importantly, "[a]ny altered features of the facility that can be made accessible shall be made accessible."[237]

SMG and France both assert that under the alterations standard Plaintiff failed to demonstrate that the facility could have been, but was not, made "readily accessible" or a plausible accommodation.[238] In support of this argument, SMG cites *Roberts v. Royal Atl. Corp*, a Second Circuit case.[239] As discussed in detail in the Court's Order and Reasons on Defendants' Motion for Summary Judgment,[240] *Roberts* does not stand for this proposition. The Second Circuit in *Roberts* clearly articulates two discrete analyses under the "alteration standard" on one hand and the "architectural barrier standard" on the other.[241] As the Second Circuit stated "section 12183 requires, with respect to altered facilities, that all feasible efforts be made toward compliance without regard to cost,"[242] whereas section 12182 "requires removal of architectural barriers, regardless of whether alterations have been made, 'where such removal is readily achievable.'"[243] In short, section 12182 and section 12183 are separate provisions, providing for two possible ways in which a defendant may discriminate against a plaintiff with a disability. Indeed, district courts in the Second Circuit recognize this distinction and the effect it has on the court's analysis.[244]

---

[237] *Id.*

[238] Rec. Doc. 105 at 17; Rec. Doc. 106 at 6.

[239] *Id.* (citing *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370, 372 (2d Cir. 2008)).

[240] Rec. Doc. 140.

[241] *Roberts*, 542 F.3d at 363.

[242] *Id*. at 367.

[243] *Id*. (quoting 42 U.S.C. § 12182(b)(2)(A)(iv)).

[244] *de la Rosa v. 597 Broadway Dev. Corp.*, No. 13CV7999 (LAK) (MHD), 2015 WL 7351540, at *7 (S.D.N.Y. Aug. 4, 2015), report and recommendation adopted in part, 2015 WL 7308661 (S.D.N.Y. Nov. 19, 2015) ("A determination that a facility has undergone an 'alteration' has considerable significance with respect to the substance of the applicable legal standard. If the facility predated 1993 and has not undergone an alteration, the test is whether a proposed remedial step is readily achievable.").

Because they contain different standards, they are to be analyzed and considered separately, as was done in *Roberts*. Therefore, in the case of an altered facility, the plaintiff is not required to show that a proposed modification is "readily achievable."

Plaintiff contends that there is no genuine issue of fact in dispute that the Superdome does not comply with the alteration requirements in six ways. Accordingly, the Court addresses each of Plaintiff's arguments in turn.

### a.        Whether there is a Sightline Obstruction at Level 100, Row 1

First, as to the sightline obstruction at Level 100, Row 1, Plaintiff points to his expert, James Terry's finding that wheelchair users on the lowered platforms on Row 1 in Section 115 could see none of the field over the tops of the heads of average height people standing on the sidelines while comparable non-disabled spectators could see 69% of the field.[245] As to the sightline obstruction at Level 100, Row 1, SMG points to Defendants' expert, Mark Mazz's finding that providing a "comparable view of the field" is virtually impossible and that an existing "continuous lateral support beam" prevents raising the front-row platform an additional six inches.[246]

ADAAG Section 4.33.3 provides that "[w]heelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public." Plaintiff has presented evidence to show that the lines of sight at Level 1, Row 100 are not comparable to those for members of the general public. Specifically, James Terry found that wheelchair users on the lowered platforms on Row 1 could see none of the field over the tops of

---

[245] Rec. Doc. 95-1 at 15 (citing Rec. Doc. 92-2 at 15).

