**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**SHELBY BAILEY**                                                    **CIVIL ACTION**

**VERSUS**                                                           **CASE NO. 18-5888**

**BOARD OF COMMISSIONERS OF THE LOUISIANA**        **SECTION: "G"(2)**
**STADIUM AND EXPOSITION DISTRICT, ET AL.**

<u>**FINDINGS OF FACT, CONCLUSIONS OF LAW AND REASONS FOR JUDGMENT**</u>

This matter came before this Court for trial without a jury on March 2, 2020 through March

3, 2020. The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which

confers on the federal district courts original jurisdiction over all civil actions arising under the

Constitution, laws, or treaties of the United States. Venue is proper in this Court under 28 U.S.C.

§ 1391(b), as the Superdome is located in this district. The substantive law applicable to this case

is the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation

Act, 29 U.S.C. §794, *et seq.*

The Court has carefully considered the testimony of all of the witnesses and the exhibits

entered into evidence during the trial, as well as the record. After reviewing all of the evidence and

pursuant to Federal Rule of Civil Procedure Rule 52(a), the Court issues the following findings of

fact and conclusions of law. To the extent that any finding of fact may be construed as a conclusion

of law, the Court hereby adopts it as such and to the extent that any conclusion of law constitutes

a finding of fact, the Court hereby adopts it as such.

For the reasons that follow, the Court finds that Plaintiff Shelby Bailey has failed to carry

his burden of proving that Defendants SMG and Kyle France, in his official capacity, violated the

Americans with Disabilities Act and/or the Rehabilitation Act. The Court is mindful that this result

1

leaves Plaintiff with "limited seating choices . . . in less than ideal locations."[1] However, the dictates of the ADA do not require otherwise. Thus, the Court's decision is compelled by the following findings of fact and conclusions of law, in particular, the structural limitations of the stadium's design, existing ADA regulations and guidelines, and case law.[2]

## I.   Background

### A.   Factual Background

On June 14, 2018, Plaintiff filed a Complaint in this Court naming as defendants SMG as the operator of the Superdome, the Board of Commissioners of the Louisiana Stadium and Exposition District (the "Board") as the owner of the Superdome, and Kyle France ("France") in his official capacity as chairman of the Board.[3] Plaintiff brings claims against the Board and France for declaratory and injunctive relief pursuant to Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act, 29 U.S.C. §794, *et seq.*[4] Plaintiff brings claims against SMG for declaratory and injunctive relief pursuant to Title III of the ADA.[5] Plaintiff also seeks recovery of attorneys' fees and costs.[6]

According to the Complaint, Plaintiff has a disability and relies on an electric wheelchair for mobility.[7] Plaintiff alleges that he has been a Saints season ticket holder for over 30 years.[8]

---

[1] *Landis v. Washington State Major League Baseball Stadium Pub. Facilities Dist.*, No. 2:18-CV-01512-BJR, 2019 WL 7157165, at *25 (W.D. Wash. Dec. 3, 2019).

[2] *See id.*

[3] Rec. Doc. 1.

[4] *Id.* at 1–2.

[5] *Id.* at 2.

[6] *Id.*

[7] *Id.* at 4.

[8] *Id.*

Plaintiff alleges that prior to 2011, his seat was located on a wheelchair accessible raised platform in the 100 Level section of the Superdome.[9] Plaintiff alleges that in 2011, Defendants began extensive renovations on the Superdome and reconfigured the accessible seating section for patrons with disabilities.[10] Plaintiff alleges that as a result of the renovations, the wheelchair accessible seating at the Superdome was moved to other positions where the views are obstructed by barriers and other patrons or players standing during the game, or the seating is not fully accessible by wheelchair.[11]

Plaintiff alleges that Defendants have been on notice of ongoing accessibility issues for many years.[12] According to the Complaint, in 2008 the United States Department of Justice conducted an inspection of the Superdome and issued a report detailing violations of ADA regulations.[13] Additionally, Plaintiff alleges that Defendants were sued by private litigants in 2018 regarding ongoing accessibility violations.[14]

As a result, Plaintiff alleges that Defendants have failed to comply with various parts of the ADA and Rehabilitation Act.[15] Plaintiff seeks compensatory and nominal damages along with declaratory and injunctive relief, and attorneys' fees.[16]

---

[9] *Id.*

[10] *Id.*

[11] *Id.* at 4–8.

[12] *Id.* at 10.

[13] *Id.*

[14] *Id.* at 10–11.

[15] *Id.* at 11–29.

[16] *Id.* at 1.

B.    *Procedural Background*

On December 13, 2019, the Court granted in part and denied in part Defendant SMG's

Motion for Judgment on the Pleadings.[17] Accepting as true the allegations in the Complaint, the

Court found that SMG could be held liable as an operator of the Superdome because SMG controls

modification of the Superdome and could cause the Superdome to comply with the ADA.[18]

Additionally, viewing the allegations in the Complaint in the light most favorable to Plaintiff, the

Court found that Plaintiff's claims for injunctive and declaratory relief were timely because the

Complaint was filed within one year of SMG allegedly denying Plaintiff "the full and equal

enjoyment" of a place of public accommodation.[19] However, the Court found that Plaintiff's claim

regarding future renovations was not ripe for judicial review.[20] Accordingly, the Court granted the

motion to the extent it sought dismissal of Plaintiff's claim regarding future renovations but denied

the motion in all other respects.[21]

On February 19, 2020, the Court granted in part and denied in part Defendants the Board,

France, and SMG's "Motion for Summary Judgment on all of Plaintiff's Remaining Claims."[22]

The Court found that under the alteration standard, Plaintiff does not have to show that a proposed

modification is "readily achievable" and even under the Second Circuit's burden-shifting

framework, Plaintiff identified some manner in which the alteration could be, or could have been,

---

[17] Rec. Doc. 86.

[18] *Id*. at 24.

[19] *Id*. at 24–25.

[20] *Id*. at 25.

[21] *Id*.

[22] Rec. Doc. 140.

made readily accessible.[23] Furthermore, the Court found that five of Plaintiff's alteration claims relate to accessibility at the 100 and 200 Levels.[24] However, the Court dismissed Plaintiff's claim that the entire facility must comply with the alteration standard by providing accessible seating stadium-wide.[25]

On February 21, 2020, the Court granted in part and denied in part SMG's "Motion for Summary Judgment on Modifications."[26] The Court found that genuine issues of material fact exist regarding SMG's level of control over the Superdome such that SMG could be considered the operator of the Superdome.[27] Additionally, the Court found summary judgment inappropriate as to Plaintiff's claims regarding the physical size and location of the video monitors; however, the Court granted summary judgment dismissing any claim as to the content on the video monitors.[28] Lastly, the Court found that National Football League regulations do not alter Defendant's obligation to comply fully with applicable accessibility standards and the ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG") unless it is virtually impossible to do so.[29]

On February 21, 2020, the Court granted in part and denied in part the Board and France's "Motion for Summary Judgment on all of Plaintiff's Remaining Claims."[30] Plaintiff did not oppose dismissal of his claims against the Board and his request for monetary damages against France;

---

[23] *Id.* at 23–31.

[24] *Id.* at 34–37.

[25] *Id.* at 37–38.

[26] Rec. Doc. 141.

[27] *Id.* at 14–19.

[28] *Id.* at 19–22.

[29] *Id.* at 23–24.

[30] Rec. Doc. 144.

accordingly, the Court dismissed those claims.[31] However, the Court determined that Plaintiff's claim against France for injunctive relief under Title II of the ADA would proceed under the doctrine of *Ex parte Young*.[32] Lastly, the Court found that Plaintiff's claims were not time barred.[33]

On February 21, 2020, the Court denied Plaintiff's "Motion for Partial Summary Judgment."[34] The Court first addressed the preliminary issue of timeliness and standing before turning to whether Plaintiff is entitled to summary judgment on the alteration claims.[35] First, because there were genuine issues of material fact in dispute regarding whether SMG is an operator under Title III, the Court determined that Plaintiff was not entitled to summary judgment against SMG.[36] Second, the Court determined that Congress's use of the present tense suggests that a new claim accrued each time that SMG allegedly denied Plaintiff "the full and equal enjoyment" of a place of public accommodation; therefore, the Court found Plaintiff's claims are timely.[37] Additionally, the Court found that SMG had not shown that Plaintiff's claims should be barred under the doctrine of laches.[38] Third, the Court determined that Plaintiff has standing to seek injunctive relief because: he has suffered an injury in fact that is concrete and particularized and actual or imminent; the injury is fairly traceable to the challenged action of Defendants; and it is

---

[31] *Id*. at 19–20.

[32] *Id*. at 20–27.

[33] *Id*. at 27–31.

[34] Rec. Doc. 145.

[35] *Id*. at 26.

[36] *Id*. at 26–27.

[37] *Id*. at 27–29.

[38] *Id*. at 29–30.

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[39]

Lastly, the Court found that genuine issues of fact exist as to each of Plaintiff's alteration

arguments.[40]

A trial without a jury was held from March 2, 2020 through March 3, 2020.[41]

On May 4, 2020, Plaintiff filed post-trial briefing and Proposed Findings of Fact & Conclusions

of Law.[42] On June 3, 2020, SMG and France filed post-trial briefing and Proposed Findings of

Fact & Conclusions of Law.[43] On June 23, 2020, Plaintiff filed a reply to Defendants' post-trial

briefing and Proposed Findings of Fact & Conclusions of Law.[44]

## II.   <u>Findings of Fact</u>

The parties agreed to many of the facts relevant to the Court's judgment in this trial when

the parties submitted their uncontested facts in the joint pre-trial order submitted into the record.[45]

The Court will note which facts the parties agreed to in the Court's citations herein.

### A.   *The Parties*

Shelby Bailey ("Plaintiff") is a resident of Louisiana who has muscular dystrophy and

relies on an electric wheelchair for mobility and ventilator to breathe.[46] Plaintiff is a qualified

individual with a disability under the ADA.[47] Plaintiff has been a New Orleans Saints season ticket

---

[39] *Id.* at 30–32.

[40] *Id.* at 32–45.

[41] Rec. Docs. 170–171.

[42] Rec. Doc. 172.

[43] Rec. Docs. 174–175.

[44] Rec. Doc. 178.

[45] *See* Rec. Doc. 163.

[46] *Parties did not contest this fact. Id.* at 2.

[47] *Parties did not contest this fact. Id.* at 4.

holder for over thirty years.[48] Plaintiff attended approximately six games during the 2017 season, approximately seven games during the 2018 season and approximately five games during the 2019 season.[49] Plaintiff intends to continue attending Saints games at the Superdome in the future.[50]

SMG is a private company that manages the Superdome pursuant to a management agreement between it and the Board of Commissioners of the Louisiana Stadium and Exposition District.[51]

The Board of Commissioners of the Louisiana Stadium and Exposition District (the "Board") is a political arm of the State of Louisiana, comprised of seven Louisiana citizens each appointed by the governor and is the owner of the Superdome.[52] The Board owns the Superdome.[53] The Board has no employees.[54] Kyle France ("France") is the chairman of the Board.[55]

**B.    The relationship between the parties**

At trial, Alan Freeman, who was hired by SMG as the general manager of the Superdome, detailed the relationship between the Board and SMG.[56] Mr. Freeman testified that the Board does not have a lot of oversight with respect to SMG's operations and that as the General Manager of the Superdome, there is no one at the Board he speaks to on a regular basis.[57] Mr. Freeman testified

---

[48] *Parties did not contest this fact. Id.* at 2.

[49] Trial Transcript, March 2, 2020, Shelby Bailey, p. 214.

[50] *Parties did not contest this fact.* Rec. Doc. 163 at 6.

[51] *Parties did not contest this fact. Id.* at 2.

[52] *Parties did not contest this fact. Id.*

[53] *Parties did not contest this fact. Id.* at 4.

[54] *Parties did not contest this fact. Id.*

[55] *Parties did not contest this fact. Id.* at 2.

[56] Trial Transcript, March 2, 2020, Alan Freeman, pp. 139–40.

[57] Trial Transcript, March 2, 2020, Alan Freeman, p. 140.

that the Board does not have any employees.[58]

Larry Roedel, who served as general counsel to the Board from 2004 to 2016, testified that the Board relies on SMG's accounting, management, and financial expertise.[59] Mr. Roedel explained that while the Board meets monthly to approve recommendations, without staff and employees, the Board is reliant on SMG.[60] Mr. Roedel could not recall a single instance during his time as general counsel when the Board rejected a significant recommendation from SMG.[61]

Doug Thornton, who served as regional vice-president of SMG, testified that SMG provides recommendations with regard to capital improvements.[62] Mr. Thornton further testified that SMG has a fair amount of operational autonomy to manage and operate the Superdome.[63] Mr. Thornton testified that SMG has its own operational division which performs venue assessments to ensure that the Superdome complies with various regulations, including OSHA, fire safety, and the ADA.[64] Mr. Freeman testified that he performed a rudimentary investigation, by sitting on a folding chair at the Row 36 seats and had other SMG staffers sit and stand in the rows in front of Row 36, to evaluate whether wheelchair users in Row 36 had the same views as other fans.[65]

Additionally, several agreements between SMG and the Board were offered into evidence

---

[58] Trial Transcript, March 2, 2020, Alan Freeman, p. 140.

[59] Trial Transcript, March 2, 2020, Larry Roedel, p. 177.

[60] Trial Transcript, March 2, 2020, Larry Roedel, p. 177.

[61] Trial Transcript, March 2, 2020, Larry Roedel, p. 87.

[62] Trial Transcript, March 2, 2020, Doug Thornton, p. 109.

[63] Trial Transcript, March 2, 2020, Doug Thornton, p. 110.

[64] Trial Transcript, March 2, 2020, Doug Thornton, p. 111.

[65] Trial Transcript, March 2, 2020, Alan Freeman, pp. 150–51.

at trial. Pursuant to the initial Management Agreement,[66] the State of Louisiana "grant[ed] [SMG] . . . the exclusive right to perform and furnish or cause to be performed and furnished, from the effective date [t]hereof, all management, services, labor and materials needed to operate and maintain the Facility known as the 'Louisiana Superdome', in the most efficient and profitable manner as can be reasonably expected."[67] The initial Management Agreement further provides under the section entitled "Capital Improvements Budget":

> At least six (6) months prior to the commencement of each Fiscal Year, [SMG] will submit a budget for such Fiscal Year setting forth projected Capital Expenditures. This budget will be subject to the procedures customarily employed in connection with the development, approval and implementation of budgets for operating agencies of the State. In addition, when [SMG] becomes aware, [SMG] will advise the State of any unanticipated condition which jeopardizes the structural soundness of the Superdome, or the ability of [SMG] to perform under this agreement, and the State agrees to make available the funds necessary to correct such conditions, within such time as required under the circumstances.[68]

"Capital Expenditures" are defined in the Management Agreement as "all expenditures for building additions, alterations or improvements, and for purchases of additional or replacement furniture, machinery or equipment, the depreciable life of which, according to accepted accounting principles, is in excess of one (1) year and expenditures for maintenance or repairs which extend the useful life of the assets being maintained or repaired for a period in excess of one year."[69]

Pursuant to the Amended and Restated Support Services Agreement, the Board delegated

---

[66] Rec. Doc. 180-9. HMC Management Corporation was the original "manager" under the initial Management Agreement. SMG became the "manager" as a result of the Fourth Amendment to Management Agreement dated June 19, 1998. Rec. Doc. 180-13. The Management Agreement has been amended a total of seven times. *See* Rec. Docs. 180-9–180-15.

[67] Rec. Doc. 180-9 at 2.

[68] *Id.* at 5–6.

[69] *Id.* at 1.

to SMG responsibility for certain services.[70] For example, the "Asset Management" section states:

> SMG shall provide all asset management services relating to the Facilities and other properties of the LSED, including maintenance of inventory control; oversight of the condition and maintenance requirements of the Facilities; to the extent that funds supplied by the LSED are made available therefor and the LSED has authority with respect thereto, see that the Facilities are maintained in good order and condition; to the extent that funds supplied by the LSED are made available therefor, rent, lease or purchase all equipment and maintenance supplies necessary or appropriate for the performance of the LSED's obligations with respect to the operation and maintenance of the Facilities; manage all maintenance and capital projects undertaken by the LSED with respect to the Facilities; and otherwise perform all services necessary or useful in preserving and protecting the assets of the LSED. In addition, SMG shall manage any capital projects undertaken by the LSED with respect to the Superdome and the Arena to the extent such function is not already within the scope of SMG's duties and authority under the State Management Agreement.[71]

Furthermore, under the Amended and Restated Support Services Agreement SMG is obligated to "prepare and submit to the LSED . . . each year, proposed capital expenditures with respect to the facilities," as well as "a detailed budget for capital projects recommended to be undertaken. . ."[72]

## C.    *The Superdome pre-2010*

The Superdome was built in 1975.[73] Prior to the 2010 Renovations, the sideline seats in the 100 Level were movable.[74] Prior to the 2010 Renovations, ADA-designated seating in the Superdome was located on temporary platforms in the last row of the 100 Level.[75] These platforms

---

[70] Rec. Doc. 180-18 at 2–4.

[71] *Id.* at 2–3.

[72] *Id.* at 5.

[73] *Parties did not contest this fact.* Rec. Doc. 163 at 4.

[74] Trial Transcript, March 2, 2020, Alan Freeman, pp. 140–41.

[75] *Parties did not contest this fact*. Rec. Doc. 163 at 4.

were located on the field.[76] Plaintiff's seat was on the fifteen yard line.[77] Prior to the 2011 season, Plaintiff viewed Saints games on such a temporary platform.[78] Plaintiff liked watching the games from the platforms because his view of the field was seldomly blocked.[79] As part of the 2010 Renovations, these platforms were removed and replaced with permanent seating.[80]

Plaintiff accessed the platform by crossing a portion of the playing field.[81] The platform did not have access to permanent accessible bathrooms or concessions; patrons seated on the platform utilized a portable toilet.[82]

## D.    *The 2010 Renovations*

On March 11, 2010, construction commenced on renovations to the Superdome (the "2010 Renovations").[83] As part of the 2010 Renovations, the sideline seats in the 100 Level were removed and replaced with new, permanent, fixed seats.[84] Approximately 3,500 new seats were added to the 100 Level.[85] However, the first nine rows of the sideline seats in the 100 Level are demountable so they can be removed for events where more floor space is needed.[86]

---

[76] *Parties did not contest this fact*. *Id*.

[77] Trial Transcript, March 2, 2020, Shelby Bailey, p. 211.

[78] *Parties did not contest this fact*. Rec. Doc. 163 at 4.

[79] Trial Transcript, March 2, 2020, Shelby Bailey, p. 211.

[80] Trial Transcript, March 2, 2020, Doug Thornton, p. 135.

[81] *Parties did not contest this fact*. Rec. Doc. 163 at 4.

[82] *Parties did not contest this fact*. *Id*. at 5.

[83] *Parties did not contest this fact*. *Id*. at 4.

[84] *Parties did not contest this fact*. *Id*. at 5.

[85] Trial Transcript, March 2, 2020, Alan Freeman, p. 143.

[86] Trial Transcript, March 2, 2020, Alan Freeman, p. 143; Trial Transcript, March 2, 2020, Doug Thornton, p. 113.

A total of 17,118 seats along the sidelines of the lower bowl were replaced as part of the 2010 Renovations.[87] The "Bunker Club," premium club seating featuring enhanced fan amenities, was also added as part of the 2010 Renovations.[88] Lastly, the sideline concourses in the 100 Level were widened.[89]

The 2010 Renovations created four separate decks on the bottom-most row of the 100 Level.[90] Those decks are located between the 30 and 40 yard lines and accommodate a total of 24 wheelchair seats and 24 companion seats.[91] Additional new, designated wheelchair accessible seats were also constructed on Row 36 in each section along the sidelines of the 100 Level as part of the 2010 Renovations, except for the seven sections located in each end zone.[92] The seats in the end-zone, consisting of 8,342 seats, were not renovated in 2010.[93] Additionally in 2010, the temporary platforms, where Plaintiff and other wheelchair users previously sat, were removed.[94] The 200 Level and the Terrace were not altered as part of the 2010 Renovations.[95]

---

[87] *Parties did not contest this fact*. Rec. Doc. 163 at 5.

[88] Trial Transcript, March 2, 2020, Alan Freeman, p. 169.

[89] Trial Transcript, March 2, 2020, Alan Freeman, p. 143.

[90] *Parties did not contest this fact*. Rec. Doc. 163 at 5.

[91] *Parties did not contest this fact*. *Id*.

[92] *Parties did not contest this fact*. *Id*. at 5.

[93] *Parties did not contest this fact*. *Id*.

[94] Trial Transcript, March 2, 2020, Doug Thornton, p. 135.

[95] At trial, SMG objected to a question related to alterations at the 200 Level of the Superdome on the basis of relevancy. Rec. Doc. 170 at 44. France joined in the objected. *Id*. at 45. SMG argued that Plaintiff's alteration claim in the Complaint was limited to 2010 Renovations, which only impacted the 100 Level of the Superdome. *Id*. at 44–45. Plaintiff represented that the renovations to the 200 Level occurred following hurricane Katrina and should qualify as an alteration. *Id*. at 49–50. However, Plaintiff conceded that an alteration claim as to the 200 Level was not in the Complaint. *Id*. at 51. Accordingly, because Plaintiff did not assert a 200 Level alteration claim in the Complaint, and did not move to amend the Complaint, the Court determined that it was not an issue at trial. *Id*. at 44–54. However, the Court clarified that evidence related to the 200 Level for other claims, including the program access claim, may still be admissible. *Id*. at 53–54.

E.      *The current configuration of the Superdome*

The Superdome is comprised of five separate seating tiers or "levels", which are vertically-stacked.[96] Closest to the field is the 100 Level or the "Lower Bowl."[97] Extending upward is the 200 Level or the "Loge Bowl," the 300 Level or the "Lower Suite Bowl," and the 400 Level or the "Upper Suite Bowl."[98] Lastly, the Superdome demarks the seating in the "500 Level or Above," or the "Upper Bowl" which includes the 500 Level, the 600 Level and the 700 Level.[99] These uppermost levels of the Superdome are known as the "Terrace."[100] The Levels are divided horizontally into sections.

At the 100 Level, there are presently 25,460 seats, of which a total of 236 are designated as wheelchair accessible seats.[101] The wheelchair-designated seats in Row 1 of the 100 Level are located between the 30-yard and 40-yard lines.[102] The wheelchair accessible seating in Row 36 of the 100 Level wraps around the length of the sideline.[103] There are currently no designated-accessible seats in the end zone sections of the 100 Level at the Superdome.[104] The seating in the Terrace is not wheelchair accessible.[105] There are no designated wheelchair accessible seats in the

---

[96] Rec. Doc. 179-6 at 1.

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] Trial Transcript, March 2, 2020, Alan Freeman, p. 151.

[101] *Parties did not contest this fact*. Rec. Doc. 163 at 5.

[102] *Parties did not contest this fact*. *Id.* at 6.

[103] Trial Transcript, March 3, 2020, James Terry, pp. 338–39.

[104] *Parties did not contest this fact*. Rec. Doc. 163 at 5.

[105] Trial Transcript, March 2, 2020, James Terry, p. 251–54; Trial Transcript, March 3, 2020, Mark Mazz, p. 447; Trial Transcript, March 2, 2020, Alan Freeman, p. 152.

200 Level of the Superdome.[106]

F.    **Plaintiff's seating after the 2010 Renovations**

After the 2010 Renovations, Plaintiff's season tickets were moved to Row 36 of section

109 in the 100 Level.[107] A concrete overhang prevents patrons seated in row 36, including Plaintiff,

from viewing the scoreboard and some aerial gameplay such as punts, kicks, and long passes.[108]

Plaintiff complained about the seats in and sightlines from Row 36 after the very first game he

attended in 2011.[109] Plaintiff has tried the designated-accessible seats in the 100 Level, but the

view is similarly obstructed.[110]

After discovering these obstructions, Plaintiff spoke with Kevin McGuire, an ADA

consultant who at various time has acted as a consultant for one or more of the following: SMG,

the LSED, and the New Orleans Saints.[111] Mr. McGuire attempted to assist Plaintiff regarding his

complaints about obstructed sightlines at the Superdome.[112] For example, Mr. McGuire assisted in

moving Plaintiff's seat to the Row 1 seats in the 100 Level.[113]

### III.    Conclusions of Law

A.    **Applicable Law**

In an attempt to clarify "the often confusing and contradictory standards" governing this

---

[106] Trial Transcript, March 2, 2020, Doug Thornton, p. 110–11; Trial Transcript, March 2, 2020, Alan Freeman, p. 151.

[107] *Parties did not contest this fact.* Rec. Doc. 163 at 6.

[108] *Parties did not contest this fact. Id.*

[109] *Parties did not contest this fact. Id.* at 7.

[110] *Parties did not contest this fact. Id.* at 6.

[111] *Parties did not contest this fact. Id.*

[112] *Parties did not contest this fact. Id.*

[113] *Parties did not contest this fact. Id.*

matter, the Court here expounds upon the regulations, interpretations of the regulations and the guidelines applicable to the ADA.[114] First, the Court reviews the text of the ADA generally, including a discussion of Title II and Title III. Next, the Court reviews the subsequent regulations and guidelines promulgated by the DOJ. The Court then analyzes which of these regulations are applicable to the claims at issue. Lastly, the Court determines whether the DOJ's interpretations of its own regulations are entitled to deference.

### 1.    ADA Compliance Generally

The Americans with Disabilities Act of 1990 ("ADA") "is a broad mandate of comprehensive character and sweeping purpose intended to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life."[115] "To effectuate its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)."[116] Plaintiff brings claims against France under Title II of the ADA and the Rehabilitation Act.[117] Plaintiff brings claims against SMG under Title III of the ADA.[118]

### i.    *Title II of the ADA and the Rehabilitation Act*

"Title II of the ADA focuses on disability discrimination in the provision of public

---

[114] *Landis*, 2019 WL 7157165, at *3 ("The Court notes that seemingly the only consistency in the applicable law is that it and its regulations are incredibly convoluted. This Court, therefore, joins many of its sister courts in bemoaning the lack of clarity regarding the issues at hand.").

[115] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (en banc) (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 599 (1999) (internal quotation marks omitted)).

[116] *PGA Tour*, 532 U.S. at 675.

[117] Rec. Doc. 1 at 1–2.

[118] *Id.* at 2.

services."[119] Specifically, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[120] A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government."[121]

Similarly, "Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal funding."[122] Like Title II, Section 504 provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[123] "The ADA and the Rehabilitation Act generally are interpreted *in pari materia*."[124] "Indeed, Congress has instructed courts that "nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under title V [i.e., § 504] of the Rehabilitation Act . . . or the regulations issued by Federal agencies pursuant to such title.'"[125]

"To show a violation of either statute, a plaintiff must prove "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that

---

[119] *Frame*, 657 F.3d at 223.

[120] 42 U.S.C. § 12132.

[121] *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (quoting 42 U.S.C. § 12131(1)(B)).

[122] *Frame*, 657 F.3d at 223.

[123] 29 U.S.C. § 794(a).

[124] *Frame*, 657 F.3d at 223 (citing *Kemp v. Holder*, 610 F.3d 231, 234–35 (5th Cir. 2010); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287–88, 289 n. 76 (5th Cir. 2005) (en banc)).

[125] *Id.* at 223–24 (quoting 42 U.S.C. § 12201(a); *Bragdon v. Abbott*, 524 U.S. 624, 632 (1998)).

such discrimination is by reason of his disability."[126]

The United States Attorney General is authorized to promulgate regulations implementing Title II.[127] The regulations provide that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."[128] A public entity must operate "each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[129] Therefore, Title II requires "program accessibility."[130]

"Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility."[131] However, a public entity is not "necessarily required . . . to make each of its existing facilities accessible to and usable by individuals with disabilities."[132] Instead, with respect to facilities built before 1992, Title II only requires "'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the

---

[126] *Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565, 574 (5th Cir. 2018) (quoting *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (per curiam)).

[127] 42 U.S.C. § 12134(a).

[128] 28 C.F.R. § 35.149.

[129] *Id*. at § 35.150(a).

[130] *Tennessee v. Lane*, 541 U.S. 509, 531 (2004).

[131] *Id.* (citing 42 U.S.C. § 12131(2)).

[132] 28 C.F.R. § 35.150(a)(1).

service."[133]

"In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards,"[134] including the ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG") set forth at 36 C.F.R. part 1191, appendices B and D. Pursuant to the regulations, "[e]ach facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility . . . shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities. . . ."[135]

### ii.     *Title III of the ADA*

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[136] A stadium is considered to be a place of public accommodation under Title III.[137] "The ADA does not require a place of public accommodation to provide a plaintiff with the ideal or preferred accommodation; rather, the ADA requires that a defendant provide a plaintiff with an accommodation that is reasonable and permits the plaintiff to participate equally in the good, service, or benefit offered."[138]

Title III defines discrimination as including "a failure to remove architectural barriers . . .

---

[133] *Lane*, 541 U.S. at 531.

[134] *Id.* (citing 28 CFR § 35.151).

[135] 28 C.F.R. § 35.151(b)(1).