[246] Rec. Doc. 105 at 19 (citing Rec. Doc. 105-2 at 8–9).

the heads of average height people standing on the sidelines while comparable non-disabled spectators could see 69% of the field.[247] In response, Defendants present the opinion of Mark Mazz stating:

> It is virtually impossible for a front row sideline wheelchair space to have a comparable view of the field to any standing spectator in the 100 Level. Raising the wheelchair spaces 6 inches makes no difference. A person in a wheelchair cannot see any of the field over an NFL player. To provide comparable views to front row standing spectators the wheelchair spaces would have to be about 24 inches higher which would block the views of the 8 rows of seats behind [] them.
>
> The wheelchair spaces are not 6 inches lower than other front row seats to protect the lines of sight of the seated spectators in . . . Row 4, the first row behind the wheelchair spaces. That row would have comparable lines of sight to other Row 4 seated spectators even if the wheelchair spaces were 6 inches higher. The elevation of the wheelchair spaces cannot be raised because of the structural framing of the seating bowl. The portal access to the wheelchair spaces must pass underneath a continuous lateral support beam (Attachment 14). The building code requires 6 feet 8 inches minimum head clearance under the beam. The actual clearance under the beam is only 6 feet 5 inches. That clearance limits the length of the ramp to 28 feet. To achieve the additional 6 inches in height the ramp requires an additional 6 feet in length plus an intermediate landing that is 5 feet long. The portal cannot accommodate the additional length.[248]

Mr. Mazz also opines that "the Superdome's seating bowl is drastically unsuitable for even the most extensive reconfigurations to provide lines of sight over standing spectators that are substantially equivalent or better than those provided for all other spectators"[249]

Under the regulations implementing Title II of the ADA "[e]ach facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility . . . shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities.

---

[247] Rec. Doc. 92-2 at 15.

[248] Rec. Doc. 105-2 at 8–9.

[249] *Id.* at 3–4.

. . ."[250] Under the regulations implementing Title III of the ADA, any alterations to a facility after 1992 must be "made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible and usable by individuals with disabilities, including individuals who use wheelchairs."[251] In Mr. Mazz's opinion, the wheelchair spaces cannot be raised because of the structural framing of the seating bowl. Furthermore, Mr. Mazz is of the opinion that the seating bowl is drastically unsuitable for even the most extensive reconfigurations to provide lines of sight over standing spectators. Based on Mr. Mazz's opinion, there is a disputed issue of material fact as to whether the 2010 Renovations ensured accessibility to the maximum extent feasible. Accordingly, Plaintiff is not entitled to summary judgment on this issue.

### b. Whether there is a Sightline Obstruction at Level 100, Row 36

Second, as to the sightline obstruction at Level 100, Row 36, Plaintiff points to Mr. Terry's finding that wheelchair users on Row 36 in the back of Section 114 could see 78% of the field over the tops of the heads of average height people standing two rows ahead of them on Row 34 while comparable spectators on row 35 could see 98% of the field.[252] As to the sightline obstruction at Level 100, Row 36, SMG points to Mr. Mazz's finding that these seats do provide comparable lines of sight to the field.[253] Mr. Mazz also opines that neither the wheelchair spaces nor the back several rows of the fixed seats can see punts reaching 150 feet above the center of the field, and it would not be possible to create lines of sight that high.[254]

---

[250] 28 C.F.R. § 35.151(b)(1).

[251] 28 C.F.R. § 36.402(a)(1).

[252] Rec. Doc. 95-1 at 16 (citing Rec. Doc. 92-2 at 15).

[253] Rec. Doc. 105 at 19 (citing Rec. Doc. 105-2 at 9–10).

[254] Rec. Doc. 105-2 at 10.

As discussed above, ADAAG Section 4.33.3 provides that "[w]heelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public." There is a genuine issue of material fact in dispute regarding whether the lines of sight at Row 36 are comparable to the lines of sight for the general public. Therefore, Plaintiff is not entitled to summary judgment on this issue.