[136] 42 U.S.C. § 12182(a).

[137] *Id.* at § 12181(7)(C).

[138] 1 Americans with Disab. Pract. & Compliance Manual § 4:1, Nondiscrimination Mandate.

in existing facilities . . . where such removal is readily achievable."[139] The term "existing facilities" includes structures built prior to the Act taking effect on January 26, 1992, which have not been modified since then.[140]

Pursuant to the regulations implementing Title III, "[a]ny alteration to a place of public accommodation . . . after January 26, 1992, shall be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."[141] Public accommodations built or altered after January 26, 1992, must comply with both the Title III regulations set forth at 28 C.F.R. part 36, subpart D and the ADAAG unless "the nature of an existing facility makes it virtually impossible to comply fully with applicable accessibility standards through a planned alteration."[142] There is an exception to Title III's requirements where "an entity can demonstrate that it is structurally impracticable to meet the requirements."[143]

### 2. Subsequent ADA Regulations

Since the ADA was enacted, the Department of Justice ("DOJ") has issued five documents addressing issues pertinent to the outcome of this matter. Below, the Court reviews the history and content of these five documents.

To begin, the Court reviews the process by which the DOJ promulgates regulations. The ADA granted the DOJ the authority to promulgate regulations and guidelines to implement the

---

[139] 42 U.S.C. § 12182(b)(2)(A)(iv).

[140] *Tatum v. Doctor's Associates, Inc.*, No. CV 14–2980, 2016 WL 852458, at *3 (E.D. La. Mar. 4, 2016)

[141] 28 C.F.R. § 36.402(a)(1).

[142] *Id.* at § 36.402(c).

[143] 42 U.S.C. § 12183(a)(1).

ADA.[144] However, this process comes with "an unusual twist."[145] In promulgating and implementing its regulations, the DOJ is required to "be consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board" ("the Access Board").[146] Accordingly, the ADA Accessibility Guidelines ("ADAAG") are developed by the Access Board.[147]

In January 1991, the Access Board published its first proposed ADAAG, which were finalized in July 1991 (the "1991 ADAAG").[148] The 1991 ADAAG was then formally adopted by the DOJ "'as the accessibility standard applicable under'" Title III.[149] Thus, "[t]he DOJ incorporated the ADAAG . . . verbatim" into what was then Appendix A.[150] Today, the 1991 ADAAG is located at Appendix D.[151]

At issue in this litigation is Section 4.33.3 of the 1991 ADAAG, which addresses the placement of wheelchair locations, and provides in whole:

> Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public. They shall adjoin an accessible route that also serves as a means of ingress and egress in case of emergency. At least one companion fixed seat shall be provided next to each wheelchair seating area. When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location. Readily removable

---

[144] *Id.* at § 12134(a) (authorizing the United States Attorney General to promulgate regulations implementing Title II); *id.* at § 12186(b).

[145] *Miller v. California Speedway Corp.*, 536 F.3d 1020, 1024 (9th Cir. 2008).

[146] 42 U.S.C. 12186(c); *see also id.* at § 12134(c).

[147] 29 U.S.C. § 792(a)(1).

[148] *Miller*, 536 F.3d at 1025.

[149] *Id.* (quoting 56 Fed. Reg. at 35,585).

[150] *Id.* at 1026 (citing 28 C.F.R. 36.406 & App. A).

[151] *See* 28 C.F.R. Pt. 36, App. D; *see also* Access Board, ADA Standards for Accessible Design (1994), https://www.ada.gov/1991standards/adastd94-archive.pdf ("1991 ADAAG").

seats may be installed in wheelchair spaces when the spaces are not required to accommodate wheelchair users.

EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress.[152]

In 1993, the DOJ, under its authority to publish technical assistance, published a Technical Assistance Manual (the "TAM").[153] "Such technical assistance manuals are meant to guide entities such as [the owners and operators of sports arenas] in some of the more technical elements of complying with the regulations."[154] The 1993 TAM did not directly address § 4.33.3, and as such, does not provide much in the way of additional context to the sightline regulations at issue in this litigation.[155] However, the 1994 Supplement to the Technical Assistance Manual (the "1994 Supplement"), provided a seemingly more aggressive interpretation of § 4.33.3 by requiring that wheelchair locations provide lines of sight *over* spectators who stand:

In addition to requiring companion seating and dispersion of wheelchair locations, ADAAG requires that wheelchair locations provide people with disabilities lines of sight comparable to those for members of the general public. Thus, in assembly areas where spectators can be expected to stand during the event or show being viewed, *the wheelchair locations must provide lines of sight over spectators who stand*. This can be accomplished in many ways, including placing wheelchair locations at the front of a seating section, or by providing sufficient additional elevation for wheelchair locations placed at the rear of seating sections to allow

---

[152] 1991 ADAAG at § 4.33.3.

[153] *See* Department of Justice, ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities (1993), https://www.ada.gov/taman3.html.

[154] *Landis*, 2019 WL 7157165, at *4.

[155] The TAM addressed "[s]eating in assembly areas" in which it provided that:

If it is readily achievable to do so, public accommodations that operate places of assembly must locate seating for individuals who use wheelchairs so that it --
      1) Is dispersed throughout the seating area;
      2) Provides lines of sight and choices of admission prices comparable to those offered to the general public;
      3) Adjoins an accessible route for emergency egress; and
      4) Permits people who use wheelchairs to sit with their friends or family.

those spectators to see over the spectators who stand in front of them.[156]

"In addition to the ADAAG and the TAMs, the DOJ also publishes more informal guidelines regarding its interpretations of the ADA, the ADAAG, and its own regulations. For example, in 1996 it published *Accessible Stadiums* in order to 'highlight[ ] key accessibility requirements of the ADA that apply to" stadiums built after the ADA's effective date.'"[157] Regarding sight line requirements, *Accessible Stadiums* provides:

> Wheelchair seating locations must provide lines of sight comparable to those provided to other spectators. In stadiums where spectators can be expected to stand during the show or event (for example, football, baseball, basketball games, or rock concerts), all or substantially all of the wheelchair seating locations must provide a line of sight over standing spectators. A comparable line of sight . . . allows a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front.[158]

In 2004, the Access Board produced updated guidelines, which the DOJ adopted in 2010 (the "2010 ADAAG").[159] The 2010 ADAAG requires that "[w]heelchair spaces shall be an integral part of the seating plan" meaning that "wheelchair spaces must be placed within the footprint of the seating area."[160] "Wheelchair spaces cannot be segregated from seating areas. For example, it would be unacceptable to place only the wheelchair spaces, or only the wheelchair spaces and their associated companion seats, outside the seating areas defined by risers in an assembly area."[161]

---

[156] *See* Title III Technical Assistance Manual 1994 Supplement (1994), https://www.ada.gov/taman3up.html.

[157] *Landis*, 2019 WL 7157165, at *5 (quoting Department of Justice, Accessible Stadiums (1996), https://www.ada.gov/stadium.pdf).

[158] Department of Justice, Accessible Stadiums 2 (1996), https://www.ada.gov/stadium.pdf.

[159] *See* 28 C.F.R. Pt. 36, App. B; *see also* Access Board, 2010 ADA Standards for Accessible Design (2010), www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf. ("2010 ADAAG").

[160] 2010 ADAAG at § 221.2.2.

[161] *Id*.

The 2010 ADAAG elaborated on the sightline requirements that were initially contained within 1991 ADAAG Section 4.33.3:

> Wheelchair spaces shall provide lines of sight complying with 802.2 and shall comply with 221.2.3. In providing lines of sight, wheelchair spaces shall be dispersed. Wheelchair spaces shall provide spectators with choices of seating locations and viewing angles that are substantially equivalent to, or better than, the choices of seating locations and viewing angles available to all other spectators. When the number of wheelchair spaces required by 221.2.1 has been met, further dispersion shall not be required.[162]

Section 802.2 provides "Lines of sight to the screen, performance area, or playing field for spectators in wheelchair spaces shall comply with 802.2."[163] Section 802.2.1.1 addresses lines of sight over seated spectators while Section 802.2.2 addresses lines of sight over standing spectators. Section 802.2.2.1 addresses lines of sight over heads of standing spectators: "Where standing spectators are provided lines of sight over the heads of spectators standing in the first row in front of their seats, spectators seated in wheelchair spaces shall be afforded lines of sight over the heads of standing spectators in the first row in front of wheelchair spaces."[164] Section 802.2.2 addresses lines of sight over standing spectators: "Where standing spectators are provided lines of sight over the shoulders and between the heads of spectators standing in the first row in front of their seats, spectators seated in wheelchair spaces shall be afforded lines of sight over the shoulders and between the heads of standing spectators in the first row in front of wheelchair spaces."[165] Additionally, the 2010 ADAAG includes a requirement for the horizontal dispersion of accessible

---

[162] *Id*. at § 221.2.3; *see also id*. ("Consistent with the overall intent of the ADA, individuals who use wheelchairs must be provided equal access so that their experience is substantially equivalent to that of other members of the audience. Thus, while individuals who use wheelchairs need not be provided with the best seats in the house, neither may they be relegated to the worst.").

[163] *Id*. at § 802.2.

[164] *Id*. at § 802.2.2.1.

[165] *Id*. at § 802.2.2.2.

seats[166] as well as the vertical dispersion of accessible seats.[167]

### 3. Whether the 1991 ADAAG Standards or the 2010 ADAAG Standard apply to the 2010 Renovations

Next, the Court must address when the 1991 ADAAG requirements apply and when the 2010 ADAAG requirements apply. In 2011, the DOJ published guidelines on whether the 2010 ADAAG or the 1991 ADAAG, applies.[168] With respect to compliance date, the regulations provide:

> New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 1991 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government (or, in those jurisdictions where the government does not certify completion of applications, if the date when the last application for a building permit or permit extension is received by the State, county, or local government) is before September 15, 2010, or if no permit is required, if the start of physical construction or alterations occurs before September 15, 2010.[169]

In other words, the 1991 ADAAG applies to new construction and alterations built prior to September, 15 2010.[170] However, the 2010 ADAAG applies to new construction and alterations

---

[166] *Id*. at § 221.2.3.1 ("Wheelchair spaces shall be dispersed horizontally."). *see also id*. ("Horizontal dispersion of wheelchair spaces is the placement of spaces in an assembly facility seating area from side-to-side or, in the case of an arena or stadium, around the field of play or performance area.").

[167] *Id*. at § 221.2.3.2 ("Wheelchair spaces shall be dispersed vertically at varying distances from the screen, performance area, or playing field. In addition, wheelchair spaces shall be located in each balcony or mezzanine that is located on an accessible route."). *see also id*. ("When wheelchair spaces are dispersed vertically in an assembly facility they are placed at different locations within the seating area from front-to-back so that the distance from the screen, stage, playing field, area of sports activity, or other focal point is varied among wheelchair spaces."). The 2010 ADAAG's vertical dispersion requirement includes an exception, which states that wheel chairs spaces are not required "in rows other than rows at points of entry to bleacher seating." 2010 ADAAG at § 221.2.3.2 ("Points of entry to bleacher seating may include, but are not limited to, cross aisles, concourses, vomitories, and entrance ramps and stairs. Vertical, center, or side aisles adjoining bleacher seating that are stepped or tiered are not considered entry points.").

[168] Department of Justice, ADA Requirements: Effective Date/Compliance Date (2011), https://www.ada.gov/revised_effective_dates-2010.htm.

[169] 28 C.F.R. § 36.406(a)(1). Facilities altered on or after September 15, 2010 and before March 15, 2010, may choose between the 1991 or 2010 Standards, whereas facilities altered on or after March 15, 2012, must comply with the 2010 Standards. *Id*.

[170] *Id*. ("New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 1991 Standards if the date when the last application for a building permit or permit extension is certified to be complete by

built after March 15, 2012.[171] Facilities built between October 2010 and February 2012 could choose between the 1991 and 2010 Standards.[172] Stadiums that would have been controlled by the 1991 ADAAG but conducted alterations after March 2012, must make those alterations in compliance with the 2010 ADAAG.[173] However, a facility that was to be constructed according to the 1991 ADAAG, but fails to meet that standard must now "be made accessible in accordance with the 2010 Standards."[174]

Here, SMG contends that no permit was required for the 2010 Renovations, and no evidence has been offered to the contrary.[175] Construction on the 2010 Renovations commenced on March 11, 2010.[176] Accordingly, the start of physical construction or alterations occurred before September 15, 2010. Therefore, the alterations for the 2010 Renovations must comply with the

---

a State, county, or local govern ment (or, in those jurisdictions where the government does not certify completion of applications, if the date when the last application for a building permit or permit extension is received by the State, county, or local government) is before September 15, 2010, or if no permit is required, if the start of physical construction or alterations occurs before September 15, 2010.").

[171] *Id*. at § 36.406(a)(3) ("New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government (or, in those jurisdictions where the government does not certify completion of applications, if the date when the last application for a building permit or permit extension is received by the State, county, or local government) is on or after March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after March 15, 2012.").

[172] *Id*. at § 36.406(a)(2) ("New construction and alterations subject to §§ 36.401 or 36.402 shall comply either with the 1991 Standards or with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government (or, in those jurisdictions where the government does not certify completion of applications, if the date when the last application for a building permit or permit extension is received by the State, county, or local government) is on or after September 15, 2010 and before March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after September 15, 2010 and before March 15, 2012.").

[173] *Id*. at § 36.406(a)(3).

[174] *Id*. § 36.406(a)(5)(ii) ("Newly constructed or altered facilities or elements covered by §§ 36.401 or 36.402 that were constructed or altered before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards.").

[175] Rec. Doc. 174 at 62.

[176] Rec. Doc. 163 at 4.

26

1991 Standards. However, if the Court finds that Defendants failed to comply with the 1991 ADAAG, Defendants will be required to bring the Superdome into compliance with the 2010 ADAAG.[177]

### 4.    Whether the DOJ's interpretations of its own regulations are entitled to substantial deference

Lastly, the Court addresses the degree of deference the DOJ is entitled to in interpreting its own regulations. Recently, in *Kisor v. Wilkie*, the United States Supreme Court addressed the continuing viability of *Auer* deference, or the judicial deference afforded to an agency's interpretation of its own regulations.[178] The Supreme Court in *Kisor* did not overrule *Auer* deference but did clarify some of the limitations in applying deference to constructions by an agency.[179] Before *Kisor*, *Auer* deference required courts to "give an agency's interpretation of its own regulations controlling weight unless it is plainly erroneous or inconsistent with the regulation."[180] After *Kisor*, a court is to afford judicial deference to an agency's interpretation of its own regulations if the agency's regulation is genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation, and the agency's interpretation in reasonable.[181] If the regulation is not ambiguous, the "regulation then must mean what it means—and the court must give it effect, as the court would any law."[182] To determine whether a regulation is ambiguous, courts must "make a conscientious effort to determine, based on indicia like text,

---

[177] 28 C.F.R. § 36.406(a)(5)(ii).

[178] *Kisor v. Wilkie*, 139 S. Ct. 2400, 2410 (2019).

[179] *Id.* at 2415–16.

[180] *Id.* at 2416.

[181] *Id.* at 2414–15.

[182] *Id.* at 2415.

structure, history, and purpose, whether the regulation really has more than one reasonable meaning."[183]

Here, the regulation at issue, Section 4.33.3 of the 1991 ADAAG, requires wheelchair accessible seats to have "lines of sight comparable to those for members of the general public."[184] The proper interpretation of the phrase comparable lines of sight "is a classic instance of an ambiguous regulation."[185] Several circuits have disagreed over what is meant by a comparable line of sight.[186] This shows the regulation is subject to differing interpretations. The ambiguity of the phrase "reflects the well-known limits of expression."[187] Lastly, the Supreme Court listed this precise provision in *Kisor* as an example of "real uncertainties about a regulation's meaning."[188] Accordingly, the Court finds that Section 4.33.3 of the 1991 ADAAG is genuinely ambiguous.

Still, as the Supreme Court has explained, the analysis remains incomplete because "not every reasonable agency reading of a genuinely ambiguous rule should receive *Auer* deference."[189]

---

[183] *Id*. at 2423–24.

[184] 1991 ADAAG at § 4.33.3.

[185] *Landis v. Washington State Major League Baseball Stadium Pub. Facilities Dist.*, 403 F.Supp.3d 907, 924 (W.D. Wash. 2019).

[186] *See, e.g.*, *Miller*, 536 F.3d 1020; *United States v. Hoyts Cinemas Corp.*, 380 F.3d 558 (1st Cir. 2004); *United States v. Cinemark USA, Inc.*, 348 F.3d 569 (6th Cir. 2003); *Oregon Paralyzed Veterans of Am. v. Regal Cinemas, Inc.*, 339 F.3d 1126 (9th Cir. 2003); *Lara v. Cinemark USA, Inc.*, 207 F.3d 783, 788–89 (5th Cir. 2000) (holding that the phrase means that wheelchair patrons must have a view without physical obstructions); *Caruso v. Blockbuster-Sony Music Entm't Ctr. at Waterfront*, 193 F.3d 730 (3d Cir. 1999) (holding that the phrase means that wheelchair seating must be dispersed throughout a facility, such that wheelchair users have a variety of viewing angles to choose from); *Paralyzed Veterans of Am. v. D. C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997).

[187] *See Kisor*, 139 S.Ct. at 2410.

[188] *Id*. ("In a rule issued to implement the Americans with Disabilities Act (ADA), the Department of Justice requires theaters and stadiums to provide people with disabilities "lines of sight comparable to those for members of the general public." 28 C.F.R. pt. 36, App. A, p. 563 (1996). Must the Washington Wizards construct wheelchair seating to offer lines of sight over spectators when they rise to their feet? Or is it enough that the facility offers comparable views so long as everyone remains seated?").

[189] *Id*. at 2416.

Before applying *Auer* deference, "a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight."[190] The Supreme Court has "laid out some especially important markers for identifying when *Auer* deference is and is not appropriate."[191] First, "the regulatory interpretation must be one actually made by the agency" meaning is the agency's official position, rather than an ad hoc statement.[192] Second, "the agency's interpretation must in some way implicate its substantive expertise."[193] And third, "an agency's reading of a rule must reflect fair and considered judgment."[194]

As discussed above, Section 4.33.3 of the 1991 ADAAG requires "people with physical disabilities [be provided] a choice of admission prices and lines of sight comparable to those for members of the general public."[195] The 1993 TAM did not directly address § 4.33.3, but the 1994 Supplement provided a seemingly more aggressive interpretation of § 4.33.3 by requiring that wheelchair locations provide lines of sight *over* spectators who stand:

> In addition to requiring companion seating and dispersion of wheelchair locations, ADAAG requires that wheelchair locations provide people with disabilities lines of sight comparable to those for members of the general public. Thus, in assembly areas where spectators can be expected to stand during the event or show being viewed, *the wheelchair locations must provide lines of sight over spectators who stand*. This can be accomplished in many ways, including placing wheelchair locations at the front of a seating section, or by providing sufficient additional elevation for wheelchair locations placed at the rear of seating sections to allow those spectators to see over the spectators who stand in front of them.[196]

---

[190] *Id*.

[191] *Id*.

[192] *Id*. (citing *United States v. Mead Corp.*, 533 U.S. 218, 257–59 (2001) (Scalia, J., dissenting)).

[193] *Id*. at 2417.

[194] *Id*. at 2417–18 (citations and internal quotation marks omitted).

[195] 1991 ADAAG at § 4.33.3.

[196] *See* Title III Technical Assistance Manual 1994 Supplement (1994), https://www.ada.gov/taman3up.html.

The Court finds that this interpretation of Section 4.33.3 is entitled to *Auer* deference. It is reasonable to interpret the term "lines of sight comparable to those for members of the general public" as requiring lines of sight over spectators who stand at events where spectators can be expected to stand. Additionally, the 1994 construction is consistent with the statutory requirement that facilities be "readily accessible to" and "usable by" persons with disabilities.[197] If the members of the general public typically stand during Saints games at the Superdome, a wheelchair user must be able to see over standing patrons to meaningfully access the facility. Because the 1994 construction reflects the DOJ's fair and considered judgment and implicates its substantive expertise, it is entitled to substantial deference.

In a guideline entitled *Accessible Stadiums*, the DOJ defined a "comparable line of sight" to allow for a person using a wheelchair to see the playing surface between the heads and over the shoulders of the person standing in the row immediately in front and over the heads of the persons standing two rows in front. The guidance provides that:

> Wheelchair seating locations must provide lines of sight comparable to those provided to other spectators. In stadiums where spectators can be expected to stand during the show or event (for example, football, baseball, basketball games, or rock concerts), all or substantially all of the wheelchair seating locations must provide a line of sight over standing spectators. A comparable line of sight . . . allows a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front.[198]

The Court finds that this interpretation of Section 4.33.3 is entitled to *Auer* deference. It is reasonable to interpret the term "lines of sight comparable to those for members of the general public" as requiring lines of sight over standing spectators, meaning that a person using a

---

[197] 42 U.S.C. § 12183(a)(1).

[198] Department of Justice, Accessible Stadiums 2 (1996), https://www.ada.gov/stadium.pdf.

wheelchair can see the playing surface between the heads and over the shoulders of the person standing in the row immediately in front and over the heads of the persons standing two rows in front. This interpretation is consistent with the statutory requirement that facilities be "readily accessible to" and "usable by" persons with disabilities.[199] If the members of the general public typically stand during Saints games at the Superdome, a wheelchair user must be able to see over the shoulders or heads of standing patrons in front of them to meaningfully access the facility. Because the guidelines in *Accessible Stadiums*, reflects the DOJ's fair and considered judgment and implicates its substantive expertise, it is entitled to substantial deference.

**B.      Whether SMG is an Operator of the Superdome under Title III**

As a preliminary matter, SMG argues that it cannot be held liable under Title III because it is not an "operator" of the Superdome. Title III of the ADA applies to "any person who owns, leases (or leases to), or operates a place of public accommodation."[200] Accordingly, the Court begins by addressing whether SMG is an operator for purposes of the ADA.

In *Neff v. Am. Dairy Queen Corp.*, the Fifth Circuit addressed what it means to "operate" a place of public accommodation under the ADA.[201] There, the Fifth Circuit explained that "[b]ecause the ADA does not define the term 'operates,' we 'construe it in accord with its ordinary and natural meaning.'"[202] The Fifth Circuit found that the term "operate" means "to put or keep in operation," "[t]o control or direct the functioning of," or "[t]o conduct the affairs of; manage."[203]

---

[199] 42 U.S.C. § 12183(a)(1).

[200] *See id.* at § 12182(a)

[201] 58 F.3d 1063 (5th Cir. 1995).

[202] *Id*. at 1066 (quoting *Smith v. United States*, 508 U.S. 223, 223 (1993); *Perrin v. United States*, 444 U.S. 37, 42 (1979).

[203] *Id.* (internal citations omitted).

In *Neff*, the plaintiff, alleged that American Dairy Queen Corporation ("ADQ") violated the ADA by failing to make certain stores accessible to her.[204] As a franchisor, ADQ licenses franchisees to establish and operate Dairy Queen retail stores, like the stores the plaintiff alleged were not accessible to her.[205] ADQ had limited control over franchisee stores; for example, the franchise agreement between the stores at issue and ADQ merely gave ADQ the power to veto modifications to the store's facilities.[206] Accordingly, the Fifth Circuit had to determine a narrow issue: "whether a franchisor with limited control over a franchisee's store" can be considered an operator.[207] The Fifth Circuit held that the relevant inquiry is whether the defendant controls the modification of the public accommodation such that the defendant could cause the accommodation to comply with the ADA.[208] Conversely, "non-structural aspects" of the facility's operations, including accounting, personnel uniforms and use of trademarks, are irrelevant to the operator inquiry.[209]

The Fifth Circuit reviewed the language in the franchise agreements and affirmed the district court's holding that this amount of control was insufficient to label ADQ an operator.[210] Importantly, the section of the franchise agreement that related to modification of the structure of

---

[204] *Id*. at 1064.

[205] *Id*.

[206] *Id*. at 1065.

[207] *Id*. at 1066.

[208] *Id.* at 1067; *see also Disabled Rights Action Comm.*, 375 F.3d at 878 (9th Cir. 2004) ("whether Title III applies...depends on whether those private entities exercise sufficient control over the Center, and in particular over the configuration of the facilities, even temporarily, with regard to accessibility, that they can be said to 'operate' the stadium"); *Colon v. League of United Latin Am. Citizens*, 91 F.3d 140 (5th Cir. 1996) ("[T]o be an 'operator' requires more than simply controlling some aspect of a public accommodation. Rather, the person must have control over the modification sought by the plaintiff.").

[209] *Id*.

[210] *Id*. at 1067–68.

franchisee stores provided "that ADQ may disapprove any proposed modifications to the [stores'] building and equipment."[211] The Fifth Circuit found that while this veto power "does amount to a limited form of control over structural modifications, [it] cannot support a holding that ADQ 'operates' the [stores] with respect to its removal of architectural barriers to the disabled."[212] Additionally, the Fifth Circuit noted that the plaintiff did not offer any evidence showing that ADQ had previously withheld its consent to proposed modifications that would have brought the stores it into compliance with the ADA.[213]

The evidence presented at trial shows that SMG is an operator of the Superdome for purposes of the ADA. The testimony of Alan Freeman ("Mr. Freeman"), Larry Roedel ("Mr. Roedel") and Doug Thornton ("Mr. Thornton") demonstrate the level of control SMG maintains over the Superdome. At trial, Mr. Freeman, who was hired by SMG as the general manager of the Superdome, detailed the relationship between the Board and SMG.[214] Mr. Freeman testified that the Board does not have a lot of oversight with respect to SMG's operations and that as the General Manager of the Superdome, there is no one at the Board he speaks to on a regular basis.[215] Mr. Freeman testified that the Board does not have any employees.[216]

Mr. Roedel, who served as general counsel to the Board from 2004 to 2016, testified that the Board relies on SMG's accounting, management, and financial expertise.[217] Mr. Roedel

---

[211] *Id*. at 1068.

[212] *Id*.

[213] *Id*.

[214] Trial Transcript, March 2, 2020, Alan Freeman, pp. 139–40.

[215] Trial Transcript, March 2, 2020, Alan Freeman, p. 140.

[216] Trial Transcript, March 2, 2020, Alan Freeman, p. 140.

[217] Trial Transcript, March 2, 2020, Larry Roedel, p. 177.

explained that while the Board meets monthly to approve recommendations, without staff and employees, the Board is reliant on SMG.[218] Mr. Roedel could not recall a single instance during his time as general counsel when the Board rejected a significant recommendations from SMG.[219]

Mr. Thornton, who served as regional vice-president of SMG, testified that SMG provides recommendations with regard to capital improvements.[220] Mr. Thornton further testified that SMG has a fair amount of operational autonomy to manage and operate the Superdome.[221] Mr. Thornton testified that SMG has its own operational division which performs venue assessments to ensure that the Superdome complies with various regulations, including OSHA, fire safety, and the ADA.[222]

Additionally, several agreements between SMG and the Board were offered into evidence at trial. These agreements further demonstrate SMG's responsibility for managing and operating the Superdome. Pursuant to the initial Management Agreement,[223] the State of Louisiana "grant[ed] [SMG] . . . the exclusive right to perform and furnish or cause to be performed and furnished, from the effective date [t]hereof, all management, services, labor and materials needed to operate and maintain the Facility known as the 'Louisiana Superdome', in the most efficient and profitable manner as can be reasonably expected."[224] The initial Management Agreement

---

[218] Trial Transcript, March 2, 2020, Larry Roedel, p. 177.

[219] Trial Transcript, March 2, 2020, Larry Roedel, p. 87.

[220] Trial Transcript, March 2, 2020, Doug Thornton, p. 109.

[221] Trial Transcript, March 2, 2020, Doug Thornton, p. 110.

[222] Trial Transcript, March 2, 2020, Doug Thornton, p. 111.

[223] Rec. Doc. 180-9. HMC Management Corporation was the original "manager" under the initial Management Agreement. SMG became the "manager" as a result of the Fourth Amendment to Management Agreement dated June 19, 1998. Rec. Doc. 180-13. The Management Agreement has been amended a total of seven times. *See* Rec. Docs. 180-9–180-15.