### c.     Whether there is Inadequate Accessible Seating at the 100 Level

Third, regarding the inadequate amount of accessible seating at the 100 Level, Plaintiff points to evidence showing that there are presently 25,460 seats, of which a total of 236 are designated as wheelchair-accessible seats, but Plaintiff contends that Defendants are required to have 256 wheelchair-accessible designated seats under the ADAAG formula.[255] Regarding the inadequate amount of accessible seating at the 100 Level, SMG asserts this issue was not raised in the Complaint, and Plaintiff has not proposed where 20 additional seats might be placed.[256]

As an initial matter, SMG asserts that a claim regarding an inadequate number of accessible seats is raised in the Complaint.[257] In the Complaint, Plaintiff alleges that "the totality of accessible designated seats in the entire stadium are located in only a few areas: Row 36 and Row 1 of the 100-level, and within the 600-level terrace. Entire levels of the stadium are lacking accessible seating, and the few areas providing wheelchair-accessible seats suffer from serious visual obstructions and other accessibility issues, as explained herein."[258] A plaintiff may not raise a new

---

[255] Rec. Doc. 95-1 at 18 (citing Rec. Doc. 92-3 at 25).

[256] Rec. Doc. 105 at 20.

[257] *Id.*

[258] Rec. Doc. 1 at 14.

claim in a motion for summary judgment.[259] However, this is not a case of a plaintiff asserting an entirely different, previously unalleged legal theory at the summary judgment stage. From the face of the complaint, there must be enough factual matter to raise a reasonable expectation that discovery will reveal evidence as to each element of the asserted claims.[260] A claim regarding inadequate accessible seating is generally raised in the Complaint,[261] and during discovery evidence was revealed as to the specific sections of the Superdome where inadequate accessible seating is available. Accordingly, this would not be an appropriate basis upon which to deny the motion for summary judgment.

ADAAG Section 4.1.2(19)(a) provides a table for calculating the number of accessible seats that must be provided in places of assembly. Defendants do not dispute that presently there are only 236 wheelchair accessible seats on the 100 Level.[262] Plaintiff asserts that 256 wheelchair accessible seats are required on the 100 Level under this formula. Defendants do not respond to this assertion in their briefing. However, a seat inventory attached to Mr. Terry's expert report indicates that 136 wheelchair accessible seats are required on the 100 Level.[263] Therefore, because there is conflicting evidence in the record, the Court finds that there is a genuine issue of material fact in dispute and denies Plaintiff's request for summary judgment.

---

[259] *See DeKort v. Integrated Coast Guard Sys.*, 475 F. App'x 521, 522 (5th Cir. 2012)

[260] *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009).

[261] Rec. Doc. 1 at 14.

[262] Rec. Doc. 92-3 at 29.

[263] *Id.*

### d. Whether Defendants Made the Superdome Less Accessible at Level 100

Fourth, Plaintiff argues that Defendants made the Superdome less accessible by removing the ADA Platforms.[264] As to removing the on-field ADA Platforms, SMG asserts that Plaintiff has failed to satisfy his burden to show that the seating was made "less" accessible or that Defendants had anything to do with the decision to move the seats.[265]

ADAAG Section 4.1.6(1)(a) provides that "[n]o alteration shall be undertaken which decreases or has the effect of decreasing accessibility or usability of a building or facility below the requirements for new construction at the time of alteration." Plaintiff asserts that prior to the 2010 Renovations, Plaintiff and others with disabilities had ADA seating at the ADA Platforms with unobstructed views.[266] In Mr. Terry's expert report, he opines that "the 2011 Alterations project relocated wheelchair users to inferior and noncompliant locations in terms of the vertical, and ticket price dispersal, lines of sight over standing spectators."[267] In his expert report, Mr. Mazz opines:

> [T]he eye level of a person in a wheelchair [on the prior ADA Platforms] would be about 6 inches lower and about 54 inches closer to the field than a person sitting in a wheelchair in the current front row 100 Level wheelchair spaces. The line of sight over persons standing along the sideline is about the same. With less equipment and less people directly in front of these seats, the view of the field would be somewhat better only between one End Zone and 25-yard line than the current front row 100 Level wheelchair spaces.[268]

Additionally, during his deposition, Plaintiff testified that when the front of the ADA Platforms would fill with patrons, the remaining persons needing accessible seating would be filled in behind

---

[264] Rec. Doc. 95-1 at 18.

[265] Rec. Doc. 105 at 20.

[266] Rec. Doc. 95-1 at 18.

[267] Rec. Doc. 92-2 at 24.