[224] Rec. Doc. 180-9 at 2.

further provides under the section entitled "Capital Improvements Budget":

> At least six (6) months prior to the commencement of each Fiscal Year, [SMG] will submit a budget for such Fiscal Year setting forth projected Capital Expenditures. This budget will be subject to the procedures customarily employed in connection with the development, approval and implementation of budgets for operating agencies of the State. In addition, when [SMG] becomes aware, [SMG] will advise the State of any unanticipated condition which jeopardizes the structural soundness of the Superdome, or the ability of [SMG] to perform under this agreement, and the State agrees to make available the funds necessary to correct such conditions, within such time as required under the circumstances.[225]

"Capital Expenditures" are defined in the Management Agreement as "all expenditures for building additions, alterations or improvements, and for purchases of additional or replacement furniture, machinery or equipment, the depreciable life of which, according to accepted accounting principles, is in excess of one (1) year and expenditures for maintenance or repairs which extend the useful life of the assets being maintained or repaired for a period in excess of one year."[226]

Pursuant to the Amended and Restated Support Services Agreement, the Board delegated to SMG responsibility for certain services.[227] For example, the "Asset Management" section states:

> SMG shall provide all asset management services relating to the Facilities and other properties of the LSED, including maintenance of inventory control; oversight of the condition and maintenance requirements of the Facilities; to the extent that funds supplied by the LSED are made available therefor and the LSED has authority with respect thereto, see that the Facilities are maintained in good order and condition; to the extent that funds supplied by the LSED are made available therefor, rent, lease or purchase all equipment and maintenance supplies necessary or appropriate for the performance of the LSED's obligations with respect to the operation and maintenance of the Facilities; manage all maintenance and capital projects undertaken by the LSED with respect to the Facilities; and otherwise perform all services necessary or useful in preserving and protecting the assets of the LSED. In addition, SMG shall manage any capital projects undertaken by the LSED with respect to the Superdome and the Arena to the extent such function is not already within the scope of SMG's duties and authority under the State

---

[225] *Id.* at 5–6.

[226] *Id.* at 1.

[227] Rec. Doc. 180-18 at 2–4.

Management Agreement.[228]

Furthermore, under the Amended and Restated Support Services Agreement SMG is obligated to "prepare and submit to the LSED . . . each year, proposed capital expenditures with respect to the facilities," as well as "a detailed budget for capital projects recommended to be undertaken. . ."[229]

The issue is whether the evidence shows sufficient control on SMG's part such that SMG can be said to "operate" the Superdome with respect to the ability to comply with the ADA.[230]  The Court finds that that it does, particularly where SMG has "the exclusive right to perform and furnish or cause to be performed and furnished . . . all management, services, labor and materials needed to *operate* and maintain the" Superdome.[231]

The testimony of Mr. Freeman, Mr. Roedel and Mr. Thornton, as well as the language in the above-mentioned agreements, establishes that SMG has sufficient control such that it "operates" the Superdome. Specifically, the Court finds that SMG could cause the Superdome to comply with the ADA. The Management Agreement and the Amended and Restated Support Services Agreement paint a picture of one entity, SMG, evaluating problems and recommending solutions and another entity, the Board, approving or rejecting those solutions. In this way, the relationship between the Board and SMG is symbiotic. This is not an uncommon arrangement, as "both the legislative history of the ADA and the regulations make clear that management, control,

---

[228] *Id.* at 2–3.

[229] *Id.* at 5.

[230] *Neff*, 58 F.3d at 1067; *see also Disabled Rights Action Comm.*, 375 F.3d at 878 (9th Cir. 2004) ("whether Title III applies…depends on whether those private entities exercise sufficient control over the Center, and in particular over the configuration of the facilities, even temporarily, with regard to accessibility, that they can be said to 'operate' the stadium"); *Colon v. League of United Latin Am. Citizens*, 91 F.3d 140 (5th Cir. 1996) ("[T]o be an 'operator' requires more than simply controlling some aspect of a public accommodation. Rather, the person must have control over the modification sought by the plaintiff.").

[231] *Id.*

36

and regulation of a place of public accommodation may be allocable between parties."[232]

The Board is comprised of seven individuals appointed by the governor and has no employees.[233] On the other hand, SMG is responsible for providing budgets, maintaining the facility, and managing all maintenance and capital projects undertaken by the Board. This is not a case of a "franchisor with limited control over a franchisee's store."[234] Rather, SMG exercises fairly significant control over the functioning and day-to-day operation of the Superdome. Accordingly, the Court finds that SMG is an operator of the Superdome under the ADA.

Here, SMG is more akin to the franchisee and the Board is more akin to the franchisor in *Neff*. The Management Agreement and the Amended and Restated Support Services Agreement show that the Board has the power to approve or disapprove of SMG's proposals. This is analogous to ADQ's power to "disapprove any proposed modifications to the [stores'] building and equipment."[235] The Fifth Circuit found that while one entity's veto power "does amount to a limited form of control over structural modifications," it does not indicate that the other entity does not operate the facility with respect to the removal of architectural barriers to the disabled.[236] Additionally, as in *Neff*, no evidence has been presented to suggest that the other entity, here the Board, withheld its consent to proposed modifications that would have brought the Superdome into compliance with the ADA.[237] In fact, the evidence suggests that the Board adopts nearly every

---

[232] *Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F.Supp.2d 460, 485-86 (D.N.J. 1998) (citing 28 C.F.R. § 36.201(b); H.R. Rep. No. 101–485(III), at 55–56).

[233] Trial Transcript, March 2, 2020, Larry Roedel, p. 75; Trial Transcript, March 2, 2020, Alan Freeman, p. 140.

[234] *Neff*, 58 F.3d at 1066.

[235] *Id*. at 1068.

[236] *Id*.

[237] *Id*.

significant SMG proposal.[238] Additionally, if SMG requests funds, the State is obligated to "make available the funds necessary to correct such conditions, within such time as required under the circumstances."[239] Accordingly, the Court finds that SMG operates the Superdome in the "'ordinary and natural meaning'" of that term.[240]

## C.   *Plaintiff's Claims*

Plaintiff argues that the Superdome does not comply with the ADA because it fails to meet various applicable standards. Plaintiff brings claims against France under Title II of the ADA and the Rehabilitation Act.[241] Plaintiff brings claims against SMG under Title III of the ADA.[242]

 "To succeed on a claim under Title II of the ADA, a plaintiff must prove: '(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.'"[243] As discussed below, Plaintiff is a qualified individual with a disability for purposes of the ADA and any discrimination is by reason of his disability. To establish the second element of his Title II claim, Plaintiff must show he was "denied the benefits of services, programs, or activities" for which the Board is responsible, or was "otherwise discriminated against" by the Board.[244]

To establish a Title III violation, Plaintiff must show "(1) [he] has a disability; (2)

---

[238] Trial Transcript, March 2, 2020, Larry Roedel, p. 87.

[239] Rec. Doc. 180-9 at 6.

[240] *Neff*, 58 F.3d at 1066 (quoting *Smith*, 508 U.S. at 223; *Perrin*, 444 U.S. at 42 (1979).

[241] Rec. Doc. 1 at 1–2.

[242] *Id.* at 2.

[243] *Wells v. Thaler*, 460 F. App'x 303, 311 (5th Cir. 2012) (quoting *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011)).

[244] *Id*. (quoting *Hale*, 642 F.3d at 499).

Defendant owned, leased, or operated a place of public accommodation; and (3) Defendant denied Plaintiff full and equal enjoyment on the basis of [his] disability."[245] As discussed below, Plaintiff is a qualified individual with a disability for purposes of the ADA. Additionally, SMG is a private entity that operates the Superdome, which is a place of public accommodation. Therefore, the first two elements are met. The Court addresses whether SMG denied Plaintiff full and equal enjoyment of football games at the Superdome on the basis of his disability below.

### 1.     Whether Plaintiff has a qualifying disability

The first element of a claim under Title II and Title III of the ADA is that the plaintiff must have a qualifying disability. An individual has a disability if he or she "[has] a physical or mental impairment that substantially limits one or more major life activities of such individual."[246] Walking, standing, and breathing are all "major life activities."[247] Title II defines as "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."[248]

There is no dispute that Plaintiff is a qualifying individual under the ADA. Plaintiff has muscular dystrophy and relies on a ventilator to breathe and a wheelchair for mobility.[249]

---

[245] *Doe v. Ortho-La Holdings, LLC*, No. CV 17-8948, 2018 WL 4613946, at *2 (E.D. La. Sept. 26, 2018) (Milazzo, J.).

[246] 42 U.S.C. § 12102(1)(A).

[247] *Id*. at § 12102(2)(A).

[248] *Id*. at § 12131(2).

[249] Trial Transcript, March 2, 2020, Shelby Bailey, p. 210.

Therefore, Plaintiff is substantially limited in the major life activities of walking, standing, and breathing.[250] Accordingly, Plaintiff is a qualified individual with a disability for purposes of Title II and Title III.[251]

### 2.   Whether the discrimination against Plaintiff is by reason of his disability

The third element of a claim under Title II of the ADA is that the plaintiff must show that he was discriminated against by reason of his disability.[252] To show that discrimination is by reason of disability, a plaintiff must provide "proof that 'the disability and its consequential limitations were known by the entity providing public services.'"[253] In *Windham v. Harris Cty., Texas*, the Fifth Circuit explained this requirement as such:

> Mere knowledge of the disability is not enough; the service provider must also have understood the limitations the plaintiff experienced as a result of that disability. Otherwise, it would be impossible for the provider to ascertain whether an accommodation is needed at all, much less identify an accommodation that would be reasonable under the circumstances. Thus, because the ADA does not require clairvoyance, the burden falls on the plaintiff to specifically identify the disability and resulting limitations, and to request an accommodation in direct and specific terms. When a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that the disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant agents.[254]

Here, Plaintiff has been to the Superdome to watch football games many times. Plaintiff alerted Defendants to his disability and the resulting limitations he experienced. Plaintiff requested an accommodation. Accordingly, the Court finds that Plaintiff experienced discrimination by

---

[250] Trial Transcript, March 2, 2020, Shelby Bailey, p. 210.

[251] *Parties did not contest this fact*. Rec Doc. 163 at 4.

[252] *Wells*, 460 F. App'x at 311 (quoting *Hale*, 642 F.3d at 499).

[253] *Windham v. Harris Cty., Texas*, 875 F.3d 229, 236 (5th Cir. 2017) (quoting *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015)) (internal brackets omitted).

[254] *Id*. at 236–37 (internal quotations, ellipsis, and citations omitted) (emphasis in original).

reason of his disability, thereby establishing the third element of his Title II claim.

### 3.      Whether Plaintiff is being denied the benefits of a program (as to France) or the benefits of a place of public accommodation (as to SMG)

Having found that (1) Plaintiff is a qualified individual with a disability for purposes of Title II and Title III; (2) Plaintiff experienced discrimination by reason of his disability, thereby establishing the third element of his Title II claim; and (3) SMG is a private entity that operates the Superdome, which is a place of public accommodation, the Court turns to the last remaining element of Plaintiff's Title II and Title III claims. The final element of a claim under Title II and Title III of the ADA is that the plaintiff is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity or the benefits of a place of public accommodation.[255]

At trial, Plaintiff advanced four theories of liability: (1) that Defendants violated the alteration requirement of the ADA; (2) that France violated the program access requirement of Title II of the ADA; (3) that France violated the equal opportunity regulation of Title II of the ADA; and (4) that Defendants violated the reasonable accommodation requirement of the ADA. The Court analyzes each theory of liability below.

### D.      *Whether Defendants violated the alteration standard of the ADA*

#### 1.      Legal standard for alterations

Congress acknowledged that some structures that were built prior to the enactment of the ADA would be unable to comply with all of the new ADAAG regulations.[256] Accordingly, the regulations differentiate between structures built prior to the Act taking effect in January 1992

---

[255] *Miraglia*, 901 F.3d at 574.

[256] *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 291 (5th Cir. 2012).

("existing facilities") and facilities built or altered after January 1992 ("altered facilities").[257] As such, the failure to remove architectural barriers in existing facilities, defined as structures built prior to the Act taking effect on January 26, 1992, where such removal is readily achievable constitutes discrimination.[258] However, when an existing facility undergoes alterations after the 1992 effective date, more stringent architectural standards apply; then, the alterations "shall be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible and usable by individuals with disabilities, including individuals who use wheelchairs."[259] In sum, existing facilities must satisfy the "readily achievable" standard whereas altered facilities must comply with the "maximum extent feasible" standard.

Under the regulations implementing Title II of the ADA "[e]ach facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility . . . shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities. . . ."[260] Under the regulations implementing Title III of the ADA, any alterations to a facility after 1992 must be "made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."[261] The Superdome was built in 1975.[262] Therefore, this heightened "alteration standard" applies only to portions of the facility where an alteration

---

[257] *Lane*, 541 U.S. at 531–32.

[258] 42 U.S.C. § 12182(b)(2)(A)(iv).

[259] 28 C.F.R. § 36.402(a)(1).

[260] *Id*. at § 35.151(b)(1).

[261] *Id*. at § 36.402(a)(1).

[262] *Parties did not contest this fact.* Rec. Doc. 163 at 4.

occurred.

An alteration is defined as a change that "could affect the usability of the building or facility or any part thereof."[263] Alterations include events such as remodeling, renovation, rehabilitation, reconstruction, and changes or rearrangement in structural parts, but typically do not include normal maintenance or painting.[264] The DOJ has instructed that "'usability' [is] to be read broadly to include any change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities."[265] "[A]ll changes directly relating to access by individuals with disabilities indisputably affect usability."[266] "Neither the ADA nor the ADAAG makes clear which party has the burden to prove that an 'alteration' did or did not occur. . ."[267]

Under the alteration standard, the altered portion of the facility must comply fully with applicable accessibility standards and the ADAAG unless it is "virtually impossible"[268] If compliance is virtually impossible, "the alteration shall provide the maximum physical accessibility feasible."[269] Importantly, "[a]ny altered features of the facility that can be made accessible shall be made accessible."[270]

---

[263] 28 C.F.R. § 36.402(b). *See also id.* at § 35.151(b)(1).

[264] *Id*. at § 36.402(b)(1).

[265] 28 C.F.R. Pt. 36, App. C.

[266] *Tatum*, 2016 WL 852458, at *4.

[267] *Rodriguez v. Barrita, Inc.*, 10 F.Supp.3d 1062, 1082 n. 17 (N.D. Cal. 2014).

[268] 28 C.F.R. § 36.402(c).

[269] *Id.*

[270] *Id.*

## 2.    Preliminary alterations issues

### i.    Whether an alteration took place

On March 11, 2010, construction commenced on renovations to the Superdome (the "2010 Renovations").[271] As part of the 2010 Renovations, the sideline seats in the 100 Level were removed and replaced with new, permanent, fixed seats.[272] However, the first nine or ten rows of the sideline seats in the 100 Level are demountable so they can be removed for events where more floor space is needed.[273] A total of 17,118 seats along the sidelines of the lower bowl were replaced as part of the 2010 Renovations.[274] Additionally in 2010, the temporary platforms Plaintiff and other wheelchair users previously sat at were removed.[275] The "Bunker Club," premium club seating featuring enhanced fan amenities, was also added as part of the 2010 renovations.[276] Additionally, the sideline concourses in the 100 Level were widened.[277]

The 2010 Renovations created four separate decks on the bottom-most row of the 100 Level.[278] Those decks are located between the 30 and 40 yard lines and accommodate a total of 24 wheelchair seats and 24 companion seats.[279] Additional new, designated wheelchair accessible seats were also constructed on Row 36 in each section along the sidelines of the 100 Level as part

---

[271] *Parties did not contest this fact*. Rec. Doc. 163 at 4.

[272] *Parties did not contest this fact*. *Id*. at 5.

[273] Trial Transcript, March 2, 2020, Alan Freeman, p. 143; Trial Transcript, March 2, 2020, Doug Thornton, p. 113.

[274] *Parties did not contest this fact*. Rec. Doc. 163 at 5.

[275] Trial Transcript, March 2, 2020, Doug Thornton, p. 135.

[276] Trial Transcript, March 2, 2020, Alan Freeman, p. 169.

[277] Trial Transcript, March 2, 2020, Alan Freeman, p. 143.

[278] *Parties did not contest this fact*. Rec. Doc. 163 at 5.

[279] *Parties did not contest this fact*. *Id*.

of the 2010 Renovations, except for the seven sections located in each end zone.[280] The seats in the end-zone, consisting of 8,342 seats, were not renovated in 2010.[281]

Here, the 2010 Renovations clearly qualify as an alteration. The changes described above "could affect the usability of the building or facility or any part thereof."[282] The DOJ has instructed that "'usability' [is] to be read broadly to include any change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities."[283] The extensive changes described above involved events such as remodeling, renovation, rehabilitation, reconstruction, and changes or rearrangement in structural parts.[284] Accordingly, the Court finds as a matter of law that the changes associated with the 2010 Renovations amounted to an alteration under the ADA.

### ii.    Where the alteration took place

Pursuant to the regulation implementing Title II, "[e]ach facility or part of a facility altered . . . shall, to the maximum extent feasible, be altered in such manner that *the altered portion of the facility* is readily accessible to and usable by individuals with disabilities. . . ."[285] The regulation implementing Title III states "[a]ny alteration to a place of public accommodation or a commercial facility, after January 26, 1992, shall be made so as to ensure that, to the maximum extent feasible, *the altered portions of the facility* are readily accessible to and usable by individuals with

---

[280] *Parties did not contest this fact*. *Id*.

[281] *Parties did not contest this fact*. *Id*.

[282] 28 C.F.R. § 36.402(b). *See also id*. at § 35.151(b)(1).

[283] 28 C.F.R. Pt. 36, App. C.

[284] *Id*. at § 36.402(b)(1).

[285] *Id*. at § 35.151(b)(1) (emphasis added).

disabilities, including individuals who use wheelchairs."[286] Therefore, these regulations are confined to "the altered portions of the facility."[287]

The parties disagree about precisely which portion the Superdome was altered. Plaintiff argues that the entire 100 Level was altered and therefore, the entire 100 Level is subject to the alteration requirement.[288] SMG argues that because the 2010 Renovations only altered the 100 Level seating along the sidelines, the alteration standard is only applicable to that seating; in other words, it would not apply to the seating in the end zones of the 100 Level, which were not altered as a part of the 2010 Renovations.[289]

In *Mannick v. Kaiser Found. Health Plan, Inc.*, a district judge in the United States District Court for the Northern District of California determined that renovations to two floors of a maternity ward did not trigger any obligation with regard to the patient rooms on other floors.[290] The court reached this conclusion because "the undisputed evidence provided by defendants shows that there was no alteration or remodeling of the patient rooms that triggered an obligation to provide an accessible patient room on one of the medical-surgical floors."[291] A partial alteration does not trigger alteration obligations to unrelated or unaltered areas of the facility.[292]

In *Brother v. CPL Investments, Inc.*, a district judge in the United States District Court for

---

[286] *Id*. at § 36.402(b) (emphasis added).

[287] *Id*. at § 35.151(b)(1).

[288] Rec. Doc. 172 at 45.

[289] Rec. Doc. 174 at 59–60.

[290] *Mannick v. Kaiser Found. Health Plan, Inc.*, No. C 03-5905 PJH, 2006 WL 1626909, at *11 (N.D. Cal. June 9, 2006).

[291] *Id*.

[292] *See Cherry v. City College of San Francisco*, No. 04-04981, 2006 U.S. Dist. LEXIS 98661, at *9 (N.D. Cal. Jan. 12, 2006) (addressing Title II claims and rejecting plaintiff's argument that "any partial alteration triggers a federal duty to renovate the entire building").

the Southern District of Florida determined that a construction project which added additional rooms to the first floor of a hotel did not trigger the stricter new construction standard to the entire hotel.[293] "Undertaking an alteration in one portion of an existing facility does not automatically make the entire existing facility subject to the new construction standards."[294]

As stated above, the alteration regulations are confined to "the altered portions of the facility."[295] Therefore, Plaintiff's alteration claims are limited to the portions of the Superdome where alterations occurred. The language of the regulations contemplates a portion by portion analysis.[296] In both *Brother* and *Mannick*, the district courts considered which *portion* of the facility could be fairly said to be altered and excluded the portions of the facility where no alteration had occurred. Using these cases as guidance, the Court finds that the alteration standard does not apply to the entire facility simply because a portion of that facility underwent an alteration. Accordingly, the alteration standard does not apply to the entire Superdome simply because the 100 Level underwent an alteration.

However, based on the extensive renovations described above, the Court finds that the 100 Level is the altered portion of the facility. The Court interprets the word "portion" of a facility to refer to discrete section of the facility. For example, the entire floor of a hospital or a hotel. The Court will not further subdivide the 100 Level into discrete portions (i.e. just the sideline seating). As part of the 2010 Renovations, the sideline seats in the 100 Level were removed and replaced with new, permanent, fixed seats.[297] The "Bunker Club," premium club seating featuring enhanced

---

[293] 317 F.Supp.2d 1358, 1370 (S.D. Fla. 2004).

[294] *Id*.

[295] 28 C.F.R. § 35.151(b)(1); 28 C.F.R. § 36.402(b).

[296] *See* 28 C.F.R. § 35.151(b)(1); 28 C.F.R. § 36.402(b).

[297] *Parties did not contest this fact*. Rec. Doc. 163 at 5.

fan amenities, was also added as part of the 2010 renovations.[298] Additionally, the sideline concourses in the 100 Level were widened.[299] These changes affect the use of the 100 Level; therefore all aspects of the 100 Level must comply with the alteration standard. Accordingly, the Court finds that the entirety of the 100 Level, including the endzone seats, are subject to the alteration standard, because they are within the portion of the facility that was altered.

Lastly, at trial, the Court determined that Plaintiff failed to raise an alteration claim as to the 200 Level in the Complaint and was therefore precluded from raising the issue at trial.[300] The record contains some evidence concerning certain repairs conducted at the 200 Level following Hurricane Katrina. However, Plaintiff conceded that an alteration claim as to the 200 Level was not raised in the Complaint.[301] Accordingly, because Plaintiff did not assert a 200 Level alteration claim in the Complaint, and did not move to amend the Complaint, the Court determined that it was not an issue at trial.[302]

In sum, the 2010 Renovations constituted an alteration to the entirety of the 100 Level under the statute and regulations. As as consequence of that determination, Defendants are obligated to ensure access to the maximum extent feasible.

---

[298] Trial Transcript, March 2, 2020, Alan Freeman, p. 169.

[299] Trial Transcript, March 2, 2020, Alan Freeman, p. 143.

[300] At trial, SMG objected to a question related to alterations at the 200 Level of the Superdome on the basis of relevancy. Rec. Doc. 170 at 44. France joined in the objected. *Id*. at 45. SMG argued that Plaintiff's alteration claim in the Complaint was limited to 2010 Renovations, which only impacted the 100 Level of the Superdome. *Id*. at 44–45. Plaintiff represented that the renovations to the 200 Level occurred following hurricane Katrina and should qualify as an alteration. *Id*. at 49–50. However, Plaintiff conceded that an alteration claim as to the 200 Level was not in the Complaint. *Id*. at 51. Accordingly, because Plaintiff did not assert a 200 Level alteration claim in the Complaint, and did not move to amend the Complaint, the Court determined that it was not an issue at trial. *Id*. at 44–54. However, the Court clarified that evidence related to the 200 Level for other claims, including the program access claim, may still be admissible. *Id*. at 53–54.

[301] *Id*. at 51.

[302] *Id*. at 44–54.

### iii.      The burden of proof under the alteration standard

The parties disagree about the appropriate burden of proof Plaintiff must meet to establish a violation of the alteration standard. Plaintiff argues that to prevail on an alteration claim, he must merely show: (1) that there has been an alternation and (2) that the altered area does not comply with the ADA Accessibility Guidelines.[303] Plaintiff contends that another section of this Court previously utilized this standard in an ADA case.[304]

SMG contends that Plaintiff has the initial burden of showing both (1) a violation of the ADA and (2) "some manner in which the alteration could be, or could have been made, 'readily accessible and usable by individuals with disabilities, including individuals who use wheelchairs.'"[305] SMG argues that this Court should adopt the reasoning of the Second Circuit in *Roberts v. Royal Atl. Corp.*[306]

The *Roberts* court analyzed when a facility is considered "altered" under the ADA.[307] In making this determination, the Second Circuit first "consider[ed] who bears the burden to establish that a modification is or is not an alteration."[308] Adopting the reasoning of the Second Circuit's prior decision in *Borkowski v. Valley Central School District*,[309] the Second Circuit stated that "in applying the Rehabilitation Act and related statutes, our case law bars us from placing both the initial burden of production and the ultimate burden of persuasion on either the plaintiff or the

---

[303] Rec. Doc. 172 at 41.

[304] *See Tatum v. Doctor's Assocs., Inc.*, No. CV 14-2980, 2016 WL 852458 (E.D. La. Mar. 4, 2016).

[305] Rec. Doc. 174 at 61 (citing *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 372 (2d Cir. 2008)).

[306] 542 F.3d 363 (2d Cir. 2008).

[307] *Id.* at 369–71.

[308] *Id.* at 370.

[309] 63 F.3d 131 (2d Cir. 1995).

defendant."[310] Therefore, the Second Circuit adopted a "middle course," in which a plaintiff seeking to establish a reasonable accommodation "bears only a burden of production" that "is not a heavy one."[311] Accordingly, "[t]o establish the existence of an alteration, a plaintiff fulfills his or her initial burden of production by identifying a modification to a facility and by making a facially plausible demonstration that the modification is an alteration under the ADA. The defendant then bears the burden of persuasion to establish that the modification is in fact not an alteration."[312] In sum, the Second Circuit held that in determining whether a modification to a facility constitutes an alteration, the plaintiff has the initial burden of production by identifying a modification to a facility and by making a facially plausible demonstration that the modification is an alteration under the ADA.[313]

Next, the *Roberts* court analyzed the second step under the alteration standard, namely when is a facility deemed "altered" made readily accessible and usable to the "maximum extent feasible."[314] The Second Circuit again applied the burden-shifting approach articulated in *Borkowski* to the "maximum extent feasible" standard and held that "once a plaintiff has met an initial burden of production identifying some manner in which the alteration could be, or could have been, made 'readily accessible and usable by individuals with disabilities, including individuals who use wheelchairs,' the defendant then bears the burden of persuading the factfinder that the plaintiff's proposal would be 'virtually impossible' in light of the 'nature of the

---

[310] *Roberts*, 542 F.3d at 370.

[311] *Borkowski*, 63 F.3d at 137–38.

[312] *Roberts*, 542 F.3d at 371.

[313] *Id.*

[314] *Id.* at 371–73.

facility.'"[315]

Here, the Court finds that Plaintiff's interpretation of the alteration standard—requiring Plaintiff to show only that there has been an alternation and that the altered area does not comply with the ADA Accessibility Guidelines—is more in line with the regulatory text. Pursuant to the regulations implementing Title III, "[a]ny alteration to a place of public accommodation . . . after January 26, 1992, shall be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."[316] Public accommodations built or altered after January 26, 1992, must comply with both the Title III regulations set forth at 28 C.F.R. part 36, subpart D and the ADAAG unless "the nature of an existing facility makes it virtually impossible to comply fully with applicable accessibility standards through a planned alteration."[317] Neither regulation explicitly or implicitly requires a plaintiff to identify "some manner in which the alteration could be, or could have been, made 'readily accessible and usable by individuals with disabilities, including individuals who use wheelchairs . . .'"[318] SMG does not cite any binding authority that would require this Court to impose such a heightened burden. Therefore, the Court declines to impose such an additional burden on plaintiffs pursuing ADA relief. Accordingly, Plaintiff has the initial burden of showing that there has been alteration and that the altered area is not compliant with the ADAAG. If Plaintiff meets this initial burden, the burden shifts to Defendants to show that compliance with the ADAAG was virtually impossible.

---

[315] *Id*. at 372 (quoting 42 U.S.C. § 12183; 28 C.F.R. § 36.402).

[316] 28 C.F.R. § 36.402(a)(1).

[317] 28 C.F.R. § 36.402(c).

[318] *Roberts*, 542 F.3d at 372 (quoting 42 U.S.C. § 12183; 28 C.F.R. § 36.402).

Even under the heightened burden-shifting framework established by the Second Circuit, a plaintiff only has the "initial burden of production identifying some manner in which the alteration could be, or could have been, made 'readily accessible and usable by individuals with disabilities.'"[319] Even if this Court were to adopt the Second Circuit's heightened burden-shifting framework, the Court finds that Plaintiff has identified some manner in which the alteration could be, or could have been, made readily accessible.[320] For example, Plaintiff's expert, Mr. Terry suggested moving the Row 1 seats from their current position to a position between the 30 yard line and the endzone.[321] SMG argues that because Mr. Terry did not fully evaluate the extent to which the proposed solutions would affect accessibility, Plaintiff failed to meet the *Robert* burden.[322] Specifically, Mr. Terry declined to opine at trial over whether his proposed solutions would achieve ADA compliance.[323]

Under *Roberts*, a plaintiff's burden of identifying *some* manner in which an alteration could have been accessible or useable by individuals with disabilities suggests the bar for production is fairly low. Certainly, it cannot be the case that a plaintiff must produce detailed architectural drawings and opine with certainty that proposed solutions would definitively result in ADA

---

[319] *Id*. (quoting 42 U.S.C. § 12183; 28 C.F.R. § 36.402).

[320] *See Rodriguez*, 10 F.Supp.3d at 1082 n. 17 ("Neither the ADA nor the ADAAG makes clear which party has the burden to prove that an 'alteration' did or did not occur, nor has the Ninth Circuit clarified the issue. In *Roberts v. Royal Atl. Corp.*, the Second Circuit adopted a burden-shifting scheme for establishing whether a public accommodation experienced a qualifying alteration . . . The court in *Roberts* reasoned that while plaintiffs should generally be capable of pointing to an initial modification potentially constituting an alteration, defendants 'can be expected to have superior access to information with which to refute assertions that their facilities have been altered within the meaning of the statute and the applicable regulations and commentary.' Here, ascertaining where the burden rests is not critical in that the conclusion of 'no alteration' arises under either formulation. Even if, consistent with *Roberts*, defendants in the Ninth Circuit must shoulder the burden of persuasion, defendants here have successfully established that the fire repairs did not constitute an alteration.").