[268] Rec. Doc. 105-2 at 4.

the persons in the front row, but that "second row" of seating was not raised.[269] Plaintiff also testified that his view was blocked on occasion by kickers practicing during the game.[270] Accordingly, there are genuine issues of material fact in dispute regarding whether the 2010 Renovations decreased or had the effect of decreasing accessibility of the 100 Level.

### e. Whether Defendants Made the Superdome Less Accessible at Level 200

Fifth, Plaintiff argues that Defendants made the Superdome less accessible by removing wheelchair accessible seats at the 200 Level.[271] Plaintiff asserts that 139 ADA seats should be provided on the 200 Level under the ADAAG.[272] Regarding the alleged removal of wheelchair accessible seats at the 200 Level, SMG asserts that this is not an alteration because the 200 Level never had wheelchair accessible seats.[273]

During his deposition, Alan Freeman, the general manager of the Superdome, detailed "the substantial renovation work [that] took place in 2009 and 2010."[274] Mr. Freeman also testified that following Hurricane Katrina 9,540 seats were removed from the 200 Level and replaced with 8,919 seats.[275] Plaintiff contends that ADA compliant seats were also removed from the 200 Level. According to Plaintiff, "[b]y removing the accessibility seating at the 200 Level, Defendants made the facility less accessible and violated the alteration requirement of the ADA."[276] In support,

---

[269] Rec. Doc. 95-11 at 15–17.

[270] *Id.* at 17.

[271] Rec. Doc. 95-1 at 19.

[272] *Id.*

[273] Rec. Doc. 105 at 21–22.

[274] Rec. Doc. 95-12 at 22.

[275] *Id.* at 51–52.

[276] Rec. Doc. 95-1 at 19.

Plaintiff cites a 2007 letter prepared by Larry Roedel, former counsel for the Board, which states that there were ADA compliant seats at the 200 Level.[277] In opposition, SMG presents a declaration of Mark Arata, an employee of SMG who has worked in the box office of the Superdome since 2001.[278] Mr. Arata states that "from 2001 to the present, there has never been any wheelchair seating in the 200 Level Loge seating area."[279]

ADAAG Section 4.1.6(1)(a) provides that "[n]o alteration shall be undertaken which decreases or has the effect of decreasing accessibility or usability of a building or facility below the requirements for new construction at the time of alteration." There is a disputed issue of material fact as to whether wheelchair accessible seating was ever available on the 200 Level. Accordingly, there are genuine issues of material fact in dispute regarding whether the 2010 Renovations decreased or had the effect of decreasing accessibility of the 200 Level.

### f. Whether Defendants Performed Modifications Affected Overall Usability

Sixth, Plaintiff asserts that by eliminating the ADA Platforms and renovating the 100 and 200 Levels, Defendants performed modifications that affect or could affect the overall usability of the Superdome.[280] SMG contends that Plaintiff has provided no basis for applying a heightened alterations standard to the entire Superdome based solely on changes to the 100 Level (and speculative changes to the 200 Level).[281]

---

[277] *Id.* (citing Rec. Doc. 95-15). SMG contends that Plaintiff has not satisfied his burden of showing that this letter—or its contents—is admissible. Rec. Doc. 105 at 22.

[278] Rec. Doc. 105-3 at 7.

[279] *Id.*

[280] Rec. Doc. 95-1 at 19.

[281] Rec. Doc. 105 at 23.

As set forth in the Court's Order and Reasons on Defendants' Motion for Summary Judgment,[282] Plaintiff's alteration claims are limited to the portions of the Superdome where alterations occurred. Therefore, Plaintiff's claim that the entire facility must comply with the alterations standard by providing accessible seating stadium-wide was dismissed with prejudice. Accordingly, Plaintiff is not entitled to summary judgment on this issue.

### V. Conclusion

For the reasons discussed above, there are genuine issues of material fact in dispute precluding the Court from granting summary judgment in favor of Plaintiff.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Shelby Bailey's "Motion for Partial Summary Judgment"[283] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this 21st day of February, 2020.

_____
**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[282] Rec. Doc. 140.

[283] Rec. Doc. 95.