[321] Trial Transcript, March 2, 2020, James Terry, pp. 260–62.

[322] Rec. Doc. 174 at 64.

[323] Trial Transcript, March 3, 2020, James Terry, pp. 290–91.

compliance in order to bring an alteration claim. Accordingly, the Court finds that Plaintiff has identified "some manner" in which the alterations to the L00 level could be, or could have been, made readily accessible to and usable by individuals with disabilities.

### 3.   Experts

Plaintiff claims that Defendants violated the ADA because the sightlines from wheelchair accessible seats to the field, Jumbotron and aerial play are not comparable to the sightlines from the seating provided to the general public. Specifically, Plaintiff claims that he is unable to see elements of football games at the Superdome because either a) spectators seated in the row in front of him stand during the game, and the Superdome has not been properly designed to provide a view of the field over standing spectators, b) the concrete overhang prevent Plaintiff from viewing aerial play or c) the players and coaches prevent Plaintiff from seeing the field.

Both parties employed experts to evaluate the sightlines from the Row 1 and Row 36 accessible seating. Plaintiff retained Jim Terry while Defendants retained Mark Mazz. Both experts presented competing opinions regarding whether the sightlines violate the regulations. The Court must therefore assess the weight to afford the opinions offered by the two experts.

### i.   James Terry's methodology

Plaintiff primarily relies on the report and testimony of his expert witness, Mr. James Terry ("Mr. Terry") for the proposition that Defendants violated the sightline requirements of the regulations. At trial, Mr. Terry testified that, in his opinion, the sightlines from wheelchair accessible seats at Row 1 and Row 36 of the Superdome are not comparable to the sightlines from general public seats.[324] Mr. Terry based his opinion on observations and measurements he made

---

[324] Trial Transcript, March 2, 2020, James Terry, p. 236 (Row 1); Trial Transcript, March 2, 2020, James Terry, p. 239 (Row 36).

during a tour of the Superdome. During that tour, Mr. Terry took numerous photographs of the field from various locations in the Superdome.[325]

At trial, Mr. Terry described his methodology. Mr. Terry used a tape measure or a carpenter's ruler to measure the average eye height of a wheelchair user in an accessible seat and placed his camera in that location (for example, from Row 36).[326] Mr. Terry then had an assistant hold a carpenter's ruler at the seat directly in front of the seat just measured to measure the height of both the shoulders and head of a standing spectator (for example, from Row 35).[327] Mr. Terry used a carpenter's ruler to measure the height of the head of a standing spectator seated two rows in front the wheelchair user (for example, Row 34).[328] Mr. Terry then took a photograph from the eye height of the wheelchair user, marking where the shoulders and head of a standing spectator in the seat directly in front of the wheelchair user would fall in the photograph.[329] Mr. Terry did not use a tripod to stabilize his camera while taking the photographs.[330] Mr. Terry replicated this process, going one row forward and marking where the head of a standing spectator in the seat two rows in front of the wheelchair user would fall in the photograph.[331] Mr. Terry did not review the architectural drawings for the 2010 Renovations in preparing his report.[332]

This process allowed Mr. Terry to gauge what a wheelchair user would see when standing

---

[325] Trial Transcript, March 2, 2020, James Terry, pp. 236–37.

[326] Trial Transcript, March 2, 2020, James Terry, pp. 241–42.

[327] Trial Transcript, March 2, 2020, James Terry, p. 242.

[328] Trial Transcript, March 2, 2020, James Terry, p. 242.

[329] Trial Transcript, March 2, 2020, James Terry, pp. 245–46.

[330] Trial Transcript, March 2, 2020, James Terry, p. 244.

[331] Trial Transcript, March 2, 2020, James Terry, pp. 245–46.

[332] Trial Transcript, March 3, 2020, James Terry, pp. 285–86.

spectators in each of the two rows immediately in front of him stood up. Mr. Terry opined this method is "the easiest way to see what somebody would actually see from a wheelchair position and from a standing spectator's position."[333] Mr. Terry then repeated this process to gauge the approximate vantage of a standing spectator from a nonaccessible seat (for example, Row 35) looking over the shoulders of an average-height standing spectator in the row immediately in front of him (for example, Row 34) and over the heads of standing spectators two rows in front (for example, Row 33).[334]

Mr. Terry imported these photographs to the "CAD file" a tool used by architects to digitally draw lines to denote where the standing spectators' heads and shoulders would fall.[335] This allowed Mr. Terry to compare the vantages of a wheelchair user in an accessible seat attempting to see over the head and shoulders of standing spectators in the two rows in front of him with the vantages of a standing spectator in a nonaccessible seat attempting to see over the head and shoulders of standing spectators in the two rows in front of him.[336] Mr. Terry utilized the same measuring techniques for sightline analysis while working as a consultant for the Department of Justice on approximately 20 cases.[337] Mr. Terry stated that his measurements were within a 2% margin of error.[338]

These comparative illustrations were introduced into evidence as Plaintiff's Exhibit 14.[339]

---

[333] Trial Transcript, March 2, 2020, James Terry, p. 237.

[334] Trial Transcript, March 2, 2020, James Terry, p. 246.

[335] Trial Transcript, March 2, 2020, James Terry, pp. 237, 245.

[336] Trial Transcript, March 2, 2020, James Terry, p. 247.

[337] Trial Transcript, March 2, 2020, James Terry, p. 244.

[338] Trial Transcript, March 3, 2020, James Terry, p. 324.

[339] Rec. Doc. 179-14.

Mr. Terry denoted the Section of the Superdome from which the photograph was taken.[340] The illustrations show that a wheelchair user in an accessible seat consistently sees less of the field than comparable standing spectator in nonaccessible seat sees. Plaintiff argues that these illustrations and Mr. Terry's testimony show that a wheelchair user in an accessible wheelchair seat cannot not see the field over the head of a spectator standing directly in front of them where comparable standing spectator in nonaccessible seat can. Therefore, Plaintiff contends that the Superdome does not provide the sightlines required by Section 4.33.3 of the 1991 ADAAG.

### ii. Mark Mazz's methodology

Defendants respond that the sightlines at Row 1 and Row 36 do not violate the ADA's sightline requirements. In support, Defendants rely on the report and testimony of their expert witness, Mr. Mark Mazz ("Mr. Mazz").

Mr. Mazz utilized a very similar methodology to the methodology Mr. Terry used to generate sightline comparisons.[341] Mr. Mazz took photographs at various locations throughout the Superdome and used tape measures to determine where the head and shoulders of standing spectators would be to determine how much of the field would be blocked.[342] Mr. Mazz used the same horizontal and vertical measurements as Mr. Terry to determine the position and location of the camera.[343] Mr. Mazz placed his camera on a tripod to ensure it was steady while taking the

---

[340] *See id.*

[341] Trial Transcript, March 3, 2020, Mark Mazz, pp. 369–70.

[342] Trial Transcript, March 3, 2020, Mark Mazz, pp. 369–70.

[343] Trial Transcript, March 3, 2020, Mark Mazz, pp. 365, 409 ("I set my camera on a tripod, set the lens at 47.45 inches, 30 inches back from if wheelchair spaces, set the tape measures for the height of the standing spectator two rows in front at 67.65, I think the dimensions are and took a photo. From that photo, I drew a line where it crossed the field. I plotted it out on the floor plan here.").

photograph and to ensure consistency as to height.[344]

Mr. Mazz then compared his findings to Mr. Terry's findings and to the architectural drawings from the 2010 Renovations.[345] Mr. Mazz opined that Mr. Terry's 2% margins of error is "way too tight" due to the high number of factors the photographer must take into account in taking these photographs.[346] Mr. Mazz noted that potential error can occur in a variety of ways in taking these photographs; for example, if the carpenter ruler is not perfectly straight and vertical.[347] Mr. Mazz assumed an 8% margin of error.[348] Mr. Mazz ultimately concluded that based on his measurements, a wheelchair user in Row 36 has a comparable line of sight to a standing spectator in Row 35.[349]

Ultimately, the Court is faced with competing expert testimony reaching opposite conclusions with regard to sightlines. Here, the Court affords Mr. Mazz's testimony more weight than Mr. Terry's testimony and contrary findings. As discussed above, Mr. Terry did not use a tripod to stabilize the camera and ensure the accuracy of its height.[350] Conversely, Mr. Mazz placed his camera on a tripod to ensure it was steady while taking the photograph and to ensure

---

[344] Trial Transcript, March 3, 2020, Mark Mazz, p. 367.

[345] Trial Transcript, March 3, 2020, Mark Mazz, p. 406.

[346] Trial Transcript, March 3, 2020, Mark Mazz, p. 368 ("I think a 2 percent margin of error is way too tight. I think the -- I -- as Jim had -- Mr. Terry had mentioned how many things that he took into consideration, he was actually taking the things that he could visually measure upon his tape measure. I'm not sure how he did that going back and forth from his actual lens, calculating it into the computer and stuff. But what he's doing is he's correcting for the things that he has knowns -- knows can be the errors. When you put in the margin of error, it's for the things that you can't be sure are there or not, but you know can occur. So you've got to apply a margin of error to everything you do.").

[347] Trial Transcript, March 3, 2020, Mark Mazz, p. 365.

[348] Trial Transcript, March 3, 2020, Mark Mazz, p. 364.

[349] Trial Transcript, March 3, 2020, Mark Mazz, p. 369.

[350] Trial Transcript, March 2, 2020, James Terry, p. 244.

consistency as to height.[351] The Court finds that the slightest error – a camera or ruler that is not perfectly straight – can dramatically alter the calculations of sightlines to a field that is hundreds of feet away.[352] For these reasons, the Court affords more weight Mr. Mazz's testimony than Mr. Terry's testimony where their findings contradict.

### 4.    Whether the Superdome has achieved accessibility to the maximum extent feasible

As discussed above, the Court finds that the 100 Level of the Superdome was altered during the 2010 Renovations; accordingly, the entirety of the 100 Level is subject to the alteration standard. Under the alteration standard, Plaintiff must show that Defendants failed to achieve accessibility "to the maximum extent feasible."[353] "Accessibility" refers to whether the alterations comply with the requirements of the applicable ADAAG.[354] As discussed above, the Court finds that the 1991 ADAAG applies to the alterations from the 2010 Renovations. Specifically, the Superdome must comply with the two requirements in Section 4.33.3 of the 1991 ADAAG: (1) "provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public" (the "Sightline Requirement") and (2)

---

[351] Trial Transcript, March 3, 2020, Mark Mazz, p. 367.

[352] Trial Transcript, March 3, 2020, Mark Mazz, p. 366–67 ("Now, we're measuring these distances over something short of 8 feet, whether it be from a wheelchair space to the head of the standing spectator or a little more than 5 feet from between the eye of the standing spectator to the head of the standing spectator. We're measuring very small distances, but we have to project this out across to the field which is several hundred feet away. So whatever minor errors that occur during measuring across a small triangle, get magnified when you go out the distance of the field . . . I placed my camera on a tripod so that I know – so that it is steady and stays in the same place. If you're holding a camera, even your heartbeat can move the camera during the shot. You don't know precisely when you take it. You also must constantly take a look at where that – where the tape measure is compared to where you're holding the camera. Also, if you're looking down to take the camera -- take the picture and looking at your lenses, you got this problem looking down to the tape measure through the camera lens, you can get a false reading that way.").

[353] 42 U.S.C. § 12183(a)(2).

[354] 1991 ADAAG at § 3.5 (defining "accessible" as "[d]escrib[ing] a site, building, facility, or portion thereof that complies with *these guidelines*"); 2010 ADAAG at § 106.5 (defining "accessible" to mean "[a] site, building, facility, or portion thereof that complies with this part").

ensure that seating for wheelchair-bound persons "be an integral part of any fixed seating plan" (the "Dispersion Requirement"). The Fifth Circuit has held that the requirement to provide comparable lines of sight is to be considered separate and apart from the dispersal requirement.[355] Accordingly, the Court addresses the Sightline Requirement first and the Dispersion Requirement second. Lastly, as discussed above, the DOJ's interpretations of the regulations that existed during the 2010 Renovations, including the 1993 TAM, the 1994 Supplement, and the *Accessible Stadiums* guideline, are entitled to *Auer* deference.

### i.   Whether there is a sightline obstruction at Level 100, Row 36

First, the Court addresses Section 4.33.3's mandate to "provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public." The phrase "comparable lines of sight" "lack[s] a concrete meaning" and is "[p]lagued by an opaque regulation and minimal legislative history."[356] This led to various interpretations as to what is exactly required of facilities with stadium-style seating.[357]

The first courts to consider this issue generally found that Section 4.33.3 required unobstructed views to the performance area or screen.[358] The government then began to advocate

---

[355] *Lara*, 207 F.3d at 787 ("First, the "lines of sight" language is entirely divorced from the dispersal requirement. The provision requiring multiple seating locations comes at the end of the regulation and does not in any way modify the earlier requirements.").

[356] *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 764 (9th Cir. 2008).

[357] *Id.* at 767 (concluding that "the tally of the different circuits' opinions as to § 4.33.3 was as follows: in the Third Circuit § 4.33.3 did not even require an unobstructed view; in the D.C. Circuit § 4.33.3 mandated that some seats had an unobstructed view; in the Fifth Circuit the provision required an unobstructed view but not comparable viewing angles; and in the First, Sixth and Ninth Circuits § 4.33.3 mandated some sort of comparable viewing angle. Three of the circuits considering the issue credited the DOJ's interpretation, but two of those three expressed skepticism as to the possibility of retroactive relief. All circuits considering § 4.33.3 found common ground on the proposition that the regulation was vague or ambiguous.").

[358] *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997), *abrogated by Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) (interpreting Section 4.33.3 to require that some accessible seating provide an unobstructed view over standing spectators at sporting events.); *but see Caruso v. Blockbuster–Sony Music*

for the litigation position that Section 4.33.3 requires that wheelchair users be offered comparable "viewing angles" as nondisabled persons.[359] The Fifth Circuit rejected this "viewing angles" theory.[360] The Fifth Circuit reasoned that because "questions regarding 'viewing angle' did not arise until well after the DOJ promulgated section 4.33.3" the phrase "lines of sight" refers to nothing more than "unobstructed views."[361] Accordingly, Section 4.33.3 does not require a facility "to provide disabled patrons with the same viewing angles available to the majority of non-disabled patrons."[362]

In the 1994 Supplement, the DOJ interpreted Section 4.33.3 to require wheelchair users be provided lines of sight over *spectators* who stand.[363] In *Accessible Stadiums*, the DOJ defined a "comparable line of sight" to allow for a person using a wheelchair to see the playing surface between the heads and over the shoulders of the person standing in the row immediately in front and over the heads of the persons standing two rows in front.[364] Since *Accessible Stadiums* is the DOJ's most contemporaneous interpretation of Section 4.33.3, that standard is entitled to deference.[365]

Therefore, the Courts finds that the applicable standard is: "[a] comparable line of sight . . .

---

*Entertainment Centre at Waterfront*, 193 F.3d 730, 736 (3d Cir. 1999) (finding that Section 4.33.3 "does not reach the issue of sightlines over standing spectators.").

[359] *Lara v. Cinemark USA, Inc.*, No. EP–97–CA–502–H, 1998 WL 1048497, at *2 (W.D. Tex. August 21, 1998), *rev'd*, 207 F.3d 783 (5th Cir. 2000).

[360] *Lara*, 207 F.3d at 789.

[361] *Id*. at 788–89.

[362] *Id*. at 789.

[363] *See* Title III Technical Assistance Manual 1994 Supplement (1994), https://www.ada.gov/taman3up.html.

[364] Department of Justice, Accessible Stadiums 2 (1996), https://www.ada.gov/stadium.pdf.

[365] *Landis*, 2019 WL 7157165 at *14.

allows a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front."[366] In other words, to comply with Section 4.33.3 of the 1991 ADAAG, the sightlines at the Superdome must provide wheelchair users views of "the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front."[367]

### a.      The playing field

Plaintiff testified that he could not see the playing field during a Saints game from his seat in Row 36.[368] Plaintiff's expert Mr. Terry testified that, when it comes to the last few rows of the 100 Level, nondisabled individuals have a better view than disabled individuals.[369] Specifically, Mr. Terry testified that wheelchair users in Row 36 could see 78% of the field over the tops of the heads of average height people standing two rows ahead of them on Row 34 while a comparable spectator in Row 35 could see 91% of the field.[370] Mr. Terry testified that both wheelchair users in Row 36 and standing spectators in Row 35, can see the entire playing field over the shoulders and between the heads of persons standing one row in front of them (Row 35 and Row 34, respectively).[371] Plaintiff introduced into evidence photographs Mr. Terry took from Row 36

---

[366] Department of Justice, Accessible Stadiums 2 (1996), https://www.ada.gov/stadium.pdf.

[367] *Id.*

[368] Trial Transcript, March 2, 2020, Shelby Bailey, p. 212.

[369] Trial Transcript, March 2, 2020, James Terry, p. 250.

[370] Trial Transcript, March 2, 2020, James Terry, pp. 247–50; Rec. Doc. 179-14 at 2. Plaintiff's Exhibit 14 shows that comparable standing can see 98% of the field. *See id.* Mr. Terry testified that this number was in error, and the correct figure is 91%. *See* Trial Transcript, March 2, 2020, James Terry, p. 249.

[371] Trial Transcript, March 2, 2020, James Terry, p. 248; Trial Transcript, March 3, 2020, James Terry, pp. 331–32.

during a football game at the Superdome to provide a visual reference.[372]

Mr. Mazz also took measurements from Row 36 of the 100 Level and compared his measurements to Mr. Terry's measurement as well as measurements calculated from the architectural drawings from the 2010 Renovations.[373] Mr. Mazz's first sightline measurement came from a wheelchair user in Row 36.[374] Mr. Mazz found that his measurements were "surprise[ingly] close" to the architectural drawings.[375] Mr. Mazz also found that a wheelchair user in Row 36 could see more of the field than what Mr. Terry's measurement showed.[376]

Mr. Mazz's next sightline measurement came from a standing spectator in Row 35.[377] Mr. Mazz found that his measurements were within 1% of the measurements from the architectural drawings.[378] Mr. Mazz also found that a standing spectator in Row 35 could see less of the field than what Mr. Terry's measurement showed.[379] Mr. Mazz ultimately concluded that the sight lines for a wheelchair user in Row 36 was comparable, and in fact, "almost identical" to the sight lines of a standing spectator in Row 35.[380]

Here, the Court finds that the lines of sight to the playing field from the Row 36 accessible seating provide wheelchair users lines of sight comparable to those for members of the general

---

[372] Trial Transcript, March 3, 2020, James Terry, p. 339; Rec. Docs. 180-26, 180-27, 180-29, 180-29.

[373] Trial Transcript, March 3, 2020, Mark Mazz, p. 406.

[374] Trial Transcript, March 3, 2020, Mark Mazz, p. 406.

[375] Trial Transcript, March 3, 2020, Mark Mazz, p. 407.

[376] Trial Transcript, March 3, 2020, Mark Mazz, p. 407.

[377] Trial Transcript, March 3, 2020, Mark Mazz, p. 408.

[378] Trial Transcript, March 3, 2020, Mark Mazz, p. 408.

[379] Trial Transcript, March 3, 2020, Mark Mazz, p. 407.

[380] Trial Transcript, March 3, 2020, Mark Mazz, p. 369.

public. Mr. Terry testified that wheelchair users in Row 36 could see 78% of the field over the tops of the heads of average height people standing two rows ahead of them on Row 34 while a comparable spectator in Row 35 could see 91% of the field.[381] Mr. Terry testified that both wheelchair users in Row 36 and standing spectators in Row 35, can see the entire playing field over the shoulders and between the heads of persons standing one row in front of them.[382] Mr. Mazz, whose measurements were within 1% of the architectural drawings, found that a standing spectator in Row 35 could see less of the field than what Mr. Terry's measurement showed.[383] Mr. Mazz ultimately concluded that the sight lines for a wheelchair user in Row 36 was comparable, and in fact, "almost identical" to the sight lines of a standing spectator in Row 35.[384] Here, the Court finds that the sightlines from the accessible seats in Row 36 are comparable to the sightlines from nonaccessible seats and that, therefore, Superdome complies with Section 4.33.3 of the 1991 ADAAG in this regard.

Additionally, in *Accessible Stadiums*, the DOJ defined a "comparable line of sight" to allow for a person using a wheelchair to see the playing surface between the heads and over the shoulders of the person standing in the row immediately in front and over the heads of the persons standing two rows in front.[385] Mr. Terry testified that both wheelchair users in Row 36 and standing

---

[381] Trial Transcript, March 2, 2020, James Terry, p. 247–50; Rec. Doc. 179-14 at 2. Plaintiff's Exhibit 14 shows that comparable standing can see 98% of the field. *See id.* Mr. Terry testified that this number was in error, and the correct figure is 91%. *See* Trial Transcript, March 2, 2020, James Terry, p. 229.

[382] Trial Transcript, March 2, 2020, James Terry, p. 248 ("It also shows the shoulders, but the shoulders don't block -- the shoulders don't block the -- any of the field, so that's what the black line is below there."); Trial Transcript, March 3, 2020, James Terry, pp. 331–32 ("this is the lines of sight in Section 114, and you did above the heads and then above the shoulders for both the wheelchair user and the comparable standing spectators. Both of them can see the entire field above the shoulders of the row in front of them, correct? A. That's correct.").

[383] Trial Transcript, March 3, 2020, Mark Mazz, p. 407.

[384] Trial Transcript, March 3, 2020, Mark Mazz, p. 369.

[385] Department of Justice, Accessible Stadiums 2 (1996), https://www.ada.gov/stadium.pdf.

spectators in Row 35, can see the entire playing field over the shoulders and between the heads of persons standing one row in front of them (Row 35 and Row 34, respectively).[386] Mr. Mazz concluded that the sight lines for a wheelchair user in Row 36 was comparable, and in fact, "almost identical" to the sight lines of a standing spectator in Row 35.[387] Accordingly, both experts agree that the sightlines to the playing field from Row 36 comply with the standard set by the *Accessible Stadiums* guideline. Accordingly, the Court concludes that the sightlines from the accessible seats in Row 36 are comparable to the sightlines from nonaccessible seats and that, therefore, Superdome complies with Section 4.33.3 of the 1991 ADAAG in this regard.

Even if the Court were to find that the Superdome did not comply with Section 4.33.3 of the 1991 ADAAG, the 2010 ADAAG would apply in making the Superdome accessible.[388] Therefore, while the sightlines in the Superdome must offer comparable lines of sight to accessible and nonaccessible seats, consistent with the mandate in Section 4.33.3 of the 1991 ADAAG, the Court will utilize the 2010 standards as a barometer.

Section 802.2.2 of the 2010 ADAAG addresses lines of sight over standing spectators.[389] Section 802.2.2 provides "[w]here standing spectators are provided lines of sight over the shoulders and between the heads of spectators standing in the first row in front of their seats, spectators seated in wheelchair spaces shall be afforded lines of sight over the shoulders and

---

[386] Trial Transcript, March 2, 2020, James Terry, p. 228; Trial Transcript, March 3, 2020, James Terry, pp. 311–12.

[387] Trial Transcript, March 3, 2020, Mark Mazz, p. 349.

[388] 28 C.F.R. § 36.406(a)(5)(ii) ("Newly constructed or altered facilities or elements covered by §§ 36.401 or 36.402 that were constructed or altered before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards.").

[389] 2010 ADAAG at § 802.2.2.2.

between the heads of standing spectators in the first row in front of wheelchair spaces."[390] Mr. Terry testified that both wheelchair users in Row 36 and standing spectators in Row 35, can see the entire playing field over the shoulders and between the heads of persons standing one row in front of them (Row 35 and Row 34, respectively).[391] Mr. Mazz concluded that the sight lines for a wheelchair user in Row 36 was comparable, and in fact, "almost identical" to the sight lines of a standing spectator in Row 35.[392] Accordingly, both experts agree that the line of sight from Row 36 of the 100 Level of the Superdome complies with Section 802.2.2 of the 2010 ADAAG. Accordingly, the Court concludes that spectators seated in wheelchair spaces in Row 36 are afforded lines of sight over the shoulders and between the heads of standing spectators in the first row in front of wheelchair spaces and that, therefore, Superdome complies with Section 802.2.2 of the 2010 ADAAG in this regard.

Thus, after determining the applicable standards and interpretations, and reviewing the evidence presented at trial, the Court finds that the sightlines to the playing field from the accessible seats in Row 36 of the 100 Level are comparable to the sightlines from nonaccessible seats and, therefore, the Superdome complies with both the 1991 ADAAG and 2010 ADAAG in this regard.

### b.      Aerial play and the Jumbotron

Next, the Court addresses the sightlines to the Jumbotron and aerial play from the accessible seats in Row 36 of the 100 Level. There is no dispute that patrons can see the Jumbotron and aerial play from Row 1. Therefore, this analysis is limited to Row 36.

---

[390] *Id.*

[391] Trial Transcript, March 2, 2020, James Terry, p. 228; Trial Transcript, March 3, 2020, James Terry, pp. 311–12.

[392] Trial Transcript, March 3, 2020, Mark Mazz, p. 349.

## A.    The Jumbotron

Plaintiff testified that from his seat in Row 36, he could not see the field, aerial gameplay, including long passes or punts, or the "big scoreboards."[393] Alan Freeman, testified that the concrete overhang obstructs the view of the aerial plays and the Jumbotron for wheelchair users in Row 36 and able-bodied patrons in Row 35.[394]

The Court finds that Section 4.33.3 of the 1991 ADAAG, does not apply to scoreboards such as the Jumbotron. In the context of alterations to assembly areas, such as the Superdome, the regulations refer specially to a movie screen, not all screens generally.[395] While the 1991 ADAAG, the TAM, and the 1994 Supplement are silent as to the main focal point of the applicable line of sight, *Accessible Stadiums* explicitly provides that "[a] comparable line of sight . . . allows a person using a wheelchair to see the *playing surface* . . . ."[396] Accordingly, the regulations and DOJ guidance suggest that the pertinent line of sight is to the main focal point of the assembly, here the playing field.

Even if the Court were to find that Section 4.33.3 of the 1991 ADAAG applied to the Jumbotron, Section 4.33.3 requires only a comparable sightline. Similar or identical information to that displayed on the Jumbotron is also provided on auxiliary monitors located throughout the Superdome, albeit on smaller screens.[397] Additionally, the comparability standard of Section 4.33.3 requires that a stadium provide sightlines to people with physical disabilities that are

---

[393] Trial Transcript, March 2, 2020, Shelby Bailey, p. 192.

[394] Trial Transcript, March 2, 2020, Alan Freeman, p. 172.

[395] *See* 28 C.F.R. § 36.406(f).

[396] Department of Justice, Accessible Stadiums 2 (1996), https://www.ada.gov/stadium.pdf. (emphasis added).

[397] Trial Transcript, March 3, 2020, James Terry, p. 309.

similarly unobstructed to the sightlines provided to the general public. As Alan Freeman testified, many patrons sitting in nonaccessible seats in the 100 Level are similarly unable to see the Jumbotron.[398] In fact, the last eight rows of patrons are unable to view the Jumbotron due to the concrete overhang.[399]

Accordingly, Plaintiff has not shown that Defendants violated the sightline requirement as it relates to the Jumbotron.

### B.      Aerial play

Next, the Court addresses the sightlines from Row 36 to the aerial play. As a preliminary matter, SMG argues that Section 4.33.3 does not apply to aerial play.[400] However, the Court finds this argument unavailing. As discussed above, the regulations and DOJ guidance suggest that the pertinent line of sight is to the main focal point of the assembly, here the playing field. The Court interprets "playing field" to refer not to the physical field upon which the game is being played, but to the actual game which is being played on the field. In other words, the regulations are designed to ensure that disabled individuals have comparable sightlines to the main focal point of the assembly area. Nobody buys tickets to a football game to simply observe the physical field itself; they go to watch the game of football. And the game of football involves an aerial component, in which the ball travels high into the air on long passes and punts. Accordingly, the Court finds that Defendants must be provide comparable lines of sight to aerial plays.

Plaintiff testified that from his seat in Row 36, he could not see the field, aerial gameplay,

---

[398] Trial Transcript, March 2, 2020, Alan Freeman, pp. 148, 170 –71.

[399] Trial Transcript, March 2, 2020, Alan Freeman, pp. 148, 170 –71.

[400] Rec. Doc. 174 at 71.

including long passes or punts, or the "big scoreboards."[401] Mr. Terry testified that a spectator in Row 36 can only see the early part of the flight of a punt, kick and long pass.[402] Mr. Mazz testified that to view aerial play, a patron must be able to see approximately 150 feet above the center of the field.[403] Alan Freeman, testified that the concrete overhang obstructs the view of the aerial plays for wheelchair users in Row 36.[404] However, Alan Freeman also testified that patrons in the first several rows of nonaccesible seating in front of Row 36 encounter the same sightline barriers to aerial play.[405] Both Mr. Mazz and Mr. Terry agreed that all patrons in the last three to four rows of the 100 Level cannot see aerial gameplay due to the concrete overhang.[406]

Here, the Court finds that the lines of sight to aerial play from the Row 36 accessible seating provide wheel chair users lines of sight comparable to those for members of the general public. The Court notes that because the obstruction is not standing spectators, but the concrete overhang, the 1994 Supplement and Accessible Stadiums are of limited usefulness in analyzing the sightline requirements to aerial play.[407]

As discussed above, the Fifth Circuit interpreted the phrase "lines of sight" to refer to

---

[401] Trial Transcript, March 2, 2020, Shelby Bailey, p. 192.

[402] Trial Transcript, March 2, 2020, James Terry, p. 239.

[403] Trial Transcript, March 3, 2020, Mark Mazz, pp. 392–93.

[404] Trial Transcript, March 2, 2020, Alan Freeman, p. 172.

[405] Trial Transcript, March 2, 2020, Alan Freeman, p. 171; Trial Transcript, March 2, 2020, Alan Freeman, p. 148.

[406] Trial Transcript, March 3, 2020, James Terry, p. 291 (opining that a wheelchair user would need to move to Row 32 to see "everything"); Trial Transcript, March 3, 2020, Mark Mazz, pp. 393–94 (opining that "if you move forward three rows and you were -- and once you move forward three rows, you can actually drop the elevation of the wheelchair. seats down to 21 inches and at that point, you can see up to a vertical view up to 170 feet. So you can see the highest of the high punts. You'll be able to see the aerial play.").

[407] In the 1994 Supplement, the DOJ interpreted Section 4.33.3 to require wheelchair users have lines of sight over spectators who stand. In *Accessible Stadiums*, the DOJ defined a "comparable line of sight" to allow for a person using a wheelchair to see the playing surface between the heads and over the shoulders of the person standing in the row immediately in front and over the heads of the persons standing two rows in front.

"unobstructed views."[408] Accordingly, Section 4.33.3 requires that a facility must provide sightlines to people with physical disabilities that are similarly unobstructed to the sightlines provided to the general public. Here, the accessible seating in Row 36 has the same obstruction, the concrete overhang, to aerial play as the next several rows on nonaccesible seating in the 100 Level.[409] Accordingly, the Court concludes that the sightlines from accessible seats to aerial play are comparable to the sightlines from nonaccessible seats and that, therefore, the Superdome complies with Section 4.33.3 of the 1991 ADAAG in this regard.

### ii.    Whether there is a sightline obstruction at Level 100, Row 1

The Row 1 seating for wheelchair users is located on a "step-down" in that the deck is a few inches lower to the ground than the front seating for able-bodied patrons.[410] Plaintiff testified that he sat in Row 1 during a Saints game, but because the seats were directly behind the players, and because he could not see over the players, he could not see the field.[411] Plaintiff's brother, Thomas Russell Bailey, who sat with Plaintiff during Saints games, testified that the Row 1 seats were not very good because the field was not visible due to the players standing on the sideline.[412]

Plaintiff's expert, Mr. Terry, testified that the Row 1 seating contains sightline issues because football players standing on the field block the view of the field.[413] Specifically, Mr. Terry testified that wheelchair users on the lowered platforms on Row 1 could see none of the field over

---

[408] *Lara*, 207 F.3d at 788–89.

[409] Trial Transcript, March 2, 2020, Alan Freeman, p. 171; Trial Transcript, March 2, 2020, Alan Freeman, p. 148.

[410] Trial Transcript, March 2, 2020, Alan Freeman, p. 145.

[411] Trial Transcript, March 2, 2020, Shelby Bailey, pp. 203, 215.

[412] Trial Transcript, March 2, 2020, Thomas Russell Bailey, p. 202.

[413] Trial Transcript, March 2, 2020, James Terry, pp. 233–35.

the tops of the heads of average height people standing on the sidelines while comparable non-disabled standing spectators could see 69% of the field over the heads of people in the front row.[414] Mr. Terry used a standing spectator in Row 4 as the comparable spectator, which is the row immediately behind wheelchair users.[415] Mr. Terry testified that wheelchair users in Row 1 can see 57% of the field and standing spectators in Row 4 can see 80% of the field over the shoulders and between the heads of players standing on the sidelines.[416] Based on this, Mr. Terry concluded that wheelchair users in Row 1 do not have comparable lines of sight to those provided for the spectators sitting immediately behind them.[417]

Defendants' expert, Mr. Mazz, agreed that all Row 1 seats along the sidelines are going to have "100 percent" obstructed views due to the players standing in front of those seats.[418] However, Mr. Mazz opined that while Row 1 seats do not offer views of the field, they do offer other amenities that patrons may be purchasing those tickets for (for example, being able to interact with the players before the game).[419] Mr. Mazz also testified that while wheelchair users in the front row can see none of the field over the heads of the players in front of them, patrons in Row 15 can only see 31% of the field.[420] Mr. Mazz opined that patrons can only expect to see the entire

---

[414] Trial Transcript, March 2, 2020, James Terry, p. 235.

[415] Trial Transcript, March 3, 2020, James Terry, pp. 339–40.

[416] Trial Transcript, March 2, 2020, James Terry, p. 235; Rec. Doc. 179-14 at 1.

[417] Trial Transcript, March 2, 2020, James Terry, p. 236.

[418] Trial Transcript, March 3, 2020, Mark Mazz, p. 381 ("There are no good seats on the sidelines in the front row. You're going to be blocked wherever you are. If you're in a wheelchair, you're going to be blocked 100 percent by the players in front of you."); *id.* at 373 ("the persons in wheelchairs see absolutely none of the field when trying to see over the heads of the players in front of them.).

[419] Trial Transcript, March 3, 2020, Mark Mazz, p. 381 ("They can't but they can say hi to players. There's interaction between people in the sidelines either before the game or what's going on. There are other reasons people want to sit in the front row. It's not going to be a good seat to see. It just won't be.").

[420] Trial Transcript, March 3, 2020, Mark Mazz, p. 393 ("[T]he persons in wheelchairs see absolutely none of the field when trying to see over the heads of the players in front of them. The persons in Row 15, front row, which

field around Row 18.[421]

Based on the evidence presented at trial, Defendants are in violation of Section 4.33.3 of the 1991 ADAAG, which requires "people with physical disabilities [be provided] a choice of admission prices and lines of sight comparable to those for members of the general public."[422] Preliminarily, the Court notes that the 1994 Supplement, the Accessible Stadiums guidelines and the 2010 ADAAG are inapplicable to the sightline analysis at Row 1, because those standards concern standing *spectators* in front of accessible seating, and of course in the front row, there are no spectators in front of the accessible seating.[423] Mr. Terry testified that wheelchair users on the lowered platforms on Row 1 could see none of the field over the tops of the heads of average height people standing on the sidelines while comparable non-disabled standing spectators could see 69% of the field over the heads of people in the front row.[424] Mr. Terry testified that wheelchair users in Row 1 can see 57% of the field and standing spectators in Row 4 can see 80% of the field over the shoulders and between the heads of players standing on the sidelines.[425] Mr. Mazz also

_____

I thought was the closest comparable to that area, can only see 31 percent of the field over the heads of the football players. It's -- you're not going to be sitting there in that front row to see the game. There's just too much of the field blocked. You've got the go back up to almost Row 18 before you can see the entire field.").

[421] Trial Transcript, March 3, 2020, Mark Mazz, p. 393.

[422] 1991 ADAAG at § 4.33.3.

[423] In the 1994 Supplement, the DOJ interpreted Section 4.33.3 to require wheelchair users lines of sight over *spectators* who stand. *See* Title III Technical Assistance Manual 1994 Supplement (1994), https://www.ada.gov/taman3up.html. Because there are no spectators in front of wheelchair users in Row 1, it is inapplicable to the present inquiry. Similarly, in *Accessible Stadiums*, the DOJ defined a "comparable line of sight" to allow for a person using a wheelchair to see the playing surface between the heads and over the shoulders of the person standing in the row immediately in front and over the heads of the persons standing two rows in front. Department of Justice, Accessible Stadiums 2 (1996), https://www.ada.gov/stadium.pdf. While "persons" is more general than "spectators" and could be read to include players and coached, the explicit reference to rows implies that "persons" refers to other spectators sitting or standing in rows in the facility. Accordingly, both the 1994 Supplement and Accessible Stadiums, do not offer additional guidance to the proper interpretation of "comparable line of sight" as it relates to Row 1.

[424] Trial Transcript, March 2, 2020, James Terry, p. 235.

[425] Trial Transcript, March 2, 2020, James Terry, p. 235; Rec. Doc. 179-14 at 1.

testified that while wheelchair users in the front row can see none of the field over the heads of the players in front of them, patrons in Row 15 can only see 31% of the field.[426]

As discussed above, the Fifth Circuit interpreted the phrase "lines of sight" to refer to "unobstructed views."[427] Accordingly, Section 4.33.3 requires that a facility must provide sightlines to people with physical disabilities that are similarly unobstructed to the sightlines provided to the general public. As Mr. Terry's measurements show, this is not the case at Row 1 of the Superdome. Accordingly, the Court finds that the sightlines for people with physical disabilities are not comparable to the sightlines of the general public and therefore, the Superdome is in violation of Section 4.33.3 of the 1991 ADAAG. However, as explained below, it would be virtually impossible to make the 100 Level accessible. Therefore, the Court finds that the 100 Level provides the maximum extent of accessibility that is feasible given the structural limitations of the facility.

### iii.     Whether Defendants violated the horizontal and vertical dispersion requirements of the ADA

Preliminarily, the Court notes that Plaintiff does not appear to be pursuing a claim with respect to the number of accessible seats in the 100 Level; rather Plaintiff appears to be arguing that the total number of wheelchair accessible seats in the Superdome as a whole falls short of the regulatory requirement.[428] However, the number of accessible seats impacts the dispersion requirements discussed below. Accordingly, the Court addresses the requirements for number of

---

[426] Trial Transcript, March 3, 2020, Mark Mazz, p. 393 ("the persons in wheelchairs see absolutely none of the field when trying to see over the heads of the players in front of them. The persons in Row 15, front row, which I thought was the closest comparable to that area, can only see 31 percent of the field over the heads of the football players. It's -- you're not going to be sitting there in that front row to see the game. There's just too much of the field blocked. You've got the go back up to almost Row 18 before you can see the entire field.").

[427] *Lara*, 207 F.3d at 788–89.

[428] Rec. Doc. 172 at 20–22 (addressing "Overall Seat Count" and analyzing the Superdome as a whole).

seats.

The Court notes that "assembly area" is defined as "[a] building or facility, *or portion thereof*, used for the purpose of entertainment, educational or civic gatherings, or similar purposes. For the purposes of these requirements, assembly areas include, but are not limited to, classrooms, lecture halls, courtrooms, public meeting rooms, public hearing rooms, legislative chambers, motion picture houses, auditoria, theaters, playhouses, dinner theaters, concert halls, centers for the performing arts, amphitheaters, arenas, stadiums, grandstands, or convention centers."[429] Here, the Court focuses on just the 100 Level, the *portion* of the facility subject to the alteration requirement. At the 100 Level, there are presently 25,460 seats.[430] Presently, there is a total of 236 wheelchair accessible seats in the 100 Level.[431]

Section 4.1.3(19) of the 1991 ADAAG provides that in places of assembly with fixed seating accessible wheelchair locations if the capacity of seating in the assembly area is over 500 6 wheelchair locations, plus 1 additional space for each total seating capacity increase of 100, are required.[432] Section 221.2.1.1 of the 2010 ADAAG provides that if there is more than 5001 seats in an assembly area, 36 wheelchair spaces, plus 1 for each 200, or fraction thereof, over 5000, is required.[433]

Here, the number of accessible seats in the 100 Level satisfies the requirements of Section

---

[429] 2010 ADAAG at § 106.5 (emphasis added).

[430] *Parties did not contest this fact.* Rec. Doc. 163 at 5.

[431] *Parties did not contest this fact. Id.*

[432] 1991 ADAAG at § 4.1.3(19) ("In places of assembly with fixed seating accessible wheelchair locations shall comply with 4.33.2, 4.33.3, and 4.33.4 and shall be provided consistent with the following table: Capacity of Seating in Assembly Areas . . . over 500[,] . . . Number of Required Wheelchair Locations . . . 6, plus 1 additional space for each total seating capacity increase of 100.").

[433] 2010 ADAAG at § 221.2.1.1.

221.2.1 of the 2010 ADAAG. As with sightlines, the Court finds that the 1991 ADAAG, and specifically Section 4.33.3 applies. However, to calculate the total required number of wheelchair accessible seats, and the distribution of those seats, the Court will utilize Section 221.1 of the 2010 ADAAG because if the Court finds that the Superdome does not comply with 1991 ADAAG dispersion requirements, the 2010 ADAAG requirement would now apply.[434] When the number of wheelchair spaces in an assembly area exceeds 5001, Section 221.2.1 of the 2010 ADAAG requires 36 wheelchair spaces plus 1 for each 200 over 5000.[435] Here, the 100 Level has 25,460 seats, but only 17,118 seats were altered as part of the 2010 Renovations.[436] Accordingly, 139 wheelchair spaces are required.[437] The 100 Level presently has 236 wheelchair spaces.[438] Accordingly, the 236 accessible seats resulting from 2010 Renovations comply in number with the applicable ADAAG standards for alterations. Therefore, the Court turns to the issue of whether Defendants violated the horizontal and vertical dispersion requirements of the ADA.

Section 4.33.3 of the 1991 ADAAG sets forth the following with respect to horizontal and vertical dispersion:

> Placement of Wheelchair Locations. Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public. They shall adjoin an accessible route that also serves

---

[434] *Landis*, 2019 WL 7157165 at *18 (internal citations omitted) ("In calculating the total required number of accessible seats, and the proportional distribution of those seats, the Court will utilize Section 221.1 of the 2010 ADAAG's calculations . . . The Court utilizes the more recent calculations set forth in Section 221.1 of the 2010 ADAAG because even were T-Mobile Park not to comply with the 1991 ADAAG's requirement, the 2010 ADAAG's requirement would now apply. Thus, while in order to comply with the ADA's requirements accessible seating in T-Mobile Park must be distributed according to Section 4.33.3's mandate, the Court will utilize the current 2010 standards as a yardstick for the proper proportional representation that should be present in the stadium between accessible and nonaccessible seats.").

[435] 2010 ADAAG at § 221.2.1.

[436] *Parties did not contest this fact.* Rec. Doc. 163 at 5.

[437]  25,460 – 5000 = 20,460. 20,460 / 200 = 102.3. 102.3 + 36 = 138.3.

[438] *Parties did not contest this fact.* Rec. Doc. 163 at 5.

as a means of egress in case of emergency. At least one companion fixed seat shall be provided next to each wheelchair seating area. When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location. Readily removable seats may be installed in wheelchair spaces when the spaces are not required to accommodate wheelchair users.

EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress.[439]

This Court interprets Section 4.33.3 to have twin requirements: (1) accessible seating must be integral to a stadium's seating plan, meaning that accessible seating is not entirely placed in one location and (2) people with physical disabilities must be given a choice of seating locations (i.e. horizontal and vertical distribution).[440] However, the distribution requirement is qualified by two exceptions. First, accessible seats "shall adjoin an accessible route that also serves as a means of egress in case of emergency."[441] Second, seating "may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent."[442] "The 5 percent slope exemption . . . permits only the clustering of seats."[443] This exemption has no impact on Section 4.33.3's requirement to offer comparable lines of sight.[444]

The 2010 ADAAG has updated requirements for the horizontal dispersion of accessible

---

[439] 1991 ADAAG at § 4.33.3.

[440] *Landis*, 2019 WL 7157165 at *18 (internal citations omitted) ("Section 4.33.3 requires a vertical distribution that is 'integral' to the stadiums seating plan in a manner comparable to the general public. Specifically, Section 4.33.3's command is that '[w]heelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of ... lines of sight comparable to those for members of the general public.' Thus, the requirement is for (1) integration within the seating plan (i.e. no placing all accessible seating in one location) and (2) comparable lines of sight (which here is also interpreted as horizontal and vertical distribution) that provide a choice of seating locations.").

[441] 1991 ADAAG at § 4.33.3.

[442] *Id*.

[443] *Lara*, 207 F.3d at 789 n.5.

[444] *Id*.

seats[445] as well as the vertical dispersion of accessible seats.[446] Specifically, Section 221.2.3 of the

2010 ADAAG provides:

> Wheelchair spaces shall provide lines of sight complying with 802.2 and shall comply with 221.2.3. In providing lines of sight, wheelchair spaces shall be dispersed. Wheelchair spaces shall provide spectators with choices of seating locations and viewing angles that are substantially equivalent to, or better than, the choices of seating locations and viewing angles available to all other spectators. When the number of wheelchair spaces required by 221.2.1 has been met, further dispersion shall not be required.
>
> EXCEPTION: Wheelchair spaces in team or player seating areas serving areas of sport activity shall not be required to comply with 221.2.3.[447]

Section 221.2.3.1 of the 2010 ADAAG provides that "[w]heelchair spaces shall be

dispersed horizontally."[448] Horizontal dispersion of wheelchair spaces refers to the placement of

spaces around the field of play.[449] An exception is provided for "row seating, [in which] two

wheelchair spaces shall be permitted to be located side-by-side."[450]

Section 221.2.3.2 of the 2010 ADAAG provides that "[w]heelchair spaces shall be

dispersed vertically at varying distances from the screen, performance area, or playing field. In

---

[445] 2010 ADAAG at § 221.2.3.1 ("Wheelchair spaces shall be dispersed horizontally."). *see also id.* ("Horizontal dispersion of wheelchair spaces is the placement of spaces in an assembly facility seating area from side-to-side or, in the case of an arena or stadium, around the field of play or performance area.").

[446] *Id.* at § 221.2.3.2 ("Wheelchair spaces shall be dispersed vertically at varying distances from the screen, performance area, or playing field. In addition, wheelchair spaces shall be located in each balcony or mezzanine that is located on an accessible route."). *see also id.* ("When wheelchair spaces are dispersed vertically in an assembly facility they are placed at different locations within the seating area from front-to-back so that the distance from the screen, stage, playing field, area of sports activity, or other focal point is varied among wheelchair spaces."). The 2010 ADAAG's vertical dispersion requirement includes an exception, which states that wheel chairs spaces are not required "in rows other than rows at points of entry to bleacher seating." 2010 ADAAG at § 221.2.3.2 ("Points of entry to bleacher seating may include, but are not limited to, cross aisles, concourses, vomitories, and entrance ramps and stairs. Vertical, center, or side aisles adjoining bleacher seating that are stepped or tiered are not considered entry points.").

[447] *Id.* at § 221.2.3.

[448] *Id.*

[449] *Id.*

[450] *Id.*

addition, wheelchair spaces shall be located in each balcony or mezzanine that is located on an accessible route."[451] The Advisory Comments state that "[w]hen wheelchair spaces are dispersed vertically in an assembly facility they are placed at different locations within the seating area from front-to-back so that the distance from the screen, stage, playing field, area of sports activity, or other focal point is varied among wheelchair spaces."[452] An exception to this provision provides "[i]n bleachers, wheelchair spaces shall not be required to be provided other than rows at points of entry to bleacher seating."[453]

The caselaw on the distribution requirements is "sparse" as "[m]ost courts that have opined on the subject have merely held that there is a vertical distribution requirement."[454] However, courts that have considered these issues have generally "tempered the vertical distribution requirement by recognizing the practical limitations associated with accessible seating."[455] This is perhaps "[b]ecause wheelchair patrons make up only a small percentage of all spectators, there need not be wheelchair seating in every section of the arena, but there must be spaces scattered throughout a sufficiently representative number of sections in the seating bowl to provide

---

[451] *Id*. at § 221.2.3.2.

[452] *Id*.

[453] *Id*.

[454] *Landis*, 2019 WL 7157165 at * 18 (citing *Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F.Supp. 393, 404 (D.D.C. 1996) ("[d]ispersal requires a choice of various seating areas, good and bad, expensive and inexpensive, which generally matches those of ambulatory spectators"); *Indep. Living Res. v. Oregon Arena Corp.*, 982 F.Supp. 698, 708, 709 (D. Or. 1997) ("DOJ interprets Standard 4.33.3 to require both vertical and horizontal dispersal, i.e., in large arenas and stadiums such as the Rose Garden the wheelchair locations must be distributed in a manner that approximates the overall distribution of seats in the facility"); *Berry v. City of Lowell*, No. 01-10694, 2003 WL 22050772, at *2 (D. Mass. May 30, 2003); *Colorado Cross-Disability Coal. v. Colorado Rockies Baseball Club, Ltd.*, 336 F.Supp. 2d 1141, 1146 (D. Colo. 2004); *Cerda v. Chicago Cubs Baseball Club, LLC*, No. 17-9023, 2019 WL 4138943, at *8–9 (N.D. Ill. Aug. 30, 2019)).

[455] *Id*. at * 19.

comparable choices."[456] In *Paralyzed Veterans of America v. Ellerbe Becket Architects & Eng'rs, P.C.*, the court found that a newly built arena did not comply with Section 4.33.3 of the 1991 ADAAG because "almost every one" of the accessible seats were located in the end zone areas.[457] In *Colorado Cross-Disability Coal. v. Colorado Rockies Baseball Club, Ltd.*, the court determined that the wheelchair seats could not be clustered in specific areas of the stadium.[458]

The 2010 ADAAG provides that "[w]hen the number of wheelchair spaces required by 221.2.1 has been met, further dispersion shall not be required."[459] As discussed above, the number of accessible seats in the 100 Level satisfies the requirements of Section 221.2.1 of the 2010 ADAAG. Because "the number of wheelchair spaces required by 221.2.1 has been met, further dispersion [is] not . . . required."[460] However, even if further dispersion had been required, the Court finds that the 100 Level of the Superdome satisfies the dispersion requirements.

The evidence shows that there is horizontal dispersion of ADA seating in the 100 Level of the Superdome. Horizontal dispersion of wheelchair spaces refers to the placement of spaces

---

[456] *Paralyzed Veterans of Am.*, 950 F.Supp. at 404; *see also Indep. Living Res.*, 982 F.Supp. at 709 ("[w]hile absolute homogeneity is usually neither feasible nor required—since wheelchair users cannot navigate stairways or the narrow passage leading to a seat in the middle of a row—neither may the arena operator relegate most wheelchair users to the dark corners of the arena"); *Cerda*, 2019 WL 4138943, at *9 ("the 2010 Standards do not say where Accessible Seats must be located and do not require the Cubs to place ADA seats in the front row").

[457] 950 F.Supp. 393, 404 (D.D.C. 1996) (interpreting the dispersal requirement of Section 4.33.3 of the 1991 ADAAG as requiring "a choice of various seating areas, good and bad, expensive and inexpensive, which generally matches those of ambulatory spectators. Furthermore, in order to comply with the other requirements of § 4.33.3, spaces with enhanced sightlines must be dispersed; a design which segregates the spaces with enhanced sightlines cannot comply, no matter how dispersed the spaces with unenhanced sightlines may be. Because an ambulatory patron may select a seat with an unobstructed view in any section of the arena, it is not "comparable" to force a wheelchair patron to choose between a good view and a good location. Because wheelchair patrons make up only a small percentage of all spectators, there need not be wheelchair seating in every section of the arena, but there must be spaces scattered throughout a sufficiently representative number of sections in the seating bowl to provide comparable choices.").

[458] 336 F.Supp. 2d 1141 (D. Col. 2004).

[459] 2010 ADAAG at § 221.2.3.

[460] *Id*.

around the field of play.[461] The Advisory Comments to Section 221.2.3.1 of the 2010 ADAAG provides that accessible seats must be placed "around the field of play."[462] The Row 36 accessible seating wraps around the length of the sideline, thereby encircling, in part, the field of play.[463] While there are no accessible seats in the endzones,[464] the Court finds that providing accessible seating along the entire length of the sideline is sufficient to satisfy the horizontal dispersion requirements. Therefore, the accessible seating in the 100 Level complies with the horizontal dispersion requirements.

The evidence also shows that there is vertical dispersion of ADA seating in the 100 Level of the Superdome. Generally, the 1991 ADAAG requires a vertical distribution that is "integral" to the stadium's seating plan.[465] "A stadium, therefore, could not fulfill Section 4.33.3's mandate by merely apportioning an equal amount of accessible seating within each of the stadium's vertical tiers but then relegating those seats entirely to the rear of each of the tiers. For instance, because ambulatory patrons have the option to access front row seating, stadiums, at the very least, must also provide accessible front row seating for wheelchair patrons."[466] Here, the Superdome offers accessible seating in Row 1 and Row 36 of the 100 Level. As such, wheelchair users are not entirely relegated to one specific spot, but rather have the choice between sitting in the front row, or the back row. Generally, the 2010 ADAAG provides that wheelchair spaces must be placed at

---

[461] *Id.*

[462] *Id.* at § 221.2.3.

[463] Trial Transcript, March 3, 2020, James Terry, pp. 338–39.

[464] Trial Transcript, March 2, 2020, James Terry, p. 258.

[465] 1991 ADAAG at § 4.33.3.

[466] *Landis*, 2019 WL 7157165 at *19.

varying distances from the playing field.[467] Importantly, the 2010 ADAAG do not require that wheelchair seating be in any specific location, so long as distance from the seats to the field of play is varied.[468] Here, the Court finds that the 100 Level of the Superdome complies with the vertical dispersion requirements because there are accessible seats at two distances from the field: Row 1 and Row 36 of the 100 Level. Therefore, there is vertical dispersion of wheelchair accessible seating in the 100 Level of the Superdome.

In sum, the Court finds that the 100 Level of the Superdome fulfills the horizontal and vertical dispersion requirements of the ADAAG.

### iv.      Whether the monitors violate the alteration requirement

SMG, on behalf of the Board, placed television monitors on the underside overhang of the 200 Level, for patrons in the 100 Level.[469] Mr. Terry testified that because the monitors are small and too few in number, they do not offer a comparable experience to the Jumbotron.[470] Photographs of the monitors were also introduced into evidence.[471] Plaintiff testified that he had difficulty watching the football game on the monitor because they were so small.[472]

The Court finds that Section 4.33.3 of the 1991 ADAAG, does not apply to the television monitors at issue. In the context of alterations to assembly areas, such as the Superdome, the regulations refer to a movie screen, not all screens generally.[473] While the 1991 ADAAG, the

---

[467] 2010 ADAAG at § 221.2.3.2.

[468] *Cerda*, 2019 WL 4138943, at *9 ("the 2010 Standards do not say where Accessible Seats must be located and do not require the Cubs to place ADA seats in the front row").

[469] Trial Transcript, March 2, 2020, Doug Thornton, pp. 137–38.

[470] Trial Transcript, March 3, 2020, James Terry, pp. 240–41.

[471] Rec. Docs. 179-13, 180-26.

[472] Trial Transcript, March 2, 2020, Shelby Bailey, p. 212.

[473] *See* 28 C.F.R. § 36.406(f).

TAM, and the 1994 Supplement are silent as to the main focal point of the applicable line of sight, *Accessible Stadiums* explicitly provides that "[a] comparable line of sight . . . allows a person using a wheelchair to see the *playing surface* . . . ."[474] Accordingly, the regulations and DOJ guidance suggest that the pertinent line of sight is to the main focal point of the assembly, here the playing field.

Even if the Court were to find that Section 4.33.3 of the 1991 ADAAG applied to the monitors, Section 4.33.3 requires only a comparable sightline. The comparability standard of Section 4.33.3 requires that a stadium provide sightlines to people with physical disabilities that are similarly unobstructed to the sightlines provided to the general public. Unlike Plaintiff's other sightline claims, there is no suggestion that standing spectators obstruct wheelchair users' view of the monitors. Furthermore, there is no suggestion that people with physical disabilities have any worse sightlines to the monitors than the sightlines offered to members of the general public. In fact, Plaintiff's expert readily agreed that there is no difference between a wheelchair users' ability to read the information on a monitor and the ability of a member of the general public sitting in the same area to read the same monitor.[475] Accordingly, the Court finds that the monitors offer the same viewing experience to all patrons and that therefore, Plaintiff has not shown that Defendants violated the sightline requirements of the ADA as it relates to the monitors.

### 5. Whether it would be virtually impossible to make the 100 Level accessible

As discussed above, Defendants were required to make any alterations "readily accessible"

---

[474] Department of Justice, Accessible Stadiums 2 (1996), https://www.ada.gov/stadium.pdf. (emphasis added).

[475] Trial Transcript, March 3, 2020, James Terry, p. 310.

to individuals with disabilities to the "maximum extent feasible."[476] Under this standard, the altered portion of the facility must comply fully with applicable accessibility standards and the ADAAG unless it is "virtually impossible" to do so.[477] If compliance is virtually impossible, "the alteration shall provide the maximum physical accessibility feasible."[478]

> The phrase 'to the maximum extent feasible' . . . applies to the occasional case where the nature of an existing facility makes it virtually impossible to comply fully with applicable accessibility standards through a planned alteration. In these circumstances, the alteration shall provide the maximum physical accessibility feasible. Any altered features of the facility that can be made accessible shall be made accessible. If providing accessibility in conformance with this section to individuals with certain disabilities (e.g., those who use wheelchairs) would not be feasible, the facility shall be made accessible to persons with other types of disabilities (e.g., those who use crutches, those who have impaired vision or hearing, or those who have other impairments).[479]

On the question of what qualifies as "virtually impossible" under the ADA, Fifth Circuit case law is sparse. Accordingly, the Court has searched more broadly in an attempt to discern precisely when compliance is virtually impossible.

In *Roberts v. Royal Atl. Corp.*, the Second Circuit held that the requirement to make a facility accessible to the maximum extent feasible is not a cost benefit analysis in which the Court weighs the costs, financial or otherwise, of making the facility accessible against the benefits of such a change.[480] Rather, it requires the facility be made accessible except where providing

---

[476] 28 C.F.R. § 36.402(c) (The "maximum extent feasible" standard only applies to "the occasional case where the nature of an existing facility makes it virtually impossible to comply" with accessibility standards). *See also* 28 C.F.R. § 35.151(b)(1).

[477] *Id.*

[478] *Id.*

[479] 28 C.F.R. § 36.402(c).

[480] 542 F.3d 363, 371 (2d Cir. 2008) ("Section 12183's "maximum extent feasible" requirement does not ask the court to make a judgment involving costs and benefits . . . The statute and regulations require that such facilities be made accessible even if the cost of doing so—financial or otherwise—is high. Indeed, in promulgating the implementing regulations, the Department explicitly rejected suggestions that cost be considered with respect to this provision.").

accessibility would be "virtually impossible" in light of the "nature of an existing facility."[481] "Only if there is some characteristic of the facility itself that makes accessibility 'virtually impossible,' then, may the provision of access be excused. Even in such cases, accessibility must be provided for all types of disabilities for which nondiscrimination is possible."[482] Lastly, "because both the statute and regulations require that the alterations themselves be made to provide the maximum feasible accessibility, a court's assessment of feasibility must be made with respect to the state of the facility before the alterations in question were made, rather than the facility's post-alteration state."[483]

In *de la Rosa v. 597 Broadway Dev. Corp.*, a magistrate judge for the United States District Court for Southern District of New York found that a proposal to build a wheelchair accessible ramp was virtually impossible to achieve.[484] The plaintiff, a wheelchair user, alleged that she was unable to access a building because it did not have a wheelchair ramp.[485] Because the court found that the property underwent an alteration, the defendant was required to ensure access to the maximum extent feasible. In an apparent response to the plaintiff, the defendant engaged a licensed architect to design a permanent ramp, which was plaintiff's preferred accommodation.[486] However, the court found that the proposed ramp would cover a manhole cover and it would block more than half the width of a sidewalk.[487] Additionally, avoidance of the manhole cover would

---

[481] 28 C.F.R. § 36.402(c).

[482] *Roberts*, 542 F.3d at 372.

[483] *Id.*

[484] No. 13CV7999 (LAK) (MHD), 2015 WL 7351540 (S.D.N.Y. Aug. 4, 2015), report and recommendation adopted in part, No. 13-CV-7999 (LAK), 2015 WL 7308661 (S.D.N.Y. Nov. 19, 2015).

[485] *Id.* at *2.

[486] *Id.* at *3.

[487] *Id.* at *14.

require the ramp to have a far steeper slope than is permitted by either the ADA or City rules.[488] The Court reasoned that both conditions would almost certainly be found inconsistent with public health and safety.[489] Therefore, the Court held that the "defendant has made an adequate showing that utilizing the proposed permanent ramp in the face of specific regulatory requirements would be virtually impossible" and therefore granted summary judgement in favor of the defendant.[490] The Court also found that the plaintiff's proposed ramp design would be virtually impossible because it did not conform to ADA or municipal requirements, namely, that the ramp would extend even further across the sidewalk, the design did not include handrails, and had a slope higher than the maximum slope allowed under the applicable ADAAG.[491]

The court's analysis in *de la Rosa*, demonstrates that "virtually impossible" is not analogous to technically impossible. Rather, it is more akin to unworkable given the current condition of the facility. Additionally, if the court finds that a proposed solution or accommodation would result in a different ADA or municipal violation, that is sufficient to establish virtual impossibility.

In a similar case, *Range v. 230 W. 41st St. LLC*, a wheelchair user asserted claims under Title III of the ADA due to the alleged lack of access to a restaurant.[492] The court first reasoned that reasonable jurors could find that three of the defendants' modifications qualified as alterations.[493] Nevertheless, the court concluded that the defendants were entitled to summary

---

[488] *Id*. at *15.

[489] *Id*. at *14.

[490] *Id*. at *16.

[491] *Id*.

[492] No. 17 CIV. 149 (LAP), 2020 WL 3034800 (S.D.N.Y. June 5, 2020).

[493] *Id*. at * 4.

judgment because "[n]o reasonable juror could conclude that the alleged alterations could have been done in a way that would have facilitated wheelchair access to the Store."[494] Because "[t]he inability of wheelchair users to enter the Store derives entirely from the elevation difference between the Store's floor and the outside sidewalk [and] has nothing to do with the [the] alleged alterations to the property . . . those alterations do not give rise to liability here."[495]

The Superdome was built in 1975.[496] This is, of course, fifteen years before the passage of the ADA and at a time when accessibility standards were just beginning to be addressed by new construction.[497] None of those early standards addressed lines of sight.[498] The Superdome was one of the first enclosed (i.e. completely indoor) stadiums in the country.[499] To build something as large as the Superdome, and maintain a roof overheard, the design was compacted, meaning that the seating tiers are stacked on top of each other.[500] This compact design and stacked-tier layout creates sightline problems from various seating locations within the Superdome, most notably with respect to the last few rows of the 100 Level beneath the concrete overhang that supports the 200 Level.

The Court finds that achieving comparable lines of sight to aerial play from the last several

---

[494] *Id.* at * 5.

[495] *Id.*

[496] *Parties did not contest this fact.* Rec. Doc. 163 at 4.

[497] Trial Transcript, March 3, 2020, Mark Mazz, p. 371.

[498] Trial Transcript, March 3, 2020, Mark Mazz, p. 371.

[499] Trial Transcript, March 3, 2020, Mark Mazz, p. 373.

[500] Trial Transcript, March 3, 2020, Mark Mazz, p. 373 ("The Superdome, I think, is the second stadium in the country to be covered, completely indoors for something this massive. And to that end, it's compacted. It's huge, but it's compacted with the way they stack their tiers in there and put the seats together. So it makes it particularly difficult to add the accessible wheelchair spaces in place and create the same lines of sight and viewing angles for persons in wheelchairs.").

row of the 100 Level would be virtually impossible. To view aerial play, a patron must be able to see approximately 150 feet above the center of the field.[501] Both experts agreed that all patrons in the last three to four rows of the 100 Level cannot see aerial gameplay due to the concrete overhang.[502] Therefore, the wheelchair accessible seats in Row 36 would need to be moved forward at least three to four rows for wheelchair users to view aerial gameplay.

Here, the Court finds there is no feasible way to move wheelchair spaces forward closer to the middle of the 100 Level. Defendants' expert testified that moving 14 wheelchair accessible seats forward in the section at the fifty-yard-line—where the overhang is the shallowest, making it the easiest place to achieve vertical sightlines—would result in a loss of 132 seats in that one section.[503] Mr. Mazz testified that this would result in a loss of close to a half a million dollars in yearly revenue.[504] As the seating moves away from the 50 yard line and closer to the endzone, the depth of the overhang increases and therefore, so does the number of seats Defendants would need to eliminate in those sections.[505] Defendants' expert estimated that in the section of the corners of the Superdome, where the overhang is deepest, 20% of the seats may need to be eliminated in order to move Row 36 forward to afford wheelchair users sightlines to aerial play.[506]

Plaintiff also suggested removing Row 35 entirely and "moving" Row 36 forward so that

---

[501] Trial Transcript, March 3, 2020, Mark Mazz, pp. 412–13.

[502] Trial Transcript, March 3, 2020, James Terry, p. 311 (opining that a wheelchair user would need to move to Row 32 to see "everything"); Trial Transcript, March 3, 2020, Mark Mazz, pp. 413–14 (opining that "if you move forward three rows and you were -- and once you move forward three rows, you can actually drop the elevation of the wheelchair. seats down to 21 inches and at that point, you can see up to a vertical view up to 170 feet. So you can see the highest of the high punts. You'll be able to see the aerial play.").

[503] Trial Transcript, March 3, 2020, Mark Mazz, pp. 413–14.

[504] Trial Transcript, March 3, 2020, Mark Mazz, p. 415.

[505] Trial Transcript, March 3, 2020, Mark Mazz, pp. 414–15.

[506] Trial Transcript, March 3, 2020, Mark Mazz, p. 415.

row is entirely accessible seating. First, as Plaintiff's expert admitted, this would not fix the sightline problems as to aerial play.[507] Defendants' expert agreed that moving one row forward would not result in enough of vertical sightline above the field to view aerial play.[508] Accordingly, the Court finds that it is virtually impossible to provide comparable lines of aerial play to the last several rows of the 100 Level, and that the Superdome provides the maximum extent of accessibility that is feasible given the structural limitations of the existing facility.

Furthermore, the Court finds that it is virtually impossible for a Row 1 sideline accessible seat to have a comparable view of the playing field to the view of standing spectators in the 100 Level. As discussed above, all Row 1 seats, including nonaccessible seats, suffer from sightline obstructions due to the personnel on the field.[509] The Row 1 sideline seats, which is where the wheelchair accessible seats are currently located, are seated immediately behind the player bench. Therefore, Plaintiff proposed two possible solutions to the sightline issues: (1) moving the accessible seats closer to the center of the 100 Level so a patron in a wheelchair is vertically high enough to see over the player bench and (2) moving the Row 1 seats down closer to the endzone, between the endzone and the 30-yard line, so that the player bench is not directly in front of the seats.[510]

Within the 100 Level, patrons sitting in the center of each section, in and around Row 18, have the best seating when it comes to sightlines. They are seated far enough from the front row that they can see over the heads of the players and coaches standing on the field in front of them,

---

[507] Trial Transcript, March 3, 2020, James Terry, p. 264.

[508] Trial Transcript, March 3, 2020, Mark Mazz, p. 413.

[509] Trial Transcript, March 3, 2020, Mark Mazz, p. 380.

[510] Trial Transcript, March 2, 2020, James Terry, pp. 260–65.

but their aerial view isn't obstructed by the concrete overhang.[511] For these reasons, Plaintiff argues the accessible seating should be placed in the center of the stadium section. Unfortunately, there are several complications that arise from affording wheelchair users seats in the center of a section.

Mr. Mazz explained the logistics of putting wheelchair seats in the center of a section, and how that decision impacts the rows around it. A wheelchair user's eyesight is 47.5 inches off the ground, whereas a comparable standing spectator's eyesight is 63.5 inches off the ground.[512] To make up this 16-inch difference, the accessible seats must be raised in height. But, for every 6 inches the accessible seating is raised, an additional row of seating is blocked.[513] So, for example, raising the height of the accessible seating by 30 inches would block the five rows immediately behind the accessible seats. Therefore, reserving the center of a section for accessible seats would monopolize a substantial portion of the 100 Level and significantly decrease the seating capacity.

Additionally, a design team would face significant hurdles in putting accessible seating in the middle of a section.[514] In addition to the standard challenges that come with building accessible seating on top of existing construction, the design team would need to figure out an ADA-compliant way to get wheelchair patrons to their seats; this may require the use of an elevator or a steep ramp.[515] More importantly, placing wheelchair seats in the center of a section could pose a threat to the safety of all patrons in the event of an emergency. A judge in the United States District Court for the District of Columbia was persuaded by a defendant's argument in support of its

---

[511] Trial Transcript, March 3, 2020, Mark Mazz, pp. 393–97.

[512] Trial Transcript, March 3, 2020, Mark Mazz, pp. 395–96.

[513] Trial Transcript, March 3, 2020, Mark Mazz, p. 397.

[514] Trial Transcript, March 3, 2020, Mark Mazz, p. 405.

[515] Trial Transcript, March 3, 2020, Mark Mazz, p. 405.

choice to retain wheelchair seating in the back of a theater rather than dispersed throughout that "the presence of a wheelchair and its occupant in the midst of able-bodied patrons in fear for their own safety could impede a mass exodus of the theater in the case of an emergency."[516]

Defendants' expert, Mr. Mazz testified that it would not be possible to put accessible seating in Row 18.[517] Mr. Mazz stated that, with a tightly designed, existing building, it is difficult if not impossible to put wheelchair accessible seating in the center of a section when considering all other factors, including maintaining paths of travel to the seats and creating vertical dispersion.[518] In sum, the Court finds that it would be virtually impossible to locate wheelchair accessible seating in the center of a section.

Plaintiff's second solution is to move the Row 1 seats to between the endzone and the 30-yard line.[519] Plaintiff primarily relies of the testimony of Brad McWhirter, a member of the architect team involved with current renovations at the Superdome and the 2006 repairs to the Superdome.[520] Mr. McWhirter testified that presently, there is no accessible route to the Row 1 seats between the end zone and the 30-yard line.[521] Mr. McWhirter testified that to install an accessible route to these seats, a T-shaped vomitory would need to be installed to create an egress to the accessible seats.[522] Mr. Mazz confirmed that a new vomitory would be necessary because

---

[516] *Fiedler v. Am. Multi-Cinema, Inc.*, 871 F.Supp. 35, 39 (D.D.C. 1994).

[517] Trial Transcript, March 3, 2020, Mark Mazz, p. 394 ("I thought I just talked about that with trying to enter a vomitory in the center of the seating area, trying to connect that to an accessible route back to where -- somewhere between the two levels, creating the vertical circulation, not disrupting all the stuff that goes on below it, the -- it's a nightmare trying to make all of that work and I'm not sure you can at that point.").

[518] Trial Transcript, March 3, 2020, Mark Mazz, p. 394.

[519] Rec. Doc. 172 at 25.

[520] Trial Transcript, March 3, 2020, Brad McWhirter, p. 457.

[521] Trial Transcript, March 3, 2020, Brad McWhirter, p. 458.

[522] Trial Transcript, March 3, 2020, Brad McWhirter, pp. 460–61.

the distance from the existing vomitory to the new Row 1 seats would exceed the maximum distance allowed by the building code for a path of egress.[523] Mr. McWhirter testified that such an installation would result in a reduction of seats.[524] Mr. McWhirter testified that currently, there are not bathrooms nor concessions to service any such accessible route, so Defendants would either have to tie the new vomitory to the existing Bunker Club expansion, or create new amenities for this section.[525]

The Court finds that this proposal would not necessarily solve the sightline problems at Row 1. First, the Court notes that Plaintiff's expert did not analyze the sightlines from the proposed location between the endzone and 30-yard line.[526] Without line of sight measurements from this alterative location, the Court cannot reliably conclude that moving the Row 1 seats closer to the endzone would achieve even better sightlines than the sightlines from the current Row 1 location, let alone result in ADAAG-compliant sightlines.

Second, the Court notes that while the obstructions are of course more notable on the 50-yard line, where a patron's view is blocked by the players and coaching staff standing immediately in front of him, the sightlines are still not "good" as a spectator in Row 1 moves toward the endzone.[527] When the play is immediately in front of a Row 1 patron sitting closer to the end zone,

---

[523] Trial Transcript, March 3, 2020, Mark Mazz, pp. 375–76 ("The means of egress requirements for the building code require that you can't have a common path longer than 50 -- that's 75 feet before you split it into two means of egress. If you -- lengthening the existing route through the existing vomitory, I believe right now, to the accessible seat farthest from where you can make that decision is 60 feet. You're limited to another 15 feet. So you can't get to another section. You would have to provide another way out.").

[524] Trial Transcript, March 3, 2020, Brad McWhirter, p. 461.

[525] Trial Transcript, March 3, 2020, Brad McWhirter, pp. 461, 469.

[526] Trial Transcript, March 3, 2020, James Terry, pp. 303–044.

[527] Trial Transcript, March 3, 2020, Mark Mazz, p. 381.

the on field personnel (camera crew, chain crew, media, etc.) would block the patron's view.[528]
When the play is away from the patron (near the opposite endzone), the play would seemingly be
blocked by the player bench.[529] Because the personnel on the field is constantly changing, Row 1
patrons will almost always have a somewhat obstructed view of the playing field, regardless of
where in the stadium those Row 1 seats exist.[530] While putting accessible seats closer to the
endzone would result in better sightlines than the current location of accessible seats on the
sideline, it still would not result in a good viewing experience.

Additionally, while the Row 1 accessible seats are located on a "step down," the Court
finds that even if the step down did not exist, or if the seats were six inches higher, patrons in these
seats would still be unable to see the playing field.[531] Simply put, Row 1 does not offer good views
of the playing field. Accordingly, the Court finds that moving the Row 1 accessible seats from the
50-yard line to the space between endzone and the 30-yard line would not result in ADA
compliance.

Furthermore, the Court finds the alterations were made accessible to people with
disabilities "to the maximum extent feasible." The alterations to the 100 Level, and specifically
Row 1, could not have been done in a way that would have facilitated unobstructed sightlines to

---

[528] Trial Transcript, March 3, 2020, Mark Mazz, p. 454 ("If the play is in front of you, you're not having the football players standing in front of you, but you do have the cheerleaders, you have the cameraman, you have the media, whoever else happens to be down in that area.").

[529] Trial Transcript, March 3, 2020, Mark Mazz, p. 454.

[530] Trial Transcript, March 3, 2020, Brad McWhirter, p. 462 ("When you're in the front row, you're -- essentially, your encumbered view is whatever people that are on the actual field right in front of you or players, media, people with field access. It's essentially changing constantly during the game as the game moves up and down the field. So viewing straight ahead may be much different depending on where the actual action is, versus if it's on the opposite side of the field, you might be looking through more players or the bench. It just depends on where the action is on the field on how to judge those sight lines.").

[531] Trial Transcript, March 3, 2020, Mark Mazz, p. 376 ("Q. And does raising a wheelchair spaces up 6 inches make a difference? A. It doesn't make a difference. You still can't see a thing.").

the playing field. The inability of wheelchair users to see the playing field and aerial play derives from the compact design and stacked-tier layout of the Superdome, as well as the natural dynamics of a professional football game, rather than any alteration to the stadium. Given those initial design choices, "the nature of [the] existing facility ma[de] it virtually impossible to comply fully with [the] accessibility standards through [the] planned alteration[s]."[532] Accordingly, the Court finds that moving the Row 1 accessible seats from the 50-yard line to the space between endzone and the 30-yard line is neither possible nor would it result in ADA compliance. Because Defendants could not have made the Superdome accessible by altering the Row 1 seats, including by moving those seats to the center of the section or by moving those seats to between the 30-yard line and the endzone, those alterations do not give rise to liability.

As part of the 2010 Renovations, Defendants added accessible seating in Row 1 and Row 36 of the 100 Level, which offered disabled patrons ease of entry and exit as well as access to concessions and restrooms. As discussed above, it would be virtually impossible to have wheelchair accessible seats in the middle rows of the 100 Level. This decision meant that disabled patrons would have certain sightline restrictions, in that disabled patrons would not have comparable sightlines to those offered to the general public. However, as Mr. Mazz testified, it is customary to put wheelchair accessible seating in the first and last row of the lower bowl of an older stadium undergoing an alteration.[533] The Court finds that the Superdome provides the

---

[532] 28 C.F.R. § 36.402(c).

[533] Trial Transcript, March 3, 2020, Mark Mazz, p. 391 ("Because it's an existing stadium, you have a lot of restrictions on where you can put things. If you wanted to try to come in somewhere in the center to provide somebody at, like, at Row 18, you're going to -- to the vomitory itself is going to take out a lot of seats above of that area, probably -- what I did say? Seven, seven to nine rows above that in that space. Also, you're going to have to figure out how to get to that level somewhere inside the stadium. So you're coming in above -- somewhere between the -- the 100 level concourse and the basement level below and all the existing things that may be in that place to get around that. It just becomes a virtual nightmare trying to figure it out and whether it's even possible to do. It just makes sense that when you're dealing with such restrictions at this point, you're putting the accessible seats in the back row and the front row when you can.").

maximum extent of accessibility that is feasible given the structural limitations of the existing facility.

E.      **Whether France violated the program access requirements of the ADA**

1.      **Title II**

Plaintiff brings a claim against Defendant Kyle France, in his official capacity as Chairman of the Board of Commissioners of the LSED, for injunctive relief under Title II of the ADA. Because France is sued in his official capacity as Chairman of the Board of Commissioners of the LSED, the claim for injunctive relief against him is, in effect, a claim for injunctive relief against the LSED.[534]

Title II of the ADA provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[535] Title II prohibits discrimination by public entities, which are defined as "any State or local government [or] any department, agency, special purpose district, or other instrumentality of a State or States or local government."[536] Accordingly, the Board is a public entity subject to the requirements of Title II. Additionally, the regulations implementing the ADA provide that Title II "applies to all services, programs, and activities provided or made available by public entities."[537] The guidance interpreting this section clarifies that "[a]ll governmental activities of public entities

---

[534] *See Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity.") (emphasis in original).

[535] 42 U.S.C. § 12132.

[536] *Id*. at § 12131(1)(A), (B).

[537] 28 C.F.R. § 35.102(a).

are covered, even if they are carried out by contractors."[538] Therefore, Saints football games at the Superdome qualify as an activity for which the Board is responsible, even though SMG is responsible for the operations of those games.

Title II provides, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[539] "To succeed on a claim under Title II of the ADA, a plaintiff must prove: '(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.'"[540] "In addition to their respective prohibitions of disability-based discrimination, both the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals."[541]

To establish the second element of his Title II claim, Plaintiff must show he was "denied the benefits of services, programs, or activities" for which the Board is responsible, or was "otherwise discriminated against" by the Board.[542]

### 2. Legal standard for program access

As one basis for the second element of Plaintiff's Title II claim, Plaintiff argues that France discriminated against him because the Superdome is not readily accessible to him.[543] 28 C.F.R.

---

[538] 28 C.F.R. pt. 35, app. B.

[539] 42 U.S.C. § 12132.

[540] *Wells*, 460 F. App'x at 311 (quoting *Hale*, 642 F.3d at 499).

[541] *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).

[542] *Wells*, 460 F. App'x at 311 (quoting *Hale*, 642 F.3d at 499).

[543] Rec. Doc. 172 at 57–61.

§ 35.150(a) provides:

> A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.

The regulations do not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities."[544] The regulations define "facility" as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located."[545] Therefore, France is not required to make each portion of the Superdome readily accessible; the issue is whether the Superdome, when viewed in its entirety, is readily accessible. However, "[w]hile proving that particular barriers exist might not be sufficient to establish Title II liability, each barrier is a building block for a finding that the Stadium, viewed in its entirety, is not readily accessible."[546]

### i.     New construction and alterations versus existing facilities

As discussed above, the regulations distinguish between structures built prior to the Act taking effect in January 1992 ("existing facilities") and facilities built or altered after January 1992 ("altered facilities").[547] A public entity's existing facilities—those facilities constructed prior to the 1992 effective date that remain unaltered—need not be "accessible to and usable by individuals with disabilities."[548] Rather, for such facilities, a public entity need only provide program access,

---

[544] 28 C.F.R. § 35.150(a)(1).

[545] *Id*. at § 35.104.

[546] *Pascuiti v. New York Yankees*, 87 F.Supp. 2d 221, 224 (S.D.N.Y. 1999).

[547] *Lane*, 541 U.S. at 531–32.

[548] 28 C.F.R. § 35.150(a)(1).

by "operat[ing] each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[549] However, when an existing facility undergoes alterations after the 1992 effective date, more stringent architectural standards apply; then, the altered facilities must "be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities. . . ."[550] To be "readily accessible," any part of a newly constructed or altered facility must be constructed in conformance with the relevant ADAAG.[551] In sum, existing facilities must satisfy the "program accessibility" standard whereas altered facilities must comply with the "maximum extent feasible" standard.

Here, the Superdome was built in 1975, before the 1992 effective date.[552] However, as discussed above, the 2010 Renovations constitute an alteration, and therefore triggered the "maximum extent feasible" standard. Because, the alteration regulations are confined to "the altered portions of the facility," the ADA's alteration standard applies only to the 100 Level, where the alteration occurred.[553] The other portions of the Superdome that were not altered as part of the 2010 Renovations are analyzed as an existing facility under the program-access standard.[554]

---

[549] *Id*. at § 35.150(a).

[550] *Id*. at § 35.151(a)(1) ("Each facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992.").

[551] *Id*. at § 35.151(c)(1)-(3) ("If physical construction or alterations commence[d] after July 26, 1992, but prior to September 15, 2010, then new construction and alterations . . . must comply with either UFAS or the 1991 [ADAAG]. . . . If physical construction or alterations commence[d] on or after September 15, 2010 and before March 15, 2012, then new construction and alterations ... may comply with . . . [t]he 2010 [ADAAG], UFAS, or the 1991 [ADAAG]. . . . If physical construction or alterations commence[d] on or after March 15, 2012, then new construction and alterations . . . shall comply with the 2010 [ADAAG].").

[552] *Parties did not contest this fact.* Rec. Doc. 163 at 4.

[553] 28 C.F.R. § 35.151(b)(1); 28 C.F.R. § 36.402(b).

[554] The Court determined that Plaintiff failed to raise an alteration claim as to the 200 Level in the Complaint and was therefore precluded from raising the issue at trial. SMG objected to a question related to alterations at the 200

Therefore, the Court applies the existing facility standards—also known as the "program accessibility" standard—to those parts of the Superdome that have not been altered.[555]

### ii.      Methods by which a public entity may achieve program access

The regulations offer public entities a number of methods by which that may comply with the program access requirement, including "any . . . methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities."[556] "In choosing among available methods for [achieving program access], a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate."[557] Importantly, "[a] public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance."[558]

The Fifth Circuit found that "[w]hile there is little precedent in this circuit regarding the application of the ADAAG to existing facilities . . . courts in various other circuits have refused to strictly apply ADAAG requirements to existing facilities but instead rely on the ADAAG for

---

Level of the Superdome on the basis of relevancy. Rec. Doc. 170 at 44. France joined in the objected. *Id*. at 45. SMG argued that Plaintiff's alteration claim in the Complaint was limited to 2010 Renovations, which only impacted the 100 Level of the Superdome. *Id*. at 44–45. Plaintiff represented that the renovations to the 200 Level occurred following hurricane Katrina and should qualify as an alteration. *Id*. at 49–50. However, Plaintiff conceded that an alteration claim as to the 200 Level was not in the Complaint. *Id*. at 51. Accordingly, because Plaintiff did not assert a 200 Level alteration claim in the Complaint, and did not move to amend the Complaint, the Court determined that it was not an issue at trial. *Id*. at 44–54. However, the Court clarified that evidence related to the 200 Level for other claims, including the program access claim, may still be admissible. *Id*. at 53–54.

[555] *Smith v. City of Lodi*, No. 2:14-CV-01318-TLN-AC, 2016 WL 3197552, *5 (E.D. Cal. June 9, 2016) ("Thus, the Court is required to apply the 2010 guidelines to any alterations made after 2010 and apply the existing facility standards—also known as the "program accessibility" standard—to those parts of the Grape Bowl that have not been altered.").

[556] 28 C.F.R. § 35.150(b)(1).

[557] *Id*.

[558] *Id*. at § 35.150(b)(1).

guidance."[559] This may be because, as the First Circuit noted, "Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available."[560] This interpretation is in line with the Supreme Court's instruction that, "[i]n the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures ... [and] [o]nly if these measures are ineffective in achieving accessibility is the public entity required to make reasonable structural changes."[561] Accordingly, this Court will not strictly apply the ADAAG requirements, but will rather rely on the ADAAG for guidance, in analyzing the unaltered portions of the Superdome.

### iii.     Caselaw on program access

In *Greer v. Richardson Independent School District*, the Fifth Circuit analyzed the program access standard.[562] There, the plaintiff, a wheelchair-using parent of a high school football player, sued a school district under Title II because the bleachers at a high school football game were not

---

[559] *Greer*, 472 F. App'x at 292, n. 3 (citing *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 861 (10th Cir. 2003) ("[W]hen determining the compliance of existing facilities with the ADA under program accessibility, courts must look at the accessibility of the facilities as a whole, not at individual elements.") (citation and internal quotation omitted); *Parker v. Universidad de P.R.*, 225 F.3d 1, 6 (1st Cir. 2000) ("Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available."); *Ass'n for Disabled Ams. v. City of Orlando*, 153 F.Supp.2d 1310, 1322 (M.D. Fla. 2001) ("Title II, the regulations implementing it, and the (admittedly sparse) case law interpreting it, do not require that facilities built prior to 1992 comply with the stringent technical standards imposed on facilities built after 1992."); *Access Now, Inc. v. S. Fla. Stadium Corp.*, 161 F.Supp.2d 1357, 1368 (S.D. Fla. 2001); *Pascuiti*, 87 F.Supp.2d at 226 ("[E]ven though only new construction and alterations must comply with the [ADAAG] Standards, those Standards nevertheless provide valuable guidance.... Deviation from the standards is relevant but not determinative; it is one consideration from which the court may conclude that noncompliance impedes access.").

[560] *Parker*, 225 F.3d at 6.

[561] *Lane*, 541 U.S. at 532.

[562] 472 F. App'x 287 (5th Cir. 2012) (unpublished).

wheelchair accessible.[563] As a result, the plaintiff watched the game from a paved area adjacent to the bleachers through a chain link fence, where she claimed she was able to see only 15% of the game.[564] Because the paved area was sloped, the plaintiff had to hold onto the chain fence to avoid rolling backwards.[565]

Unfortunately, "the regulations do not provide any objective criteria for evaluating program accessibility."[566] As such "program accessibility is ultimately a subjective determination [made] by viewing the program or activity at issue in its entirety and not solely by evaluating individual elements of the facility where the program is held."[567]

The Fifth Circuit instructed that the first step is to determine what constitutes sufficient access to the "program".[568] In *Greer*, the Fifth Circuit declined to define the precise line, but stated that "an operator of an existing facility . . . need only show that the *program* offered . . . when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[569] In doing so, the Court rejected the plaintiff's attempt to nullify the "program access" standard by conflating it with facility accessibility generally.[570] However, the Fifth Circuit found that because most attendees go to a football game to watch the game, affording wheelchair patrons the ability to merely buy a ticket or make a purchase from the concession stand, would be insufficient to

---

[563] *Id*. at 288.

[564] *Id*.

[565] *Id*.

[566] *Id*. at 291–92.

[567] *Id*.

[568] *Id*. at 293.

[569] *Id*. at 294 (emphasis original) (citing 28 C.F.R. § 35.150(a)).

[570] *Id*.

provide program access if the wheelchair user was unable to view the actual football game.[571]

Ultimately, the Fifth Circuit determined that the school district provided program accessibility to wheelchair users, even though the bleachers were not accessible to wheelchairs, because the school district provided accommodations that allowed wheelchair users to enjoy football games.[572] The court determined that the plaintiff failed to demonstrate how minor deviations from the ADAAG requirements prevented her or other disabled individuals from accessing the program i.e., watching a football game.[573] Additionally, the court noted that two wheelchair users had attended events at the field at issue and stated that they had no issues attending events.[574] Lastly, the court noted that the plaintiff "admitted she was able to access the parking lot, navigate into the stadium, buy a ticket, make a purchase from the concession stand, and view a portion of the game."[575] The court also stated it is unclear how the defendants could have developed an "accessibility plan that would always satisfy the viewing preferences for disabled individuals other than by what they have already done—providing several alternative accessible seating areas."[576]

Additionally, the court noted that the plaintiff's viewing experience was "a product of her

---

[571] *Id*. at 295 (finding that "[m]ost attendees at a [] football game . . . are not going to the stadium for the quality of the hot dogs at the concession stand. Thus, being able to do things such as buying a ticket and visiting the concession stand would not be sufficient to provide program access if she was unable to view the actual football game.').

[572] *Id*.

[573] *Id*.

[574] *Id*.

[575] *Id*.

[576] *Id*. at 297 ("Considering the size and types of events held at Berkner B, such as football games and track meets, it is unclear how RISD officials would be able to develop a universal accessibility plan that would always satisfy the viewing preferences for disabled individuals other than by what they have already done—providing several alternative accessible seating areas.").

own choices" because she "never asked if she could be accommodated by sitting somewhere else in the stadium, such as the track that surrounds the football field, that would have provided an unobstructed view."[577] "There is a common sense aspect to determining whether a public entity has provided accommodations for a disabled individual, part of which requires the public entity be made aware of the inadequacy of the accommodations provided."[578] Therefore, the court held, "when a disabled individual such as Greer attends one event at a venue she was otherwise unfamiliar with, that person does not by default gain a prima facie case of discrimination under Title II merely because she is dissatisfied with her seating location and makes no effort to ask the venue's staff as to where alternative accessible seating is located or if she and her family can be accommodated."[579]

In *Daubert v. Lindsay Unified Sch. Dist.*, the Ninth Circuit addressed a similar factual circumstance.[580] There, a high school football patron who used a wheelchair alleged that a school district was in violation of Title II of the ADA because the bleachers at the high school football field were not wheelchair accessible.[581] First, the court determined that the "program access" requirement did not require the school district to provide access to a specific area of facility, the bleachers, because the facility was an existing facility.[582] Second, the court determined that as an

---

[577] *Id*. at 295–97 (finding that "simply asking a few questions of the event venue's staff for more suitable accommodations is likely to be more effective and consistent with case law than remaining silent and resorting to a Title II discrimination claim in the federal court system.").

[578] *Id*. at 296.

[579] *Id*.

[580] 760 F.3d 982 (9th Cir. 2014).

[581] *Id*. at 984.

[582] *Id*. at 988.

existing facility, the bleachers were not subject to the ADAAG's requirements.[583] Because the school district offered many different locations from which spectators who used wheelchairs were able to view football games and because those spectators enjoyed unobstructed views from at least three of those locations, the court determined that that the football games at the football stadium are "readily accessible" to individuals who use wheelchairs.[584] Additionally, the court found that the school district was not required to make structural changes to the facility under the program access standard to existing facilities.[585]

### 3.    Application

Plaintiff alleges that the following barriers exist at the Superdome in violation of the program access requirement of the ADA: (1) sightline obstructions of the field at the Front Row Wheelchair Decks due to the presence of the players and coaches; (2) sightline obstructions at 100 Level, Row 36 of the Jumbotron, and aerial gameplay due to an overhang; (3) sightline obstructions to the field at 100 Level Row 36 due to standing spectators; (4) the monitors at the 100 Level are not large enough; (5) there is no ADA seating at the 200 Level, in violation of the vertical dispersion requirement; (6) there is no ADA seating at the Terrace level, in violation of the vertical dispersion requirement; (7) the Terrace Decks are inaccessible due to width issues, depth issues, and metal bars that block a wheelchair user's view of the field; and (8) there is an

---

[583] Id. ("As discussed above, only facilities that were constructed or altered after January 26, 1992 are subject to the ADAAG's requirements. With respect to facilities that were constructed prior to this date, a public entity need only 'operate each ... program [at that facility] ... [so that it] is readily accessible to and usable by individuals with disabilities.' Like the ADAAG, section 35.150 prioritizes integration, but it does not require existing facilities to undergo structural changes to achieve integration.") (internal citations omitted).

[584] Id.

[585] Id. ("In light of the structure of the facility, any further measures to provide integrated wheelchair seating would require the School District to undertake structural alterations of the bleachers. Because we conclude that the School District provides Daubert with program access to Lindsay High School football games under 28 C.F.R. § 35.150, and because the School District is not required to comply with the ADAAG, the School District is not required to make such structural alterations.").

inadequate amount of compliant ADA seating within the entire Superdome.[586]

The Court addressed the sightlines from Row 36 and Row 1 of the 100 Level as well as the size of the monitors in the 100 Level as part of its alteration standard analysis. Here, the Court addresses Plaintiff's contention that (1) the lack of wheelchair accessible seating at the 200 Level is a violation of the vertical dispersion requirement; (2) the lack of wheelchair accessible seating at the Terrace Level is a violation of the vertical dispersion requirement; and (3) there is an inadequate amount of compliant ADA seating within the entire Superdome.

As discussed above, the other portions of the Superdome, including the 200 Level and the Terrace Level, are existing facilities under the applicable regulations.[587] As existing facilities, they are analyzed under the "program accessibility" standard.[588]

Guiding the Court's analysis is the Fifth Circuit's instruction that "the regulations do not provide any objective criteria for evaluating program accessibility . . . [P]rogram accessibility is ultimately a subjective determination [made] by viewing the program or activity at issue in its entirety and not solely by evaluating individual elements of the facility where the program is held."[589] Thus, France "need only show that the *program* offered . . . when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[590]

First, the Court must define the program at issue and then, determine whether it is readily

---

[586] Rec. Doc. 172 at 59.

[587] 28 C.F.R. § 35.150.

[588] *Smith v. City of Lodi*, No. 2:14-CV-01318-TLN-AC, 2016 WL 3197552, *5 (E.D. Cal. June 9, 2016) ("Thus, the Court is required to apply the 2010 guidelines to any alterations made after 2010 and apply the existing facility standards—also known as the "program accessibility" standard—to those parts of the Grape Bowl that have not been altered.").

[589] *Id*. at 291–92.

[590] *Id*. at 294 (emphasis original) (citing 28 C.F.R. § 35.150(a)).

accessible.[591] In *Daubert*, the Ninth Circuit determined that the "program" in question was the football game and did not include the social experience of watching the game with the crowd, which was purely "incidental" to the football game.[592] The Ninth Circuit reasoned that for purposes of "program accessibility," a program "is a normal function of a governmental entity," that is, "anything a public entity does."[593] Accordingly, the Court finds that the program at issue is Saints football games.

Plaintiff argues that the lack of wheelchair accessible seating at the 200 Level and the Terrace is a violation of the vertical dispersion requirement. The four uppermost levels of the Superdome are known as the Terrace.[594] While there are four decks in the Terrace that may be considered wheelchair accessible, they are not currently used as wheelchair-designated seats for Saints games.[595] Mr. Freeman testified that the seats in the Terrace are not used as wheelchair seats because the Superdome has other options when it comes to wheelchair accessible seating and because there may be an access issue with getting wheelchair users to the Terrace.[596]

Mr. Terry inspected the depth and the width of the seats in the Terrace and determined that they were not deep enough or wide enough to comply with either the 1991 ADAAG or the 2010 ADAAG.[597] Mr. Mazz agreed that the seats in the Terrace do not comply with the 1991 or the 2010

---

[591] *Greer*, 472 F. App'x at 293.

[592] *Daubert*, 760 F.3d at 987.

[593] *Id*. (quoting *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002)).

[594] Trial Transcript, March 2, 2020, Alan Freeman, p. 151.

[595] Trial Transcript, March 2, 2020, Alan Freeman, p. 152.

[596] Trial Transcript, March 2, 2020, Alan Freeman, p. 152.

[597] Trial Transcript, March 2, 2020, James Terry, pp. 251–54.

ADAAG standards because they are not sufficiently deep.[598] Therefore, it is undisputed that the seating in the Terrace is not wheelchair accessible. Additionally, there are no designated wheelchair accessible seats in the 200 Level of the Superdome.[599] However, because the Terrace and the 200 Level are unaltered, existing facilities, the fact that the seats in those section are not accessible does not amount to exclusion under Title II so long as the Superdome provides program access to Saints football games.

Preliminarily, the Court notes that the Fifth Circuit previously instructed that strict compliance with the ADAAG standard is not required for existing facilities.[600] As discussed above, only facilities that were constructed or altered after January 26, 1992 are subject to the ADAAG's requirements.[601] With respect to existing facilities, a public entity need only "operate each . . . program [at that facility] . . . [so that it] is readily accessible to and usable by individuals with disabilities."[602]

Additionally, as in *Greer* and *Daubert*, the requirement to provide access to a football game does not require that the public entity provide access to a specific area of facility if that area is an

---

[598] Trial Transcript, March 3, 2020, Mark Mazz, p. 447.

[599] Trial Transcript, March 2, 2020, Doug Thornton, pp. 110–11; Trial Transcript, March 2, 2020, Alan Freeman, p. 151.

[600] *Greer*, 472 F. App'x at 292, n. 3 (citing *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 861 (10th Cir. 2003) ("[W]hen determining the compliance of existing facilities with the ADA under program accessibility, courts must look at the accessibility of the facilities as a whole, not at individual elements.") (citation and internal quotation omitted); *Parker*, 225 F.3d at 6 ("Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available."); *Ass'n for Disabled Ams.*, 153 F.Supp.2d at 1322 ("Title II, the regulations implementing it, and the (admittedly sparse) case law interpreting it, do not require that facilities built prior to 1992 comply with the stringent technical standards imposed on facilities built after 1992."); *Access Now, Inc.*, 161 F.Supp.2d at 1368; *Pascuiti*, 87 F.Supp.2d at 226 ("[E]ven though only new construction and alterations must comply with the [ADAAG] Standards, those Standards nevertheless provide valuable guidance.... Deviation from the standards is relevant but not determinative; it is one consideration from which the court may conclude that noncompliance impedes access.").

[601] 28 C.F.R. § 35.151(a)(1).

[602] 28 C.F.R. § 35.150(a)(1).

existing facility.[603] In both *Greer* and *Daubert*, the Fifth and Ninth Circuits held that to satisfy the program access standard, a facility need not offer any "particular . . . experience" particularly if that "experience is merely incidental to the program the government offers (i.e., football games), and providing this experience is not fairly characterized as 'a normal function of a government entity.'"[604] For example, in *Greer*, the Fifth Circuit determined that program accessibility does not require "that a disabled individual . . . be able to . . . experience [a football] game from the general admission public bleachers . . . ."[605]

Here, Plaintiff requests that the Court order that the Superdome add wheelchair accessible seating to the 200 Level and to the Terrace.[606] But if the Court finds that Plaintiff is provided with program access to Saints football games at the Superdome as it currently exists, the Court may not order injunctive relief as to an unaltered portion of the facility. Importantly, *Greer* and *Daubert* both make clear that a wheelchair using patron attending a football game is not entitled to sit in a specific section of the stadium.[607] Lastly, France is not required to make structural changes to an existing facility where other methods are effective in achieving compliance.[608] France's duty is to

---

[603] *Greer*, 472 F. App'x at 294 ("As an existing facility, RISD's duty is to provide program access to events at Berkner B, which may be achieved without providing access to the bleachers."); *Daubert*, 760 F.3d at 988 ("For these reasons, we reject Daubert's contention that the relevant "program" is the south-side bleachers, and we conclude that the School District complies with Title II, so long as it provides program access to its football games.").

[604] *Daubert*, 760 F.3d at 987 (9th Cir. 2014) ("Here, the School District offers football games as a public program, and the bleachers are one part of the facility in which that program takes place. While sitting in the southside bleachers may offer a particular social experience, this experience is merely incidental to the program the government offers (i.e., football games), and providing this experience is not fairly characterized as 'a normal function of a government entity.'") (citing *Greer*, 472 F. App'x at 293 as a "well-reasoned opinion" that reaches the same conclusion).

[605] *Greer*, 472 F. App'x at 293.

[606] Rec. Doc. 172 at 79.

[607] *Greer*, 472 F. App'x at 294; *Daubert*, 760 F.3d at 987–88.

[608] 28 C.F.R. § 35.150(b)(1); *see also Daubert*, 760 F.3d at 988 ("In light of the structure of the facility, any further measures to provide integrated wheelchair seating would require the School District to undertake structural alterations of the bleachers. Because we conclude that the School District provides Daubert with program access to

provide program access to events at the Superdome, which may be achieved without providing wheelchair access to the 200 Level or the Terrace.[609]

Here, the Court finds that Saints football games at the Superdome are readily accessible to individuals who use wheelchairs. Spectators who use wheelchairs are able to view Saints football games from Row 1 and Row 36 of the 100 Level. From Row 36, wheelchair using patrons enjoy views that are comparable to the views of the general public. In both *Greer* and *Daubert*, the Fifth and Ninth Circuits concluded that the football game at issue was made accessible by providing alternative viewing locations to wheelchair users, which was enough to provide access when looking at the program as a whole, even though the plaintiffs in each case alleged that the views from each of those alternate locations were inferior.[610]

Here, France has provided program accessibility to wheelchair users, even though the Terrace and the 200 Level are not accessible to wheelchairs, because the Superdome has provided alternative accommodations that allow wheelchair users to enjoy football games.[611] As in *Greer*, it is unclear how France could have developed an "accessibility plan that would always satisfy the viewing preferences for disabled individuals other than by what [he has] already done—providing several alternative accessible seating areas."[612]

Next, the Court finds that the current seating at the Superdome is appropriately integrated

---

Lindsay High School football games under 28 C.F.R. § 35.150, and because the School District is not required to comply with the ADAAG, the School District is not required to make such structural alterations.").

[609] *Greer*, 472 F. App'x at 294 ("As an existing facility, RISD's duty is to provide program access to events at Berkner B, which may be achieved without providing access to the bleachers.").

[610] *Id*. at 293–94.

[611] *Id*. at 295.

[612] *Id*. at 297 ("Considering the size and types of events held at Berkner B, such as football games and track meets, it is unclear how RISD officials would be able to develop a universal accessibility plan that would always satisfy the viewing preferences for disabled individuals other than by what they have already done—providing several alternative accessible seating areas.").

under the circumstances. The regulations provide that a public entity must "give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate."[613] Spectators who use wheelchairs may sit at Row 1 or Row 36 of the 100 Level. In *Daubert*, the Ninth Circuit determined that, the alternate accessible viewing sites were appropriately integrated, even though they were not as integrated as the bleachers, because they were located near the bleachers or in other places where spectators congregated.[614]

Additionally, in light of the structure of the facility, any further measures to provide integrated wheelchair seating would require Defendants to undertake structural alterations of the other sections of the Superdome, namely the 200 Level and the Terrace. "A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance."[615] Because the Court finds that France provides Plaintiff with program access to Saints football games, the Court will not require such structural alterations.[616]

Lastly, the Court addresses the total number of wheelchair accessible seats in the Superdome as a whole. Section 4.1.3(19) of the 1991 ADAAG provides that in places of assembly with fixed seating accessible wheelchair locations, if the capacity of seating in the assembly area is over 500, 6 wheelchair locations, plus 1 additional space for each total seating capacity increase

---

[613] 28 C.F.R. § 35.150(b)(1).

[614] *Daubert*, 760 F.3d at 988.

[615] 28 C.F.R. § 35.150(b)(1).

[616] *Id*. *See also Daubert*, 760 F.3d at 988 ("In light of the structure of the facility, any further measures to provide integrated wheelchair seating would require the School District to undertake structural alterations of the bleachers. Because we conclude that the School District provides Daubert with program access to Lindsay High School football games under 28 C.F.R. § 35.150, and because the School District is not required to comply with the ADAAG, the School District is not required to make such structural alterations.").

of 100, are required.[617] Section 221.2.1.1 of the 2010 ADAAG provides that if there are more than

5001 seats in an assembly area, 36 wheelchair spaces, plus 1 for each 200, or fraction thereof, over

5000, is required.[618] As discussed above, although the Court finds that the 1991 ADAAG, and

specifically Section 4.33.3 applies, to calculate the total required number of wheelchair accessible

seats, and the distribution of those seats, the Court will utilize Section 221.1 of the 2010 ADAAG

because if the Court finds that the Superdome does not comply with 1991 ADAAG dispersion

requirements, the 2010 ADAAG requirement would now apply.[619] When the number of wheelchair

spaces in an assembly area exceeds 5001, Section 221.2.1 of the 2010 ADAAG requires 36

wheelchair spaces plus 1 for each 200 over 5000.[620]

At trial, Plaintiff introduced a "Seating Count" prepared by the Architects working on the

current renovations to the Superdome.[621] The document details the existing seating count at the

Superdome.[622] According to the Seating Count, the Superdome has a total of 73,098 seats.[623] Using

the formula in the 2010 ADAAG, 377 wheelchair accessible seats are required in the Superdome

---

[617] 1991 ADAAG at § 4.1.3(19) ("In places of assembly with fixed seating accessible wheelchair locations shall comply with 4.33.2, 4.33.3, and 4.33.4 and shall be provided consistent with the following table: Capacity of Seating in Assembly Areas . . . over 500[,] . . . Number of Required Wheelchair Locations . . . 6, plus 1 additional space for each total seating capacity increase of 100.").

[618] 2010 ADAAG at § 221.2.1.1.

[619] *Landis*, 2019 WL 7157165 at * 18 (internal citations omitted) ("In calculating the total required number of accessible seats, and the proportional distribution of those seats, the Court will utilize Section 221.1 of the 2010 ADAAG's calculations . . . The Court utilizes the more recent calculations set forth in Section 221.1 of the 2010 ADAAG because even were T-Mobile Park not to comply with the 1991 ADAAG's requirement, the 2010 ADAAG's requirement would now apply. Thus, while in order to comply with the ADA's requirements accessible seating in T-Mobile Park must be distributed according to Section 4.33.3's mandate, the Court will utilize the current 2010 standards as a yardstick for the proper proportional representation that should be present in the stadium between accessible and nonaccessible seats.").

[620] 2010 ADAAG at § 221.2.1.

[621] Trial Transcript, March 2, 2020, Doug Thornton, p. 120.

[622] Trial Transcript, March 2, 2020, Doug Thornton, p. 120.

[623] Rec. Doc. 179-6.

as a whole.[624] Presently, there are 236 wheelchair accessible seats in the Superdome, all located within the 100 Level.[625] Accordingly, the Superdome does not comply with the 2010 ADAAG as it relates to the total number of wheelchair accessible seats required in the stadium as a whole. Additionally, because the 1991 ADAAG has an even stricter requirement as to the total number of wheelchair accessible seats, the Superdome does not comply with the 1991 ADAAG either.

As discussed above, the Fifth Circuit previously instructed that strict compliance with the relevant ADAAG standard is not required for existing facilities.[626] Rather, only facilities that were constructed or altered after January 26, 1992 are subject to the ADAAG's requirements.[627] With respect to existing facilities, a public entity need only "operate each . . . program [at that facility] . . . [so that it] is readily accessible to and usable by individuals with disabilities."[628] Here, the only portion of the Superdome that was altered is the 100 Level. The 200 Level and the Terrace were not altered as part of the 2010 Renovations. The Court previously determined that the altered portion of the Superdome, the 100 Level, complies with the number of wheelchair seats required by the applicable ADAAG standards for alterations.

---

[624] $73,098 - 5000 = 68,098.$ $68,098 / 200 = 340.49.$ $340.49 + 36 = 376.49.$

[625] *Parties did not contest this fact.* Rec. Doc. 163 at 5.

[626] *Greer*, 472 F. App'x at 292, n. 3 (citing *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 861 (10th Cir. 2003) ("[W]hen determining the compliance of existing facilities with the ADA under program accessibility, courts must look at the accessibility of the facilities as a whole, not at individual elements.") (citation and internal quotation omitted); *Parker*, 225 F.3d at 6 ("Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available."); *Ass'n for Disabled Ams.*, 153 F.Supp.2d at 1322 ("Title II, the regulations implementing it, and the (admittedly sparse) case law interpreting it, do not require that facilities built prior to 1992 comply with the stringent technical standards imposed on facilities built after 1992."); *Access Now, Inc.*, 161 F.Supp.2d at 1368; *Pascuiti*, 87 F.Supp.2d at 226 ("[E]ven though only new construction and alterations must comply with the [ADAAG] Standards, those Standards nevertheless provide valuable guidance.... Deviation from the standards is relevant but not determinative; it is one consideration from which the court may conclude that noncompliance impedes access.").

[627] 28 C.F.R. § 35.151(a)(1).

[628] *Id*. at § 35.150(a)(1).

Noting that strict compliance with the relevant ADAAG standard is not required for existing facilities and that the Court is to look at the accessibility of the facility as a whole, not at individual elements, the Court finds that France satisfies the program access requirement, even though the Superdome does not have the requisite the total number of seats per the ADAAG. The Fifth Circuit has instructed that the relevant ADAAG is to be utilized as a guideline in analyzing the program access requirement. Here, despite the fact that the ADAAG would require 377 wheelchair accessible seats, and the Superdome only has 236 wheelchair accessible seats, the Court nonetheless finds that France satisfies the program access requirement when viewing the Superdome as a whole. As a district judge for the Southern District of New York noted, "[w]hile proving that particular barriers exist might not be sufficient to establish Title II liability, each barrier is a building block for a finding that the Stadium, viewed in its entirety, is not readily accessible."[629] Here, this one building block is not enough for the Court to conclude that the Superdome, when viewed in its entirety, is not readily accessible to wheelchair users.

Additionally, in light of the structure of the facility, any further measures to provide additional wheelchair seating would require France to undertake structural alterations of the other sections of the Superdome, namely the 200 Level and the Terrace. "A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance."[630] Because the Court finds that France provides Plaintiff with program access to Saints football games, the Court will not require such structural alterations.[631]

---

[629] *Pascuiti*, 87 F.Supp.2d at 224.

[630] 28 C.F.R. § 35.150(b)(1).

[631] *Id*. *See also Daubert*, 760 F.3d at 988 ("In light of the structure of the facility, any further measures to provide integrated wheelchair seating would require the School District to undertake structural alterations of the bleachers. Because we conclude that the School District provides Daubert with program access to Lindsay High School

In sum, the program, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.[632] Accordingly, the Court finds that Plaintiff was not denied program access to Saints football games.

**F.      *Whether France denied Plaintiff the opportunity to participate in or benefit from, an aid, benefit, or service***

As another basis for the second element of Plaintiff's Title II claim, Plaintiff argues that France discriminated against him by denying him the opportunity to participate in or benefit from, an aid, benefit, or service.[633] Specifically, Plaintiff alleges that France's action denied Plaintiff an equal opportunity to view the playing field, aerial plays, and the Jumbotron.[634]

The regulations detail what a public entity may not do if it is to ensure that it does not exclude persons with disabilities from enjoying the same benefits afforded to the general population. In pertinent part, the regulations provide:

> (b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—
>
>> (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;
>>
>> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;[635]

In *Alexander v. Choate*, the United States Supreme Court held that section 504 of the Rehabilitation Act "requires that an otherwise qualified handicapped individual must be provided

---

football games under 28 C.F.R. § 35.150, and because the School District is not required to comply with the ADAAG, the School District is not required to make such structural alterations.").

[632] *Greer*, 472 Fed. Appx. at 294 (citing 28 C.F.R. § 35.150(a)).

[633] Rec. Doc. 172 at 61–63.

[634] *Id*. at 62.

[635] 28 C.F.R. § 35.130(b)(1)(i–iii).

with *meaningful* access to the benefit" that the public entity offers.[636] The Ninth and Second Circuits have applied this construction of section 504 in ADA Title II cases.[637] The Fifth Circuit has reasoned that because "[t]he remedies, procedures, and rights available under the Rehabilitation Act parallel those available under the ADA"[638] the "'[j]urisprudence interpreting either section is applicable to both.'"[639]

The Court finds that Plaintiff has failed to show that France denied Plaintiff the opportunity to participate in or benefit from an aid, benefit, or service. The ADA does not entitle wheelchair-bound individuals to a preferred modification or accommodation. Rather, a plaintiff is entitled to "meaningful access."[640] "'Meaningful access,' however, does not mean 'equal access' or preferential treatment."[641] Section 504 and the ADA "seek[ ] to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance [however] [t]he[se] Act[s] do [ ] not guarantee the handicapped equal results. . . .'"[642] Lastly, if alternative reasonable accommodations already allow for "meaningful access," a claim for injunctive relief must fail.[643]

Here, the Court finds that Plaintiff already has meaningful access to Saints games at the

---

[636] 469 U.S. 287, 301 (1985).

[637] *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1102 (9th Cir. 2013); *McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012).

[638] *Cadena v. El Paso Cty.*, 946 F.3d 717 (5th Cir. 2020) (citing *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002)).

[639] *Delano-Pyle*, 302 F.3d at 574 (quoting *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000)).

[640] *Alexander*, 469 U.S. at 301.

[641] *A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F.Supp. 2d 660, 680 (E.D.N.Y. 2012), aff'd sub nom. *Moody ex rel. J.M. v. NYC Dep't of Educ.*, 513 F. App'x 95 (2d Cir. 2013).

[642] *Choate*, 469 U.S. at 304 (internal citations omitted).

[643] *Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir.2003) ("There would be no need for injunctive relief if the plaintiffs were already being reasonably accommodated.").

Superdome. The Court addressed the sightlines from Row 36 and Row 1 as well as the Jumbotron above. Based on those findings, the Court concludes that Plaintiff had the opportunity to participate in Saints games at the Superdome. Accordingly, the Court finds that Plaintiff has not shown that France denied Plaintiff an equal opportunity to participate in Saints games at the Superdome.

Plaintiff argues this case is analogous to *Henrietta D. v. Giuliani*.[644] There, a district judge held that the City of New York failed to provide meaningful access to public assistance programs, benefits, and services to city residents with acquired immune deficiency syndrome or HIV-related illnesses.[645] But here, the Court cannot conclude that "[t]he extensive evidence proffered at trial . . . establishes unequivocally that defendants are chronically and systematically failing to provide plaintiffs with meaningful access to critical subsistence benefits and services, with devastating consequences."[646] Plaintiff was afforded meaningful access to the Superdome. Accordingly, the Court finds that Plaintiff has failed to show that France denied Plaintiff the opportunity to participate in or benefit from an aid, benefit, or service.

## G.    *Whether France and SMG failed to provide a requested reasonable accommodation*

### 1.    Legal standard for a reasonable accommodation / modification

Title III requires a public accommodation to make reasonable modifications when the modifications are necessary to afford facilities to individuals with disabilities.[647] In *Johnson v.*

---

[644] 119 F.Supp. 2d 181 (E.D.N.Y. 2000), aff'd sub nom. *Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003)

[645] *Id.*

[646] *Id.* at 209 ("At this time, the Court finds that plaintiffs demonstrated at trial that the ramp that DASIS purports to be is broken, i.e., that defendants are failing to make the reasonable accommodations necessary to ensure plaintiffs meaningful access to, and an equal opportunity to benefit from, the social welfare benefits and services that defendants provide to eligible New York City residents.").

[647] 42 U.S.C.A. § 12182(b)(2)(A)(ii) ("[A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations");

*Gambrinus Co./Spoetzl Brewery*, the Fifth Circuit imported the analytical framework and allocation of burdens of proof developed in the context of Title I jurisprudence into Title III "reasonable modifications" cases.[648] Accordingly, the Court employs the same burden shifting framework to the present Title III analysis.

Unlike Titles I and III, Title II does not include an explicit obligation to make reasonable accommodations. However, Fifth Circuit caselaw "recognize[s] that a public entity's failure reasonably to accommodate the known limitations of persons with disabilities can also constitute disability discrimination under Title II."[649] Additionally, the regulations implementing Title II require a public entity to make reasonable modifications when necessary to avoid discrimination on the basis of a disability.[650]

Relatedly, Plaintiff uses the terms "modification" and "accommodation" interchangeably.[651] The term "reasonable accommodations" is derived from the employment

---

28 C.F.R. § 36.302(a) ("A public accommodation shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the public accommodation can demonstrate that making the modifications would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations.").

[648] 116 F.3d 1052 (5th Cir. 1997).

[649] *Windham v. Harris Cty., Texas*, 875 F.3d 229, 235 (5th Cir. 2017) (citing *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 & n.11 (5th Cir. 2005) ("[Title II] impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." (citing 42 U.S.C. § 12131)); *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 Fed.Appx. 214, 215 (5th Cir. 2015); *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015)); *see also Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1195 n. 8 (10th Cir. 2007) ("Title II's use of the term 'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable accommodation.'"); *McGary v. City of Portland*, 386 F.3d 1259, 1266 n. 3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards.").

[650] 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

[651] *See* Rec. Doc. 172 at 63–65.

discrimination provisions of Title I.[652] The regulations implementing Titles II and III define discrimination to include the failure to make "reasonable modifications." The term "reasonable accommodations" in Title I is generally considered synonymous with the term "reasonable modifications" in Title II.[653] Accordingly, the Court interprets the term "reasonable modification" as used in Titles II and III to have the same meaning as the term "reasonable accommodation" as used in Title I.[654]

In *Johnson v. Gambrinus Co./Spoetzl Brewery*, the Fifth Circuit applied the analysis from a Title I reasonable accommodations case in the employment context to a Title III reasonable modifications case.[655] In *Johnson*, the plaintiff alleged that the owner of a beer brewery's refusal

---

[652] 42 U.S.C. § 12112(b)(5)(A)–(B) (defining discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity" or "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant").

[653] *See, e.g.*, *Seremeth v. Bd. of Cty. Comm'rs of Frederick*, 673 F.3d 333, 336 (4th Cir. 2012*); Robertson v. Las Animas Sheriff's Dep't*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) ("Title II's use of the term 'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable accommodation.'"); *McGary v. Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards."); *McElwee v. County of Orange*, 700 F.3d 635, 640 n.2 (2d Cir. 2012) (finding that "courts use the terms 'reasonable modifications' in Title II and 'reasonable accommodations' in Title I interchangeably") (collecting cases).

[654] *See Simmang v. Texas Bd. of Law Examiners*, No. A-03-CA-650 LY, 2005 WL 8155707, at *8 n.8 (W.D. Tex. Apr. 7, 2005).

[655] 116 F.3d 1052, 1059 (5th Cir. 1997) ("While *Riel* was a Title I reasonable accommodations case, its analysis is easily transferrable to the Title III reasonable modifications context. The language of both provisions is very similar: Title I defines discrimination to include "not making reasonable accommodations ... unless [the defendant] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). Title III defines discrimination to include "a failure to make reasonable modifications ... unless the entity can demonstrate that making such modifications would fundamentally alter the nature of [the public accommodation]." Id. § 12182(b)(2)(A)(ii). In light of the statutes' parallel language, we find no basis for distinguishing their respective burdens of proof. While Title I provides an undue hardship defense and Title III provides a fundamental alteration defense, fundamental alteration is merely a particular type of undue hardship. *See* 29 C.F.R. pt. 1630 app., § 1630.2(p). Consequently, while the scope of the affirmative defense under Title III is more narrow than that provided by Title I, the type of proof—that is, proof focusing on the specific circumstances rather than on reasonableness in general—is the same.").

to allow him to take a brewery tour with his guide dog violated the ADA.[656] The Fifth Circuit

described the reasonable modifications framework in a Title III case as follows:

> The plaintiff has the burden of proving that a modification was requested and that
> the requested modification is reasonable. The plaintiff meets this burden by
> introducing evidence that the requested modification is reasonable in the general
> sense, that is, reasonable in the run of cases. While the defendant may introduce
> evidence indicating that the plaintiff's requested modification is not reasonable in
> the run of cases, the plaintiff bears the ultimate burden of proof on the issue. If the
> plaintiff meets this burden, the defendant must make the requested modification
> unless the defendant pleads and meets its burden of proving that the requested
> modification would fundamentally alter the nature of the public accommodation.
> The type of evidence that satisfies this burden focuses on the specifics of the
> plaintiff's or defendant's circumstances and not on the general nature of the
> accommodation. Under the statutory framework, such evidence is relevant only to
> a fundamental alteration defense and not relevant to the plaintiff's burden to show
> that the requested modification is reasonable in the run of cases.[657]

A plaintiff "need [not] go into the specifics of *how*" the modification would function, but

he must actually request a reasonable modification.[658] "An accommodation is reasonable if it is

both efficacious and proportional to the costs to implement it. An accommodation is unreasonable

if it imposes undue financial or administrative burdens or requires a fundamental alteration in the

nature of the program."[659] "Determination of the reasonableness of a proposed modification is

generally fact-specific."[660]

### 2.    Analysis

Plaintiff's counsel alleges that he sent a pre-suit letter to France and SMG, and Christopher

---

[656] *Id*. at 1055–56.

[657] *Id*. at 1059–60 (internal citations omitted).

[658] *Elliott v. Harris*, 205 F. App'x 255, 258 (5th Cir. 2006) ("Thus, for example, Elliott did not need to go into the specifics of how the lead rope would be used. But he still needed to show the requested modification.").

[659] *Simmang v. Texas Bd. of Law Examiners*, No. A-03-CA-650 LY, 2005 WL 8155707 (W.D. Tex. Apr. 7, 2005) (citing *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)).

[660] *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 508 (4th Cir. 2016).

Walters ("Walters"), an Assistant Attorney General for the State of Louisiana on November 21, 2017.[661] The letter was meant to serve "as a formal request to meet to discuss whether [Plaintiff's] issues and claims can be resolved without litigation."[662] The letter documented Plaintiff's grievances regarding the designated accessible seating.[663] The letter then stated that Plaintiff and his counsel "welcome an opportunity to sit down together to discuss these issues, and what LSED/SMG intends to do to correct them."[664] While the letter does not specifically state the modifications Plaintiff was seeking, it does generally set forth Plaintiff's grievances and asks Defendants to correct those grievances.

On January 10, 2018, Plaintiff's counsel emailed Walters.[665] The emailed provided: "The attached letter was sent on November 21, 2017. We copied you via US Mail. We've not heard a response from anyone yet. We hope we can resolve this matter without litigation. Please let me know if you would like to work together to resolve the issues detailed in the letter. If not, we will move forward with a lawsuit."[666] The following day, Walters forwarded the email to Larry Roedel, then the Board's General Counsel, and Alan Freeman, the General Manager of the Superdome and an employee of SMG.[667] At trial, Mr. Freeman confirmed that the email address listed, alan.freeman@smgneworleans.com, was his email address at the time and that he had no reason

---

[661] Rec. Doc. 179-1.

[662] *Id*. at 1.

[663] *Id*. at 1–2.

[664] *Id*. at 2.

[665] Rec. Doc. 179-9.

[666] *Id*. at 2.

[667] *Id*. at 1.

to believe he did not receive the forwarded email from Walters.[668] However, Mr. Freeman testified that he did not recall seeing the letter.[669]

### i.      Whether a reasonable modification was requested

Under *Johnson*, the plaintiff must first prove that a reasonable modification was requested.[670] This request must consist of more than just a statement that the person with the disability is "unhappy with the manner in which" the defendant handled the situation.[671] Rather, the plaintiff must suggest a modification that "would rectify the problem which he perceives."[672] A plaintiff "need [not] go into the specifics of *how*" the modification would function, but he must actually request a reasonable modification.[673]

SMG first argues that Plaintiff has not proven that he requested an accommodation because he failed to show that Defendants actually received the pre-suit letter. SMG does not dispute that the addresses shown on the letter are the proper addresses or argue that Plaintiff failed to properly stamp or mail the letter. Instead, SMG points out that the letter indicates that it was mailed via certified mail and that Plaintiff did not introduce the return receipt as evidence.[674]

In *Mulder v. Comm'r*, the Fifth Circuit considered whether the IRS had exercised due

---

[668] Trial Transcript, March 2, 2020, Alan Freeman, p. 155.

[669] Trial Transcript, March 2, 2020, Alan Freeman, p. 154.

[670] *Johnson*, 116 F.3d at 1059.

[671] *Dahlberg v. Avis Rent A Car Sys., Inc.*, 92 F.Supp. 2d 1091, 1108 (D. Colo. 2000) (finding that a disabled driver failed to satisfy the *Johnson* burden shifting framework because he did not suggest any modification to the car rental company's reservation system which would address his concerns and did not produce any evidence that modification of system would be reasonable in the run of cases).

[672] *Id.*

[673] *Elliott*, 205 F. App'x at 258 ("Thus, for example, Elliott did not need to go into the specifics of how the lead rope would be used. But he still needed to show the requested modification.").

[674] Rec. Doc. 174 at 23–24.

diligence in ascertaining the address of a taxpayer. The court held:

> The notice of deficiency was sent by certified mail, return receipt requested. [The plaintiff], his mother, and his CPA all deny knowledge of the notice. There is no proof of delivery in the record. Moreover, the IRS file does not contain either the original letter or the executed return receipt. While it is presumed that a properly-addressed piece of mail placed in the care of the Postal Service has been delivered, no such presumption of delivery exists for certified mail when the requested return receipt is not received by the sender . . . . As the [Seventh Circuit has] observed, "[t]he fact that the Commissioner's file contains no return receipt for the [deficiency] notice . . . fosters the conclusion that fault for the petitioner's failure to receive notice must rest with the Postal Service or the Commissioner, but, in any event, not with petitioners. Either the Postal Service mishandled the notice or the Commissioner's agents misplaced the return receipt" . . . . The court concluded that if the delivery receipt was not returned to the IRS, the notice letter must not have been delivered.[675]

The reason for such a holding "is that the sender of a certified letter who does not receive the return receipt is on notice that the addressee may not have received the letter . . . . It is then incumbent upon the sender to inquire with the addressee or send the letter again. In this case, plaintiff did neither."[676] "The strong presumption of delivery is justified for certified mail because of the extra assurances of effective delivery provided by the U.S. Postal Service. When certified mail is used, the Postal Service's delivery efforts are documented: there is a return receipt or written proof of attempted delivery and notification to the addressee of certified mail."[677]

In *Lundy v. United States*, a district judge in the United States District Court or the Southern District of Texas found a "broad judicial consensus on certified mail; specifically, that any presumption in favor of mailing or delivery is destroyed when the sender cannot produce the return

---

[675] *Mulder v. Comm'r*, 855 F.2d 208, 212 (5th Cir. 1988) (*quoting McPartlin v. Commissioner*, 653 F.2d 1185, 1191 (7th Cir. 1981)).

[676] *Moya v. United States*, 35 F.3d 501, 504 (10th Cir. 1994) (citing *McPartlin*, 635 F.2d at 1191).

[677] *Nibagwire v. Gonzales*, 450 F.3d 153, 156 (4th Cir. 2006).

receipt."[678] In *McCall v. Bowen*, the Fifth Circuit found that a factfinder could reasonably infer receipt of a letter sent by certified mail in the absence of a return receipt where an Agency provided a copy of the letter which was properly addressed, date stamped, and had the certified mail number written on it and submitted an affidavit that the letter had been sent to that address by certified mail.[679] In *Crear v. Select Portfolio Servicing Inc.*, the Fifth Circuit determined that a declaration stating that letters were sent by certified mail was prima facie evidence that the letters were sent.[680]

Here, Plaintiff introduced into evidence a letter that has the words "VIA CERTIFIED MAIL – RETURN RECEIPT" at the top.[681] Plaintiff has not produced the return receipt for the letter. Additionally, Plaintiff has not provided a declaration or affidavit stating that the letter had been sent to the addresses on the letter by certified mail. Moreover, there is no certified mail number written on the letter. The Fifth Circuit and district courts in the Fifth Circuit have generally held that there is no presumption of delivery for certified mail when the return receipt is not in the record, there is no affidavit that the letter was sent to the address by certified mail, and there is no certified mail number written on the letter.[682] Accordingly, the presumption in favor of delivery of the pre-suit letter is destroyed by Plaintiff's failure to introduce the above described evidence.

However, the Court may still infer receipt of the pre-suit letter. In *McCall v. Bowen*, the Fifth Circuit found that a factfinder could reasonably infer receipt of a letter sent by certified mail in the absence of a return receipt where an Agency provided a copy of the letter which was properly

---

[678] 2007 WL 655756, at *5 (S.D.Tex. Feb. 27, 2007).

[679] 832 F.2d 862, 864–65 (5th Cir. 1987).

[680] 760 F. App'x 291, 295 (5th Cir. 2019).

[681] Rec. Doc. 179-1.

[682] *See Mulder*, 855 F.2d at 212; *Lundy*, 2007 WL 655756, at *5.

addressed, date stamped, and had the certified mail number written on it.[683] The Agency also submitted an affidavit that the letter had been sent to that address by certified mail.[684] While Plaintiff did not write the certified mail number on the letter nor submit an affidavit that the letter had been sent to that address by certified mail, the evidence shows that at some point, Defendants were made aware of Plaintiff's pre-suit letter. Mr. McGuire, an ADA consultant who has worked with the Board and SMG, was made aware of Plaintiff's disability and sightline issues from his seats.[685] Mr. McGuire discussed the seating options with Plaintiff, eventually moved Plaintiff to four different seating locations, and followed up with Plaintiff to ask how those seats were.[686] Additionally, Plaintiff's counsel's email to Walters clearly refers to the attachment as the November pre-suit letter. It is undisputed that Walters forwarded this email to representatives of the Board and SMG. Based on the above facts, the Court concludes that the pre-suit letter was delivered to Defendants.

However, Plaintiff at no point actually requests a modification or accommodation in the letter. Plaintiff's letter highlights his "grievances," but does not request an accommodation or modification that would rectify those grievances. The request for a reasonable modification is more than just a statement that the person with the disability is "unhappy with the manner in which" the defendant handled the situation.[687] Rather, the plaintiff must suggest a modification that "would

---

[683] 832 F.2d 862, 864–65 (5th Cir. 1987).

[684] *Id*.

[685] Trial Transcript, March 2, 2020, Kevin McGuire, pp. 178–79.

[686] Trial Transcript, March 2, 2020, Kevin McGuire, pp. 186–87.

[687] *Dahlberg*, 92 F.Supp. 2d at 1108 (finding that a disabled driver failed to satisfy the *Johnson* burden shifting framework because he did not suggest any modification to the car rental company's reservation system which would address his concerns and did not produce any evidence that modification of system would be reasonable in the run of cases).

rectify the problem which he perceives."[688] The closest Plaintiff comes to requesting a modification is stating that he "welcome[s] an opportunity to sit down together to discuss these issues, and what LSED/SMG intends to do to correct them."[689]

In *Elliott v. Harris*, the plaintiff, a blind 15-year old, requested a lead rope so he could ride horses at the defendant's establishment.[690] When the defendant refused the request and refunded the payment, the plaintiff filed suit under Title III.[691] The plaintiff appealed the district court's final judgment, arguing that the district court erred by limiting its jury instructions to the plaintiff's proposed use of a lead rope.[692] The Fifth Circuit affirmed, finding that the plaintiff failed to suggest "any other modes of accommodation on which the district court should have instructed the jury."[693] While the plaintiff "did not need to go into the specifics of how the lead rope would be used[,] he still needed to show the requested modification."[694] Because the only modification the plaintiff referred to was the lead rope, that was the only modification the jury was allowed to consider.[695]

In *Shaywitz v. Am. Bd. of Psychiatry & Neurology*, a physician who suffered from dyslexia and an anxiety disorder alleged that the defendant, the American Board of Psychiatry and Neurology, failed to accommodate his disability in administering its certification examination.[696]

---

[688] *Id.*

[689] Rec. Doc. 179-1 at 2.

[690] 205 F. App'x 255, 256 (5th Cir. 2006).

[691] *Id.*

[692] *Id.* at 257.

[693] *Id.* at 258.

[694] *Id.*

[695] *Id.*

[696] 848 F.Supp.2d 460, 461 (S.D.N.Y. 2012).

The plaintiff's counsel contacted the defendant by phone and submitted a written letter to the defendant, detailing plaintiff's qualifications, his dyslexia and anxiety disorder, and his attempts to pass the certification examination.[697] As in this case, the plaintiff "rest[ed] his claim alleging failure to accommodate on the September 2007 Letter written by his counsel. . . ."[698] The district court determined that the letter was deficient because it "d[id] not provide any documentation regarding [the plaintiff's] conditions, nor d[id] it contain an identified request for accommodation."[699] While the district court found that the letter "explicitly discusses [the plaintiff's] dyslexia, cardiac arrhythmias and anxiety, it d[id] not provide any documentation regarding those conditions, nor d[id] it contain an identifiable request for accommodation. Instead, the letter threatens litigation and ends essentially with a legal conclusion that 'there is no rational reason to deny Board certification to [the plaintiff].'"[700] Because the pre-suit letter did not "contain an identifiable request for accommodation," it could not be considered a request for a reasonable accommodation.[701]

In *Dahlberg v. Avis Rent A Car Sys., Inc.*, the plaintiff, a disabled driver, alleged that the defendant, an automobile rental company, failed to make a reasonable modification to its allegedly discriminatory reservation system.[702] The district court determined that the plaintiff failed to satisfy the *Johnson* burden shifting framework because he did not suggest an actual modification

---

[697] *Id.* at 465. The letter provided in sum: "[w]e believe there is no rational reason to deny Board certification to Dr. Shaywitz and that the [Board]'s actions in denying Dr. Shaywitz the opportunity to fully pursue his chosen profession on account of his medical condition and in continuing to apply concededly unreliable subjective filters to restrict Dr. Shaywitz's ability to compete for business opportunities is unlawful."

[698] *Id.* at 467.

[699] *Id.* at 468.

[700] *Id.*

[701] *Id.*

[702] 92 F.Supp.2d 1091 (D. Colo. 2000).

to the defendant's reservation system which would address his concerns, and did not produce any evidence that modification of that system would be reasonable in the run of cases.[703] The court reasoned that a request for a reasonable modification must consist of more than just a statement that the person with the disability is "unhappy with the manner in which" the defendant handled the situation.[704] Rather, the plaintiff must suggest a modification that "would rectify the problem which he perceives."[705]

Instead, the plaintiff "attempt[ed] to deflect his burden of suggesting a reasonable modification onto" the defendant.[706] The district court found that such an approach is inconsistent with the *Johnson* burden shifting framework.[707] Similarly, regarding defendant's use of an outside reservation system, "to the extent that [the plaintiff's] suggestion that [the defendant] 'use something else' can even be viewed as a suggested modification," the district court found that "such a modification [was] unreasonable as a matter of law."[708] *Dahlberg* makes clear that a plaintiff must suggest a specific modification—an identifiable change in policy or procedure beyond a simple request to "do something"—in order to satisfy the first step of *Johnson*. Without such an explicit request, the court cannot adequately determine whether the modification is reasonable.

Here, as in *Shaywitz*, Plaintiff "rests his claim alleging failure to accommodate on the

---

[703] *Id*. at 1105–08.

[704] *Id*. at 1108.

[705] *Id*.

[706] *Id*.

[707] *Id*.

[708] *Id*. at 1109.

[November pre-suit letter] written by his counsel. . . ."[709] The Complaint also provides that the November 2017 pre-suit letter is the basis for his reasonable accommodation claim.[710] And here, as in *Shaywitz*, while the letter "explicitly discusses [the plaintiff's disability] . . . it [does not] contain an identifiable request for accommodation. Instead, the letter threatens litigation and ends essentially with a legal conclusion. . . ."[711] Because the November pre-suit letter does not "contain an identifiable request for accommodation," it cannot not be considered a request for a reasonable accommodation.[712]

The caselaw described above shows that it is not enough to simply highlight disability related grievances. Rather, a plaintiff seeking to make a reasonable modification claim must also identify a reasonable modification, a specific solution which would rectify the plaintiff's grievances. Here, Plaintiff's counsel makes no request for a reasonable modification in his November pre-suit letter. If anything, Plaintiff's counsel attempts to place the burden on Defendants to propose a reasonable modification when he writes that he would "welcome an opportunity to sit down together to discuss these issues, and what LSED/SMG intends to do to correct them."[713]

However, *Johnson* makes clear that under the burden shifting framework adopted by the Fifth Circuit, the "plaintiff has the burden of proving that a modification was requested and that

---

[709] *Shaywitz*, 848 F.Supp.2d at 467.

[710] Rec. Doc. 1 at 8 ("In November 2017, the undersigned counsel sent a pre-suit conciliation letter to the DEFENDANTS notifying them of the violations of MR. BAILEY's rights and attempting to discuss a mutual resolution to the lack of appropriate ADA accessible seating at the Superdome. This letter constituted a request for "reasonable accommodation" or "reasonable modification" under the ADA and RA.").

[711] *Shaywitz*, 848 F.Supp.2d at 468.

[712] *Id.*

[713] Rec. Doc. 179-1 at 2.

the requested modification is reasonable."[714] Plaintiff's request for a reasonable modification must consist of more than a statement that he is "unhappy with the manner in which" SMG and France have failed to accommodate his complaint. Rather, the caselaw shows that Plaintiff must actually suggest a specific modification that "would rectify the problem which he perceives."[715] Finding none in the November pre-suit letter, the Court must conclude that Plaintiff failed to suggest a modification and therefore did not meet his initial burden under *Johnson*.

### ii. Whether the "good faith interactive process" applies here

In his post trail briefing, Plaintiff analogizes to cases in which a disabled employee requests an accommodation from his or her employer.[716] In the employment context, "[w]hen a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation."[717] The good faith interactive process is defined as "a meaningful dialogue with the employee to find the best means of accommodating that disability."[718] "This obligation arises once an employer is put on notice of an employee's need to be reasonably accommodated—which usually, but not always, occurs after the employee requests an accommodation."[719]

"The ADA provides a right to reasonable accommodation, not to the employee's preferred

---

[714] *Johnson*, 116 F.3d at 1059.

[715] *Id*. at 1108.

[716] Rec. Doc. 172 at 63–65.

[717] E.*E.O.C. v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009).

[718] *Chevron Phillips Chem. Co.*, 570 F.3d at 621 (quoting *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2005)).

[719] *Amedee v. Shell Chem. LP-Geismer Plant*, 384 F.Supp.3d 613, 642–43 (M.D. La. 2019), aff' sub nom. *Amedee v. Shell Chem., L.P.*, 953 F.3d 831 (5th Cir. 2020).

accommodation."[720] "The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform."[721] "A disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously."[722] "[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA."[723] However, "an employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer."[724] The precise "contours of the interactive process must be determined on a case-by-case basis."[725]

Plaintiff argues that Defendants were required to the engage in the "good faith interactive process" described above, and that the failure to do so is a violation of the ADA.[726] However, it is unclear if this obligation to engage in a sufficient interactive process extends to situations outside the employment context. Most cases in which a covered entity must engage in an informal "interactive process" to determine whether it is practicable to accommodate a disability occur in the employee-employer relationship. A law review article providing an overview of the reasonable

---

[720] *Id.*

[721] *Jenkins*, 487 F.3d at 315.

[722] *Id.* at 316.

[723] *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999).

[724] *Id.*

[725] *Picard v. St. Tammany Parish Hosp.*, 611 F.Supp.2d 608, 621 (E.D. La. 2009).

[726] Rec. Doc. 172 at 64 ("Upon receipt of Mr. Bailey's request for reasonable modification, Defendants were required to engage in the interactive process so that together they could determine what reasonable accommodations might be available. The documentary evidence introduced at trial shows that, despite receipt of a request for reasonable accommodation, Defendants did not engage in a good faith, interactive dialogue, ultimately necessitating the instant ligation.").

accommodation provides:

> The 'interactive process' is a mechanism employers and employees use to determine whether there is an accommodation that will allow a particular disabled individual to perform the essential functions of a particular job. It may be useful to think of the interactive process as a dialogue with an employee about a specific issue-what he or she needs to perform the essential functions of a particular job and whether the employer can or will provide it.[727]

Plaintiff provides no argument as to why this Court should extend this obligation from the employment context to the situation between Plaintiff on the one hand and France and SMG on the other. Additionally, while there are some instances for which an entity's refusal to engage in an interactive process would bolster a claim of liability "the ADA imposes liability for, *inter alia*, discriminatory refusal to undertake a feasible accommodation, not mere refusal to explore possible accommodations where, in the end, no accommodation was possible."[728] "Thus, a failure to engage in the interactive process is only actionable if, among other things, a good faith effort to assist the disabled could have resulted in a reasonable accommodation."[729]

Even if that obligation existed in this case, there is some evidence to suggest that Defendants engaged in such a "good faith interactive process." The good faith interactive process is defined as "'a meaningful dialogue with the employee to find the best means of accommodating that disability.'"[730] Here, Plaintiff was put in touch with Kevin McGuire, an ADA consultant who

---

[727] Grant T. Collins & Penelope J. Phillips, *Overview of Reasonable Accommodation and the Shifting Emphasis from Who Is Disabled to Who Can Work*, 34 HAMLINE L. REV. 469, 482 (2011).

[728] *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 99 (2d Cir. 2009) (internal citation omitted).

[729] *Killoran on behalf of A.K. v. Westhampton Beach Sch. Dist.*, No. 18-CV-3389 (JS)(SIL), 2020 WL 1325572, at *7 (E.D.N.Y. Feb. 12, 2020), report and recommendation adopted sub nom. *Killoran v. Westhampton Beach Sch. Dist.*, No. 2:18-CV-03389, 2020 WL 1433647 (E.D.N.Y. Mar. 11, 2020).

[730] *Chevron Phillips Chem. Co.*, 570 F.3d at 621 (quoting *Tobin*, 433 F.3d at 108).

has worked with the Board and SMG.[731] Mr. McGuire "explained every option that we had at our disposal" in attempting to accommodate Plaintiff.[732] Mr. McGuire discussed with Plaintiff his different seating options, eventually moved him to four different seating locations, and followed up with Plaintiff to ask if those seats rectified Plaintiff's grievances.[733]

While Plaintiff was never satisfied with these seats, that does not necessarily mean that Defendants violated the reasonable accommodation standard nor any obligation to engage in an interactive process. The ADA does not require that a disabled person be provided with every accommodation he requests. In the employment context, "[a] disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously."[734] Therefore, even if Defendants were obligated to engage in a "good faith interactive process" the Court finds that they participated in "a meaningful dialogue with [Plaintiff] to find the best means of accommodating that disability."[735]

## IV.      Conclusion

For the reasons stated above, this Court finds that Plaintiff Shelby Bailey has failed to carry his burden of proving that Defendants SMG and Kyle France, in his official capacity, violated the Americans with Disabilities Act and/or the Rehabilitation Act. The Court is mindful that this result leaves Plaintiff with "limited seating choices . . . in less than ideal locations."[736] However, the

---

[731] Trial Transcript, March 2, 2020, Thomas Russell Bailey, pp. 200–202; Trial Transcript, March 2, 2020, Kevin McGuire, pp. 178–79.

[732] Trial Transcript, March 2, 2020, Kevin McGuire, p. 183.

[733] Trial Transcript, March 2, 2020, Kevin McGuire, pp. 186–87.

[734] *Id*. at 316.

[735] *Chevron Phillips Chem. Co.*, 570 F.3d at 621 (quoting *Tobin*, 433 F.3d at 108).

[736] *Landis*, 2019 WL 7157165 at *25.

dictates of the ADA do not require otherwise. Thus, the Court's decision is compelled by the preceding findings of fact and conclusions of law, in particular, the structural limitations of the stadium's design, existing ADA regulations and guidelines, and case law.[737]

Accordingly,

**IT IS ORDERED, ADJUDGED AND DECREED** that there be judgment in favor of Defendants SMG and Kyle France, in his official capacity, and against Plaintiff, Shelby Bailey, dismissing Plaintiff's claims with prejudice.

**NEW ORLEANS, LOUISIANA,** this 4th day of September, 2020.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[737] *See id.*